UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| 1. UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> 1. OKLAHOMA GAS & ELECTRIC COMPANY <br><br> Defendant. | Civil Action No. CIV-13-690-D |

## COMPLAINT FOR DECLARATORY RELIEF

The United States of America ("United States"), by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), alleges as follows:

### NATURE OF THE ACTION

1. Pursuant to 28 U.S.C. §§ 2201(a) and 2202, the United States seeks a declaration that Oklahoma Gas and Electric Co., a subsidiary of OGE Energy Corp. ("Company" or "OG&E") failed to project emissions resulting from construction projects at its facilities as required by the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. §§ 7401 *et seq.*, and EPA's implementing regulations, codified at 40 C.F.R. § 51.166, and as incorporated into Oklahoma's State Implementation Plan ("SIP") at OAPCR 1.4.1 - 1.4.4.

1

2.     Specifically, the United States seeks a declaration that OG&E failed to project and assess future facility emissions as required by 42 U.S.C. § 7475 when the Company undertook various construction projects between 2003 and 2006 at its Muskogee and Sooner Plants, located in Fort Gibson and Red Rock, Oklahoma, respectively.  *See also* 57 Fed. Reg. 32,314, 32,323, 32,325 (July 21, 1992) (describing the requisite "actual-to-future-actual" test for projecting future emissions); *id.* at 32,335–36 (codified at 40 C.F.R. § 51.166(b)(32) (defining "representative actual emissions")).

3.     The Clean Air Act requires regulated facilities to anticipate future emissions increases that would result from physical changes, so that, if required, steps can be taken to prevent the increased emission of harmful air pollution.  This assessment must occur before construction on a proposed project is undertaken.  This statutory design serves to protect the public health and welfare, but it also best serves economic efficiency: if a project is likely to cause an increase in pollution, the proper pollution controls can be designed and installed at the same time, rather than forcing the unit to shut down a second time in order to install the required equipment.

4.     OG&E performed numerous projects at its Muskogee and Sooner facilities without properly assessing the impact those projects would have on the plants' future emissions.  The analyses performed by OG&E at the time are legally insufficient under the requirements of the CAA and EPA's regulations as incorporated into Oklahoma's SIP.  By failing to comply with CAA regulations, OG&E deprived Plaintiff and the public of the ability to conduct a meaningful review of the effects of its modifications on air quality and public health.

## JURISDICTION AND VENUE

5. This action seeks a declaration that OG&E did not, as a matter of law, project whether future emissions "would result" from various proposed construction projects as required by the CAA. This Court has jurisdiction to determine this federal question pursuant to 42 U.S.C. § 7413(b), and jurisdiction to issue a declaration pursuant to 28 U.S.C. §§ 2201–02.

6. Venue is proper in this District pursuant to Sections 113(b) of the Act, 42 U.S.C. § 7413(b), 28 U.S.C. §§ 1391(b) and (c), because OG&E's principal place of business is located within this district.

## NOTICES

5. EPA issued a Notice of Violation ("NOV") to Defendant on April 26, 2011 pursuant to Section 113(a) and (b) of the Act, 42 U.S.C. §§ 7413(a) and (b), and provided a copy of the NOV to the State of Oklahoma.

6. The 30-day period between issuance of the NOV and commencement of a civil action, required under CAA Section 113, 42 U.S.C. § 7413, has elapsed.

7. The United States is providing notice of the commencement of this action to the appropriate state air quality control agency for the State of Oklahoma, Oklahoma Department of Environmental Quality ("ODEQ"), pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b).

## AUTHORITY

8. Authority to bring this action is vested in the Attorney General of the United States by CAA Section 305, 42 U.S.C. § 7605, and pursuant to 28 U.S.C. §§ 516 and 519.

## DEFENDANT

9. Defendant OG&E is a subsidiary of OGE Energy Corporation formed under the laws of the State of Oklahoma and has a mailing address of P.O. Box 321, Oklahoma City, Oklahoma 73101.

10. As a corporate entity, OG&E is a "person" within the meaning of CAA Section 302(e), 42 U.S.C. § 7602(e).

11. OG&E is the owner and/or operator of the Sooner Generating Station in Red Rock, Oklahoma.

12. OG&E is the owner and/or operator of the Muskogee Generating Station in Fort Gibson, Oklahoma.

13. OG&E's Sooner Plant consists, in part, of Units 1 and 2, which are coal-fired electric generating units. OG&E's Muskogee Plant consists, in part, of Units 4, 5, and 6, which are also coal-fired electric generating units. Coal-fired units include boilers that burn coal to convert water into steam, which is then used to generate electricity. Hot gases from the combustion of coal flow through the boiler and pass across and around groups of boiler tubes in the unit. The hot gases heat the water in these boiler tubes and convert it into steam. The steam generated in these boiler tubes is then sent to a series of steam turbines that spin a generator to produce electricity. The tubes in the boiler are

grouped into boiler tube components, which consist of massive arrays of numerous large steel tubes. Combustion gas exiting the boiler is used to preheat the air entering the boiler through the use of an air preheater, a series of enormous baskets with corrugated metal heat exchanging surface. The air preheater and boiler tube components such as the superheater, economizer, reheater, and lower slope tubes are major boiler components which can weigh many tons and cost millions of dollars to replace.

14.  When a major component in a coal-fired electric generating unit breaks down, such as one of the components replaced by OG&E, it causes the unit to be taken out of service for repairs—events known as "forced outages." A deteriorated major component can cause increasing numbers of forced outages, as well as maintenance and scheduled outages needed to maintain the worn-out equipment, preventing the unit from generating electricity when it is needed. By replacing the worn-out component that is causing the outages, a utility can improve the unit's availability to operate more hours in a year. These additional hours of operation often translate into increased amounts of coal burned in the unit and more annual pollution emitted from the unit's smokestack into the atmosphere.

15.  In addition to improving the availability of a coal-fired generating unit, replacing deteriorated components with new, improved components can also increase the capacity of the boiler to pass steam through the components to the turbines at greater volumes and/or at higher temperatures. This can result in an increase in the amount of coal burned, and pollution emitted, during each hour of the unit's operation. Even if a project does not increase the amount of coal burned per hour, an improved component

can increase the capacity and/or efficiency of the unit, which for coal-fired generating units like the Sooner and Muskogee Units, can make the units more cost-effective and thus more economical to operate than other units. Such modifications can lead the facility to operate that improved unit during more hours and/or at higher levels of operation, which in turn can lead to increases in coal burned at the unit and increased amounts of $SO_2$, $NO_x$, and other pollutants emitted from the unit's smokestack on an annual basis.

16. The emission of $SO_2$, $NO_x$, and other pollutants harms public health and the environment, contributing to premature mortality, aggregation of respiratory and cardiovascular disease, asthma attacks, acid rain, and other adverse effects in downwind communities and natural areas. *See*, *e.g.*, 73 Fed. Reg. 28,321, 28,324, 28,327–28 (May 16, 2008).

## STATUTORY AND REGULATORY BACKGROUND

### A. The Clean Air Act

17. The Clean Air Act is designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1).

18. Section 109 of the Act, 42 U.S.C. § 7409, requires the Administrator of EPA to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS" or "ambient air quality standards") for those air pollutants ("criteria pollutants") for which air quality criteria have been issued pursuant to Section 108 of the Act, 42 U.S.C. § 7408, such as sulfur dioxide ("$SO_2$"), nitrogen oxides

6

("NO$_x$"), or particulate matter smaller than 2.5 microns ("PM$_{2.5}$").  40 C.F.R. §§ 50.4, 50.5, 50.7, 50.11, and 50.13.

19.     Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  An area that meets the NAAQS for a particular pollutant is termed an "attainment" area with respect to such pollutant.  An area that does not meet the NAAQS for a particular pollutant is termed a "nonattainment" area with respect to such pollutant.  An area that cannot be classified as either "attainment" or "nonattainment" with respect to a particular pollutant due to insufficient data is termed "unclassifiable" with respect to such pollutant.

20.     Part C of Title I of the CAA, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as either attainment or unclassifiable for purposes of meeting the NAAQS standards.  These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process.  42 U.S.C. § 7470.  These provisions are referred to herein as the "PSD program."

21.     As part of the PSD program, Section 165(a) of the Act, 42 U.S.C. § 7475(a), among other things, prohibits the "construction" of a "major emitting facility" in

an area designated as attainment or unclassifiable unless a permit has been issued that comports with the requirements of Section 165 and the facility employs the "Best Available Control Technology" ("BACT") for each pollutant subject to regulation under the Act that is emitted from the facility. Further, CAA Section 165(a)(3), 42 U.S.C. § 7475(a)(3), allows issuance of a PSD permit only if "the owner or operator of such facility demonstrates, as required pursuant to section 7410(j) of this title, that emissions from construction or operation of such facility" will not compromise compliance with applicable air quality standards.

22. Section 169(2)(c) of the Act, 42 U.S.C. § 7479(2)(c), defines "construction" as including "modification" (as defined in CAA Section 111(a)). "Modification" is defined in CAA Section 111(a), 42 U.S.C. § 7411(a), to be "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."

23. By requiring pre-construction permitting and providing for pre-construction enforcement, the CAA thus requires sources to assess the projected impacts of their proposed modification projects before implementation in order to determine whether the PSD program requires the installation of BACT concurrent with that project's construction. Modified sources are thereafter subject to continuous emissions limitations.

**B. Applicable Regulations**

24. Pursuant to CAA Section 110, 42 U.S.C. § 7410, each State must adopt and submit to EPA for approval a State Implementation Plan ("SIP") that includes, among

other things, regulations to prevent the significant deterioration of air quality under CAA Sections 161-165, 42 U.S.C. §§ 7471-7475.  Section 161 of the Act, 42 U.S.C. § 7471, requires that each applicable SIP contain a PSD program.

25. Pursuant to CAA Section 302(q), 42 U.S.C. § 7602(q), an applicable implementation plan is the implementation plan, or most recent revision thereof, which has been approved by EPA pursuant to CAA Section 110, 42 U.S.C. § 7410, or promulgated by EPA pursuant to CAA Section 110(c), 42 U.S.C. § 7410(c), and which implements the relevant requirements of the Act.  Upon EPA approval, SIP requirements are federally enforceable under Section 113 of the Act, 42 U.S.C. § 7413, and 40 C.F.R. § 52.23.

26. A state may comply with CAA Section 161, 42 U.S.C. § 7471, by having its own PSD regulations approved by EPA as part of its SIP, which must be at least as stringent as those set forth at 40 C.F.R. § 51.166.  If a state does not have a PSD program that has been approved by EPA and incorporated into the SIP, then the EPA federal PSD regulations set forth at 40 C.F.R. § 52.21 shall be incorporated by reference into the SIP. 40 C.F.R. § 52.21(a).

27. EPA approved Oklahoma's PSD program on August 25, 1983. 48 Fed. Reg. 38, 635.  The state of Oklahoma's PSD program is part of the Oklahoma Air Pollution Control Regulations ("OAPCR"). OAPCR 1.4.1 – 1.4.4 (1983).  On February 13, 1980, EPA approved the Oklahoma Department of Environmental Quality's ("ODEQ" or "Oklahoma") Air Quality Control Implementation Plan, which Oklahoma later re-designated the Oklahoma SIP. 45 Fed. Reg. 9,733 (Feb. 13, 1980).  Since then,

EPA has reviewed and approved various amendments and revisions to the SIP, 40 C.F.R. § 52.1960 (setting forth EPA actions taken in regards to the Oklahoma SIP), but the substance of Oklahoma's pertinent PSD provisions remained untouched for all times relevant to this action, *see, e.g.*, 64 Fed. Reg. 59,629 (Nov. 3, 1999) (approving only a re-codification of SIP provisions).

28. The Oklahoma PSD program, as codified in the SIP, requires PSD permits for "major modifications" to major sources of air pollution. OAPCR 1.4.1(c)(1). Major sources of air pollution include certain enumerated categories of facilities which emit, or have the potential to emit, 100 tons per year or more of any CAA regulated air pollutant. The Oklahoma SIP includes fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input as one of these regulated major sources. OAPCR 1.4.4(b)(1)(A).

29. The Oklahoma PSD program, as codified in the SIP, has defined a "major modification" as any physical change or change in the method of operation of a major stationary source that "would result" in a significant net emissions increase of a regulated NSR pollutant. OOAPCR 1.4.4(b)(2)(A).

30. The Oklahoma PSD program, as codified in the SIP, has defined a "net emissions increase" as the increase in emissions from a particular physical change or change in the method of operation at a stationary source or any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable. *See* OAPCR 1.4.4(b)(3)(A); 1.4.4(b)(22)(A).

31. The Oklahoma PSD program, as codified in the SIP, has defined a "significant" net emissions increase as a net emissions increase that would equal or exceed 40 tons per year of $SO_2$ and 40 tons per year of $NO_x$. OAPCR 1.4.4(b)(22)(A).

32. Prior to commencing construction on plant modifications, a utility must, *inter alia*, evaluate whether those projects "would result in a significant net emissions increase of any pollutant subject to regulation." OAPCR 1.4.4(b)(2).

33. A company makes such an evaluation by comparing its pre-construction baseline emissions with a projection of the future post-project emissions that are likely to result from the project. *See* 42 U.S.C. § 7475(a); 57 Fed. Reg. 32,314, 32,335–36 (July 21, 1992); 56 Fed. Reg. 27,630, 27630-33 & n. 10 (June 14, 1991); 45 Fed. Reg. 52,725 (Aug. 7, 1980); OAPCR 1.4.2(a)(1); 1.4.4(f)(1)(B); OAPCR 1.4.2(c).

34. The regulations do not authorize a source to make an unenforceable promise to limit emissions once a project has been implemented in lieu of performing the CAA-required, project-specific projection of likely future emissions.

C. **The Declaratory Judgment Act**

35. Pursuant to 28 U.S.C. § 2201(a), any court of the United States may, in a case of actual controversy within its jurisdiction, "declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought."

36. 28 U.S.C. § 2202 provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

**ENFORCEMENT PROVISIONS**

37. Sections 113(a)(1) and (3) of the Act, 42 U.S.C. §§ 7413(a)(1) and (3), provide that the Administrator may bring a civil action in accordance with Section 113(b) of the Act, 42 U.S.C. § 7413(b), whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated or is in violation of any requirement or prohibition of, *inter alia*, the PSD requirements of Section 165(a) of the Act, 42 U.S.C. § 7475(a), or any rule or permit issued thereunder; or the provisions of any approved SIP or any permit issued thereunder.

38. 40 C.F.R. § 52.23 provides, *inter alia*, that any failure by a person to comply with any provision of 40 C.F.R. Part 52, or with any approved regulatory provision of a SIP, shall render such person in violation of the applicable SIP, and subject to enforcement action pursuant to Section 113 of the Act, 42 U.S.C. §7413.

39. Section 167 of the Act, 42 U.S.C. § 7477, authorizes the Administrator to initiate an action for injunctive relief to prevent the construction, modification or operation of a major emitting facility which does not conform to the PSD requirements of the Act. This pre-construction enforcement authority pre-supposes that projects will be fully evaluated before construction begins.

**GENERAL ALLEGATIONS**

40. Paragraphs 1 through 39 are realleged and incorporated by reference.

41. The Muskogee and Sooner Plants are located in Muskogee County, Oklahoma, and Noble County, Oklahoma, respectively. At all times relevant to the claims in this Complaint, Muskogee and Noble Counties have been areas designated as in

attainment or unclassifiable with the NAAQS for $SO_2$, $NO_x$, and PM and are thus subject to PSD regulations for modifications or construction at the facilities. 40 C.F.R. § 81.337.

42. Between 2003 and 2006, OG&E undertook a suite of renovation projects at its Sooner and Muskogee generating facilities. Specifically:

    a. On or about September 18, 2003, OG&E began actual construction of an approximately $3.73 million overhaul of Muskogee Unit 4 that was completed and became operational on or about October 26, 2003. These modifications included one or more physical changes at Muskogee Unit 4 including the complete replacement and reconfiguration of the economizer. OG&E identified this modification as a "reliability" and "end of life" project intended to "greatly enhance the operability, efficiency, and maximum continuous net generation" of Muskogee Unit 4.

    b. On or about February 13, 2004, OG&E began actual construction of an approximately $2.5 million overhaul of Sooner Unit 2 that was completed and became operational on or about April 18, 2004. This modification included one or more physical changes at Sooner Unit 2 including replacement of the economizer. OG&E identified this modification as a "reliability," and "end of life" project intended to "greatly enhance the operability, efficiency, and maximum continuous net generation" of Sooner Unit 2.

    c. On or about April 6, 2004, OG&E began actual construction of an approximately $10.2 million overhaul of Muskogee Unit 5 that was completed and became operational on or about May 28, 2004. These modifications included one

13

or more physical changes at Muskogee Unit 5 including the replacement of turbine blades and the addition of heat transfer surface in the boiler. OG&E identified these modifications as "capacity" projects necessary for the implementation of a "new advanced design steam path."

   d. On or about October 16, 2004, OG&E began actual construction of an approximately $10.8 million overhaul of Muskogee Unit 6 that was completed and became operational on or about December 21, 2004.  These modifications included one or more physical changes at Muskogee Unit 6 including the replacement of turbine blades and the addition of heat transfer surface in the boiler. OG&E identified these modifications as "capacity" projects necessary for the implementation of a "new advanced design steam path."

   e. On or about February 11, 2005, OG&E began actual construction of an approximately $5.8 million overhaul of Muskogee Unit 4 that was completed and became operational on or about April 22, 2005. These modifications included one or more physical changes at Muskogee Unit 4 including the replacement of turbine blades and the addition of heat transfer surface in the boiler. OG&E identified these modifications as "capacity" projects necessary for the implementation of a "new advanced design steam path."

   f. On or about September 19, 2005, OG&E began actual construction of an approximately $4.33 million overhaul of Muskogee Unit 5 that was completed and became operational on or about December 2, 2005. These modifications included one or more physical changes at Muskogee Unit 5

including the replacement of the economizer and low pressure blades as well as various other upgrades to the steam turbine system. OG&E identified these modifications as "reliability" and "end of life" projects intended to "greatly enhance the operability, efficiency, and maximum continuous net generation" of Muskogee Unit 5.

      g.      On or about January 27, 2006, OG&E began actual construction of an approximately $12.4 million overhaul of Sooner Unit 1 that was completed and became operational on or about March 7, 2006. These modifications included one or more physical changes at Sooner Unit 1 including the replacement of the economizer, turbine rotor, and low pressure blades as well as the addition of heat transfer surface in the boiler. OG&E identified these modifications as "reliability," "capacity," and "end of life" projects intended to "greatly enhance the operability, efficiency, and maximum continuous net generation" of Sooner Unit 1.

      h.      On or about October 23, 2006, OG&E began actual construction of an approximately $11.1 million overhaul of Sooner Unit 2 that was completed and became operational on or about December 18, 2006. These modifications included one or more physical changes at Sooner Unit 2 including the replacement of turbine blades, the rotor, and the addition of heat transfer surface in the boiler. OG&E identified these modifications as "capacity" projects necessary for the implementation of a "new advanced design steam path."

43.      OG&E did not seek a PSD permit for any of the projects described in paragraphs 42(a) through 42(h) above.

44. At or around the time OG&E began construction on the projects described in paragraphs 42(a) through 42(h) above, OG&E sent a report to ODEQ describing each project and purporting to set forth NSR applicability analyses for each project. In each instance, OG&E failed to include a projection of post-project emissions as required by EPA and ODEQ regulations.

45. Instead, in each letter, the company "propose[d]" to "limit emissions" from the generating units "such that the emission increase [would] not exceed the PSD significant threshold increase level" during the five years following each project. OG&E described this as its "proposed plan of action for compliance" with the CAA's PSD requirements.

46. OG&E's emissions analysis is insufficient under the CAA and implementing regulations.

47. OG&E has relied on this approach to evade the requisite preconstruction PSD project analysis and applicability determination. As such, there exists an immediate and substantial controversy between the United States and OG&E with regard to the interpretation and proper application of the Clean Air Act and associated implementing regulations. Resolution of this controversy is central to the evaluation and resolution of any illegal construction violations related to the projects described in paragraphs 42(a) through 42(h) above.

**CLAIM FOR RELIEF**

*Declaratory Judgment*

48. Paragraphs 1 through 47 are realleged and incorporated by reference.

49.     OG&E failed, as a matter of law, to evaluate whether each project listed in paragraphs 42(a) through 42(h) "would result" in a significant increase in post-project emissions of regulated pollutants at each modified facility.  OAPCR 1.4.4(b)(2); 42 U.S.C. § 7475(a).

50.     Because of this immediate and substantial controversy, the United States requests a declaration from the Court that:

   a.     OG&E's project assessments did not comply with the CAA's pre-project emissions analysis requirements in the Oklahoma SIP, and

   b.     OG&E's "proposed plan of action for compliance" is insufficient as a matter of law to comply with applicable PSD requirements.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF prays that the Court:

51.     Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, that OG&E did not assess the impact of its projects on future emissions, and that OG&E's "proposed plan of action for compliance" does not comply with the CAA or the state or federal regulations adopted to implement the CAA's PSD requirements;

52.     Require OG&E to properly assess whether its projects were likely to result in a significant emissions increase or a significant net emissions increase and to submit that assessment of its projects to EPA within 90 days of the issuance of the order, to be evaluated and permitted as necessary thereafter; and

53.     Award such other and further relief as is just and equitable.

Dated: July 8, 2013                           Respectfully Submitted,


                                                  s/ *Robert G. Dreher*
ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


                                                  s/ *Elias L. Quinn*
ELIAS L. QUINN
JASON A. DUNN
JAMES A. LOFTON
Bar Number: 42159 (CO)
Attorney for Plaintiff United States
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
Telephone:  (202) 514-2756
Facsimile:  (202) 514-0097
E-mail: Elias.Quinn@usdoj.gov


OF COUNSEL:

SABRINA ARGENTIERI
Attorney-Advisor
U.S. EPA, Region 5
77 W. Jackson Blvd.
Chicago, IL 60604

LORRAINE DIXON
Assistant Regional Counsel
U.S. EPA, Region 6
1445 Ross Avenue
Dallas, Texas 75202