# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    Plaintiff,

          v.

OKLAHOMA GAS & ELECTRIC CO.,

    Defendant.

Civil Action No. 5:13-cv-00690-D

## PLAINTIFF UNITED STATES' OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDEMENT AND DECLARATORY RELIEF

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ............................ vii

INTRODUCTION ............................................................................................. 1

BACKGROUND ............................................................................................... 2

    I.     Congress' PSD Program ...................................................... 3

    II.    PSD Regulations ................................................................. 5

         A.    Emissions Projections ............................................. 6

         B.    Emissions Management Options .............................. 8

    III.   OG&E's "Compliance Plan" .............................................. 10

JURISDICTION ............................................................................................. 13

STANDARD OF REVIEW .............................................................................. 13

ARGUMENT .................................................................................................. 14

    I.     The Clean Air Act's Preconstruction Mandate Does Not Allow For A Wait-And-See Approach To Public Health Protection ........................ 15

    II.    The Regulations Do Not Accept Bare, Unenforceable Promises In Place Of Detailed Emissions Analyses ........................................... 20

    III.   EPA's Recordkeeping Rules Provide A Safeguard Against Operator Gamesmanship, Not A Safe Haven Against Agency Enforcement ................ 25

         A.    Recordkeeping Under EPA's PSD Rules ............................. 26

         B.    Post-Project Recordkeeping Does Not Replace Pre-Project Compliance .............................................................. 26

CONCLUSION ............................................................................................... 29

# TABLE OF AUTHORITIES

## Federal Cases

*Ala. Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979).................................... 15, 18, 19

*Alaska Dept. Env. Consv. v. EPA*, 540 U.S. 461, 472 (2004) ............................................ 4

*Anthony v. United States*, 520 F.3d 374 (5th Cir. 2008) ................................................. 19

*Barnard v. Theobald*, Nos. 11-16625, 11-16655, 2013 WL 3285286
  (9th Cir. July 1, 2013) ...................................................................................... 19

*Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984)................................................. 13, 14

*Decker v. NW Envtl. Def. Center*, 133 S. Ct. 1326 (2013) ............................................. 14

*Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007) ...................................................... 3

*Fed. Express Corp. v. Holowecki*, 552 U.S. 389 (2008) .................................................. 18

*Koch Indus., Inc. v. United States*, 603 F.3d 816 (10th Cir. 2010) ................................. 19

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ............................................ 13

*Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677 (10th Cir. 2010) ................. 24

*Natl. Mining Ass'n v. EPA*, 59 F.3d 1351 (D.C. Cir. 1995)......................................... 9, 21

*New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005)..........................................................*passim*

*Puerto Rican Cement Co., Inc. v. EPA*, 889 F.2d 229 (1st Cir. 1989)............................. 16

*Sec. of Labor, Mine Safety & Health Admin. v. Western Fuels-Utah, Inc.*,
  900 F.2d 318 (D.C. Cir. 1990)...................................................................................... 19

*State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979 (10th Cir. 1994)............................. 13

*Qwest Corp. v. Colo. Pub. Util. Comm'n*, 656 F.3d 1093 (10th Cir. 2011)..................... 14

*Time Warner Ent. Co., L.P. v. Everest Midwest Licensee, L.L.C.*, 381 F.3d 1039
  (10th Cir. 2004) ....................................................................................................... 23

*United States v. Cinergy Corp.*, 384 F. Supp. 2d 1272 (S.D. Ind. 2005) ........................ 16

*United States v. Cinergy Corp.*, 458 F.3d 705 (7th Cir. 2006)...................................... 7, 16

*United States v. Cinergy Corp.*, No. 1:99-CV-1693-LJM-JMS, 2009 WL 94515
     (S.D. Ind. Jan. 7, 2009) ......................................................................... 9

*United States v. City of Las Cruces*, 289 F.3d 1170 (10th Cir. 2002) ............................ 13

*United States v. DTE Energy Co.*, 711 F.3d 643 (6th Cir. 2013) .................... 8, 17, 18, 20

*United States v. Duke Energy Corp.*, No. 1:00-CV-1262, 2010 WL 3023517
     (M.D.N.C. July 28, 2010) ................................................................. 7, 16

*United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996) ........................ 8

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003) ............. 4, 7, 16

*United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692-C-M/F,
     2002 WL 1629817 (S.D. Ind. July 18, 2002) ............................................. 17

*United States v. S. Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994 (S.D. Ind. 2003) ........... 19

*United States v. Xcel Energy, Inc.*, 759 F. Supp. 2d 1106 (D. Minn. 2010) ............... 5, 18

*Wild Earth Guardians v. Lamar Util. Bd.*, No. 1:09-cv-02974, 2013 WL 1164324
     (D. Colo. Mar. 21, 2013) .................................................................. 10

*Wilson v. Burlington N. R.R. Co.*, 803 F.2d 563 (10th Cir. 1986) .................................. 19

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ..................................*passim*

## Federal Statutes

28 U.S.C. § 2201 .................................................................................... 2

28 U.S.C. § 2201(a) ................................................................................ 13

42 U.S.C. § 7401(b)(1) ............................................................................. 3

42 U.S.C. § 7411(a)(4) ............................................................................. 4

42 U.S.C. § 7413 ................................................................................. 4, 8

42 U.S.C. § 7413(a) .............................................................................. 5

42 U.S.C. § 7413(b) .............................................................................. 5

42 U.S.C . § 7470 ........................................................................... 14, 15

42 U.S.C. § 7470(1) .............................................................................. 3

42 U.S.C. § 7475 ....................................................................... 6, 15, 18

42 U.S.C. § 7475(a)(1) .................................................................. 3, 4, 15

42 U.S.C. § 7475(a)(3) ................................................................. 4, 16, 18

42 U.S.C. § 7475(a)(4) ......................................................................... 3

42 U.S.C. § 7475(a)(6) .................................................................... 4, 16

42 U.S.C. § 7477 ................................................................... 4, 8, 15, 18

42 U.S.C. § 7479(2)(C) ......................................................................... 4

42 U.S.C. § 7479(3) .............................................................................. 3

42 U.S.C. § 7604(a)(3) .................................................................... 4, 15

## Federal Regulations
### [1984 C.F.R. Edition Unless Otherwise Noted]

40 C.F.R. § 52.21(b)(33) (1993).................................................... 6, 20, 22

40 C.F.R. § 52.21(j) ............................................................................ 23

40 C.F.R. § 52.21(k) ........................................................................... 23

40 C.F.R. § 52.21(m) .......................................................................... 23

40 C.F.R. § 52.21(o) ........................................................................... 23

40 C.F.R. § 52.21(a)(2)(iv)(b) (2012) .................................................... 26

40 C.F.R. § 52.21(b)(2)(i) ............................................................. 5, 6, 23

40 C.F.R. § 52.21(b)(2)(i) (2012) ...................................................................... 5

40 C.F.R. § 52.21(b)(3)(vi)(b) ............................................................... 5, 9, 21

40 C.F.R. § 52.21(b)(3)(vi)(b) (2012) ............................................................... 5

40 C.F.R. § 52.21(b)(41)(i) (2012) .................................................................... 7

40 C.F.R. § 52.21(b)(41)(ii) (2012) ................................................................... 7

40 C.F.R. § 52.21(r)(1) ...................................................................................... 6

40 C.F.R. § 52.21(r)(1) (2012) ........................................................................ 28

40 C.F.R. § 52.21(r)(6) (2012) ........................................................................ 26

40 C.F.R. § 52.21(aa) (2012) ............................................................................ 9


45 Fed. Reg. 52,676 (Aug. 7, 1980) ............................................................ 5, 16

48 Fed. Reg. 38,635 (Aug. 25,1983) ................................................................. 5

56 Fed. Reg. 27,630 (June 14, 1991) ................................................................. 6

57 Fed. Reg. 32,314 (July 21, 1992) ........................................................ *passim*

67 Fed. Reg. 80,186 (Dec. 31, 2002).............................................. 5, 7, 9, 27, 28

## Federal Rules of Civil Procedure

Fed. R. Civ. P. 57.............................................................................................. 2

## State Regulations

OAPCR § 1.4.4 .................................................................................................. 5

OAPCR § 1.4.4(b)(2)........................................................................................ 23

OAPCR § 1.4.4(b)(2)(A) .................................................................................... 6

OAPCR § 1.4.4(b)(3)(F)............................................................................... 9, 21

OAPCR § 1.4.4(e) ........................................................................................ 23

OAPCR § 1.4.4(f) ........................................................................................ 23

## Miscellaneous

123 CONG. REC. 27,070 (1977) .................................................................... 3

Brief for Respondent, *New York v. EPA*, No. 02-1387, 2004 WL 5846388
    (D.C. Cir. Oct. 26, 2004) ........................................................................ 28

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

CAA             Clean Air Act

BACT            Best Available Control Technology

EPA             United States Environmental Protection Agency

NSR             New Source Review

OAPCR           Oklahoma Air Pollution Control Regulations

ODEQ            Oklahoma Department of Environmental Quality

OG&E            Oklahoma Gas & Electric Co.

PSD             Prevention of Significant Deterioration

$SO_2$            Sulfur Dioxide

tpy             tons per year

TSD             Technical Support Document

**INTRODUCTION**

The Clean Air Act's Prevention of Significant Deterioration (PSD) program was designed to do just what the name suggests: *prevent* air quality degradation and so protect human health and welfare.  In order to anticipate increases in air pollution, power plant operators must perform detailed projections of their future emissions before they modify their facilities.  Just as drug manufacturers must test their products to determine whether they are safe before putting them on the market, power plant operators must assess their projects to establish whether proposed modifications "would result" in increased pollution before they begin construction.  EPA's implementing regulations detail the projection process.  Where that projection indicates an operator's modification of its facility would result in increased emissions, the facility must obtain a permit setting emissions limitations for future operation of the modified plant.

Between 2003 and 2006, Oklahoma Gas & Electric Co. (OG&E) implemented a suite of extensive renovation projects at its Sooner and Muskogee electric generating facilities.  But OG&E did not perform the required emissions projections to assess whether these upgrades would lead to a significant increase in pollution before it began construction.  Instead, the Company proposed a "plan of action" whereby it would temporarily constrain its emissions for a short while after its projects were completed. OG&E said its action plan sufficed for compliance, but in fact it is a roadmap for evasion. OG&E's proposal seeks to install a loophole that runs contrary to the statute, the regulations, and EPA's longstanding interpretation of its own rules.  Where the Clean Air Act mandates enforceable protections for public health and welfare, OG&E offers

1

unenforceable promises.  Where the Act requires the prevention of pollution increases,

OG&E offers mere delay.

Most importantly for this action, OG&E insists that its proposed plan immunizes it

from *protective* or *preventative* enforcement actions under the Clean Air Act.

Notwithstanding its express purpose and language, OG&E insists the PSD program is, in

effect, a "wait-and-see" program, and an enforcement action will not be ripe unless and

until the Company deviates from its plan to keep its emissions below regulatory

"significance" levels.  But nothing in the Act or the regulations requires the United States

to wait for OG&E to harm public health before bringing an enforcement action, just as

nothing would require the United States to stand idly by as a pharmaceutical company

sold an untested drug.  Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, the United

States requests a declaration of law as to this critical, threshold issue.  The parties have

reached an impasse as to the fundamental operation of the governing law—and, indeed,

whether judicial enforcement may even be available.  The United States believes a

speedy resolution of this point would best serve judicial efficiency, protect the public

fisc, and promote a resolution in this case.

## BACKGROUND

The Parties have an immediate and concrete dispute as to the operation of PSD

regulations.  The PSD rules state that an operator must evaluate its future emissions

before modifying its facilities; if an operator expects to increase air pollution by more

than a certain amount, it must get a permit and employ pollution control techniques

before any excess pollution harms the public.  OG&E has claimed in letters to state

2

regulators that an unenforceable, temporary plan to limit emissions to just below PSD

triggering levels constitutes compliance with the rules.  It does not.  The United States

thus respectfully requests that this Court declare OG&E's "proposed plan of action for

compliance" insufficient as a matter of law to comply with PSD's preconstruction

emissions projection requirements, and direct the Company to submit proper projections

for its upgrades to regulatory authorities for review and for all necessary permits.

## I.   Congress' PSD Program

Congress enacted the CAA "to protect and enhance the quality of the Nation's air

resources so as to promote the public health and welfare and the productive capacity of

its population."  42 U.S.C. § 7401(b)(1).  In 1977, Congress added the New Source

Review (NSR) Program—which includes the PSD provisions—after earlier programs

failed to achieve the Clean Air Act's statutory goals.  *Envtl. Def. v. Duke Energy Corp.*,

549 U.S. 561, 567–68 (2007).   PSD aims to "protect the public health and welfare from

any actual or potential adverse effect" that might result from air pollution—even in

places where national air quality standards are met.  42 U.S.C. § 7470(1).[1]

Under the program, new sources of air pollution must obtain permits and operate

state-of-the-art pollution controls—"best available control technology" or "BACT" in

CAA parlance—in order to meet emissions limitations.  42 U.S.C. §§ 7475(a)(1), (4),

7479(3).  To ease the initial burden of complying with PSD, Congress "grandfathered"

---

[1]   *See also* Stat. of Rep. Rogers, Clean Air Conf. Rep. (1977), 123 CONG. REC. 27,070 (1977) ("First, and foremost, protection of the public health remains the paramount purpose and value under the Act . . . [T]he overriding commitment of the 1977 Act (just as the 1970 legislation) is to the protection of public health.")

existing sources from the program.  However, existing sources have to come up to modern air pollution emissions standards if they make "modifications" to their facilities. 42 U.S.C. §§ 7479(2)(C), 7411(a)(4); *New York v. EPA*, 413 F.3d 3, 13 (D.C. Cir. 2005).

As crafted by Congress, the PSD Program is a *pre*construction review and permitting program.  An operator must determine whether PSD requirements apply to a given project before it begins that project; the statute specifically bars construction or modification of a facility "unless . . . a permit has been issued," 42 U.S.C. § 7475(a)(1). Such permits require a number of "preconditions."  *Alaska Dept. Env. Consv. v. EPA*, 540 U.S. 461, 472 (2004).   For example, operators must demonstrate prior to construction "that emissions from construction or operation of such facility *will not* cause, or contribute to, air pollution in excess" of various air quality standards.  *Id.* § 7475(a)(3) (emphasis added).  The operator must also analyze the "air quality impacts *projected* for the area as a result of growth associated with [the] facility."  *Id.* § 7475(a)(6) (emphasis added).  Thus, the statute makes it "abundantly clear that PSD applicability is to be determined prior to the commencement of a project."  *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 881 (S.D. Ohio 2003).

Of course, Congress authorized EPA to bring enforcement actions wherever sources have violated or are in violation of the Clean Air Act's requirements.  *See* 42 U.S.C. § 7413.  But Congress also backed up PSD's pollution-prevention directive with enforcement provisions that allow EPA, state agencies, and citizen groups to bring enforcement actions against operators *before* construction begins and *before* pollution increases occur and affect public air resources.  42 U.S.C. §§ 7477, 7604(a)(3); *United*

4

*States v. Xcel Energy Inc.*, 759 F. Supp. 2d 1106, 1113 (D. Minn. 2010) (The CAA

"clearly accords EPA the authority to investigate, and then to prevent through appropriate

legal remedies, violations committed before construction commences.").

## II.    PSD Regulations

Under the Clean Air Act's cooperative federalism design, PSD implementing rules

are developed by states pursuant to the minimum federal requirements crafted by EPA.

These "state implementation plans" or "SIPs" are subject to EPA approval; once

approved they are federally enforceable.  42 U.S.C. §§ 7413(a), (b).

EPA first promulgated PSD regulations in 1980.[2]  Oklahoma's SIP was modeled

after EPA's 1980 PSD rules, and it has not been substantively updated since.[3]  EPA has

since clarified and revised its PSD rules in 1992[4] and in 2002,[5] but the pertinent parts of

the PSD rules have never changed: as the first step in assuring public health is adequately

protected, an operator must *either* (a) perform a detailed projection of future emissions to

determine whether a modification "would result in" a significant emissions increase,[6] *or*

(b) accept a legally and practicably enforceable limit on future operations.[7]

---

[2]    45 Fed. Reg. 52,676 (Aug. 7, 1980).

[3]    *See* OAPCR § 1.4.4 (Okla's PSD SIP); 48 Fed. Reg. 38,635 (Aug. 25, 1983) (EPA's approval of the Okla SIP); 40 C.F.R. § 52.1960 (cataloging EPA actions taken in regards to Oklahoma's SIP).

[4]    57 Fed. Reg. 32,314 (July 21, 1992).

[5]    67 Fed. Reg. 80,186 (Dec. 31, 2002).

[6]    *Compare* 40 C.F.R. § 52.21(b)(2)(i) (2012) *with* 45 Fed. Reg. at 52,735 (1980 promulgation of 40 C.F.R. § 52.21(b)(2)(i)).

[7]    *Compare, e.g.*, 40 C.F.R. § 52.21(b)(3)(vi)(b) (2012) *with* 45 Fed. Reg. at 52,736 (1980 promulgation of 40 C.F.R. § 52.21(b)(3)(vi)(b)).

A.    **Emissions Projections**

True to Congress' "[p]reconstruction requirements," 42 U.S.C. § 7475, the PSD rules require operators of air pollution sources to determine whether proposed construction work constitutes a "major modification" before beginning construction. Oklahoma Air Pollution Control Regulations (OAPCR) § 1.4.1(c)(1); 40 C.F.R. § 52.21(r)(1) (1984).  A "major modification" is in turn defined as a physical or operational change that "*would result*" in a significant emissions increase.  OAPCR § 1.4.4(b)(2)(A) (1997) (emphasis added); 40 C.F.R. § 52.21(b)(2)(i) (1984) (same).

Determining whether a construction project "would result" in an emissions increase requires a detailed analysis.  As EPA explained in the early 1990's, a power plant operator should make that assessment by comparing "representative actual emissions for the baseline period [prior to a planned modification] to estimated future actual emissions [after the modification] based on all the available facts in the record." EPA Guidance Document, Letter from William Rosenberg, EPA, to John Boston, WEPCO (June 9, 1990) ("WEPCo Remand Letter") (Ex. 1) at 7–8.[8]  The projection should attend to a number of factors, and should be calculated by multiplying:

---

[8]    In *Wisconsin Electric Power Company v. Reilly ("WEPCo")*, 893 F.2d 901, the Seventh Circuit rejected EPA's attempt to use an "actual-to-potential" test to determine expected post-modification emissions at a utility.  Such a test requires a utility to assume that it will operate at full capacity following a modification. The WEPCo Remand Letter, issued in response to the Seventh Circuit's criticisms, outlined an electric utility's preconstruction projection process under a more realistic actual-to-projected-actual test. This methodology was further clarified when EPA promulgated the 1992 Rules.  *See*, *e.g.*, 56 Fed. Reg. 27630, 27633 (June 14, 1991); 57 Fed. Reg. at 32,335–36 (codified at 40 C.F.R. § 52.21(b)(33) (1993) (defining "representative actual emissions")).

> (1) The hourly emissions rate, which is based on the unit's physical and operational capabilities following the change and . . . enforceable operational restrictions that would affect the hourly emissions rate following this change; and (2) projected capacity utilization, which is based on (a) the unit's historical annual utilization, and (b) all available information regarding the unit's likely post-change capacity utilization.

57 Fed. Reg. at 32,323; *see also United States v. Duke Energy Corp.*, 2010 WL 3023517, at *5- *6 (M.D.N.C. July 28, 2010) (requiring a reasonable projection based on a broad range of data); *Ohio Edison*, 276 F. Supp. 2d at 865–66 (outlining projection methodology), at 875 (rejecting defendant's argument that post-project emissions data determines PSD liability), & at 889–90 (requiring preconstruction projections).  This future projection should be performed for a period of years post-project which is "representative of normal source operations."  *Id.*  For an electric utility, "'normal' operations means directly responding to demand for electricity."  *Id.* at 32,325.[9]

Ultimately, "what is required for determining whether a construction permit must be sought for a planned physical change in the plant is not prescience, but merely a reasonable estimate of the amount of additional emissions that the change will cause." *United States v. Cinergy Corp.*, 458 F.3d 705, 709 (7th Cir. 2006).  But this preconstruction projection process informs what steps must be taken to protect the public health, so if an operator makes "no projection, or the projection is made in contravention of the regulations guiding how the projection is to be made, then the system is not

---

[9]   EPA's subsequent 2002 rules are not applicable here because they have not been incorporated into Oklahoma's SIP; but neither did they change anything about this projection requirement for utilities.  *See* 40 C.F.R. § 52.21(b)(41)(i), (ii) (2012) (defining "projected actual emissions" and outlining projection process); *accord* 67 Fed. Reg. at 80,192 (2002 Rules make only "minor changes" to regulations for electric utilities).

working."  *United States v. DTE Energy Co.*, 711 F.3d 643, 649 (6th Cir. 2013).  Thus,

EPA "*must*" be allowed to "ensur[e] that operators follow the requirements in making

[emissions] projections."  *Id.* at 650 (emphasis added); *see also* 42 U.S.C. §§ 7413, 7477.

Operators that fail to evaluate the impact of their projects according to PSD's

requirements are "subject to an enforcement proceeding."  *DTE*, 711 F.3d at 649.

> **B.**    **Emissions Management Options**

EPA has crafted a variety of regulatory options that allow operators to "manage"

their emissions to below PSD-triggering levels rather than assessing the effect a

modification will have on a facility's future emissions.  However, since "EPA cannot

reasonably rely on a utility's own unenforceable estimates of its annual emissions,"

*WEPCo*, 893 F.2d at 917–18, operators that elect to simply manage their emissions must

use one of these regulatory options, which provide additional assurances that their future

operations will not harm the public health by significantly increasing pollution.

One of the most common ways source operators avoid "major modification"

requirements is by getting a so-called "synthetic minor" permit.  With a synthetic minor

permit, an operator is allowed to avoid PSD review and BACT obligations if it adopts a

legally and practicably enforceable emissions limits at or below the significance

threshold for each pollutant.  The permit makes the reduced emissions limits enforceable

and measures compliance with those limits against specific, verifiable parameters.

Importantly, the emissions limits would then apply in perpetuity.  *See United States v.*

*Marine Shale Processors*, 81 F.3d 1329, 1352, 1357 (5th Cir. 1996) (explaining concept

of "synthetic minor" sources, and noting that a source "could avoid preconstruction

review as a synthetic minor source" if it agreed to enforceable operating restrictions); *see also United States v. Cinergy Corp.*, No. 1:99-CV-1693-LJM-JMS, 2009 WL 94515, at *2 (S.D. Ind. Jan. 7, 2009) ("Had Cinergy sought pre-project synthetic minor permits . . . it would have been subject to an emissions cap").

Similarly, operators may seek to "zero out" future emissions increases with contemporaneous emissions decreases. But here again, the operator can only get credit for the future decreases in pollution—and so avoid PSD review and BACT obligations—where those reductions have been reduced to an enforceable requirement before construction. *See* OAPCR § 1.4.4(b)(3)(F) & 40 C.F.R. § 52.21(b)(3)(vi)(*b*) (1984) ("A decrease in actual emissions is creditable [in the emissions calculation] *only to the extent that* . . . [i]t is federally enforceable at and after the time that actual construction on the particular change begins"); *accord Natl. Mining Ass'n v. EPA*, 59 F.3d 1351, 1362 (D.C. Cir. 1995) (noting that federally enforceable controls do not include "operational restrictions that an owner might voluntarily adopt").[10]

The requirement of readily-enforceable, do-not-exceed emissions limits like those involved in these alternative options is a sensible trade where operators opt out of the preconstruction analysis requirements in favor of an emissions management plan. Without such a limit, EPA could not immediately enforce PSD violations where an operator failed to properly manage its emissions. Rather, EPA would have to prove in

---

[10]   EPA's 2002 Rules include the "plantwide applicability limitations" provisions, whcih provide still another alternative to traditional preconstruction assessments, but which similarly require sources adopt emissions limits and various operational and reporting measures so compliance can be readily verified and violations can be readily enforced. *See* 40 C.F.R. § 52.21(aa); 67 Fed. Reg. at 80,208; *New York*, 413 F.3d at 36.

court that a power plant operator should have anticipated the emissions increase under the projection regulations—precisely the same analysis that the operator elected to avoid before beginning construction[11]— or EPA would have to establish that the post-project emissions increases were causally related to the already-finished modification.  Thus, under EPA's longstanding implementation of Congress' forward-looking pollution prevention program, if an operator elects not to provide a detailed analysis of its future emissions in accordance with the regulations, it must provide a legally and practicably enforceable assurance that its operations will not result in illegal pollution.  Any other approach, and air pollution sources could offload their forward-looking obligations and delay compliance without cost or consequence.

### III.    OG&E's "Compliance Plan"[12]

1.    From 2003 to 2006, OG&E undertook a suite of renovation work across the company's Sooner and Muskogee facilities.  The work ultimately cost more than $80 million.  *See*, *e.g.*, Letter from D. Pollock re: Coal Plant Upgrade Status [1846] (March 12, 2007) (Ex. 2).

2.    This work included replacing the units' economizers which are major components in the units' boilers, upgrading their high pressure and intermediate pressure

---

[11]    *Accord Wild Earth Guardians v. Lamar Util. Bd.*, No. 1:09-cv-02974, 2013 WL 1164324 at *6–*8 (D. Colo. Mar. 21, 2013) (holding utility was a "major source" for purposes of certain CAA regulations from the time it projected major-source levels of emissions until the time it obtained a synthetic minor source permit, even though it had never *actually* emitted major-source levels of pollution in the interim).

[12]    As this motion presents a purely legal question, it does not set forth a statement of "undisputed facts" necessary for judicial decision.  However, this section provides the factual history giving rise to the present dispute.

(HP/IP) turbine sections, replacing their low pressure (LP) turbine blades, and expanding the heating surface area of their boilers' reheaters and superheaters. *Id.*; *see also* OG&E Project Reports (Exs. 3-A–3-H) (OG&E's submittals regarding the projects described in the United States' complaint, ECF No. 1, ¶¶ 42.a – 42.h).

3.      In the days before beginning construction on each of these projects—or, sometimes, after a project had already begun—OG&E sent a letter to the Oklahoma Department of Environmental Quality (ODEQ) notifying the agency of the work to be done.  The letters also transmitted reports, which purported to contain OG&E's project evaluations under various CAA programs. *See* OG&E Project Reports (Exs. 3-A – 3-H).

4.      These Project Reports are, for the purposes of this brief, substantively identical.  After a short description of the proposed project, each report declares: "This document determines potential emissions impacts for the proposed project, the potential applicability to . . . New Source Review (NSR), and sets forth OG&E's proposed plan of action for compliance." *E.g.* 2006 Sooner 2 Project Report (Ex. 3-H) at 1.[13]

5.      In a section called "Emissions Impact of the Project," each Report then sets forth a "projection" of future emissions.  Specifically, OG&E describes its calculation of its historic or "baseline" emissions levels from previous years of emissions data, and then calculates what it calls "the allowable increase in emissions that would not be subject to PSD requirements" by adding the regulatory significance threshold to the baseline emissions and subtracting 0.1.  For example, if a unit's $SO_2$ emissions during the baseline period was 10,000.0 tons per year (tpy), then, since the regulations deem a 40-ton

---

[13]   Pin cites to Project Report pages refer to the report's internal pagination.

emissions increase "significant," OG&E would have concluded 10,039.9 tpy to be an "allowable increase in emissions" in the years following the project. Each report then collects those calculations in a table under the heading "Projected Future Actual (tpy)":

### TABLE 4-1. ALLOWABLE EMISSIONS FOR PROJECT

| Pollutant | Past Actual (tpy) | SER (tpy) | Projected Future Actual (tpy) |
|-----------|-------------------|-----------|-------------------------------|
| $PM_{10}$ | 449.99 | 15 | 464.89 |
| $SO_2$ | 10,209.5 | 40 | 10,249.4 |
| $NO_x$ | 6,674.12 | 40 | 6,714.02 |
| VOC | 67.57 | 40 | 107.47 |
| CO | 563.04 | 100 | 662.94 |
| $H_2SO_4$ | 3.9 | 7 | 10.8 |

2005 Muskogee 5 Project Report (Ex. 3-F) at 5.

6.    Nowhere in the Project Reports does OG&E discuss enforceable restrictions on its hourly emissions rates, projected capacity utilization based on historical or future capacity utilization, or anticipated levels of business operations; nor does the Company describe how the projects would affect emissions during normal operations.

7.    Each report concludes with the following:

PROPOSAL

OG&E proposes to limit emissions . . . on [the Unit] after the [project] such that the emission increase will not exceed the PSD significant threshold increase level. OG&E will maintain and submit to ODEQ on a calendar year basis for a period of five years starting with the first full calendar year after the date the unit resume regular operation, information demonstrating the [project] did not result in an emissions increase.

*E.g.*, 2006 Sooner 2 Project Report (Ex. 3-H) at 6.

12

## JURISDICTION

An action for declaratory judgment may be brought in any case "of actual controversy" and a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The instant case presents a definite and concrete dispute which affects the parties' adverse legal interests and warrants declaratory relief— essentially, whether administrative or judicial review is available under certain PSD regulations. *Cf. MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 127 (2007) (equating the "actual controversy" requirement with the Constitution's case-or-controversy requirement). This Court should hear this declaratory judgment action because it concerns a question of federal law, and there is no more expedient or efficient alternative available to aid the resolution of the instant dispute. *Accord State Farm Fire & Cas. Co. v. Mhoon* 31 F.3d 979, 983 (10th Cir.1994) (setting forth factors for consideration); *United States v. City of Las Cruces*, 289 F.3d 1170, 1184 (10th Cir. 2002) (noting uncertainty as to whether courts may decline to hear declaratory judgment actions when they present questions of federal law).

## STANDARD OF REVIEW

"[I]n enacting the NSR program, 'Congress sought to accommodate the conflict between the economic interest in permitting capital improvements to continue and the environmental interest in improving air quality,' and *delegated the responsibility of balancing those interests to EPA*." *New York*, 413 F.3d at 23 (emphasis added) (quoting *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 851 & 865 (1984)). If there is ambiguity in

13

the language of the CAA, a court should defer to EPA's permissible construction as expressed in EPA's regulations. *Chevron*, 467 U.S. at 844. When examining EPA's regulations, the Agency's interpretation of its own rules is entitled to even further deference: it is considered "controlling" as long as it is not "plainly erroneous or inconsistent" with the regulatory language. *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal citations omitted); *Qwest Corp. v. Colo. Pub. Util. Comm'n*, 656 F.3d 1093, 1098 (10th Cir. 2011). Indeed, "[i]t is well established that an agency's interpretation need not be the only possible reading of a regulation—or even the best one—to prevail." *Decker v. NW Evntl. Def. Center*, 133 S. Ct. 1326, 1337 (2013).

## ARGUMENT

In its submittals to state regulators, OG&E claimed its unenforceable plan to manage its emissions for a short while satisfied its PSD obligations. By equating its voluntary—and temporary—emissions management scheme with "compliance," OG&E insists that no NSR enforcement action can be ripe unless and until the company fails in its own unenforceable plan and emissions actually do increase as a result of its extensive renovation work. But as the statute, the regulations, and more than three decades of implementation and case law attest, the PSD program requires that sources take steps to protect public health *before* modifying facilities by assessing future pollution levels, undergoing review, and, where necessary, employing pollution control techniques to maintain emissions limitations. This process aims to *prevent* degradations to air quality. *See*, *e.g.*, 42 U.S.C. § 7470. Thus, PSD applicability necessarily hinges on pre-construction estimates of a project's effect on future emissions.

14

Under the plain language of the Clean Air Act, an operator's preconstruction conduct may be subject to agency review, and an operator's preconstruction violations may lead to enforcement actions.  Where the statute establishes enforceable requirements for the protection of public health,[14] OG&E offers the unenforceable promises of a regulated source.[15]  Where the statute aims to prevent emissions increases,[16] OG&E proposes merely to delay them.[17]  This Court should declare that OG&E's "plan of action" cannot suffice for compliance.

## I.      The Clean Air Act's Preconstruction Mandate Does Not Allow For A Wait-And-See Approach To Public Health Protection

There is no question that the PSD program is inherently a forward-looking, preconstruction program; it is in Congress' express objective, 42 U.S.C. § 7470, it is in the program's many "[p]reconstruction requirements," *id.* § 7475, and it is in the program's authorization of preventative enforcement, *id.* §§ 7477, 7604(a)(3).

As directed by Congress, an operator must determine whether PSD requirements apply to a given plant modification *before* it begins construction; the statute specifically bars modification of a facility "unless a permit has been issued," 42 U.S.C. § 7475(a)(1). The operator planning to construct a PSD-triggering modification must demonstrate *prior to construction* "that emissions from construction or operation of such facility *will not*

---

[14]   42 U.S.C. §§ 7475(a), 7477, 7604(a)(3).

[15]   *Contra WEPCo*, 893 F.2d at 917–18 ("EPA cannot reasonably rely on a utility's own unenforceable estimates of its annual emissions.").

[16]   42 U.S.C. § 7475(a)(1), (3), (4).

[17]   *Contra Ala. Power Co. v. Castle*, 636 F.2d 323, 400 (D.C. Cir. 1979) (plain language of the statute covers all but *de minimis* emissions increases).

cause, or contribute to, air pollution in excess" of various standards.  *Id.* § 7475(a)(3) (emphasis added).  It must also provide an analysis of "air quality impacts *projected* for the area as a result of growth associated with [the] facility."  *Id.* § 7475(a)(6) (emphasis added).  The statute thus makes it "abundantly clear that PSD applicability is to be determined prior to the commencement of a project."  *Ohio Edison*, 276 F. Supp. 2d at 881.[18]  A central purpose of this PSD review process is to impose substantive safeguards that ensure the protection of air quality *before* construction takes place.  *New York*, 413 F.3d at 13; *WEPCo*, 893 F.2d at 909; *Puerto Rican Cement Co., Inc. v. EPA*, 889 F.2d 229, 294 (1st Cir. 1989).

True to the statute's preventative focus, a central question when assessing PSD liability has always been whether an operator *should have projected* the modification to lead to emissions increases under the projection regulations, thereby triggering permitting and pollution control obligations.  *See* 45 Fed. Reg. at 52,725 (An operator should keep "[s]ufficient records regarding the details of . . . applicable source determinations . . . so as to verify that no permit was required," and "[a]ny source which improperly avoids review and commences construction will be considered in violation of the applicable SIP and will be retroactively reviewed under the applicable NSR regulation."); *Duke Energy*, 2010 WL 3023517, at *6 ("this Court need only determine whether Duke Energy reasonably should have projected a significant increase in emissions" (citing *Cinergy*, 458 F.3d at 707-08)).  Where an operator does not perform its projection in accordance

---

[18]  *See also United States v. Cinergy Corp*, 384 F. Supp. 2d 1272, 1276–77 (S.D. Ind. 2005) *aff'd* 458 F.3d 705, 708 (7th Cir. 2006); *United States v. Duke Energy Corp.*, No. 1:00-CV-1262, 2010 WL 3023517, at *5 (M.D.N.C. July 28, 2010).

with the regulations, the operator cannot be allowed to skirt its forward-looking

obligations by saying "let's wait to see if emissions go up."  As one district court put it:

> any other construction of the [Clean Air] Act and its regulations would turn
> the preconstruction permitting program on its head and would allow
> sources to construct without a permit while they wait to see if it would be
> proven that emissions would increase.  Clearly, Congress did not intend
> such an outcome, which would eviscerate the *preconstruction* dimension of
> the program.  Thus, the Court concludes that the issue of whether [a
> utility's] projects required a preconstruction permit must be determined by
> reviewing evidence of the projected post-project emissions increases, and
> not by reviewing evidence of the actual post-project emissions data.

*United States v. S. Ind. Gas & Elec. Co.* .(*"SIGECO"*), No. IP99-1692-C-M/F, 2002 WL

1629817, at *2-3 & n.3 (S.D. Ind. July 18, 2002) (internal quotations and citations

omitted); *see also DTE Energy*, 711 F.3d at 649 ("[I]f EPA were barred from challenging

preconstruction projections that fail to follow regulations, New Source Review would

cease to be a preconstruction review program.").

Yet OG&E's submittals ask for a free pass from the Act's preventative

requirements.  In its Project Reports, OG&E proposes that its voluntary—and

temporary—emissions management scheme is compliant with the CAA requirements.

*E.g.* 2006 Sooner 2 Project Report (Ex. 3-H) at 1, 6.  Essentially, OG&E insists that,

unless and until the company fails to follow its own plan—that is, until its facilities

increase their emission of harmful pollution—EPA cannot bring an NSR enforcement

action against it.  OG&E's "plan of action" would turn the PSD preconstruction

permitting program into a "wait and see" program under which an operator need do

nothing more than pronounce its intention that its emissions will not increase as a result

17

of its proposed modification.  As the Sixth Circuit recently put it, "[t]hat is not correct." *DTE Energy*, 711 F.3d at 649.

The Seventh Circuit made it clear more than 20 years ago that NSR applicability should be determined based on a "realistic assessment" of future emissions, and that "EPA cannot reasonably rely on a utility's own unenforceable estimates of its annual emissions."  *WEPCo*, 893 F.2d  at 917–18 & n.14 (quoting, *inter alia*, *Alabama Power* , 636 F.2d at379).  Nothing in the statute forces EPA to stay its hand at the behest of the operator, or wait and see if a project results in harmful pollution increases before acting to protect public health.  In fact, the Act "clearly accords EPA the authority to investigate, and then to *prevent* through appropriate legal remedies, violations committed *before* construction commences," and so long before emissions increase.  *Xcel Energy*, 759 F. Supp. 2d at 1113 (emphasis added).

But under the Company's approach, an operator need not undertake a careful projection of future emissions, *contra* 57 Fed. Reg. at 32,323, nor perform a pre-project assessment of air quality impacts, *contra, e.g.,* 42 U.S.C. § 7475(a)(3).  Rather, an operator need only claim that it will manage its emissions post-project to avoid triggering PSD.  According to OG&E, such unenforceable pledges *foreclose* the public's right to protective enforcement or preventative action.  That cannot be.  Congress mandated an enforceable, preconstruction program, 42 U.S.C. §§ 7475, 7477, and EPA's PSD Rules did not repeal that statutory directive.  *See Fed. Express Corp. v. Holoweck*i, 552 U.S.

18

389, 401–02 (2008) (rejecting an interpretation of a regulation because it would be in "tension with the structure and purposes" of the authorizing statute).[19]

To be sure, pollution control measures can be expensive, and an operator may see value in delaying that expenditure as long as possible. *See Wilson v. Burlington N. RR. Co.*, 803 F.2d 563, 566 (10th Cir. 1986) (J. McKay, concurring) (recognizing the "potentially immense value of money over time"); *see also Barnard v. Theobald*, Nos. 11-16625, 11-16655, 2013 WL 3285286 at *7 (9th Cir. July 1, 2013) (warning parties might "exploit the time value of money" by working to "delay[] payment." (internal citations omitted)). But to ignore PSD's preconstruction requirements is to ignore the law: Congress has already decided that pollution controls should be employed when a facility is modified. *See WEPCo*, 893 F.2d at 909. Though it's implementation may "prove inconvenient and costly to affected industries[,] . . . the *clear language of the statute* unavoidably imposes these costs except for *de minimis* [emissions] increases." *Ala. Power*, 636 F.2d at 400 (italics added); *see also United States v. S. Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994, 1009-10 (S.D. Ind. 2003) (CAA's broad definition of "modification" is illustrative of Congressional intent for broad NSR applicability).

Ultimately, OG&E's proposal would install an exception to NSR applicability that swallows the preconstruction rule and swaps out pre-harm protections for post-harm

---

[19] *See also Koch Indus. v. United States*, 603 F.3d 816, 821 (10th Cir. 2010) ("[I]mplementing regulations must be interpreted so as to harmonize with and further and not to conflict with the objective of the statute it implements." (internal quotations omitted)); *Sec. of Labor, Mine Safety, & Health Admin. v. Western Fuels-Utah, Inc.*, 900 F.2d 318, 320 (D.C. Cir. 1990) (same); *Anthony v. United States*, 520 F.3d 374, 380 (5th Cir. 2008) ("[C]ourts should not interpret an agency regulation to thwart the statutory mandate it was designed to implement." (internal quotations omitted)).

litigation.  The Company's proposed scheme is flatly inconsistent with the PSD program;

as the Sixth Circuit recently held in *DTE Energy*, an "operator has to make projections

according to the requirements for such projections contained in the regulations.  If the

operator does not do so, and proceeds to construction, it is subject to an enforcement

proceeding."  711 F.3d at 649.

**II.    The Regulations Do Not Accept Bare, Unenforceable Promises In Place Of Detailed Emissions Analyses**

Under the PSD regulations, operators must project how a modification will affect

the facility's future emissions by considering a wide array of factors.  *See* 57 Fed. Reg. at

32,323 (describing projection calculation); 40 C.F.R. § 52.21(b)(33) (1993) (defining

"representative actual emissions").  Although proper projections should consider "all

available information," an operator may not base its projection on an unsupported and

unenforceable plan to limit emissions during the period covered by the projection; EPA

"cannot reasonably rely on an operator's own unenforceable estimates of its annual

emissions" when evaluating the adequacy of an operator's emissions projection.

*WEPCo*, 893 F.2d at 917; *see also* WEPCo Remand Letter (Ex. 1) at 6.  Thus, operators

must *either* perform detailed emissions projections in accordance with the regulations

which are reviewable by enforcement agencies and courts of law, *or* they must accept

legally and practically enforceable emissions limits going forward.  *Supra* Background

§ II.  Should an operator seek to escape a PSD-triggering increase by counting

simultaneous decreases in operations or emissions, the operator may only get credit for

those emission reductions if they are *enforceable at the time of a modification*.  *See*

20

OAPCR § 1.4.4(b)(3)(F) and 40 C.F.R. § 52.21(b)(3)(vi)(*b*) (1984) ("A decrease in actual emissions is creditable [in the emissions calculation] *only to the extent* that . . . [i]t is federally enforceable at and after the time that actual construction on the particular change begins"); *accord Natl. Mining*, 59 F.3d at 1362 (noting that federally enforceable controls do not include "operational restrictions that an owner might voluntarily adopt"). Put simply, an operator's unsupported and unenforceable plans do not satisfy the regulations' projection requirement or the statute's pollution prevention mandate.

This does not mean every projection performed by an electric utility must be turned into an enforceable emissions limitation. Rather, operators must follow the emissions projection requirements set forth in the Rules and EPA guidance documents— the requirements crafted to ensure an analysis will protect the public health in advance of an emissions increase. A utility is welcome to avoid performing a detailed projection by making a bare promise to keep its emissions below significance levels—but only if that promise is reduced to a readily-enforceable emissions limitation. OG&E has done neither, asking instead for a free pass from the protective requirements of the CAA, and offering the cold comfort of PSD enforcement only after pollution increases.

EPA squarely addressed the issue of voluntary restrictions in an administrative proceeding regarding another electric utility, Wisconsin Power and Light. *See* Order of the Administrator, *In re: Wisc. Pow. & Light, Columbia Gen. Station* ("*Columbia Generating Order*") (Oct. 8, 2009) (Ex. 4) at 7–9 (interpreting regulations based on EPA's 1992 PSD Rules). There, the State granted a permit application in which Wisconsin Power and Light had indicated its future emissions would be "managed" to

stay below "the sum of past actual emissions plus the significance threshold." *Id.* at 6, 8.

The State reasoned that, "so long as the facility would be operated in a way that would

not result in a significant net emissions increase, the project would not be a major

modification," and offered that the applicant would limit its emissions for five years

following the project. *Id.* at 8.  EPA proclaimed this a "faulty analysis." *Id.*  The Agency

objected to the State's permit, and the Administrator explained that, "[s]ince this artificial

emission limit could not be considered 'representative actual annual emissions of the

unit' following the physical change, [the State] used the wrong methodology for

measuring post-project emission increases for an electric utility steam generating unit."

*Id.* at 9.[20]

Similarly, by merely "agree[ing] informally to constrain" its post-project

emissions, OG&E used the "wrong methodology" for calculating its projected emissions.

*Id.*; *see also* 40 C.F.R. § 52.21(b)(33) (1993) (defining "representative actual

emissions").  Unless it adopts a legally and practicably enforceable emissions limit, a

company must project future emissions that are *representative of normal source

operations*.  57 Fed. Reg. at 32,325.  As EPA explained when it rejected Wisconsin

Power and Light's permit, absent from the company's plan to use "post-project emissions

management as a way to avoid PSD[ was] an explanation of how providing for a period

of five years in which a facility artificially limits its emissions, and monitors to stay

---

[20]   *See also* EPA Guidance Document, Letter from Dianne McNally (U.S. EPA) to
Mark Wejkszner (Pa. Dep't Envtl. Protection) (April 20, 2010) (Ex. 5) at 3 (Company's
PSD analysis rejected as insufficient where projected emissions were determined "simply
on the basis of calculating a level that would result in an emissions increases from the
project that are below PSD significance levels.").

below the significance threshold, is consistent with this requirement." *Columbia Generating Order* (Ex. 4) at 9.  EPA's interpretation makes sense: where the statute contemplates preventing emissions increases, projections of future emissions should focus on whether a project will enable a facility to pollute more when operated under normal (responding directly to demand) conditions. OG&E cannot claim its mere statement of intent to temporarily manage emissions complies with the regulations' preconstruction projection requirements.

The structure of the PSD rules further underscores the absurdity of OG&E's proposal.  The rules proscribe construction of "major modifications" that "*would result*" in increased air pollution unless the operator has obtained a permit for the modification. OAPCR § 1.4.4(b)(2), (c) (emphasis added); 40 C.F.R. § 52.21(b)(2)(i) (1984) (same). They also require a facility to perform an "air quality impact evaluation" to show that emissions "*will not* cause or contribute" to air pollution violations; and to demonstrate that proposed pollution controls are the best available wherever significant emissions increases "*would occur* as a result" of the modification.  OAPCR §§ 1.4.4(e), (f) (emphasis added); *see also*, *e.g.*, 40 C.F.R. §§ 52.21(j), (k), (m), (o) (1984) (imposing various preconstruction analysis obligations).  The PSD rules are filled with *preconstruction* requirements which mirror those of the statute—all of which would be completely superfluous or entirely unenforceable if an operator could simply proclaim its intent not to increase emissions and wait to be proven wrong in court with post-project emissions data.  *Contra Time Warner Ent. Co., L.P. v. Everest Midwest Licensee, LLC*, 381 F.3d 1039, 1050 (10th Cir. 2004) (a regulation should be interpreted so "no part is

23

rendered superfluous" and such that it does "not conflict with the objective of its organic statute" (citations omitted)); *see also Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 706 (10th Cir. 2010).

Although it is plain as a matter of law that mere statements of intent and unenforceable "plans of action" cannot replace emissions projections under the PSD Rules, OG&E's internal discussions of its renovations help illustrate why that must be the case. OG&E's own documents underscore that its proposal was but a temporary management plan aimed at avoiding the expense of pollution control devices (such as "scrubbers"). In a letter with the subject line "Coal Unit Operation After Certain Maintenance Upgrades," OG&E's Manager of Power Supply Services explained the Company's strategy:

> It was decided when we made the upgrades that Power Supply would operate, for at least five years after the last upgrade to a unit, at or below the original design conditions of the unit. . . . It is recognized the units will make a few more Megawatts output due to efficiency improvements and we should utilize that improvement. **We agreed not to take full advantage of the upgrade capability due to environmental considerations that could be imposed on the units.**

Letter Attached to Email from O.W. Beasley to J. Parham, Nov. 27, 2007 [1843 002] (Ex. 6) (emphasis added). As the manager elaborated in the context of work performed at Muskogee Unit 4:

> we opted to place a cap on our emissions in order to avoid triggering new regulations. New regulations would likely have required a scrubber and NOX control. . . . We committed to remain under the cap for 5 years.

Letter from D. Branecky to A. Gould, Sept. 14, 2006 [1865 001] (Ex. 7). Plainly, OG&E's own discussions of its facility upgrades highlight the concern that the work may

well lead to an emissions increase in the years to come, after the expiration of the Company's temporary management plan.  *See also* Email from Larry Kuennan, July 29, 2004 [1854 001] (excerpted at Ex. 8) (describing operation of OG&E units under environmental constraints for 5 years following upgrades performed at each unit).

OG&E's "compliance" plan therefore fails both the letter and the spirit of PSD law.  OG&E did not project its emissions during years of "normal operations," *cf.* 57 Fed. Reg. at 32,325, opting instead to delay normal operations by artificially constraining emissions for a short while.  To comply with PSD's forward-looking requirements, operators must either perform detailed calculations in accordance with the regulations, or adopt enforceable emissions limits; one way or another, operators must take steps to assure the public its construction projects will not lead to increases in air pollution.  *See supra* Background § II.   Far from reassuring, OG&E's temporary manage-and-report scheme falls short of the Company's legal obligations under the PSD regulations.

### III.   EPA's Recordkeeping Rules Provide A Safeguard Against Operator Gamesmanship, Not A Safe Haven Against Agency Enforcement

In its Project Reports, OG&E cites to the recordkeeping and reporting provisions in EPA's 2002 Rules, suggesting that compliance with recordkeeping requirements suffices for compliance with PSD.  *See, e.g.*, 2006 Sooner 2 Project Report (Ex. 3-H) at 4 (citing 40 C.F.R. § 52.21(r)(6)).  The applicable rules in Oklahoma do not include the 2002 provisions that OG&E relies upon.  *See supra* p. 5.  But in any event, the recordkeeping and reporting requirements in no way altered or replaced the forward-looking requirements that have always been the cornerstone of the PSD program.

### A.     Recordkeeping Under EPA's PSD Rules

In its 1992 PSD Rules, and again in its 2002 PSD Rules, EPA added a requirement

that electric utilities not only *project* their future emissions before undertaking a project,

but that they also keep records of post-project emissions for a period of years after the

projects are implemented—sometimes five years, sometimes ten, depending on the kind

of modification an operator has undertaken.  *See* 57 Fed. Reg. at 32,325; 40 C.F.R.

§ 52.21(r)(6) (2003).  As the Agency explained, "without appropriate safeguards[,]

increases in future actual emissions that in fact resulted from the physical or operational

change could go unnoticed and unreviewed."  57 Fed. Reg. at 32,325; *see also New York*,

413 F.3d at 35 (explaining how a source could understate expected emissions and thus

improperly conclude NSR did not apply).  Thus, as an additional protection, where post-

project records reveal that emissions have *in fact* increased as a result of the project, the

facility is subject to PSD's BACT obligations at that time—regardless of what

preconstruction analyses indicated.  *See* 57 Fed. Reg. at 32,325 (if "the reviewing

authority determines that the source's emissions have in fact increased significantly over

baseline levels as a result of the change, the source would become subject to NSR

requirements at that time"); 40 C.F.R. § 52.21(a)(2)(iv)(b) (2012).

### B.     Post-Project Recordkeeping Does Not Replace Pre-Project Compliance

Even if OG&E could rely on the later PSD recordkeeping and reporting provisions

(it cannot), those regulations do not support the Company's "proposed plan of action."

Electric utilities were required to record and report post-project emissions

beginning under EPA's 1992 Rules.  But the Agency's regulations have always echoed

Congress' statutory command and maintained Congress' forward-looking focus.  Neither the 1992 Rules nor EPA's contemporaneous explanation suggest that the recordkeeping requirements created a safe haven from enforcement.  Rather, submission of post-project data provided a safeguard necessary to protect the integrity of the requisite preconstruction prediction.  57 Fed. Reg. at 32,336 (1992 revision to 40 C.F.R. § 52.21(b)(21)(v), requiring submission of post-project data as a condition of using more flexible prediction method); *id.* at 32,316 ("Applicability of the CAA's NSR provisions *must* be determined in advance of construction") (emphasis added); *id.* at 32,325 (explaining reason for "safeguard")*; New York*, 413 F.3d at 34 (reporting required to "verify the projections' accuracy"); *see also* 67 Fed. Reg. at 80,188 (post-project reporting under 1992 Rules required to "ensure the projection [was] valid").

In fact, EPA has explicitly determined that those reporting obligations do not supplant the PSD program's preconstruction projection requirement, which necessarily flows from Congress' preconstruction review and pollution prevention directive.  In EPA's Columbia Generating Order, the Agency proclaimed the very tactic proffered by OG&E amounts to avoidance rather than compliance.  There, like OG&E in this case, the operator had simply promised to "limit operations . . . for the five-year period following the project."  (Ex. 4) at 8.  EPA rejected the approach:

> [T]he five years in which the facility has agreed informally to constrain it[s] emissions and report post-change emissions data appears directed at aligning with the post project recordkeeping requirement in [the applicable rules]; but *this five year window does not by its terms establish a window in which, if a facility artificially constrains its emissions, it avoids NSR.*

*Id.* at 9 (emphasis added).  Thus, the recordkeeping provisions did not replace the touchstone PSD obligation that facilities prepare preconstruction emissions projections.

EPA's 2002 Rules—including the inapplicable provisions cited by OG&E—operate no differently.  Indeed, to accept OG&E's reading would require the Court to ignore a raft of contrary regulatory provisions and contemporaneous agency pronouncements.  For example:

- EPA explained the 2002 Rules made only "minor changes" to PSD for utilities;[21]

- The recordkeeping requirements do not preclude preconstruction enforcement; rather EPA explained that they act as a backstop to ensure projections maintain their integrity and emissions increases do not go unnoticed or unreviewed;[22]

- When it promulgated the 2002 Rules, EPA explicitly stated that "[t]he NSR program remains a pre-construction review program;"[23]

- EPA confirmed in the 2002 Preamble that sources that fail to "properly project emissions" will be subject to "applicable enforcement provisions (including the possibility of citizens' suits),"[24] and underscored that "[t]here are no provisions in the final [2002] rules to protect from civil or criminal penalties the owner or operator of a source that constructs a 'major modification' without obtaining a major [PSD] permit."[25]

---

[21]   57 Fed. Reg. at 32,325; 67 Fed. Reg. at 80,192.

[22]   *Supra* p. 26; Brief for EPA, *New York v. EPA*, No. 02-1387, 2004 WL 5846388, at *98 (D.C. Cir. Oct. 26, 2004) ("EPA did not alter any of the mechanisms provided by the CAA to take enforcement action against sources that improperly determined that NSR does not apply.  In fact, it added a monitoring requirement for changes that have a reasonable possibility of resulting in a significant increase.").

[23]   PSD TSD (excerpted at Ex. 9) at I-4-41; 57 Fed. Reg. at 32,316 ("Applicability of the CAA's NSR provisions must be determined in advance of construction").

[24]   67 Fed. Reg. at 80,190.

[25]   PSD TSD (excerpted at Ex. 9) at I-4-26; *see also* 40 C.F.R. § 52.21(r)(1) (2012) (owner who constructs a major modification "without applying for and receiving approval . . . shall be subject to appropriate enforcement action").

The reporting provisions were designed as a safeguard against operator gamesmanship. They were not designed as a safe harbor against enforcement—indeed such a use would contradict the statute's plain terms.  Even if they applied in this case, the recordkeeping and reporting provisions set forth in the 2002 Rules in no way replaced a source's obligation to perform preconstruction emissions projections and assess the project's impact on a facility's future pollution levels.  OG&E's effort to replace preventative action with five years of reporting is unsupported by the rules OG&E cites and the language of the Clean Air Act itself.

## CONCLUSION

The Clean Air Act is intended to protect human health and the environment from the harmful effects of air pollution.  To better implement these protections, Congress designed a program to ensure any modification's air pollution consequences are properly evaluated and addressed in advance.  Under EPA's implementing rules, operators must either perform detailed projections of future emissions in accordance with the PSD regulations, or they must adopt readily-enforceable emissions limits on future operations. OG&E did neither, insisting instead that enforcement must be delayed until after the pollution is emitted and the public is harmed by the Company's voluntary—and temporary—emissions management plan.  That is inconsistent with the statute's mandate, the regulations' language, and common sense.

The United States and the public must be allowed to evaluate and challenge a utility's preconstruction conduct before it results in harmful emissions increases. Accordingly, the United States respectfully requests that this Court declare OG&E's

"proposed plan of action" legally insufficient for compliance with the Clean Air Act's

PSD program and applicable implementing regulations.  Construction projects such as

those undertaken by OG&E must be assessed in advance; where projections performed in

accordance with regulatory requirements reveal the project would result in a PSD-

triggering emissions increase, the operator must comply with PSD's preconstruction

requirements, including obtaining a permit for the modification and operating modern

pollution controls.  This Court should direct OG&E to submit its various facility upgrades

to the appropriate permitting authorities for an applicability determination and all

necessary permits.


Dated: August 30, 2013                    Respectfully Submitted,

                                          ROBERT G. DREHER
                                          Acting Assistant Attorney General
                                          Environment and Natural Resources
                                            Division
                                          U.S. Department of Justice


                                          s/ *Elias L. Quinn*
                                          ELIAS L. QUINN
                                          Bar Number: 42159 (CO)
                                          JASON A. DUNN
                                          JAMES A. LOFTON
                                          Attorneys for Plaintiff United States
                                          Environmental Enforcement Section
                                          Environment and Natural Resources
                                            Division
OF COUNSEL:                               U.S. Department of Justice
                                          P.O. Box 7611
SABRINA ARGENTIERI                        Washington, DC  20044-7611
Attorney-Advisor                          Telephone:  (202) 514-2756
U.S. EPA, Region 5                        Facsimile:  (202) 514-0097
77 W. Jackson Blvd.                       E-mail: Elias.Quinn@usdoj.gov
Chicago, IL 60604

LORRAINE DIXON
Assistant Regional Counsel
U.S. EPA, Region 6
1445 Ross Avenue
Dallas, Texas 75202

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2013, I electronically filed the foregoing

Opening Brief and all supporting documents to the Clerk of Court using the ECF System

for filing.  Based on the records currently on file, the Clerk of Court will transmit a

Notice of Electronic Filing to the following ECF Registrants:

**Brian J. Murray**
Jones Day

**Charles T. Wehland**
Jones Day

**Donald K. Shandy**
Ryan Whaley Coldiron Shandy PC

**Patrick R. Pearce, Jr.**
Ryan Whaley Coldiron Shandy PC

s/ *Elias L. Quinn*