# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff*, | ) | Civil Action No. CIV-13-690-D |
| | ) | |
| v. | ) | Judge Timothy D. DeGiusti |
| | ) | |
| OKLAHOMA GAS AND ELECTRIC | ) | |
| COMPANY, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## OKLAHOMA GAS AND ELECTRIC COMPANY'S
## OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS

Donald K. Shandy (OBA No. 11511)
  DShandy@ryanwhaley.com
Patrick R. Pearce, Jr. (OBA No. 18802)
  RPearce@ryanwhaley.com
RYAN WHALEY COLDIRON
SHANDY PLLC
119 N. Robinson Avenue, Ste 900
Oklahoma City, OK 73102
Telephone:  (405) 239-6040
Fax:           (405) 239-6766

Date:  September 6, 2013

Brian J. Murray
  bjmurray@jonesday.com
Charles Wehland
  ctwehland@jonesday.com
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601-1692
Telephone:  (312) 782-3939
Fax:           (312) 782-8585

*Counsel for Defendant Oklahoma Gas &*
*Electric Company*

CHI-1900817

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

BACKGROUND .................................................................................................... 3

    A.    The Clean Air Act Framework ................................................................ 3

        1.    The Clean Air Act Creates A Federal/State Partnership To Attain And Maintain Clean Air ......................................................... 3

        2.    The PSD Program ......................................................................... 4

    B.    This Lawsuit And The PSD Claims ......................................................... 5

ARGUMENT ......................................................................................................... 7

I.    THERE HAS BEEN NO SIGNIFICANT NET EMISSIONS INCREASE FROM ANY OF THE PROJECTS AT ISSUE; ACCORDINGLY, THERE IS NO INJURY FOR THIS COURT TO REDRESS, AND THE REQUESTED RELIEF WOULD BE FUTILE ...................................................... 7

    A.    PSD Permits Are Required Only For "Major Modifications," And OG&E Correctly Determined That The Projects At Issue Were Not "Major Modifications" ......................................................................... 8

    B.    EPA Lacks Authority To Second Guess Emissions Projections That Have Been Proven Accurate By Real-World Emissions Data ................... 15

II.    THE GOVERNMENT'S CLAIM IS UNTIMELY ............................................. 18

    A.    The Clean Air Act Does Not Authorize Relief for Past Violations ........... 18

    B.    The Government's Claims are Barred by 28 U.S.C. § 2462 ..................... 19

        1.    The Declaratory And Injunctive Relief Sought By The Government Would Act As A Penalty on OG&E ......................... 20

        2.    Since The Government Is Seeking A Penalty, Its Claim For Relief Is Barred By the Statute of Limitations ............................... 23

CONCLUSION ...................................................................................................... 25

CHI-1900817

# TABLE OF AUTHORITIES

Page

## CASES

*Alaska Dep't of Envtl. Conservation v. EPA,*
  540 U.S. 461 (2004)..................................................................................... 5, 19

*Colo.Envtl. Coal. v. Office of Legacy Mgmt.,*
  819 F. Supp. 2d 1193 (D. Colo. 2011)....................................................... 10

*Consumer Data Indus. Ass'n v. King,*
  678 F.3d 898 (10th Cir. 2012) ..................................................................... 7

*Fed. Election Comm'n v. Nat'l Right to Work Comm., Inc.,*
  916 F. Supp. 10 (D.D.C. 1996) ................................................................... 19

*Gabelli v. SEC,*
  133 S. Ct. 1216 (2013)................................................................................ 24

*Gee v. Pacheco,*
  627 F.3d 1178 (10th Cir. 2010) ................................................................... 9

*Johnson v. SEC,*
  87 F.3d 484 (D.C. Cir. 1996) ................................................................ 20, 22

*Jordan v. Sosa,*
  654 F.3d 1012 (10th Cir. 2011) ........................................... 7, 16, 17, 18

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)...................................................................................... 7

*Mitchell v. Chambers Const. Co.,*
  214 F.2d 515 (10th Cir. 1954) ................................................................... 16

*Nat'l Parks and Conservation Assoc. Inc. v. Tenn. Valley Authority,*
  502 F.3d 1316 (11th Cir. 2007) ................................................................. 24

*Pace v. Swerdlow,*
  519 F.3d 1067 (10th Cir. 2008) ................................................................... 9

*Pa. Dep't of Envtl. Protection v. EME Homer City Generation, L.P.,*
  Nos. 11-4406, 11-4407, 11-4408, 2013 WL 4437219 (3d Cir. Aug. 21, 2013) ...*passim*

*Proffitt v. FIDC,*
  200 F.3d 855 (D.C. Cir. 2000) .............................................................. 21, 22

# TABLE OF AUTHORITIES
## (continued)

Page

*Rio Grande Silvery Minnow v. Bureau of Reclamation*,
601 F.3d 1096 (10th Cir. 2010) ................................................ 16

*Robinson v. Midland Funding, LLC*,
No. 10CV2261 MMA AJB, 2011 WL 1434919 (S.D. Cal. Apr. 13, 2011) ............... 10

*SEC v. Bartek*,
484 Fed. App'x 949 (5th Cir. 2012) ............................................ 20

*SEC v. Jones*,
476 F. Supp. 2d 374 (S.D.N.Y. 2007) .......................................... 20

*Sierra Club v. Otter Tail Power Co.*,
615 F.3d 1008 (8th Cir. 2010) ................................................ 24

*Stewart v. United States*,
327 F.2d 201 (10th Cir. 1964) ............................................... 7, 16

*Train v. NRDC*,
421 U.S. 60 (1975) ............................................................ 4

*United States v. AM General Corp.*,
34 F.3d 472 (7th Cir. 1994) ................................................ 20, 21

*United States v. DTE Energy Co.*,
711 F.3d 643 (6th Cir. 2013) ........................................ 15, 16, 17

*United States v. Perry*,
431 F.2d 1020 (9th Cir. 1970) ................................................ 20

*United States v. Telluride Co.*,
146 F.3d 1241 (10th Cir. 1998) ............................................ 20, 21

*WildEarth Guardians v. Pub. Serv. Co. of Colo.*,
690 F.3d 1174 (10th Cir. 2012) ............................................ 16, 17

*Wyoming v. U.S. Dep't of Agr.*,
414 F.3d 1207 (10th Cir. 2005) .............................................. 16

## STATUTES

28 U.S.C. § 2201 ........................................................... 6, 18

28 U.S.C. § 2462 ......................................................... *passim*

CHI-1900817

# TABLE OF AUTHORITIES
### (continued)

**Page**

42 U.S.C. § 7401(b)(1) .................................................................................... 3

42 U.S.C. § 7409 ....................................................................................... 3, 4

42 U.S.C. § 7413(b) ...................................................................................... 19

## OTHER AUTHORITIES

40 C.F.R. Part. 50 ........................................................................................... 3

40 C.F.R. § 51.166 ................................................................................. *passim*

40 C.F.R. § 71.6(a)(6)(i) .............................................................................. 23

40 C.F.R. § 71.7(f) ....................................................................................... 23

48 Fed. Reg. 38,635 ........................................................................................ 4

57 Fed. Reg. 32,314, 32,323-324 (July 21, 1992) ........................................ 9

67 Fed. Reg. 80,186, at 80,197 (Dec. 31, 2002) ........................................ 17

30A C.J.S. Equity § 15 ................................................................................. 17

Fed. R. Civ. P. 57 ........................................................................................... 6

http://ampd.epa.gov/ampd/QueryToolie.html. ...................................... 10, 12

https://www.deq.state.ok.us/aqdnew/ComplianceEnforcement/AQD_PenaltyGuide
    .pdf .......................................................................................................... 22

**INTRODUCTION**

Oklahoma Gas and Electric Company ("OG&E") owns and operates electricity-generating facilities in Oklahoma.  Among them are the two coal-fired power plants known as the Muskogee and Sooner plants.  Between 2003 and 2006, OG&E conducted eight routine maintenance and repair projects at five separate electricity-generating units, as identified in the Complaint, at these plants.  For each project, OG&E sent a Project Notification to the Oklahoma Department of Environmental Quality ("ODEQ").  These notifications explained the scope of each proposed project and calculated and projected that non-Prevention of Significant Deterioration ("PSD") or only minimal post-project increases in the emissions of regulated pollutants from the units would follow.

ODEQ, which under the Clean Air Act ("CAA") is the primary authority for maintaining air quality in Oklahoma, did not direct OG&E to submit additional emissions projections for any of the projects, did not require OG&E to apply for a PSD permit for any of the projects, and did not take steps to stop construction on any of the projects.  After each project, OG&E sent annual reports to ODEQ on the actual monitored emissions of regulated pollutants from the units.  So, for each project, there are at least five years of actual post-project emissions data showing the amount of pollutants that were, in fact, emitted at the units—data that also confirmed OG&E's projections of minimal post-project emissions increases.

In this lawsuit, the United States contends that, before OG&E commenced these eight projects, it was required by state and federal provisions of the CAA to obtain PSD permits.  The Government's Complaint requests:  (1) declaratory judgment that OG&E

somehow violated the law despite its compliance with state and federal regulations; and (2) that OG&E be required to go back in time and redo the pre-project projections that it already completed as much as a decade ago. But this time the Government requests that the new projections be sent to the Environmental Protection Agency ("EPA") instead of ODEQ.

Although PSD permits are required only where a project will cause a "significant" increase in regulated pollutants, not a single projection provided by OG&E showed that any increase would be "significant" within the meaning of the relevant CAA provisions. Additionally, the post-project annual reports show that those projections were accurate: no "significant" increase in regulated pollutants did, in fact, occur. Nevertheless, EPA asks this Court to order OG&E to recalculate its projected emissions and find that a significant emissions increase that did not, in fact, occur *could have been predicted to occur at the time of the projects*.

Moreover, the face of the Complaint shows that each challenged project commenced at least six-and-a-half years—and some up to a decade—before this lawsuit was filed. Indeed, it was not until April 26, 2011, several years after the projects commenced, that EPA issued a Notice of Violation ("NOV") to OG&E as part of its ongoing quest to penalize coal-fired electric plants. The Government then waited two additional years before finally filing this lawsuit on July 8, 2013.

Accordingly, this case must be dismissed in its entirety, for either of two reasons:

- *First*, OG&E projected that no significant emissions increases would occur, and several years of actual post-project monitoring data proves that these pre-project projections were accurate. Therefore, there is no injury for this Court to redress,

2

and the claims are moot.  Likewise, forcing OG&E to redo projections several years after-the-fact when no mistake was made in the first place violates the equitable maxim that "equity will not do a useless or vain thing."  Finally, the applicable PSD rules did not require *any* projections to be submitted to ODEQ or EPA.

- *Second*, the Government's claim is untimely.  The CAA does not provide the relief the government seeks for a violation allegedly completed long ago.  Besides, under 28 U.S.C. § 2462, any relief sought, including non-monetary relief, that goes beyond compensating a party for its injury is a penalty.  And, where there are years of monitoring data voluntarily provided to the agency to conclusively show that neither the Government nor the environment have suffered any injury, the costly and time-consuming relief sought by the Government that goes beyond the requirements of the PSD rules acts as a penalty on OG&E.  Because each project took place more than five years ago, the Government's claim seeking to penalize OG&E is time-barred.

## BACKGROUND

### A.    The Clean Air Act Framework.

#### 1.    The Clean Air Act Creates A Federal/State Partnership To Attain And Maintain Clean Air.

Congress passed the CAA "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).  The CAA divides this responsibility between the federal and state governments.  EPA is tasked with determining national air quality standards, *see id.* § 7409, but the states are responsible for implementing programs to attain and maintain those standards, *see id.* §§ 7407(a) & 7410.

Consistent with that framework, EPA promulgated National Ambient Air Quality Standards ("NAAQS") under the CAA for six pollutants:  ground-level ozone, lead, sulfur dioxide, carbon monoxide, nitrogen dioxide, and particulate matter.  42 U.S.C. § 7409; *see generally* 40 C.F.R. Part 50.  Under the CAA, EPA determines whether areas of a state comply with the NAAQS for those pollutants.  The CAA then directs the states

3

to adopt State Implementation Plans ("SIPs") to achieve and maintain NAAQS.  42

U.S.C. § 7410(a).  These SIPs are submitted to EPA for approval or disapproval.  *Id.*

§ 7410(a), (k).  The CAA vests primary SIP enforcement authority in state or local

governments.  *See Pa. Dep't. of Envtl. Protection v. EME Homer City Generation, L.P.*,

Nos. 11-4406, 11-4407, 11-4408, 2013 WL 4437219, at *2 (3d Cir. Aug. 21, 2013) ("The

states then take primary responsibility . . . for choosing how to meet the NAAQS within

their borders."); *Train v. NRDC*, 421 U.S. 60, 79 (1975) (EPA "is relegated by the [CAA]

to a secondary role in the process of determining and enforcing the specific, source-by-

source emission limitations which are necessary if the national standards it has set are to

be met.").

### 2.    The PSD Program.

One initiative that the CAA directs states to implement to attain and maintain

NAAQS is the New Source Review ("NSR") program.  For areas with air that falls below

standards ("nonattainment areas"), the Nonattainment New Source Review program

seeks to ensure that new emissions will not thwart progress towards meeting NAAQS.  In

areas with air that meet standards ("attainment areas"), the PSD program requires that

any new emissions will not significantly erode air quality.

The PSD program addresses the impact on ambient air quality from both new

construction of, and modification to, large pollutant-emitting facilities in attainment

areas.  42 U.S.C. §§ 7470-7492.  The CAA requires states to include PSD programs in

their SIPs, which are subject to EPA approval.  *Id.* § 7471.  Oklahoma adopted the

required PSD rules, which were located at Oklahoma Air Pollution Control Regulation

4

("OAPCR") 1.4.4 during the time period relevant to this suit.  (*See* Ex. 1.)  EPA approved the original Oklahoma PSD regulations on August 25, 1983, 48 Fed. Reg. 38,635, and the approved SIP regulations remained unchanged for purposes related to this suit until 2010.

The PSD permit program does not apply to existing sources unless and until they undergo a "major modification."  40 C.F.R. § 51.166(a)(7)(ii).  Likewise, the approved PSD regulations in force in Oklahoma between 2003 and 2006 applied new source requirements only "to all major stationary sources and major modifications."  OAPCR 1.4.4(a).  A "major modification," in turn, occurs only if there is a physical change or change in the method of operation that causes a "significant emissions increase."  40 C.F.R § 51.166(a)(7)(iv)(a); *id.* § 51.166(b)(2)(i); OAPCR 1.4.4(b)(2).  Where PSD applies to a major modification, the owner or operator must obtain a PSD preconstruction permit that includes Best Available Control Technology ("BACT") for the relevant pollutants to be emitted, as determined by the permitting authority on a case-by-case basis.  40 C.F.R. § 51.166(b)(12); *id.* § 51.166(j)(3).  EPA approved the Oklahoma SIP, and therefore, ODEQ has primary authority to enforce PSD requirements in Oklahoma and to make reasonable BACT determinations.  *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 488-90 (2004).  The EPA-approved regulations do not require the submission of pre-project emission projections to any governmental authority.

**B.      This Lawsuit And The PSD Claims.**

This lawsuit relates to eight projects undertaken by OG&E between September 18, 2003, and October 23, 2006, at its Sooner and Muskogee plants.  As the dates indicate, each project commenced between six-and-a-half and ten years before this lawsuit was

5

filed.  These projects included the routine replacement of turbine blades, rotors, and low

pressure blades, the addition of heat transfer surfaces, and the replacement of

economizers.  For each project at issue, OG&E sent Project Notifications to ODEQ

explaining the scope of the changes to each facility, calculating what emissions would be

"significant" under the CAA for each covered pollutant, and projecting that each project

would not increase covered pollutant emissions levels over the "significant" emissions

threshold.  The EPA-approved regulations in the SIP did not require OG&E to submit its

projections to ODEQ.  OG&E also recorded actual emissions levels following the

projects and reported the actual emissions to ODEQ or EPA.  Although the EPA-

approved regulations in the SIP did not require OG&E to submit these post-project

reports, the reports confirm the projections:  there have been no "significant" increases in

covered pollutants, and indeed, emissions levels have actually decreased following the

projects in most cases.

Nonetheless, EPA issued a Notice of Violation ("NOV") to OG&E on April 26,

2011.  EPA then waited two additional years before filing this lawsuit on July 8, 2013—

nearly ten years after the first project listed in the Complaint, and nearly six-and-a-half

years after the last project listed, had commenced.  The Government asserts that each of

these projects triggered a duty to satisfy PSD pre-construction requirements, and that the

alleged failure to satisfy these conditions "deprived [the Government] and the public of

the ability to conduct a meaningful review of the effects of [the] modifications on air

quality and public health."  (Compl. ¶¶ 4, 42, 44-47.)  Notably, the Complaint does not

allege that there has been any increase in emissions of any covered pollutant, let alone an

6

increase in pollutants over the "significant" threshold.  Nonetheless, the Government

seeks relief pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, alleging that OG&E did

not properly assess the impact of its projects on future emissions, in violation of PSD

requirements.  (*Id.* at ¶ 51 (Prayer).)  In its Prayer for Relief, the Government also seeks a

judgment requiring "OG&E to properly assess whether its projects were likely to result in

a significant emissions increase or a significant net emissions increase and to submit that

assessment of its projects to EPA within 90 days[.]"  (*Id.* at ¶ 52 (Prayer).)  For the

following reasons, the Complaint should be dismissed in its entirety.

## ARGUMENT

**I.     THERE HAS BEEN NO SIGNIFICANT NET EMISSIONS INCREASE FROM ANY OF THE PROJECTS AT ISSUE; ACCORDINGLY, THERE IS NO INJURY FOR THIS COURT TO REDRESS, AND THE REQUESTED RELIEF WOULD BE FUTILE.**

To have standing before a federal court, the plaintiff must show "an injury to

himself that is likely to be redressed by a favorable decision."  *Consumer Data Indus.*

*Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012); *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560-61 (1992).  If there is no real injury to redress, then a live case or

controversy does not exist and the case must be dismissed.  *See id.* at 578; *see also*

*Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011).  Relatedly, a court sitting in equity

will not require the doing of a futile action if the requested relief is merely a useless

formality.  *Stewart v. United States*, 327 F.2d 201, 203 (10th Cir. 1964).

The Government seeks relief from this Court declaring that OG&E performed its

pre-project emissions projections improperly.  It also requests that OG&E be forced to

7

redo these projections and submit them to the EPA (even though the PSD rules in the

approved SIP do not require the submission of projections to the reviewing authority) so

that EPA can decide whether BACT was required at the plants.  The Government seeks

this relief even though there are years of submitted actual emissions data showing that

OG&E's pre-project projections were accurate, and there have been no "significant"

emissions increases following the projects.  That is, the Government requests the Court to

intervene and require action by OG&E where there is irrefutably no injury to redress.

This is improper.

> **A.   PSD Permits Are Required Only For "Major Modifications," And OG&E Correctly Determined That The Projects At Issue Were Not "Major Modifications."**

PSD permits are only required for the construction of new sources and for major

modifications of existing sources.  *See* 40 C.F.R. § 51.166(a)(7)(ii) ( "The [PSD]

requirements of paragraphs (j) through (r) of this section apply to . . . the major

modification of any existing major stationary source, except as this section otherwise

provides[.]"); OAPCR 1.4.4(a) ("The new source requirements of this section . . . shall

apply to all major stationary sources and major modifications as specified . . . ."); *EME

Homer City Generation*, 2013 WL 4437219 at *10 ("[S]ources are not required to report

or obtain a PSD permit for routine maintenance that they believe falls below a 'major

modification.'").  Accordingly, if a project at an existing facility like the Sooner and

Muskogee plants is not a "major modification," then PSD requirements do not apply

under either federal or state CAA provisions.

A "major modification," in turn, requires a change that would result in a "significant" emissions increase of a regulated NSR pollutant. 40 C.F.R. § 51.166(b)(2); OAPCR 1.4.4(b)(2). The emissions rates required to make an increase "significant" vary by pollutant. For example, both federal and Oklahoma provisions define a "significant" increase in $NO_x$ or $SO_2$ as an increase greater than or equal to 40 tons per year ("tpy"). *See* 40 C.F.R. § 51.166(b)(23); OAPCR 1.4.4(b)(22).

Because no "significant" emissions increase of regulated pollutants was projected by OG&E or, in fact, occurred, none of the projects at issue here resulted in a "major modification."[1]  $SO_2$ is the highest-emitted pollutant for the relevant OG&E units, therefore the $SO_2$ emissions data amply makes this point and will be used in this brief for purposes of explanation. For each project, OG&E submitted a Project Notification to ODEQ that set forth the unit's maximum level of $SO_2$ emissions (tpy) before the project, as well as the maximum level of $SO_2$ emissions (tpy) projected afterward.[2]  The pre-

---

[1] The projects also would not be considered major modifications if they qualify for the exemption for routine maintenance, repair or replacement ("RMRR"). 40 C.F.R. § 51.166(b)(2)(iii) (1993). OG&E's Project Notifications stated that the projects may qualify as RMRR. This Motion focuses solely on the emission projections in the Project Notifications and does not address the RMRR issues.

[2] OG&E's Project Notifications are attached as Exs. 2-9. These Project Notifications, referenced in the Complaint at ¶¶ 44, 45, 51, can be considered by this Court on this Motion to Dismiss. *See Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008) (holding that district court was correct to consider "all of the materials referenced in the Complaint" on a motion to dismiss); *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (stating that, in addition to the complaint, a court can consider "documents that the complaint incorporates by reference" and "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity" on a motion to dismiss).

project level of emissions was referred to in the Project Notifications as "Past Actual" emissions.[3]  The projected post-project level of emissions was referred to as "Projected Future Actual" emissions.[4]  Both numbers are shown in Figure A below (in Columns C and D).

Because Projected Future Actual $SO_2$ emissions (Column D) were less than 40 tpy greater than Past Actual $SO_2$ emissions before each project (Column C), OG&E accurately projected that no "significant" $SO_2$ emissions increase would occur within the meaning of the CAA.  Several years of actual emissions data following the projects have confirmed that OG&E's emission projections were accurate. [5]  In fact, maximum $SO_2$

---

[3] OG&E correctly determined Past Actual emissions based on actual emissions data taken from a representative 24-month period in the five years before the modification.  40 C.F.R. § 51.166(b)(21)(v) (1993); OAPCR 1.4.4(b)(20); *see also* 57 Fed. Reg. 32,314, 32,323-324 (July 21, 1992).

[4] OG&E correctly projected that actual emissions following the challenged modifications would not exceed the Projected Future Actual level given what OG&E knew about historical operations and expected levels of future demand and utilization of the relevant units.  OG&E's determination of Projected Future Actual emissions was entirely consistent with the requirements for projecting future actual emissions.  *See* 40 C.F.R. § 51.166(b)(21)(v) (1993) (defining "actual emissions" following a proposed modification of an existing electric utility steam generating unit as "representative actual annual emissions"); 40 C.F.R. § 51.166(b)(32) (1993) (listing "projected capacity utilization," a "company's own representations," and "filings with the State or Federal regulatory authorities" as information that is appropriate for the reviewing authority to consider when determining "representative actual annual emissions").

[5] Maximum actual $SO_2$ emissions data in Column E were collected under EPA's Acid Rain Program and are available as part of EPA's Air Markets Program Data, http://ampd.epa.gov/ampd/QueryToolie.html.  This information is publicly available on EPA's website and is, therefore, judicially noticeable.  *See Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1199 n.2 (D. Colo. 2011); *see also Robinson v. Midland Funding, LLC*, No. 10CV2261 MMA AJB, 2011 WL 1434919, at *2 (S.D. Cal.

10

emissions by calendar year since the projects (Column E) have generally been *less* than

Past Actual emissions before the projects (Column C):

**Figure A**: Actual and Projected SO$_2$ Emissions For OG&E Projects

| A | B | C | D | E |
|---|---|---|---|---|
| Unit / Project | Year | Past Actual (tpy) | Projected Future Actual (tpy) | Maximum Actual In Any Subsequent Calendar Year (tpy) |
| Muskogee Unit 4 Economizer Replacement | 2003 | 10,201 | 10,240.9 | 9,774.6 (CY 2008) |
| Sooner Unit 2 Economizer Replacement | 2004 | 11,168.5 | 11,208.4 | 9,630.4 (CY 2011) |
| Muskogee Unit 5 Turbine Blade Replacement and Boiler Heat Transfer Surface Project | 2004-2005 | 10,209.5 | 10,249.4 | 10,224.0 (CY 2006) |
| Muskogee Unit 6 Turbine Blade Replacement and Boiler Heat Transfer Surface Project | 2004 | 10,381.2 | 10,421.1 | 9,504.7 (CY 2005) |
| Muskogee Unit 4 Turbine Blade Replacement and Boiler Heat Transfer Surface Project | 2005 | 9,918.7 | 9,958.6 | 9,774.6 (CY 2008) |
| Muskogee Unit 5 Economizer Replacement and Steam Turbine Blade Replacement | 2005 | 10,209.5 | 10,249.4 | 10,224.0 (CY 2006) |
| Sooner Unit 1 Turbine Blade Replacement and Boiler Heat Transfer Surface Project | 2006 | 10,453.0 | 10,492.9 | 10,483.7 (CY 2008) |
| Sooner Unit 2 Turbine Blade Replacement and Boiler Heat Transfer Surface Project | 2006 | 9,761.2 | 9,801.1 | 9,630.3 (CY 2011) |

---

(continued…)

Apr. 13, 2011) ("[C]ourts regularly take judicial notice of documents . . . which are
documents that are administered by or publicly filed with the administrative agency.").

CHI-1900817

For every calendar year following each project, OG&E has provided ODEQ with actual emissions data that confirmed the accuracy of OG&E's pre-construction emissions projections.[6]  This data confirms that there was no "significant" increase in emissions following the projects (and, in fact, no emissions increase whatsoever), even without excluding emissions increases that could have been accommodated before the projects occurred, as OG&E would be entitled to do under the "demand growth" exclusion, 40 C.F.R. § 51.166(b)(32)(ii) (1993).

Figures B through F below illustrate the point.  Each shows the annual level of $SO_2$ actually emitted from the OG&E units between 1999 and 2012, as well as the maximum level of $SO_2$ emissions that OG&E projected would occur after each challenged project—a number that was under the "significant" increase threshold in every case.  These figures illustrate that annual $SO_2$ emissions have never exceeded the levels that OG&E projected for the relevant units, and therefore, they have never exceeded "significant" levels.[7]  Trends have necessarily been the same for other PSD-regulated pollutants emitted by the OG&E units.

---

[6] The submission of five years of post-project emission data is required by the so-called *WEPCO* rule that EPA adopted in 1992 for states to consider including in their PSD implementation plans.  *See* 40 C.F.R. § 51.166(b)(21)(v) (1993).  These rules were never adopted by Oklahoma.

[7] Actual $SO_2$ emissions data in Figures B through F were collected under EPA's Acid Rain Program.  This data is part of EPA's Air Markets Program Data, which is accessible online at http://ampd.epa.gov/ampd/QueryToolie.html (follow "Create a Query: Start").  This data is publicly available on the agency's website and is, therefore, judicially noticeable.  *See supra* note 5.

12









CHI-1900817





Perhaps because the actual data eviscerates the Government's allegations of "significant" emissions increases, the Government alleges instead that the emissions projections, which have been proven to be entirely accurate, were somehow "legally insufficient." (Compl. ¶ 4.)  This allegation is based on an attempt to re-characterize the emissions projections in OG&E's Project Notifications as a "promise to limit emissions" *(id.* at ¶ 34), even when the pre-project emissions projections are identified as projected emissions in OG&E's Project Notifications.  (*See* Exs. 2-9.)  But in the face of real-life

14

data, the Government's theoretical allegations state no injury to itself or the environment for this Court to redress.

B.     **EPA Lacks Authority To Second Guess Emissions Projections That Have Been Proven Accurate By Real-World Emissions Data.**

None of the projects at issue in this case was a "major modification;" therefore, it was unnecessary for OG&E to seek a PSD permit, and there is no injury for this Court to redress.  In *United States v. DTE Energy Co.*, 711 F.3d 643 (6th Cir. 2013), the Sixth Circuit rejected a similar ploy by the Government, rightly holding that allowing EPA to second-guess pre-project projections before post-project data is available would transform PSD requirements into an unlawful "prior approval scheme" in all but the most egregious cases.  *Id.* at 649.  The court found that the CAA "scheme does not contemplate approval of the projection prior to construction."  *Id.* at 651.  Instead, "[a] project-and-report scheme is entirely compatible with the statute's intent, which . . . is to prevent increases in air pollution.  *If a company's projections are later proven incorrect, EPA can bring an enforcement action*."  *Id.* (internal quotations and citations omitted) (emphasis added).

While the majority offered no opinion on whether DTE Energy's pre-project projections were sufficient, the court gave an example of a limited and "blatant" circumstance when it is appropriate for EPA to halt construction before post-project data becomes available—when "an operator . . . uses an improper baseline period or uses the wrong number to determine whether a projected emissions increase is significant."  *Id.* at 650.  But in cases where post-project data affirmatively demonstrates that there has been

15

no mistake in projections, it would be inappropriate to allow a government challenge to those projections after-the-fact without also looking at the available post-project data. *Id.* at 652-53 (Batchelder, J., dissenting); *see also id.* at 651-52 (Majority Op.) (essentially agreeing). And where this data confirms that pre-project projections were accurate, there is no redressible injury and the court should dismiss for lack of standing. *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1185 (10th Cir. 2012).

Likewise, under Article III of the Constitution, federal judicial power extends only to "actual, ongoing cases or controversies." *Wyoming v. U.S. Dep't of Agr.*, 414 F.3d 1207, 1211 (10th Cir. 2005). Therefore, declaratory judgment actions must be sustainable under the same mootness criteria that apply to any other lawsuit. *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010). Thus, in an action for declaratory relief, "a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant." *Jordan*, 654 F.3d at 1025. "The crucial question is whether granting a *present* determination of the issues offered will have some effect in the real world." *Rio Grande Silvery Minnow*, 601 F.3d at 1110.

The redressible injury requirement of standing, and the actual controversy requirement to avoid mootness, mirror the equitable maxim that "[e]quity will not do a useless or vain thing, and in the absence of some likelihood or probability that the violations will recur, the court is fully justified in refraining from entering an empty decree." *Mitchell v. Chambers Const. Co.*, 214 F.2d 515, 517 (10th Cir. 1954); *see also Stewart*, 327 F.2d at 203 ("[E]quity will not require a useless thing, or insist upon an idle

16

formality."). Therefore, when a party seeks equitable relief where there has been no injury, the court should refuse to grant the requested relief.

This case is a poster child for these bedrock legal principles. Unlike in *DTE*, there are years of post-project data for each project at issue showing that OG&E's projections were, in fact, accurate. Applying the Court's rationale in *DTE*, then, where the pre-project projections were not "later proven incorrect," *DTE*, 711 F.3d at 651, but were instead supported by data showing that neither the Government nor the environment have suffered an injury, the Court must dismiss for lack of a redressible injury, *WildEarth Guardians*, 690 F.3d at 1185, or live controversy, *Jordan*, 654 F.3d at 1025.

Similarly, the Government asks this Court, sitting in equity, to issue a judgment that would be "useless" and "futile" since (1) OG&E's pre-project projections were accurate and (2) data conclusively shows that no "significant" emissions increase has resulted from the projects. Entering a judgment and requiring OG&E to redo years-old projections—though the outcome of those projections has already been determined—would violate a well-known equitable maxim forbidding the order of futile actions. 30A C.J.S. Equity § 15 ("[E]ven though the court has jurisdiction, it will not lend its powers to accomplish a useless purpose, nor will it grant a decree which does not confer any real benefit or effect any real relief."). Moreover, because the projects occurred more than five years ago, and post-change emissions have not increased, EPA's own rules provide that no further action would be appropriate. 67 Fed. Reg. 80,186, at 80,197 (Dec. 31, 2002).

CHI-1900817

Finally, the relief requested by EPA—submission of new Project Notifications to EPA—goes well beyond compliance with the EPA-approved rules that applied to OG&E when the projects commenced construction.  The Complaint is devoid of any allegation that OG&E was required to submit its Project Notifications to any governmental authority.  This is because there was no requirement to do so in either the EPA-approved SIP for Oklahoma or in the 1992 EPA rules that are cited in the Complaint.  (Compl. ¶¶ 2, 33.)  The fact that OG&E voluntarily submitted the Project Notifications to ODEQ should not now be used as a basis for penalizing OG&E.

Thus, the only purpose to be served by proceeding to evaluate the Project Notifications further would be to provide guidance to third parties who currently are contemplating initiating projects in jurisdictions where the PSD rules require submittal of an emission projection to a reviewing authority.  But, the Tenth Circuit has made clear that whether "a declaration might guide *third parties* (*i.e.*, those not parties to the lawsuit) in their future interactions with a plaintiff is insufficient" to establish jurisdiction under 28 U.S.C. § 2201.  *Jordan*, 654 F.3d at 1026.  For these reasons alone, this enforcement action seeking equitable redress for a non-existent injury can and should be dismissed.

## II.   THE GOVERNMENT'S CLAIM IS UNTIMELY

The Complaint should also be dismissed on the alternative ground that it comes too late.

### A.   The Clean Air Act Does Not Authorize Relief for Past Violations.

To begin with, the CAA does not authorize EPA to seek an injunction against OG&E for wholly past violations.  EPA is authorized to initiate civil enforcement for

18

PSD violations seeking "to restrain such violation" and "to require compliance."  42

U.S.C. § 7413(b).  These types of relief give a forward looking remedy for ongoing

violations.  *See EME Homer City Generation*, 2013 WL 4437219 at *12.  But a violation

of the PSD requirement is complete when construction commences.  *See Midwest*

*Generation*, 720 F.3d 644, 647 (7th Cir. 2013).  It is impossible to "restrain" a violation

that occurred years ago, and courts cannot "require compliance" from defendants who are

not currently violating the CAA.  *See EME Homer City*, 2013 WL 4437219, at *12.  So

the relief the Government requests is simply not available under the CAA.

### B.     The Government's Claims are Barred by 28 U.S.C. § 2462.

The claim is also expressly time-barred.  Because the CAA does not contain a

statute of limitations, the catch-all limitations period of 28 U.S.C. § 2462 applies:

"Except as otherwise provided by Act of Congress, an action, suit or proceeding for the

enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be

entertained unless commenced within five years from the date when the claim first

accrued[.]"  The reasons behind the five year limitations period are practical: "the

practical concerns alone for problems of missing documents, faded memories, and absent

witnesses that inevitably occur with the passage of time are no less problematic in

adjudicating actions for declaratory and injunctive relief than in determining liability for

monetary civil penalties."  *Fed. Election Comm'n v. Nat'l Right to Work Comm., Inc.*,

916 F. Supp. 10, 15 (D.D.C. 1996).  Indeed, the Supreme Court has recognized that

where the Government substantially delays in filing a CAA suit after a project,

enforcement is particularly unreasonable.  *See Alaska Dep't of Envtl. Conservation*, 540

19

U.S. at 495 (citing *United States v. AM General Corp.*, 34 F.3d 472, 475 (7th Cir. 1994)).

The plain text and these pragmatic considerations all require dismissal of this case.

  **1. The Declaratory And Injunctive Relief Sought By The Government Would Act As A Penalty on OG&E.**

  The limitations period of § 2462 bars suits for "any civil fine, penalty, or forfeiture, pecuniary or otherwise[.]"  Penalties are not limited to claims for monetary relief.  *See United States v. Telluride Co.*, 146 F.3d 1241, 1245 (10th Cir. 1998) ("[W]e construe § 2462 as applying to non-monetary penalties."); *SEC v. Bartek*, 484 Fed. App'x 949 (5th Cir. 2012).  Rather, for purposes of § 2462, a "penalty" is any punishment that goes beyond compensation for a defendant's injury, *Telluride Co.*, 146 F.3d at 1246—that is, beyond making the plaintiff whole, or remedying the damage actually "caused to the harmed parties by the defendant's action."  *Johnson v. SEC*, 87 F.3d 484, 488 (D.C. Cir. 1996); *see also United States v. Perry*, 431 F.2d 1020, 1025 (9th Cir. 1970) ("The question is whether the Government's remedy under the Act is compensatory in nature, or has a purpose going beyond making the plaintiff whole.").

  To determine whether relief sought is a "penalty" under § 2462, a court should also consider "the degree and extent of the consequences to the subject of the sanction."  *Bartek*, 484 F. App'x at 957; *Johnson*, 87 F.3d at 488.  The likelihood of a recurring violation and the potential for future harm to the public also determines whether the requested relief is a penalty under the statute.  *See SEC v. Jones*, 476 F. Supp. 2d 374, 383-84 (S.D.N.Y. 2007).  A court should also consider the length of time that the Government delayed in bringing suit.  Where the Government has unnecessarily delayed,

although it was aware of the conduct at issue for a long period, there is a greater

likelihood that the relief sought is punitive. *See Proffitt v. FIDC*, 200 F.3d 855, 861-62

(D.C. Cir. 2000) ("That the expulsion sanction is punitive is further manifested by the

fact that the FDIC did not act for more than six years[.]"); *AM General Corp.*, 34 F.3d at

475 (noting that EPA's delay in filing suit resulted in a "harsh remedy" and that the court

could not find any justification for such a remedy in language of the CAA).

Following these guideposts, it is clear that granting the relief sought here by the

Government would unnecessarily penalize OG&E. *First*, as set forth above there is no

damage to the Government or to the environment here, as five to ten years of actual post-

project emissions data conclusively prove. As the court found in *Telluride*, "[w]e

interpret a penalty for purposes of § 2462 as a sanction or punishment imposed for

violating a public law which goes beyond compensation for the injury caused by the

defendant." 146 F.3d at 1246. Since there is *no injury to be compensated* here, the relief

requested by the Government necessarily penalizes OG&E, and can only be a penalty

under § 2462.

*Second*, the Government cannot show that future harm to the public is likely if its

relief is not granted. *See Jones*, 476 F. Supp. 2d at 383-84. Consistent with the goals of

the CAA, post-project data illustrates that for several years after the projects at issue,

pollutant emissions have actually *decreased* from their pre-project levels in most cases.

EPA has not alleged that this trend will change, and if the trend in emissions ever did

change such that a significant emissions increase resulted from the projects, the

Government would have the right at that point to bring an enforcement action.

21

*Third*, courts are to consider the impact of the requested relief on the subject of the proposed sanction to determine whether it is a penalty under the statute. *See Johnson*, 87 F.3d at 488. Here, the cost of re-projecting emissions for projects that took place several years ago would be significant, given the length of time since the projects occurred. The requested projections would also be time-consuming for OG&E and the agencies to review, and especially taxing if required in the Government's requested 90-day time period. Given the significant amount of time that has elapsed between the eight projects and the date the suit was filed, it is clear that the relief the Government seeks would penalize OG&E by requiring a significant cost to the company in money and manpower. *Proffitt*, 200 F.3d at 861-62.

*Fourth*, a finding of non-compliance with PSD requirements could result in increased future penalties for a utility company like OG&E. For example, pursuant to the ODEQ Air Quality Division Penalty Guidance (Revised 1/22/13),[8] "evidence that the owner/operator has violated an air quality requirement in the past" may be used by enforcement personnel in the Air Quality Division to increase the amount of a proposed penalty. *Id.* at 3. Any future penalty assessed against OG&E could potentially be increased by 20 percent, 35 percent, or adjusted upward by an order of magnitude based on past noncompliance. *Id.*

---

[8] *See* https://www.deq.state.ok.us/aqdnew/ComplianceEnforcement/AQD_PenaltyGuide.pdf (last visited Aug. 21, 2013).

*Finally*, a finding of noncompliance could also be used as grounds for future permit termination, revocation, or for denial of a permit renewal application. *See* 40 C.F.R. § 71.6(a)(6)(i). Title V permits may be reopened for cause prior to the expiration of the permit. In accordance with 40 C.F.R. § 71.7(f), a permit shall be reopened and revised if "the permitting authority . . . determines that the permit contains a material mistake or that inaccurate statements were made in establishing the emissions standards or other terms or conditions of the permit", or if the permit "must be revised or revoked to assure compliance with the applicable requirements." All of these actions are punitive and would result in substantial costs to the company. And all of these results are particularly incongruous in light of the absence of any applicable regulatory requirement for OG&E to submit the Project Notifications to any governmental authority.

Unsurprisingly, the Government states in its Prayer for Relief that the new projections it seeks would be "evaluated and permitted as necessary thereafter." (Compl. ¶ 52.) This suggests that should the Government obtain the judgment or new projections it seeks, it may result in further litigation for OG&E. For all of these reasons, the relief sought by the Government would penalize OG&E in a case where there has been no demonstrated injury to the Government or the environment.

      **2.**      **Since The Government Is Seeking A Penalty, Its Claim For Relief Is Barred By the Statute of Limitations.**

Under § 2462, the Government is barred from seeking penalties after five years. Because the Government seeks a remedy pursuant to the pre-construction requirements of OAPCR 1.4.4 and 40 C.F.R. § 51.166, the statute of limitations began to run at the start

23

date of construction.  It has been at least six-and-a-half years since the projects at issue in this case commenced.  Therefore, the Government's claims are time barred.

When the Government seeks relief for an alleged violation of pre-construction or modification requirements under the CAA, the alleged violation takes place at the time construction or modification commences.  Therefore, as the Courts of Appeals have unanimously recognized, the statute of limitations begins to run at the commencement of the construction or modification at issue.  *See* OAPCR 1.4.4; *see also EME Homer City Generation, L.P.*, 2013 WL 4437219 at *6; *Midwest Generation*, 720 F.3d at 647; *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010); *Nat'l Parks and Conservation Assoc. Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316 (11th Cir. 2007).

Here, the projects at issue commenced between 2003 and 2006, nearly six-and-a-half to ten years before the Government filed this lawsuit.  As the Seventh Circuit stated in *Midwest Generation*, § 7475 bears the caption "Preconstruction requirements" and "spells out the conditions that must be met before the permit will issue."  720 F.3d at 647. Therefore, any "violation is complete when construction commences without a permit in hand."  *Id.*  For the same reason, the statute of limitations in this case began to run at the time of each project and has long since expired.

For similar reasons, the "discovery rule" does not apply to this case, and therefore the statute of limitations has run.  The discovery rule holds that a statute of limitations does not begin to run until a party becomes aware of the alleged injury.  But the Supreme Court addressed the issue in *Gabelli v. SEC*, 133 S. Ct. 1216 (2013), and held that the time for the United States to file suit under § 2462 begins to run with the violation and

24

not with the Government's discovery of the alleged injury.  As the Seventh Circuit stated in *Midwest Generation*, "the statute of limitations begins to run when the claim accrues." 720 F.3d at 646; *see also EME Homer City Generation*, 2013 WL 4437219 at *6 ("[T]he violation is complete when construction [or modification] commences without a permit in hand.").  And under § 7475, claims accrue at the time of the project's commencement. Accordingly, the Government's Complaint is barred by the five year statute of limitations.

## CONCLUSION

For the foregoing reasons, OG&E respectfully requests that this Court grant its motion to dismiss.

CHI-1900817

Date: September 6, 2013                    Respectfully Submitted,

                                           s/ Brian J. Murray
                                             Brian J. Murray
                                                bjmurray@jonesday.com
                                             Charles T. Wehland
                                                ctwehland@jonesday.com
                                             JONES DAY
                                             77 West Wacker Drive, Suite 3500
                                             Chicago, Illinois  60601-1692
                                             Telephone:  (312) 782-3939
                                             Facsimile:   (312) 782-8585

                                             Donald K. Shandy (OBA No. 11511)
                                                DShandy@ryanwhaley.com
                                             Patrick R. Pearce, Jr. (OBA No. 18802)
                                                RPearce@ryanwhaley.com
                                             RYAN WHALEY COLDIRON
                                             SHANDY PLLC
                                             119 N. Robinson Avenue, Ste 900
                                             Oklahoma City, OK 73102
                                             Telephone:  (405) 239-6040
                                             Fax:          (405) 239-6766

                                             *Counsel for Defendant Oklahoma Gas
                                             & Electric Company*

CHI-1900817

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2013 I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Elias L Quinn
US Dept of Justice Civil Div-601-DC
601 D St NW
Washington, DC 20004
Phone:  (202) 514-2756
Fax:      (202) 514-0097
elias.quinn@usdoj.gov


s/ Brian J. Murray
Brian J. Murray