# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

OKLAHOMA GAS AND ELECTRIC
COMPANY,

    *Defendant*.

Civil Action No. CIV-13-690-D

Judge Timothy D. DeGiusti

---

# BRIEF OF UTILITY AIR REGULATORY
# GROUP AS *AMICUS CURIAE*

---

Of Counsel:
F. WILLIAM BROWNELL
MAKRAM B. JABER
NASH E. LONG, III
BRENT A. ROSSER
GEORGE P. SIBLEY, III
HUNTON & WILLIAMS LLP
2200 Pennsylvania Ave., N.W.
Washington, D.C. 20037
mjaber@hunton.com
(202) 955-1500

ROBERT G. MCCAMPBELL* (OBA 10390)
FELLERS SNIDER BLANKENSHIP
    BAILEY & TIPPENS
100 N. Broadway, Suite 1700
Oklahoma City, OK 73102
(405) 232-0621
(405) 232-9659 Facsimile
rmccampbell@fellerssnider.com

*Counsel of Record
Attorneys for Amici Curiae*

November 4, 2013

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................iii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ...........................................viii

INTEREST OF AMICUS............................................................................................... 1

INTRODUCTION ......................................................................................................... 1

LEGAL BACKGROUND ............................................................................................. 4

I.     Statutory and Regulatory Background. ................................................................ 4

II.    NSR Regulation and Enforcement ...................................................................... 8

       A.     The 1980 and 1992 NSR Rules ................................................................ 8

       B.     The NSR Enforcement Initiative: A Theory of Universal Liability. .......... 11

       C.     The 2002 NSR Reform Rules.................................................................. 19

III.   DTE Energy: The Sixth Circuit Rejects the Central Tenets of the
       Government's Enforcement Initiative Theory. ...................................................... 21

ARGUMENT................................................................................................................ 24

I.     The Government Cannot "Enforce NSR" by Second-Guessing OG&E's
       Projections. ........................................................................................................ 25

II.    OG&E's Commitment to Keep Emissions Below Baseline Levels Furthers
       the Goal of NSR. ............................................................................................... 28

CONCLUSION ............................................................................................................ 30

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Alabama Power*, 372 F. Supp. 2d 1283 (2005) ................................................... 16

*Alabama Power*, 681 F. Supp. 2d 1292 (N.D. Ala. 2008) ................................. 17

*Christensen v. Harris County*, 529 U.S. 576 (2000) ......................................... 28

*Envt'l Defense v. Duke Energy Corp.,* 549 U.S. 561 (2007)............................. 8, 9, 12, 13

*In re Tennessee Valley Auth.*, 9 E.A.D. 357, 2000 WL 1358648 (EAB Sept.
    15, 2000), *vacated, TVA v. Whitman*, 336 F.3d 1236 (11th Cir. 2003)................... 18

*Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*,
    502 F.3d 1316 (11th Cir. 2007) ............................................................... 18

*Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, No. 3:01-CV-
    71, 2010 WL 1291335 (E.D. Tenn. Mar. 31, 2010)............................................. 18

*Pa. Dep't of Envtl. Prot. v. Allegheny Energy, Inc.*, No. 05-885, 2008 WL
    4960100 (W.D. Pa. Sept. 2, 2008) ) ........................................................ 18

*SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943)................................................. 28

*Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010) ............... 18

*Sierra Club v. Ruckelshaus*, 344 F. Supp. 253 (D.D.C.), *aff'd per curiam* 4
    Env't Rep. Cas. (BNA) 1815 (D.C. Cir. 1972) .............................................. 4, 5

*United States v. Cinergy Corp.* 384 F.Supp 2d 1272 (S.D. Ind. 2005) ............. 19

*United States v. Cinergy Corp.* 458 F.3d 705 (7th Cir. 2006)......................... 8,9,27, 28

*United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619
    (M.D.N.C. 2003) .............................................................................. 8, 12, 13, 14, 15

*United States v. Duke Energy Corp.*, No. 1:00CV1262, 2010 WL 3023517,
    (M.D.N.C. July 28, 2010)....................................................................... 18, 19

*United States v. DTE Energy Co.*, No. 10-13101, 2011 WL 37065855 (E.D.
    Mich. Aug. 23, 2011) ......................................................................... 21

*United States v. DTE Energy Co.*, 711 F.3d 643
    (6th Cir. 2013) ...............................................2, 3, 7, 11, 22, 23, 24, 25, 26, 27, 30

*United States v. E. Ky. Power Coop., Inc.*, 498 F. Supp. 2d 976 (E.D. Ky.
    2007) ) .................................................................................................... 17

*United States v. EME Homer City Generation*, 727 F.3d 274 (3d Cir. 2013) ........ 5, 12, 18

*United States v. Midwest Generation LLC*, 720 F.3d 644 (7th Cir. 2013)......................... 8

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003) ................. 8, 19

*United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692 C-M/F, 2002 WL
    1629817 (S.D. Ind. July 18, 2002) ) ...................................................... 19

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ...................................... 8, 14

## FEDERAL STATUTES

42 U.S.C. § 7409(a)(1) ................................................................................................ 4

42 U.S.C. § 7409(b)(1) ............................................................................................. 4, 7

42 U.S.C. § 7410 ......................................................................................................... 7

42 U.S.C. § 7411(a)(4) ....................................................................................2, 6, 19, 20

42 U.S.C. § 7470(5)..................................................................................................... 6

42 U.S.C. § 7473 ......................................................................................................... 6

42 U.S.C. § 7479(4)..................................................................................................... 6

42 U.S.C. §§ 7491-7492 .............................................................................................. 7

42 U.S.C. §§ 7651-7651o ............................................................................................ 7

## FEDERAL REGULATIONS

40 C.F.R § 52.21........................................................................................................ 5

40 C.F.R § 52.21(a)(2)(iv) ................................................................. 20

40 C.F.R § 52.21(a)(2)(iv)(a) .......................................................... 6, 20

40 C.F.R § 52.21(a)(2)(iv)(b) ....................................................... 3, 6, 20

40 C.F.R § 52.21(b)(2) .................................................................. 2, 6

40 C.F.R § 52.21(b)(33)(ii)(1992) ..................................................... 10

40 C.F.R § 52.21(r)(6) ................................................................... 20

40 C.F.R § 51.166 ........................................................................... 5

## FEDERAL REGISTER

48 Fed. Reg. 38,635 (Aug. 25, 1983) ................................................. 5

57 Fed. Reg. 32,314 (July 21, 1992) ................................... 8, 9, 10, 14

63 Fed. Reg. 39,857 (July 24, 1998) ................................................ 14

67 Fed. Reg. 80,186 (Dec. 31, 2002) .......................................... 14, 19

70 Fed. Reg. 61,081 (Oct. 20, 2005) ............................................ 7, 16

## LEGISLATIVE HISTORY

Bruce Buckheit, Testimony before the Senate Democratic Policy Comm.
(Feb. 6, 2004), *available at*
http://dpc.senate.gov/hearings/hearing11/buckheit.pdf ......................... 17

H.R. Rep. No. 95-294 at 185 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1077,
1264 ................................................................................................ 6

*Joint Hearing on NSR Issues Before the Senate Environment and Public
Works Comm. and the Senate Judiciary Comm.*, 107th Cong. (July
16, 2002) (testimony of E. Donald Elliott), *available at*
http://epw.senate.gov/107th/Elliott_071602.htm ............................... 15

## MISCELLANEOUS

Bruce Barcott, *Changing All the Rules*, The New York Times (Magazine)
(Apr. 4, 2004), *available at*
http://www.nytimes.com/2004/04/04/magazine/changing-all-the-
rules.html ............................................................................................................... 11

Br. for Resp. EPA at 76, *New York v. EPA*, No. 02-1387, 2004 WL
5846388 (D.C. Cir. Oct. 26, 2004) ........................................................................ 7

EPA, EPA-454/R-12-001, *Our Nation's Air: Status and Trends Through
2010* (Feb. 2012), *available at*
http://www.epa.gov/airtrends/2011/report/fullreport.pdf. ...................................... 8

EPA, *Supplemental Analysis of the Environmental Impact of the 2002 Final
NSR Improvement Rules* at 14 (Nov. 21, 2002), *available at*
http://www.epa.gov/nsr/documents/nsr-analysis.pdf. ............................................ 29

EPA, EPA-456/R-03-005, *Technical Support Document for the Prevention
of Significant Deterioration (PSD) and Nonattainment Area New
Source Review (NSR):  Reconsideration* (Oct. 30, 2003) ...................................... 6

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

CAA   Clean Air Act

EPA   United States Environmental Protection Agency

NAAQS  National Ambient Air Quality Standards

NNSR   Nonattainment New Source Review

NSR   New Source Review

OG&E   Oklahoma Gas and Electric Company

PSD   Prevention of Significant Deterioration

SIP   State Implementation Plan

## INTEREST OF AMICUS

The Utility Air Regulatory Group (UARG) is a non-profit, unincorporated association whose members include individual electric utilities and national industry trade associations.  UARG participates on behalf of members collectively in Clean Air Act (CAA) proceedings that affect the interests of electricity generation companies and in litigation arising from those proceedings.  As further described in the accompanying Motion and Brief in Support of the Utility Air Regulatory Group for Leave to File a Brief as *Amicus Curiae*, UARG's members have a substantial interest in ensuring that state and federal New Source Review (NSR) regulations are interpreted and applied in a manner consistent with their purpose and their plain language.

## INTRODUCTION

The Government has spent the last 14 years filing cases that purportedly seek to "enforce" NSR.  This "enforcement initiative" targets maintenance activities (i.e., component repair and replacement projects) undertaken at coal-fired power plants, frequently many years, if not decades, after the fact.  In these cases, the Government typically contends that these maintenance activities constituted "major modifications" to existing power plants that should have triggered NSR permitting requirements.  By failing to obtain preconstruction permits, the Government contends, these utilities have violated the CAA and thus are subject to massive civil penalties.  The goal of these cases has been to force utilities to install expensive emission-control technology ahead of the schedule otherwise dictated by other CAA programs that aim to reduce emissions.

Unlike those programs, the statutory objective of NSR is not to reduce emissions, but rather to limit and regulate emission increases from new construction. *See* 42 U.S.C. § 7411(a)(4) (defining "modification" as a physical change which "increases the amount" of air pollution); 40 C.F.R. § 52.21(b)(2)(i) (defining "major modification" as a change that would result in a "significant net emissions increase"). As the Sixth Circuit noted, "[t]hese definitions are incompatible with [the Government]'s argument that [NSR] is a program designed to force every source to eventually adopt modern emissions control technology." *United States v. DTE Energy Co.*, 711 F.3d 643, 650-51 (6th Cir. 2013).

It thus is unsurprising that the legal interpretations and theories that animate the enforcement initiative contradict over two decades of Environmental Protection Agency (EPA) practice and guidance that preceded it. Though the Government continues to prosecute these actions, it does so based not upon longstanding views made known to the regulated community, but rather upon litigation positions it seeks to impose retroactively without prospective notice-and-comment rulemaking. Nor has the Government developed any semblance of consistency in the way it interprets the applicable regulations, even with respect to the many utilities it already has sued.

The enforcement initiative's track record has not been marked by success.[1] In fact, the Government suffered a significant rebuke from the Sixth Circuit earlier this year. *See DTE Energy Co.*, 711 F.3d at 649-52. In *DTE Energy*, the court squarely rejected

---

[1] For an account of the checkered history of the NSR enforcement initiative and its limited success, *see infra* at 11-19.

one of the pillars of the Government's litigation-driven view of NSR—its contention that a maintenance project at a power plant can be deemed a "major modification" even though the operator projected it would not cause an increase in emissions, and it has not, in fact, caused an increase in emissions. This "second-guessing" approach to enforcement transforms a "project-and-report scheme" into a "prior approval scheme" in contravention of the statute and the regulations, the court held. *Id.* at 649. Post-construction emissions—not a post hoc preconstruction projection developed for litigation by a team of Government-hired "experts"—dictate whether a project was, in fact, a "major modification." *Id.* at 651. And voluntarily curtailing operations to avoid any increase in emissions after a project furthers the goal of the statute and is in no way improper. *Id.* at 650.

This case, filed in the wake of *DTE Energy*, can fairly be seen as an attempt to evade and diminish its significant holding. Unlike previous NSR enforcement cases, the Government here does not contend that the projects undertaken by Defendant Oklahoma Gas and Electric Company (OG&E) were "major modifications." How could it? Emissions have not increased after the projects. They are thus by definition not "major modifications." *See DTE Energy*, 711 F.3d at 651 (citing 40 C.F.R. § 52.21(a)(2)(iv)(*b*); *see also id.* at 652 (Batchelder, C.J., dissenting). Instead, the Government asks for a declaration that OG&E "did not assess the impact of its projects on future emissions" and that OG&E's commitment to voluntarily curtail emissions to avoid a significant emissions increase "does not comply with the CAA or the state or federal regulations adopted to implement the CAA's prevention of significant deterioration (PSD) requirements." Compl. ¶ 51. As a further remedy, the Government asks that OG&E be required to sub-

mit new "projections" to EPA for approval, *id.* ¶ 52, whereafter EPA would dictate whether OG&E must retroactively obtain a permit for these projects as if they were major modifications, notwithstanding that they have not caused any increase in emissions.  In short, the Government envisions a process whereby it would achieve the same end point it has sought in every enforcement initiative case—a finding that challenged projects were major modifications and thus subject to NSR permitting requirements.

The Government's latest enforcement theory is at odds with the language and purpose of the statute, the text of the regulations, and the seminal holding in *DTE Energy*. UARG files this brief to provide the Court with important context that helps demonstrate this new theory's critical flaws.

## LEGAL BACKGROUND

### I.     Statutory and Regulatory Background.

Congress enacted the primary provisions of Title I of the CAA in 1970 and major amendments in 1977 and 1990.  Pub. L. No. 91-604, 84 Stat. 1676 (Dec. 31, 1970); Pub. L. No. 95-95, 91 Stat. 685 (Aug. 7, 1977); Pub. L. No. 101-549, 104 Stat. 2399 (Nov. 15, 1990).  Congress in 1970 directed EPA to develop National Ambient Air Quality Standards (NAAQS) to protect public health with an adequate margin of safety.  42 U.S.C. § 7409(a)(1), (b)(1).  The States, in turn, were to develop State implementation plans (SIPs) setting source-by-source emissions limits to meet the NAAQS.  *Id.* § 7410.  In 1972, a court ordered EPA to require SIP revisions to prevent "significant deterioration" of air quality in areas meeting the NAAQS, *Sierra Club v. Ruckelshaus*, 344 F. Supp. 253

(D.D.C.), *aff'd per curiam* 4 Env't Rep. Cas. (BNA) 1815 (D.C. Cir. 1972), which EPA then did.

In 1977, Congress amended the CAA to codify the regulatory PSD preconstruction permit program promulgated in 1974 and to create a Nonattainment NSR program (NNSR) (collectively, the "NSR programs"). These programs apply on a pollutant-by-pollutant basis depending on whether the source is located in a NAAQS attainment area (PSD) or a NAAQS nonattainment area (NNSR) for that pollutant. *See* 42 U.S.C. § 7470 *et seq.* (PSD program requirements); *id.* § 7501 *et seq.* (NNSR program requirements); *see also United States v. EME Homer City Generation*, 727 F.3d 274, 279 (3d Cir. 2013) (describing PSD and NNSR programs). Only the PSD program applies here, because the relevant areas of Oklahoma meet air quality standards for all relevant pollutants.

EPA defines the minimum requirements for these programs, which States then implement through SIPs. The EPA regulation defining the minimum requirements for the PSD program is 40 C.F.R. § 52.21.[2] EPA approved the Oklahoma PSD rules—which were modeled after the 1980 NSR rules—on August 25, 1983, 48 Fed. Reg. 38,635, and the approved SIP remained unchanged for purposes of this action until 2010.

The CAA regulates new and existing major stationary sources differently. In general, ***new*** sources—i.e., sources that are constructed or that undergo "major modifica-

---

[2] Section 51.166 technically imposes the requirements that SIPs must contain, while section 52.21 sets forth the provisions that apply if an approvable SIP has not been submitted. The substantive provisions relevant here are identical in both sections, so for ease of reference, we refer only to section 52.21.

tions" after the effective date of the applicable NSR provisions—must undergo precon-

struction review and permitting, and as part of this process may be required to install ad-

ditional emission controls.  Congress chose to impose these obligations on new sources

because it determined that new sources could incorporate more cost-effectively and effi-

ciently those types of emissions controls into their designs as they were being built than

could existing sources. *See, e.g.*, H.R. Rep. No. 95-294 at 185 (1977), *reprinted in* 1977

U.S.C.C.A.N. 1077, 1264.

In defining whether a project at an existing source constitutes a "major modifica-

tion" that triggers NSR permitting, both the CAA itself and EPA's NSR rules focus on

actual emissions increases that add to existing pollution above "baseline" levels.  *See* 42

U.S.C. §§ 7470(5), 7473, 7479(4).  The CAA defines "modification" as "any physical

change in, or change in the method of operation of, a stationary source which ***increases***

***the amount*** of any air pollutant emitted by such source . . . ."  42 U.S.C. § 7411(a)(4)

(emphasis added).  And EPA's rules make clear that a physical change must cause a sig-

nificant increase in emissions to qualify as a "major modification."  *See* 40 C.F.R.

§ 52.21(a)(2)(iv)(*a*), (*b*); *id.* § 52.21(b)(2).

NSR, therefore, is not a mechanism to force the retirement of older units or to oth-

erwise mandate emission reductions.  Rather, as EPA itself has explained repeatedly,

"[the NSR] program's ***limited object is to limit significant emissions increases*** from new

and modified sources."  EPA, EPA-456/R-03-005, *Technical Support Document for the*

*Prevention of Significant Deterioration (PSD) and Nonattainment Area New Source Re-*

*view (NSR):  Reconsideration* (EPA's Response to Petitions for Reconsideration) at 105

(Oct. 30, 2003) (emphasis added), *available at*

http://www.epa.gov/NSR/documents/petitionresponses10-30-03.pdf. *See also* 70 Fed.

Reg. 61,081, 61,088 (Oct. 20, 2005) ("[T]he primary purpose of the major NSR program

is ***not to reduce emissions***, but to balance the need for environmental protection and eco-

nomic growth … .") (emphasis added); *see also DTE Energy Co.*, 711 F.3d at 650-51

(noting that the statutory and regulatory definitions of "major modification" are "incom-

patible with EPA's argument that [NSR] is a program designed to force every source to

eventually adopt modern emissions control technology."). Accordingly, the NSR rules

are designed to ensure "that ***only*** changes causing a ***real*** increase in pollution are subject

to NSR." Br. for Resp. EPA at 76, *New York v. EPA*, No. 02-1387, 2004 WL 5846388, at

\*76 (D.C. Cir. Oct. 26, 2004) (emphases added). Other CAA programs and mecha-

nisms—such as SIPs specifically designed to meet or exceed federal air quality standards,

42 U.S.C. § 7410; visibility protection programs, *id.* §§ 7491-7492; and the Title IV Acid

Rain program, *id.* §§ 7651-7651o—are the CAA vehicles for achieving emissions ***reduc-

tions***. Indeed, notwithstanding the Government's claims about "grandfathered" sources,[3]

these CAA programs have worked well to dramatically reduce emissions from the utility

sector over the last three decades resulting in substantial air quality improvements. *See,*

---

[3] The Government repeatedly insinuates in its brief that the continued operation of OG&E's plants at the same levels as they operated before the projects somehow adverse-ly impacts air quality and public health. It is hard to imagine how OG&E's continued operations of its plants under permits issued by the Oklahoma state agency and under the SIP, which is designed to maintain local air quality well below NAAQS that EPA has set to protect public health with "an adequate margin of safety," 42 U.S.C. § 7409(b)(1), can possibly have an adverse impact on air quality or public health.

*e.g.,* EPA, EPA-454/R-12-001, *Our Nation's Air: Status and Trends Through 2010* at 1-2

(Feb. 2012), *available at* http://www.epa.gov/airtrends/2011/report/fullreport.pdf.

## II.    NSR Regulation and Enforcement

### A.    The 1980 and 1992 NSR Rules

As explained above, NSR is triggered when an existing major source undertakes a

"major modification."  Although simple in concept, the definition of "major modifica-

tion" has proven difficult to apply.[4]  *United States v. Midwest Generation, LLC*, 720 F.3d

644, 645 (7th Cir. 2013) ("The question 'how much repair or change requires a permit?'

has been contentious and difficult.").  As currently construed by the courts, EPA's 1980

NSR Rules contemplated a preconstruction judgment of whether a "change" is "project-

ed" to cause a "significant net increase" in emissions over baseline levels.  *See, e.g.,*

*United States v. Cinergy Corp.*, 458 F.3d 705, 709 (7th Cir. 2006).[5]  But these rules pro-

---

[4] For a thorough description of the regulatory history of NSR and the varying EPA interpretations of the NSR rules leading up to the "NSR enforcement initiative," which EPA launched against the utility industry in 1999, *see United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 634-37 (M.D.N.C. 2003) (describing regulatory history of the routine maintenance, repair, and replacement provision), 641-42, 644-46 (describing regulatory history of the emissions increase provisions), *aff'd on other grounds*, 411 F.3d 539 (4th Cir. 2005), *vacated, Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007).

[5] As the Government correctly acknowledges, the Seventh Circuit long ago reject-ed as impermissible the Government's attempt to impose an "actual-to-potential" test for projecting future emissions.  DOJ Br. at 6 n.8 (citing *Wis. Elec. Power Co. v. Reilly* (*WEPCo*), 893 F.2d 901 (7th Cir. 1990)).  As EPA acknowledged in the 1992 rulemaking (sometimes referred to as the "WEPCo Rule"), the Seventh Circuit found the actual-to-potential test to be inconsistent with the plain language of the 1980 Rules.  57 Fed. Reg. 32,314, 32,317 (July 21, 1992) (the 1992 Rules); *see WEPCo*, 893 F.2d at 917-18 (reject-ing "actual-to-potential" test for existing units); *see also United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 863 (S.D. Ohio 2003) (same).

vided no guidance on how to project emissions and imposed no pre- or post-construction recordkeeping requirements. *See, e.g., id.* ("[W]hat is required … is … merely a reasonable estimate of the amount of additional emissions that the change will cause."); *see also Duke Energy*, 549 U.S. at 577, 578 (explaining "the 1980 PSD regulations may be no seamless narrative," but "[w]hat these provisions are getting at is a measure of actual operations averaged over time . . . ."). As discussed in greater detail below, these ambiguities gave rise to wildly inconsistent interpretations of the 1980 Rules by EPA's enforcement arm in a series of cases comprising its NSR "enforcement initiative."

EPA began clarifying the rules in 1992, when EPA revised the 1980 Rules to specify for electric utilities a new emission projection technique, called "the 'representative actual annual emissions' methodology." *See* 57 Fed. Reg. at 32,325. In general, this methodology provided for utilities to project future emissions based on anticipated operations and, after excluding emission increases that are unrelated to the proposed project, to compare those emissions to a baseline period to determine whether an increase was projected to occur as a result of the project. EPA coupled this pre-project emission projection with a "post-construction" monitoring requirement for sources opting to use this emission projection approach. *Id.*

During the rulemaking for these changes, some commenters expressed concern that "utilities could deliberately underestimate future operations (and thus emissions) for the purpose of avoiding review or that even where a forthright estimate is made, the forecast may prove inaccurate." *Id.* EPA explained that this concern was misplaced, because the post-construction monitoring would "guard against the possibility that significant in-

creases in actual emissions attributable to the change may occur under this methodology." *Id*. EPA explained further that "NSR applies only where the emissions increase is caused by the change," and "[i]f … the reviewing authority determines [based on post-project data] that the … emissions have in fact increased significantly over baseline … as a result of the change, the source would become subject to NSR requirements ***at that time***." *Id.* (emphasis added).

The 1992 Rules also provided explicit guidance on the "causation" test for determining whether a "change" causes an emissions increase.  In projecting future emissions, one must:

> Exclude, in calculating any increase in emissions that results from the particular physical change … at an electric utility steam generating unit, that portion of the unit's emissions following the change that [1] could have been accommodated during the representative baseline period and [2] is attributable to an increase in projected capacity utilization at the unit that is unrelated to the particular change ….

40 C.F.R. § 52.21(b)(33)(ii)(1992).[6]  Finally, in administering these requirements, EPA made clear that it did not "require sources to obtain a formal applicability determination before proceeding with construction."  57 Fed. Reg. at 32, 332.  Rather, EPA indicated that "source owners or operators in most instances are able to readily ascertain whether NSR requirements apply to them."  *Id*.  As a result, the "NSR program has always relied upon ***sources*** to decide when and whether they need a major NSR permit."  EPA's Re-

---

[6] In the preamble, EPA explained that for the first prong of the causation analysis (i.e., "capable of accommodating"), a "but for" causation standard applied.  57 Fed. Reg. at 32,326.  For the second prong (i.e., "unrelated to the change"), the causation standard is whether the "change" was the "predominant cause" of the increase.  *Id.* at 32,327.

sponse to Petitions for Reconsideration at 72 (emphasis added).[7]

**B.      The NSR Enforcement Initiative: A Theory of Universal Liability.**

In the late 1990s, EPA's Enforcement Office developed a theory of universal NSR liability for the electric utility industry.  In mid-1999, EPA's enforcement chief claimed that EPA had assembled a clear case that the entire utility industry systematically violated NSR for two decades:  "Unless we're getting something wrong here," the EPA official recalls saying to utility executives, "these are violations of the law.  Y'all want to step up to the plate?"  Bruce Barcott, *Changing All the Rules*, The New York Times (Magazine) (Apr. 4, 2004), *available at* http://www.nytimes.com/2004/04/04/magazine/changing-all-the-rules.html.  The Government wanted a global settlement, under which industry would agree to accelerate future control technology retrofits required under other CAA programs.  Otherwise, EPA's Enforcement Office expressed concern that the "SIP process" in place would not "result in reduced emissions until well after the millennium."  Jim Jackson, *et al.*, "Coal-Fired Power Plants" Enforcement Memorandum, *Inside EPA* at 9 (Dec. 12, 1997) (attached as Ex. 1).

As it turns out, EPA's Enforcement Office ***was*** getting "something wrong"—it was advancing a radical, new NSR program contrary to "EPA's statements in the Federal Register, its statements to the regulated community and Congress, and its conduct for at

---

[7] The Government's drug manufacturer analogy (DOJ Br. at 1-2) thus does not support its arguments: while the Food and Drug Administration requires prior approval of drugs before they are sold to the public, EPA has repeatedly stated that it does not require prior approval of projects before they are constructed.  *See also DTE Energy*, 711 F.3d at 651 ("A project-and-report scheme is entirely compatible with the statute's intent . . . .").

least two decades." *United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 637 (M.D.N.C. 2003), *aff'd on other grounds*, 411 F.3d 439 (4th Cir. 2005), *vacated, Envtl. Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007).  As the head of Wisconsin's environmental agency bluntly told EPA, "the changes in PSD/NSR applicability policy are apparently being enforced retroactively by EPA ....  To go back now and enforce a revised policy on sources that relied in good faith on decisions by EPA or WDNR is totally inappropriate."  Letter from George Meyer, Sec'y, Wisconsin DNR, to Francis Lyons, Adm'r, EPA Region V (Oct. 18, 1999) (attached as Ex. 2).[8]

Undeterred, the Government commenced its enforcement initiative in November 1999 and filed seven lawsuits against Midwestern and Southern coal-fired utilities, and an administrative action against the Tennessee Valley Authority (TVA), the federal government's own electric utility.  *See EME Homer City Generation*, 727 F.3d at 281 (That action was the first in what had been described as "the largest, most contentious industry-wide enforcement initiative in EPA history to retroactively target violations of the [NSR] program.") (internal quotes omitted).  Until this case, these enforcement initiative actions followed a common template.  The Government would allege that dozens of routine

---

[8] *See also* Letter from John Daniel, Jr., Dir., Air Program Coordination, Virginia Dept. of Envtl. Quality, to Bruce Buckheit, Dir., EPA Office of Enforcement and Compliance Assurance (Oct. 29, 1999) ("The way [EPA is] now trying to deal with routine maintenance, repair, and replacement is a significant deviation from the way EPA has considered this since the 1970s. ...  If EPA wants to change the way they have historically looked at routine maintenance, repair, and replacement, they should do it by rulemaking rather than an enforcement initiative that contradicts EPA's own policies for the last 25 years.") (attached as Ex. 3).

maintenance projects at coal-fired power plants were "major modifications" undertaken without the proper NSR permits.   But rather than focusing on **actual** emissions resulting from the projects in question, the Government adopted a strategy of hiring a team of "experts" to develop after-the-fact projections to second-guess what emissions the utility **should have projected** to occur as a result of the projects.   These projections were made using an enforcement-driven emissions methodology that invariably predicts an emissions increase for virtually any maintenance project at a utility unit.

This methodology was not the product of any longstanding interpretation and application of the NSR rules.   Indeed, tracing the history of EPA's inconsistent statements on the emissions increase requirements under the 1980 Rules—the version of the rules that is effectively applicable here—can be a dizzying exercise.   In 1981, shortly after promulgating those rules, EPA endorsed an "actual-to-actual" test, pursuant to which a "major modification" occurs only where an activity increases a unit's capacity to emit pollution measured in terms of its hourly emission rate.   Edward Reich, the EPA official responsible for issuing authoritative NSR determinations at the time, confirmed in two separate memoranda that NSR applicability "'is determined by evaluating any change in [hourly] emissions rates caused by'" a physical or operational change.   *Duke Energy*, 278 F. Supp. 2d at 641 (quoting Reich memorandum).[9]   In 1988, however, EPA asserted the

---

[9] In 2007—after the projects at issue here—the Supreme Court ruled EPA's Director of Enforcement was incorrect in his interpretation.   *Duke Energy*, 549 U.S. at 580. Nonetheless, that the official in charge of enforcing the NSR rules in the early 1980s, shortly after their promulgation, as well as various EPA Regional officials, *see, e.g.,* U.S. EPA, Region IV, Mem. to State & Local Agencies (July 12, 1982) (attached as Ex. 4),

(Continued . . . .)

"actual-to-potential" test—where post-change emissions are calculated by multiplying a unit's maximum emission rate by the total number of hours in an entire year, whether the facility operates or not—was the ***only*** permissible way to calculate emissions.  At that time, EPA stated the 1980 NSR rules "'provide ***no support*** for'" a methodology based on "'projected' actual emissions."  *Id.* at 646 (quoting Mem. from Don Clay, Acting Asst. Admin'r for Air and Radiation, EPA, to David Kee, Dir., Air and Radiation Div., EPA Region V regarding WEPCo determination (Sept. 9, 1988)) (emphasis added).

Two years later, following the Seventh Circuit's rejection of EPA's "actual-to-potential" test in *WEPCo*, EPA did not return to its initial "actual-to-actual" interpretation but instead adopted the same "actual-to-projected-actual" test EPA insisted earlier had "no support" in the regulations.[10]  Then, in 1998 and 2002, EPA asserted in *Federal Register* preambles that the "actual-to-potential" test—explicitly abandoned by EPA itself in the 1992 rulemaking after *WEPCo, see* 57 Fed. Reg. at 32,317 (where "'normal operations' have begun . . .  the actual-to-potential test is impermissible")—was and always has been the sole means of measuring emission increases under the 1980 Rules.  67 Fed. Reg. 80,186, 80,191-92, 80,199 (Dec. 31, 2002); 63 Fed. Reg. 39,857, 39,859 n.4 (July 24, 1998).

---

apparently got it wrong only serves to highlight EPA's own confusion about its rules.

[10] Letter from William Rosenberg, EPA Asst. Adm'r for Air and Radiation, to John Boston, WEPCo, regarding EPA's Revised PSD Applicability Determination in Response to Court's Remand Order, at 7 (June 8, 1990) (summarily dismissing the Seventh Circuit's instructions as "incorrect" and applying instead an actual-to-projected-actual test) (Ex. 5).

In litigating another NSR case, EPA initially invoked the "actual-to-potential" test but eventually asked the court to apply some version of the "actual-to-projected-actual" test. *Duke Energy*, 278 F. Supp. 2d at 640 n.17.  As the court noted, however, EPA itself had "concluded that '[t]he [1980] PSD regulations provide no support for this view' … [and] EPA's proffered expert on PSD regulations indicated that the tests he applied, which are variations of the actual-to-projected-actual test, were not set forth in the 1980 rules." *Id.* at 646.  In the words of its own former general counsel, EPA's enforcement initiative rests "on the premise that the same words in the law meant one thing in 1985, another thing in 1992, still another in 1996, yet another in 1998 and will someday mean something still different in the future." *Joint Hearing on NSR Issues Before the Senate Environment and Public Works Comm. and the Senate Judiciary Comm.*, 107th Cong. at 2-3 (July 16, 2002) (testimony of E. Donald Elliott), *available at* http://epw.senate.gov/107th/Elliott_071602.htm.

Even after EPA changed course in 1999, however, it still did not have its story straight about how it was supposed to apply the emissions increase test to utilities.  In October 2001, for example, EPA admitted that if a utility had come to it with a question about how to calculate emissions, it would have given different answers before and after May 1999.  Rule 30(b)(6) Dep of David Lloyd, at 70:3-71:24, *United States v. Duke Energy Corp.*, No. 1:00cv01262 (M.D.N.C.) (Oct. 4, 2001) (Lloyd Dep.) (excerpts attached as Ex. 6).  In fact, as of the fall of 1999, various EPA regions were performing the emissions calculations in different ways.  Dep. of John Hewson at 69:1-72:13, *Duke Energy,* No. 1:00cv01262 (M.D.N.C.) (Dec. 17, 2001) (excerpts attached as Ex. 7).  As EPA testi-

fied, "there's no specific method or no specific type of calculation" for addressing emissions under its 1980 rules.  Lloyd Dep. at 138:2-3 (Ex. 6); *see also* EPA's Opp'n to Duke Energy Mot. for Summ. J., at 8,  *Duke Energy,* No. 1:00cv01262 (M.D.N.C.) (Jan. 4, 2008) (conceding that the 1980 Rules "do not describe particular data or formulas that must be used to estimate such increases for units that have begun normal operations") (excerpts attached as Ex. 8).  Given EPA's own confusion and multiple flip-flops, one court characterized EPA's enforcement initiative as nothing more than a "sport, which is not exactly what one would expect to find in a national regulatory enforcement program." *Alabama Power*, 372 F. Supp. 2d at 1306 n.44.  Even EPA, six years into the enforcement initiative, conceded "it can be difficult … to know with reasonable certainty whether a particular activity would trigger major NSR." 70 Fed. Reg. 61,081, 61,093 (Oct. 20, 2005).

Because the Government's positions on the meaning and application of the NSR regulations have been inconsistent, utilities and several states have challenged the NSR enforcement initiative as an unlawful effort to revise the NSR program to create universal liability.  In an *amicus* brief filed with the Supreme Court, ten states—Alabama, Alaska, Colorado, Indiana, Kansas, Nebraska, South Carolina, South Dakota, Virginia and Wyoming—debunked the Government's apparent "elaborate conspiracy theory" that "state environmental agencies" and "every major utility-industry player (and, more particularly, every major player's lawyers) either fundamentally misunderstood or blatantly ignored EPA guidance on the meaning" of the NSR regulations for over twenty years.  *Compare* Brief of State of Alabama *et al.* as *Amici Curiae* at 14, *Envtl. Def. v. Duke Energy Corp.,*

549 U.S. 561 (2007) (No. 05-848) (States' Br.) (excerpts attached as Ex. 9) *with* Testimony of Bruce Buckheit before the Senate Democratic Policy Comm. (Feb. 6, 2004) (stating that power companies have demonstrated a "cavalier disregard for the law over the past twenty years"), *available at* http://dpc.senate.gov/hearings/hearing11/buckheit.pdf.  Rather, the states offered the most obvious explanation: "EPA's current litigating position just wasn't the prevailing understanding of NSR/PSD applicability during the two decades that preceded the current enforcement initiative's launch in 1999."  State's Br. at 14; *see also Ala. Power*, 681 F. Supp. 2d at 1310  ("[EPA] could not tell Congress it envisioned very few ***future WEPCO***-type enforcement actions on the one hand, and then argue in subsequent enforcement actions that the utility industry was unreasonable in relying on those, or similar, EPA statements.").

Although at great cost in long, drawn-out litigation, the utilities have generally prevailed in the enforcement cases.  Upon review of the CAA, the NSR rules, and EPA guidance and conduct for at least two decades, many courts have rejected the Government's interpretations of the NSR regulations.  *See, e.g., United States v. E. Ky. Power Coop., Inc.*, 498 F. Supp. 2d 976, 993 (E.D. Ky.  2007) (holding Agency deserves no deference where it "takes an inconsistent view of the regulations, makes inconsistent statements with respect to the regulation, and also enforces the regulation with no discernible consistency"); *Sierra Club v. TVA*, No. 02-cv-2279-VEH, slip op. at 9 (N.D. Ala. July 5, 2006) ("I do not see how anyone can say with a straight face that EPA's 1999 interpretation of RMRR and emissions … was the same as [the] published SIP regulations.") (at-

tached as Ex. 10).[11]  More recently, two Circuit Courts affirmed the outright dismissal of

EPA's NSR enforcement actions because they were filed—much like this case—too long

after the alleged violations had occurred.  *See EME Homer City Generation*, 727 F.3d at

284-300; *Midwest Generation*, 720 F.3d at 647-48.[12]

The Government did, however, achieve a few limited successes that allowed the

enforcement initiative to persist in spite of its significant legal flaws.  Most significantly,

EPA's Environmental Appeals Board (EAB)—in a decision later declared by the Elev-

enth Circuit to be a nullity because the EAB "entirely ignor[ed] the concept of the rule of

law"—adopted the remarkable position that a project that does not cause an emission in-

crease could nonetheless be deemed a major modification, if the Government could show

that a litigation-driven projection of future emissions would have shown an increase in

emissions caused by the project.  *In re Tennessee Valley Auth.*, 9 E.A.D. 357, 2000 WL

1358648 (EAB Sept. 15, 2000), *vacated, TVA v. Whitman*, 336 F.3d 1236,  1246 (11th

---

[11] *See also United States v. Duke Energy Corp.*, No. 1:00CV1262, 2010 WL 3023517, at *7 (M.D.N.C. July 28, 2010) ("EPA is bound by its own interpretation of the PSD regulations, which have consistently referenced industry standards."); *Pa. Dep't of Envtl. Prot. v. Allegheny Energy, Inc.*, No. 05-885, 2008 WL 4960100, at *5, 7 (W.D. Pa. Sept. 2, 2008) (adopting standard of courts that "have not accorded deference to the EPA's narrow interpretation of RMRR due to the agency's conflicting guidance on the issue after *WEPCo*," but instead comporting with "EPA's original interpretations of RMRR").

[12] Citizen suits filed by environmental group plaintiffs reached similar results.  *See Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1023 (8th Cir. 2010) (affirming dismissal of NSR citizen suit); *Nat'l Parks & Conservation Ass'n, Inc. v. TVA*, 502 F.3d 1316, 1330 (11th Cir. 2007) (same); *Nat'l Parks Conservation Ass'n, Inc. v. TVA*, No. 3:01-CV-71, 2010 WL 1291335, at *27-34 (E.D. Tenn. Mar. 31, 2010) (following a bench trial, the court entered judgment for TVA, finding the tube component replacement projects in question did not trigger NSR permitting requirements).

Cir. 2003).  EPA's EAB reading of the rules in the *TVA* decision was inconsistent with

the CAA's definition of "modification" as a project "which ***increases the amount*** of any

air pollutant emitted by such source."  42 U.S.C. § 7411(a)(4) (emphasis added).  But be-

fore the Eleventh Circuit vacated it, a district court relied exclusively on the EAB's *TVA*

decision and endorsed the Government's enforcement-by-post-hoc-projection reading of

the regulations.  *United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692 C-M/F, 2002

WL 1629817, *3 (S.D. Ind. July 18, 2002) (*SIGECO*).  Two other district judges have

reached a similar result, but they relied exclusively on the flawed reasoning of *SIGECO*.

*See Ohio Edison Co.*, 276 F. Supp. 2d at 881 (relying exclusively on *SIGECO*); *United*

*States v. Duke Energy Corp.*, No. 1:00CV1262, 2010 WL 3023517, at *2 (M.D.N.C. July

28, 2010) (relying exclusively on *Ohio Edison*); *see also United States v. Cinergy Corp.*,

384 F. Supp. 2d 1272, 1277 (S.D. Ind. 2005) (authored by same judge as in *SIGECO*).

### C.      The 2002 NSR Reform Rules

By 2002, EPA acknowledged that changes to the NSR program had to be made to

clarify the rules and resolve some of the confusion created by the Government's litiga-

tion-driven interpretations of the 1980 and 1992 rules.  So in December 2002—based on

more than 130,000 written comments and multiple public meetings involving more than

100 groups—EPA amended both the 1980 Rules and the 1992 Rules.  *See* 67 Fed. Reg.

80,186 (Dec. 31, 2002).  The new rules articulated more clearly the principles that govern

the application of PSD program requirements[13] and specified sources' pre- and post-

---

[13] In those rules, EPA states in the clearest possible terms: "a project is a major

(Continued . . . .)

construction obligations.  *See* 40 C.F.R. § 52.21(a)(2)(iv) & (r)(6).  In those rules, EPA

set forth a detailed "projected emissions" applicability test that would apply to all catego-

ries of sources, and they affirmed the 1992 Rules' "causation" requirements.  And the

2002 Rules beefed up post-construction emission monitoring and reporting requirements

for certain categories of sources by establishing additional post-change emissions moni-

toring and reporting requirements for projects as to which there is a "reasonable possibil-

ity" of a significant emissions increase caused by the project, even though the source op-

erator's preconstruction projection does not predict that the project will cause a signifi-

cant emissions increase.  Taken together, these provisions confirm the focus of EPA's

NSR program, consistent with its statutory origin, as a program designed to evaluate and

limit projects that "increase[] the amount" of an emitted air pollutant.  42 U.S.C.

§ 7411(a)(4).  Only projects that cause a significant increase in emissions can be deemed

major modifications, and the validity of preconstruction projections are measured by ac-

tual post-project data.   In this way, EPA explained, the revised rules "better ensure[ ] that

a project will not be considered a major modification where there will not be a significant

emissions increase resulting from the modification project at the source."  EPA's Re-

sponse to Comments at I-5-23.

---

modification for a regulated NSR pollutant if it causes … a significant emissions increase
…. The project is not a modification if it does not cause a significant emissions in-
crease."  40 C.F.R. § 52.21(a)(2)(iv)(*a*).  And in the very next provision, where EPA de-
scribes the procedure for preconstruction projections, EPA states:  "Regardless of ***any
such*** preconstruction projections, a major modification results if the project causes a sig-
nificant emissions increase and a significant net emissions increase."  *Id.*
§ 52.21(a)(2)(iv)(*b*) (emphasis added).

**III.**   *DTE Energy***: The Sixth Circuit Rejects the Central Tenets of the Government's Enforcement Initiative Theory.**

In August 2010, the Government filed an NSR enforcement action challenging projects undertaken by DTE Energy Company just months earlier.  As in previous enforcement actions, the Government sought to prove that these projects were, in fact, "major modifications" and thus subject to NSR permitting requirements.  The Government intended to prove its case by showing, through expert testimony, that DTE ***should have projected*** that the projects ***would cause*** an increase in emissions, regardless of DTE's projection that no increase would result from the project and regardless of whether actual post-project emissions ever increased above baseline levels.  The district court ultimately granted DTE summary judgment, agreeing with DTE that the rules do not allow the Government to enforce NSR by second-guessing an operator's preconstruction projection.  *United States v. DTE Energy Co.*, No. 10-13101, 2011 WL 3706585, at *4-5 (E.D. Mich. Aug. 23, 2011).  And because there had been no increase in emissions in the short time since the project was completed, the Government's action was, at best, premature.  *Id.*

On appeal, the Government argued, as it had in other enforcement initiative cases, that it should be allowed to prove that a major modification has occurred by second-guessing the operator's projection:  "[The Government] can … enforce PSD requirements by demonstrating that the operator ***should have*** projected that emissions would increase."  Br. for the United States as Appellant (U.S. *DTE* Br.) at 29 (emphasis in original); *see also* Reply Br. for the United States as Appellant at 5 (claiming that "the statute itself, the … regulation, case law, and decades of NSR practice … all … make clear that EPA can

enforce NSR based on the pollution an operator should have expected to result from construction"). Citing cases like *SIGECO* and *Ohio Edison* that grew from EAB's unlawful *TVA* decision, the Government contended that it need not adduce evidence of an actual increase in emissions after the project to meet its burden. U.S. *DTE* Br. at 31. It would suffice, argued the Government, to show that a "projection" made after the fact in the context of an enforcement case would have shown an increase. *Id.*

The Sixth Circuit disagreed: "[T]he district court's premises are largely correct." *DTE Energy Co.*, 711 F.3d at 649. The NSR rules "do[] not contemplate approval of the projection prior to construction." *Id*. The regulations, therefore, "allow operators to undertake projects without having EPA second-guess their projections." *Id*. at 644. Were EPA allowed to "second-guess the making of the projections, then a project-and-report scheme would be transformed into a prior approval scheme." *Id*. at 649. Moreover, "keep[ing] … post-construction emissions down in order to avoid the significant increases that would require a permit … is entirely consistent with the statute and regulations." *Id.* Indeed, "purposely manag[ing] the cost of electricity from [a power plant] to keep its emissions from increasing … further[s] the goal of the statute." *Id.* at 651.[14]

---

[14] The Sixth Circuit also agreed with the district court on the role of post-project data—they dictate whether or not a modification has occurred, where the operator has projected no increase in emissions due to the project, as is the case here. "If [the] company's projections are later proven incorrect, EPA can bring an enforcement action" alleging a major modification. *DTE Energy*, 711 F.3d at 651. This reflects the nature of the statutory and regulatory modification program: "As EPA conceded at oral argument, the statute and regulations allow sources to replace parts indefinitely without losing their grandfathered status so long as none of those changes cause an emissions increase." *Id.*

The Sixth Circuit ultimately remanded the case, because the panel majority concluded that the district court's legal holding might have been stated too broadly in one limited respect.  Specifically, even though an operator's projections are not subject to second-guessing by EPA, "[t]he operator has to make projections according to the requirements for such projections contained in the regulations.  If the operator does not do so, and proceeds to construction, it is subject to an enforcement proceeding."  *Id.* at 649. Stated differently, "[i]f there is no projection, or the projection is made in contravention of the regulations guiding how the projection is to be made, then the system is not working."  *Id.*  "[A]t a ***basic level*** the operator has to make a projection in compliance with how the projections are to be made."  *Id.* (emphasis added).  Thus, "[the Government] must be able to prevent construction if an operator … uses an improper baseline period or uses the wrong number to determine whether a projected emissions increase is significant."  *Id.* at 650.  But the Sixth Circuit was careful to emphasize that the Government cannot substitute its judgment for that of the operator as to the likely demand for the unit in the projected years or with respect to the weight given to each of the relevant factors the operator must consider.[15]  The object of such an action, rather, is to ensure "at a basic level" that "the operator has … [made] a projection in compliance with how the projec-

---

[15] Indeed, as if anticipating what the Government is trying to do in this case—i.e., to rely on the limited remand in *DTE* to argue that the court's decision supports the Government's approach to enforcement—the Sixth Circuit made clear:  "Our reversal does not constitute endorsement of EPA's suggestions."  711 F.3d at 652.

tions are to be made." *Id.* at 649.  But critically, "this does not mean that the agency gets *in effect* to require prior approval of the projections." *Id.* (emphasis added).

The Sixth Circuit's decision in *DTE*—the most comprehensive treatment by any Circuit Court of the Government's burden of proof in these NSR enforcement cases—is a thorough rebuke of the Government's made-for-litigation, "alternative reality" approach to NSR enforcement.  It calls into serious question—and in some instances overrules outright—the line of cases springing from the EAB's ill-begotten *TVA* decision on which the Government relies to perpetuate its ill-advised and costly enforcement initiative.

## ARGUMENT

This case was filed less than four months after the Sixth Circuit's decision in *DTE Energy*, and it differs in key respects from enforcement actions that had preceded it.  Unlike previous cases, the Government does not expressly contend that the maintenance projects in question were "major modifications" under the CAA and NSR regulations.  To make that contention, the Government would be faced with the same problem it faced in *DTE Energy*—emissions have not increased after OG&E's projects, so by definition, those projects cannot be "major modifications."  Nor could the Government try to prove that the projects were major modifications by overtly second-guessing OG&E's projection—the *DTE Energy* decision plainly delegitimizes that approach.

The Government instead attempts to take advantage of the narrow window for enforcement the Sixth Circuit left open by framing its case as an action to determine "at a basic level" whether the operator conducted a projection in compliance with the "specific instructions" in the rules governing rules for projections.  The Government thus seeks a

declaration that OG&E failed to perform a preconstruction projection as required by the 1980 rules. *See* Compl. ¶ 51. In addition, the Government contends that OG&E's commitment to ensure emissions do not exceed baseline levels somehow violated those rules. The Government thus asks that OG&E be made to perform a "proper projection" and then submit it to EPA for review and approval, *id.* ¶ 52. The Government seems to contemplate that, if the "new" projection does not conform to its litigation position, it could disapprove the new projections and require OG&E to obtain PSD permits retroactively.

The Government's revised approach is flawed. First, the Government cannot second-guess the projections actually performed by OG&E. Instead, the Government is limited to seeking a determination of compliance with the "specific requirements" of the Oklahoma SIP governing preconstruction projections. The enforcement scheme EPA envisions would transform NSR into a "prior approval" scheme that is fundamentally at odds with the system created by the statute and the NSR regulations. Second, it is entirely proper for an operator to commit to voluntarily limit emissions to avoid an increase that might trigger NSR enforcement. Indeed, EPA expected operators would do so in its rulemakings, and the Sixth Circuit in *DTE* explicitly upheld that approach to compliance.

## I. The Government Cannot "Enforce NSR" by Second-Guessing OG&E's Projections.

The NSR rules create a "project-and-report" system. *DTE Energy Co.*, 711 F.3d at 649. The Government therefore cannot "enforce" NSR by second-guessing an operator's preconstruction projection, because that would create, in effect, a "prior approval" system. *Id.* "If operators had to defend every projection to the agency's satisfaction, com-

panies would hesitate to make any changes, including those that may improve air quality." *Id.*  The NSR rules thus "take a middle road by trusting operators to make projections but giving them specific instructions to follow." *Id.*  Accordingly, where the source has projected no increase in emissions due to the project, post-project data will dictate whether a modification has occurred.  "If [the] company's projections are later proven incorrect, [the Government] can bring an enforcement action" alleging a major modification. *Id.* at 651. This system is "entirely compatible with the statute's intent, which … is 'to prevent increases in air pollution.'" *Id.*

In its Complaint, the Government carefully avoids asking the Court to declare that any of the projects at issue in this case were actually "major modifications."  It instead asks for a declaration that OG&E "did not assess the impact of its projects on future emissions," Compl. ¶ 51, and suggests that operators must provide to regulators "a detailed analysis of its future emissions" so that regulators can act to prevent projects from going forward, DOJ Br. at 10, 18.  The Government thus suggests implicitly that it retains the right to approve or disapprove a source's projections.  That is not the law.

To begin, the 1980 Rules do not require operators to submit any preconstruction notice to regulators.  Such notices are required under the 2002 NSR rules in some circumstances, but Oklahoma has yet to adopt those rules.  Even if such notices were required, the purpose is not to allow for second-guessing of the operator's business and engineering judgment.  At most, the Government may evaluate, "at a basic level," whether the projection conformed to the regulations' specific requirements governing such projections.  If the operator failed to comply with the regulations, the Government may pursue

an enforcement action to compel compliance with those projection regulations.  *See DTE Energy*, 711 F.3d at 649.  But the focus of such an enforcement action is not on the end result, which the Government cannot second-guess, but rather on compliance with the explicit, objective requirements of the projection regulations.  Here, the Government's burden is thus to identify a specific instruction in the 1980 Rules with which OG&E failed to comply—it will not suffice for the Government to show that its litigation-retained experts may have reached a different result had they conducted the projection.

Oklahoma's governing regulations are based on the 1980 Rules, which (unlike the 2002 rules) impose no specific requirements for such projections, only the general requirement to make a "reasonable estimate of the amount of additional emissions that the change will cause."  *Cinergy*, 458 F.3d at 709.  The Government alleges that OG&E conducted no projection of future emissions at all, but that allegation appears to have been based on a misinterpretation of the voluntary notice OG&E provided to Oklahoma regulators.  As OG&E persuasively has demonstrated, for each project at issue, it did conduct preconstruction projections and concluded there would be no emissions increase caused by the projects.  Oklahoma Gas and Electric Company's Resp. to the Environmental Protection Agency's Mot. for Summ. J. (Doc. No. 27) at 5-7, 9-10.  The Government has failed to identify any way in which OG&E's "reasonable estimate," *Cinergy*, 458 F.3d at

709, deviated from any specific instructions of the 1980 rules; indeed, as noted above and as EPA has repeatedly acknowledged, there are no such instructions under those rules.[16]

And even if the Government could succeed in showing OG&E failed to comply with some unwritten aspect of the 1980 Rules, it is unclear what the Government hopes to accomplish by having OG&E ordered to conduct a new projection. The only accurate projection anyone could do now, years after the projects, would be one that shows what actually has happened—i.e., emissions consistently below baseline levels at all units.

## II.     OG&E's Commitment to Keep Emissions Below Baseline Levels Furthers the Goal of NSR.

The Government also takes issue with OG&E's commitment, stated in its voluntary preconstruction notifications, to ensure that post construction emissions do not exceed baseline levels. This, says the Government, is not allowed by the regulations and instead is a "roadmap for evasion." DOJ Br. at 1. If OG&E wanted to manage emissions to ensure NSR compliance, it was required to apply for and obtain a "synthetic minor" permit, which imposes "legally and practically enforceable emission limits at or below the significance threshold for each pollutant." DOJ Br. at 8. "A utility is welcome to avoid performing a detailed projection by making a bare promise to keep its emission be-

---

[16] To the extent the Government is asking this Court to create specific instructions not found in the language of the 1980 Rules, this Court lacks subject matter jurisdiction to do so, for a "judicial judgment cannot be made to do service for an administrative judgment." *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943). To the extent the Government seeks deference to its engrafting such specific instructions in the guise of "interpretation," this Court should reject it. *See Christensen v. Harris County*, 529 U.S. 576, 588 (2000) ("To defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation.").

low significance levels—but only if that promise is reduced to a readily-enforceable emissions limitation." DOJ Br. at 21. OG&E, the Government argues, chose neither option and thus failed to comply with the regulations. DOJ Br. at 20-25.

The Government's outrage over OG&E's commitment to conform operations to its projection is directly at odds with EPA's own expectations when it enacted the most recent version of the NSR rules. During that rulemaking, interested parties expressed concern that sources using the actual-to-projected-actual test would no longer seek enforceable permit conditions to limit emissions to pre-project levels. In response, EPA explained that the environmental benefit of the rules would be preserved, because sources using the actual-to-projected-actual test would conform operations to meet the projection:

> While the actual-to-projected-actual test would reduce the number of sources who would need to take [synthetic minor] permit limits, we find that the environmental benefit of these permit limits is effectively preserved because *any source* projecting no significant actual increase *must stay within that projection or face NSR*.

EPA, *Supplemental Analysis of the Environmental Impact of the 2002 Final NSR Improvement Rules* at 14 (Nov. 21, 2002) (emphases added), *available at* http://www.epa.gov/nsr/documents/nsr-analysis.pdf.

In other words, EPA recognized that it was creating a strong incentive for sources to control operations to ensure that post-project emissions conform to pre-project projections. OG&E has acted consistent with that incentive and will presumably ensure that there would be no increase in emissions from its Sooner and Muskogee units for any rea-

son, much less due to the projects.[17]  Only in the Government's made-for-litigation "through the looking glass" view of NSR is it a bad thing—in a program intended to limit and evaluate emission increases—for an operator to ensure that post-project emissions do not increase over baseline levels.

This is why the Sixth Circuit rejected this very argument in *DTE Energy*.  In that case, as here, the Government was exercised over DTE's commitment to ensure emissions would not increase following the challenged projects, going so far as to "repeatedly suggest[] bad faith on the part of the operator."  711 F.3d at 650.  The Sixth Circuit found nothing problematic about the practice at all; to the contrary:  "[K]eep[ing] … post-construction emissions down in order to avoid the significant increases that would require a permit . . . .  is entirely consistent with the statute and regulations." *Id.* at 651.  Indeed, voluntarily preventing increases in emissions "furthers the goal of the statute." *Id.*

In short, OG&E's commitment to prevent any increase in emissions due to its projects is fully consistent with the statute and governing regulations.  OG&E should be lauded, not pilloried, for furthering the objectives of the statute.

## CONCLUSION

For these reasons, UARG respectfully suggests that the Government's motion for summary judgment should denied.

---

[17] OG&E's projections thus differ from the projections at issue in the EPA Administrative Order cited by the Government.  DOJ Br. at 21 (citing *In re: Wisconsin Power & Light Columbia Generating Station*, Petition No. 11-2008-1 (EPA Oct 8, 2009)).  In that circumstance, the operator actually projected an increase in emissions caused by the project, but tried to avoid NSR by voluntarily committing to manage emissions after the project.  OG&E, by contrast, did not project an increase caused by the projects.

Submitted, this 4th day of November, 2013.

By: /s/ *Robert G. McCampbell*

Robert G. McCampbell (OBA 10390)
Fellers Snider
100 N. Broadway, Suite 1700
Oklahoma City, OK 73102
rmccampbell@fellerssnider.com
(405) 239-7252

F. William Brownell
Makram B. Jaber
Nash E. Long, III
Brent A. Rosser
George P. Sibley, III
Hunton & Williams LLP
2200 Pennsylvania Ave., N.W.
Washington, D.C. 20037
mjaber@hunton.com
(202) 955-1500

*Counsel for Utility Air Regulatory Group*

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2013 I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Elias L Quinn
US Dept of Justice Civil Div-601-DC
601 D St NW
Washington, DC 20004
Phone:  (202) 514-2756
Fax:      (202) 514-0097
elias.quinn@usdoj.gov

Brian J. Murray
Charles T. Wehland
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601-1692
Telephone:  (312) 782-3939
Fax:          (312) 782-8585
bjmurray@jonesday.com
ctwehland@jonesday.com

Donald K. Shandy (OBA No. 11511)
Patrick R. Pearce, Jr. (OBA No. 18802)
RYAN WHALEY COLDIRON
 SHANDY PLLC
119 N. Robinson Avenue, Ste 900
Oklahoma City, OK 73102
Telephone:   (405) 239-6040
Fax:          (405) 239-6766
DShandy@ryanwhaley.com
RPearce@ryanwhaley.com

Jacquelyn L. Dill
Dill Law Firm, P.C.
12101 N. MacArthur Blvd. Suite 200
Oklahoma City, Oklahoma 73162
Phone:  (405) 722-9600
Fax:       (405) 694-4568
jdill@dilllawfirm.com

/s/ *Robert G. McCampbell*
Robert G. McCampbell

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

OKLAHOMA GAS AND ELECTRIC
COMPANY,

    *Defendant*.

Civil Action No. CIV-13-690-D

Judge Timothy D. DeGiusti

## BRIEF OF UTILITY AIR REGULATORY
## GROUP AS *AMICUS CURIAE*

### Index of Exhibits

| Exhibit | Description |
|---|---|
| 1 | Jim Jackson, *et al.*, "Coal-Fired Power Plants" Enforcement Memorandum, *Inside EPA* at 9 (Dec. 12, 1997) |
| 2 | Letter from George Meyer, Sec'y, Wisconsin DNR, to Francis Lyons, Adm'r, EPA Region V (Oct. 18, 1999) |
| 3 | Letter from John Daniel, Jr., Dir., Air Program Coordination, Virginia Dept. of Envtl. Quality, to Bruce Buckheit, Dir., EPA Office of Enforcement and Compliance Assurance (Oct. 29, 1999) |
| 4 | U.S. EPA, Region IV, Mem. to State & Local Agencies (July 12, 1982) |
| 5 | Letter from William Rosenberg, EPA Ass't Adm'r for Air and Radiation, to John Boston, WEPCo, regarding EPA's Revised PSD Applicability Determination in Response to Court's Remand Order (June 8, 1990) |
| 6 | Rule 30(b)(6) Dep of David Lloyd, *United States v. Duke Energy Corp.*, No. 1:00cv01262 (M.D.N.C.) (Oct. 4, 2001) (excerpts) |
| 7 | Dep. of John Hewson, *Duke Energy,* No. 1:00cv01262 (M.D.N.C.) (Dec. 17, 2001) (excerpts) |
| 8 | EPA's Opp'n to Duke Energy Mot. for Summ. J., *Duke Energy,* No. 1:00cv01262 (M.D.N.C.) (Jan. 4, 2008) (excerpts) |

| Exhibit | Description |
|:---:|:---|
| **9** | Brief of State of Alabama *et al.* as *Amici Curiae, Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007) (No. 05-848) (excerpt) |
| **10** | *Sierra Club v. TVA*, No. 02-cv-2279-VEH, slip op. (N.D. Ala. July 5, 2006) |

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

OKLAHOMA GAS AND ELECTRIC
COMPANY,

    *Defendant*.

Civil Action No. CIV-13-690-D

Judge Timothy D. DeGiusti

## BRIEF OF UTILITY AIR REGULATORY
## GROUP AS *AMICUS CURIAE*

## Exhibit 1

# INSIDE EPA'S

## ENFORCEMENT FOCUS

*This week, Inside EPA is publishing the fourth of five national, sector-specific, enforcement strategies drafted by EPA. The following is an outline of EPA's strategy for the electric utilities sector. Next week: Iron and Steel*

### COAL-FIRED POWER PLANTS

OBJECTIVE: Evaluate NSR/PSD/NSPS compliance and, if appropriate, aggressively pursue significant NOx emission reductions.

BACKGROUND:

• 415 coal-fired electric generating facilities, with 65% located in Regions 3, 4 and 5

• Coal-fired power plants are the nation's largest emitters of NOx, S02 and C02

• Few facilities have been retired; 30 year old plants are operating longer and more efficiently than ever, yet few (if any) have ever admitted to "modifications"

• electric power industry is undergoing fundamental change and restructuring likely to result in increased reliance on underutilized, relatively inexpensive coal-fired facilities

• Transport mechanisms, extensively studied by OTAG, probably adversely affect ozone levels and compliance in downwind areas (e.g., Midwest (Ohio River Valley) facilities impact the Northeast)

ENFORCEMENT-RELATED ACTIVITIES:

• Identify a manageable number of facilities (25) that appear particularly deserving of NSR/PSD/NSPS scrutiny (e.g., large, old, "dirty" plants, particularly those that may impact ozone compliance in downwind areas)

• Utilize comprehensive file reviews and available expertise to focus investigative resources

• Develop focused tools for recognizing and pursuing possible NSR/PSD noncompliance

• Conduct rigorous, intensive facility evaluations, including site reviews, administrative depositions of key plant personnel and information requests (CAA 1 14)

COMPLIANCE ASSURANCE-BASED ACTIVITIES:

• Facilitate and enhance OECA's ability to select appropriate facilities to be evaluated

• Identify and pursue issues of general compliance concern

• Evaluate past, present and emerging control technologies, both domestically and internationally

• Review published information on technologies, hardware improvements and operational changes that may increase air emissions

• Conduct root cause analyses

• Develop tools and a communication strategy to translate enforcement results (based on past actions) into improved, more environmentally responsible corporate decisions and actions in the future

BACKGROUND

There are over 415 coal-fired power plants that generate electricity in the United States (excluding independent power producers and cogenerators). Most are investor owned and located East of the Mississippi River, with a large concentration of the largest and oldest facilities near the Ohio River in West Virginia, Ohio, Kentucky and Indiana (65% of all coal-fired plants are in Regions 3, 4 and 5).

Electric utilities are the country's largest emitters of S02 and C02 and the largest stationary source of NOx emissions. This industry has largely avoided installing costly pollution controls. In part, this is because many were grandfathered and are not subject to particularly stringent SIP emission limits. Although 30+ years old, many of these facilities are now operating more efficiently and at their highest capacities/capabilities ever; few (if any) have ever admitted being "modified" under NSR/PSD/NSPS. Average NOx emissions from such plants are 2-3 times higher than from comparable plants built in the 1980s. PSD is triggered by increased NOx emissions of 40 TPY, a relatively trivial amount for facilities that typically emit more than 10,000 TPY of NOx.

The electric power industry is undergoing fundamental change as a result of recent and on-going regulatory reform/deregulation efforts at both the state and federal level. FERC is deregulating interstate power transmission and the wholesale market for energy; states are pursuing deregulation at the consumer/retail level (a.k.a. retail wheeling) in much the same way that long distance telephone service was deregulated in the 1980s. This vision for the future and industry-wide restructuring will place a premium on the inexpensive generation of power as utilities will no longer be guaranteed a reasonable rate of return in exchange for their commitment to provide universal service in certain geographical areas. Since 60-80% of the cost of power generation is fuel and since coal is substantially less costly than other fuels (e.g., natural gas), it is anticipated that coal-fired power plants will experience significantly increased utilization, resulting in substantial emission increases. This, in turn, is expected to exacerbate an already difficult situation for many ozone nonattainment areas as a consequence of ozone transport mechanisms extensively studied through the OTAG process.

When approving the new ozone NAAQS last summer, President Clinton identified that EPA would soon be issuing a proposed rule to address the challenge faced by states downwind from major electric power plants. Many states were not satisfied, and in mid-August eight Northeastern States filed a petition (under CAA 126) for the Agency to find that upwind states were affecting their attainment and maintenance of the NAAQS (ozone), thereby requiring those upwind states to reduce emissions from their sources. Two states' petitions identified specific Ohio River Valley coal-fired power plants as being in need of reduced emission limits; one state (Pennsylvania) went so far as to urge adoption of specific emission reduction requirements by dates certain. Even if the Agency acts favorably and initiates the SIP process as mentioned by the president, it is unlikely to result in reduced emissions until well after the millennium.

OVERALL STRATEGY/APPROACH

Based upon the sheer magnitude of this industry's emissions (and hence opportunities for significant environmental improvement) and recognizing that S02 controls are achieving major reductions, this activity is focusing on NOx emission increases in the context of physical or operational changes that

may have triggered NSR/PSD/NSPS. We are prepared to take enforcement action for noncompliance attributable to triggering events that occurred since 1977. If changes/modifications occurred resulting increased emissions, we would then require installation of "best available control technology" (BACT), as determinable at that time (e.g., although low NOx burners and SCR/NSCR are BACT today, BACT in the late 1970s might only be low NOx burners). Regardless, earlier and more significant emission reductions would be possible.

In recognition of ubiquitous ozone problems in the Northeast, our effort is focusing largely (but not exclusively) on facilities likely to affect that area (e.g., plants located in Ohio, West Virginia, Kentucky and Indiana ). Other, old, large and/or relatively dirty plants in Regions 3, 4 and 5 are also being evaluated.

Overall compliance rates for this industry are not particularly noteworthy (a not surprising result since few meaningful limitations currently apply). Our intent is to investigate this industry in a way quite different from earlier, more traditional, inspections. We are focusing our inquiry on only a few issues and pollutants and expending considerable initial effort on understanding this industry so as to be better equipped to identify and recognize less-than-obvious changes/modifications that may have been made.

Since its inception, our investigation has been closely coordinated between ORE/AED and OC/METD. This cooperative effort has enabled us to better identify facilities to be identified, evaluate targeting tools (e.g., federal filings with the FERC and comprehensive databases for this industry). It is envisioned that this initiative will spawn several years of Agency effort, not only in enforcement-related activities by HQ and the regions, but also in identifying common issues and pursuing problems faced by this industry.

ENFORCEMENT-ORIENTED ACTIVITIES
• Identify 25 facilities to be evaluated for possible NSR/PSD/NSPS noncompliance
• Retain industry expert(s) to aid in the Agency's understanding of the industry and its operations
• Review comprehensive information on each identified facility (e.g., state environmental files, filings with state public utility commissions (PUCs), FERC and SEC)
• Develop list of possible changes to focus inspections/fact gathering/case development
• Inspect facilities, issue CAA 114 requests and/or conduct administrative depositions of key plant personnel to identify activities that may constitute a physical change or a change in the plant's method of operation
• Initiate enforcement actions, as appropriate

COMPLIANCE ASSURANCE-BASED ACTIVITIES
Working in tandem and in concert, each enforcement-oriented activity includes a major undertaking by OC/MET that is considered essential if this initiative is to be successful in changing corporate behavior and significantly improving the environmental performance of this industry. Currently anticipated OC/MET activities include:
• participating in facility selection activities, a form of "targeting", including evaluation of purchased databases of general applicability to the Agency
• using newly available tools to identify additional facili-

ties for future evaluation
• identifying issues of general compliance concern within this industry
• pursuing issues of general concern (e.g., identifying manufacturers and purchasers of boilers designed with FGR, vendors and purchasers of ESP "optimization" technologies, etc.)
• evaluating control technologies for possible use by this industry (both domestically and internationally and both current, as well the development of these technologies over time)
• reviewing the wealth of published information on technologies, hardware
improvements and operational changes in this industry
• assessing relevant agency guidance on this industry and seeking appropriate clarifications (if and as necessary)
• conducting root cause analyses for identified NSR/PSD/NSPS compliance issues
• educating the industry to improve their environmental compliance and performance, particularly at a time when the industry is undergoing fundamental structural change

MILESTONES
1st. Quarter FY 1998
• Identify 25 facilities in EPA Regions 3, 4 and 5 to be evaluated under this initiative
• Collect comprehensive, publicly available information on 15 identified facilities
• Analyze collected data for possible indications of "change"
• Develop a first draft list of compliance concerns that could trigger NSR/PSD/NSPS
• Purchase key databases for use in compliance-related activities
• Begin conducting first-round of facility-based activities (e.g., CAA 114 requests, administrative depositions, etc.)
• Engage DOJ participation in this initiative
2nd Quarter FY 1998
• Complete collection of comprehensive, publicly available information
• Continue first-round of facility-based activities at specified facilities
• Begin conducting focused inspections/investigations at first five facilities.
• Expand list of compliance concerns as knowledge/experience increases
• Identify and asses key Agency guidance, making recommendations for areas of needed clarification
3rd Quarter FY 1998
• Complete first-round of facility-based activities at remaining facilities
• Continue conducting focused inspections/investigations at specified facilities
• Evaluate control technologies for possible use
• Complete initial review of published information on technologies, hardware and operational changes
4th Quarter FY 1998
• Make first formal referrals to DOJ (if appropriate)
• Determine whether wide-spread industry compliance problems likely exist and, if so, develop an outreach strategy designed to change behavior

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

OKLAHOMA GAS AND ELECTRIC
COMPANY,

    *Defendant*.

Civil Action No. CIV-13-690-D

Judge Timothy D. DeGiusti

**BRIEF OF UTILITY AIR REGULATORY
GROUP AS *AMICUS CURIAE***

**Exhibit 2**



**State of Wisconsin \ DEPARTMENT OF NATURAL RESOURCES**

Tommy G. Thompson, Governor
George E. Meyer, Secretary

101 S. Webster St.
Box 7921
Madison, Wisconsin 53707-7921
Telephone 608-266-2621
FAX 608-267-3579
TDD 608-267-6897

*APB*
*AECA*

October 18, 1999

**RECEIVED**

OCT 2 6 1999

U.S. EPA REGION 5
OFFICE OF REGIONAL ADMINISTRATOR

Mr. Francis Lyons, Administrator
U.S. Enviromental Protection Agency
77 West Jackson Blvd.
Chicago, IL 60604

Subject: EPA's PSD/NSR Clean Air Act Enforcement Initiative

Dear Mr. Lyons:

Recently, representatives of the paper industry in Wisconsin contacted me with very serious concerns about an enforcement initiative being undertaken by EPA related to routine replacement and maintenance aspects of Prevention of Significant Deterioration and New Source Review (PSD/NSR) permitting. I find this enforcement initiative very troubling from several perspectives.

First, dialogue between EPA and the states should have occurred prior to this initiative being launched so that the states, as delegated air permitting authorities, can be consistent in our permitting as well as enforcement decisions. I am concerned that this lack of communication between EPA and the states is not in keeping with the spirit of the EnPPA process and the partnership concepts embodied in it.

Second, states were not provided timely information on EPA's revised interpretation of its PSD/NSR applicability guidance. As a result, state air permitting agencies may be inadvertently providing incorrect guidance to emission sources, and making permitting decisions inconsistent with the current policy. Due to the lack of information and communication, we are setting the stage for future conflict with the regulated community, and between our agencies.

Perhaps the most troubling aspect of this enforcement initiative is that the changes in PSD/NSR applicability policy are apparently being enforced retroactively by EPA. In many past cases, PSD questions were raised and discussed with EPA. Permitting decisions were made based on guidance that existed at the time. In many of these cases, the decision was that PSD did not apply. To go back now and enforce a revised policy on sources that relied in good faith on decisions by EPA or WDNR is totally inappropriate. This destroys trust between the regulatory agencies and the regulated community.

In fairness to all permitting agencies and the facilities that are regulated, EPA should explain why the former PSD policy was incorrect in its interpretation of applicability of PSD for routine

---



.eplacement and maintenance requirements. EPA should clearly articulate the reasons for the changes in the PSD applicability policy for routine replacement and maintenance and provide an opportunity for public comment through the federal register. Finally, EPA should in the same federal notice provide the rationale and justification for applying this new policy interpretation retroactively.   Only in publishing its rationale and actions will EPA help to assure that all air permitting authorities will make consistent PSD decisions in the future. It is imperative that this information be provided before EPA proceeds further with implementation of the PSD/NSR initiative.

Thank you for considering these concerns and suggestions. If you or your staff would like to discuss our perspectives in more detail, please contact Lloyd Eagan at 608-266-0603.

Sincerely

George E. Meyer, Secretary
Wisconsin Department of Natural Resources

cc:    Robert Perciasepe – EPA Headquarters
       Steve Herman – EPA Headquarters
       Bruce Buckheit – EPA Headquarters
       Margaret Guerriero – EPA Region 5
       Region 5 States' Air Directors
       Lloyd Eagan – AM/7
       Brenda Hagman – LE/5

EPA5EA001994

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

OKLAHOMA GAS AND ELECTRIC
COMPANY,

    *Defendant*.

Civil Action No. CIV-13-690-D

Judge Timothy D. DeGiusti

## BRIEF OF UTILITY AIR REGULATORY
## GROUP AS *AMICUS CURIAE*

## Exhibit 3

**RECEIVED**

NOV 2 1999

BUREAU OF AIR QUALITY

Post-It™ brand fax transmittal

Beverly Gragg
404-562-9164
Don Dee B.
2 pages

# COMMONWEALTH of VIRGINIA

## DEPARTMENT OF ENVIRONMENTAL QUALITY

*Street address:* 629 East Main Street, Richmond, Virginia 23219
*Mailing address:* P.O. Box 10009, Richmond, Virginia 23240
Fax (804) 698-4500    TDD (804) 698-4021
http://www.deq.state.va.us

James S. Gilmore, III
Governor

John Paul Woodley, Jr.
Secretary of Natural Resources

Dennis H. Treacy
Director

(804) 698-4000
1-800-592-5482

October 29, 1999

Mr. Bruce C. Buckheit, 2242A
USEPA Headquarters
401 M Street, S. W.
Washington, D.C.  20460

Dear Mr. Buckheit:

   After listening to your presentation at the STAPPA/ALAPCO meeting, I feel compelled to write and let you know how concerned many of us are over OECA's approach to the issue of maintenance, repair, and replacement practices. Outlined below are some of our thoughts on what you presented.

   ◆   Your characterization of utilities as being grand fathered sources and not utilizing controls is incorrect and misleading. All utilities have had to make reductions in both $SO_2$ and $NOx$ in order to comply with Title IV of the Clean Air Act.

   ◆   Some 13 states offered EPA alternatives to the $NOx$ SIP call that would have achieved a significant reduction in $NOx$ emissions. If EPA had accepted such proposals, we'd be well on the way to achieving $NOx$ reductions. EPA's insistence on a one-size-fits-all was not realistic or technically defensible; and if EPA had not been so inflexible, we would be well on the way to realizing these controls now.

   ◆   The way you are now trying to deal with routine maintenance, repair, and replacement is a significant deviation from the way EPA has considered this since the 1970s. In addition, such an interpretation will have a devastating effect on realistic New Source Review (NSR) reform, not only for the utility sector but for everyone else. Based on your example, a PAL permit would not be realistic, since the only emissions you can count on are what you actually

---

*An Agency of the Natural Resources Secretariat*

4TVA 002361

Mr. Bruce C. Buckheit
October 29, 1999
Page Two

emitted for the previous two years. For example, if there is a business turndown and someone decides that they need better packing in a distillation column or a better crusher or conveying equipment that would allow them to operate more efficiently, they could not return to their originally permitted limits without going through PSD again. This is not a realistic balance of economic and environmental concerns.

♦ If EPA wants to change the way they have historically looked at routine maintenance, repair, and replacement, they should do it by rulemaking rather than an enforcement initiative that contradicts EPA's own policies for the last 25 years or so.

Because of my concern about how this could affect NSR, I'm sharing this letter with other members of STAPPA. Once the 8-hour standard gets reinstated at whatever level is deemed appropriate, there will be a need for further NOx reductions. That would be the way to get it, not what OECA is doing now.

Sincerely,

John M. Daniel, Jr., P.E., DEE
Director, Air Program Coordination

JMD/jw
cc:  Karen L. Blanchard, EPA, OAQPS
     William Becker, STAPPA
     Felicia Robinson, Indiana
     Curt Marshall, Ohio
     William O'Sullivan, New Jersey
     John Paul, Ohio
     Dennis Drake, Michigan
     John Benedict, West Virginia
     Susan Wierman, MARAMA
     Phil Brantley, SESARM
     Larry Byrum, CenSARA

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

OKLAHOMA GAS AND ELECTRIC
COMPANY,

    *Defendant*.

Civil Action No. CIV-13-690-D

Judge Timothy D. DeGiusti

## BRIEF OF UTILITY AIR REGULATORY
## GROUP AS *AMICUS CURIAE*

## Exhibit 4



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

REGION IV

345 COURTLAND STREET
ATLANTA GEORGIA 30365

**JUL 12 1982**

REF: 4AW-AM

TO ALL STATE AND LOCAL AGENCY DIRECTORS:

During the recent mid-year audits of the State air agencies, it was
suggested that EPA Region IV prepare a quarterly summary of items of
interest to State and local new source review staff, and distribute
it to air pollution control agencies in Region IV. Such a summary
would include recent policy decisions, interpretations of EPA
regulations, BACT determinations of special interest, and any other
items which would be of interest to new source review personnel.

This letter is the first such summary. Future summaries will be
sent to you approximately each quarter. If you have any questions
regarding this letter, please notify Roger Pfaff directly.

I.  CMA Agreement:

When EPA promulgated changes to the EPA PSD and nonattainment
regulations (8/7/80) in response to the Alabama Power court
decision, it was sued by several industrial groups. The suit is
referred to as the CMA suit (Chemical Manufacturers
Association). On February 22, 1980, EPA and the litigants
reached an agreement on all the issues. Under separate cover,
each state agency is being sent a copy of the agreement. EPA
agreed to propose two sets of revisions to the EPA new source
review regulations. Some of the major proposals will be:

1)  No fugitive emissons will count in determining
applicability to the regulation.

2)  Limitations do not have to be federally enforceable to
count as restrictions.

3)  The netting baseline for modifications will be either the
actual emissions (the present rule) or potential emissions,
whichever is more favorable to the source, except that if
potential is used, it must be the hourly potential, not the
yearly potential. This change would allow a source whose
potential is higher than is actual to build new units and
increase actual emissions without being subject.

copy filed
in p. 9-1d

JUL 1982
RECEIVED
AIR
POLLUTION



2

4)   For nonattainment review, the offset baseline will be
either actual or potential emissions, as described above,
so long as RFP is met.

## II. Capable of Accommodating Definition

Fuel switches at boilers are exempted from PSD if the source
(i.e., plant) is "capable of accommodating" the new fuel. EPA's
policy regarding whether an individual boiler is capable of
accommodating a fuel is somewhat well established, but whether
an entire plant is capable of accommodating is open to
interpretation. For example, if an oil fired boiler can burn
coal, but no coal handling equipment is in place, is the entire
plant "capable of accommodating" coal?  Region IV has requested
an official policy determination on this issue from EPA
Headquarters.  Based on a previous policy determination, under
the 1978 PSD regulations, one could conclude that the increased
emissions from a coal-accommodative boiler would not trigger
review, but if the increased emissions from the coal handling
equipment were significant (25TPY TSP at a major source) the
coal handling equipment would be subject to PSD.  (See PSD
determination 84 in EPA's "Summary of PSD Determinations" from
Edward E. Reich).

As soon as we receive an updated answer on this question, we
will let you know.

## III. BACT/LAER Clearinghouse

You may be aware that EPA's Office of Air Quality Planning and
Standards has been reworking the format of the BACT/LAER
Clearinghouse to provide for a computerized output.  That
project is now complete, and each participating State and Local
Agency should have received the first copy of the computerized
Clearinghouse report.  Success of future issues depends upon
your submittal of future determinations, so please make a
continued effort to keep the Clearinghouse up-to-date.

## IV. Questions and Answers

Question:  Do 52.21(k) and (o) apply to pollutants emitted in
less than significant amounts?

Answer:  Yes.



3

Question:  Some pollutants were not regulated by PSD before
March, 1978.  In counting contemporaneous increases and
decreases, do emissions before that date count?

Answer:  Yes.  Any pollutant now regulated by the Act is treated
equally, even if the pollutant was only recently regulated.

Question:  A source to be modified will be subject to PSD due to
a significant increase in $SO_2$ emissions.  After the
modification there will be no increase in the hourly particulate
emissions.  The source presently operates at 4,000 hours per
year.  If the PSD permit would allow 7,000 hours per year, would
this be judged a significant increase in particulate emissions,
and cause the source to be subject to PSD for particulate?

Answer:  No.  Since the modification does not cause any increase
in emissions, no increase in annual emissions should be
calculated.

Question:  A source obtained a PSD permit for a new oil-fired
boiler in 1977.  The boiler is operating now.  The owner wishes
to convert the boiler to coal.  There will be less than a
significant increase in actual emissions of each pollutant.  Is
the conversion subject to PSD?

Answer:  No.  The conversion would be treated just like a
replacement.  The fact that the boiler is subject to PSD permit
is presently immaterial.  But, the new emission limits must be
made federally enforceable and represent a less than significant
increase over present actual emissions.  Also, do not overlook
$NO_x$, CO, lead, Hg, Be.

Question:  An existing major source replaces a kiln with an
identical new kiln.  At the same time, a new boiler is added.
If the new kiln is proposed to emit the same rates of pollutants
as the existing kiln, but the boiler emits significant amounts
of those pollutants, is the new kiln subject to BACT?

Answer:  Yes.  If the actions are taken at the same time, BACT
would apply to both units, since a net increase would result at
each unit.  [52.21(j)(3)]

Sincerely yours,

James T. Wilburn, Chief
Air Management Branch
Air & Waste Management Division

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

OKLAHOMA GAS AND ELECTRIC
COMPANY,

    *Defendant*.

Civil Action No. CIV-13-690-D

Judge Timothy D. DeGiusti

## BRIEF OF UTILITY AIR REGULATORY
## GROUP AS *AMICUS CURIAE*

## Exhibit 5



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20160

JUN 8 1990

OFFICE OF
AIR AND RADIATION

Mr. John Boston
President
Wisconsin Electric Power Company
Post Office Box 2046
Milwaukee, Wisconsin  52301

Dear Mr. Boston:

On January 19, 1990, the United States Court of Appeals for
the Seventh Circuit in Wisconsin Electric Power Co. v. Reilly,
Nos. 88-3264 and 89-1339, issued its decision regarding a
challenge by Wisconsin Electric Power Company (WEPCO) to two
final determinations issued by the Environmental Protection
Agency (EPA).  In these determinations, EPA concluded that
WEPCO's proposed renovations to its Port Washington power plant
would be subject to new source performance standards (NSPS) and
prevention of significant deterioration (PSD) requirements.

In its decision, the court upheld all but one of the
positions advanced by EPA in the NSPS and PSD applicability
determinations.  However, the court rejected EPA's position on
the issue of whether the "actual-to-potential" method--referred
to by the court as the "potential to emit concept"--should be
used to calculate emissions increases for PSD purposes in this
case.  Consequently, the Seventh Circuit vacated and remanded the
PSD determination to EPA for further action consistent with the
court's decision.

As you know, EPA decided to acquiesce in the court's holding
rather than seek rehearing.  This letter constitutes EPA's
revised PSD applicability determination in response to the
court's remand order.

The Agency believes that the court's principal instruction--
that EPA consider past operating conditions at the plant when
addressing modifications that involve "like-kind replacements"--
can be reasonably accommodated within the present regulatory
framework without further litigation in this case.  The net
result of the court's ruling is the recognition of a subcategory
of "like-kind replacements" under the "major modification"
definition of EPA's new source review provisions.

As explained below, EPA will employ an "actual-to-actual"
method to calculate emissions increases for WEPCO's proposed
renovations to its Port Washington power plant.  The outcome in
this case is that WEPCO will not be subject to PSD review for

sulfur dioxide (SO$_2$), particulate matter (PM), carbon monoxide, or hydrocarbons. However, there will be a significant net increase in actual emissions of nitrogen oxides (NO$_x$), and WEPCO must obtain a PSD permit for that pollutant.

## I.  BACKGROUND

### A.  Factual Background.

The WEPCO owns and operates five coal-fired, steam-generating units at its Port Washington facility near Milwaukee. All units had an original design capacity of 80 megawatts when they were placed in service between 1935 and 1950. However, due to age-related deterioration and loss of efficiency, both the physical capability and actual utilization of the plant have declined over time. Unit 5 was shut down completely due to a cracked rear steam drum. Consequently, by 1987, WEPCO was faced with removing the units from service as they reached their planned retirement dates beginning in the early 1990's, unless it undertook a costly "life extension" program to restore the physical and economic viability of the units and extend their useful life for approximately 20 years. The WEPCO proposed such a life extension to include replacement of the steam drums, air heaters, and other major capital improvements totaling over $80 million. It should be noted that this program is not a pollution control project (i.e., it is not intended to add on or improve pollution control systems even though modest improvements to the particulate matter control devices are a part of the program).

In a series of applicability determinations in 1988 and 1989, EPA ruled that the renovations planned under WEPCO's life extension program would constitute a "modification" for purposes of the NSPS provisions of the Clean Air Act (Act), and a "major modification" under the PSD provisions of the Act. Thus, WEPCO would have had to install some level of control equipment or physical capacity restriction to avoid NSPS coverage for three of the five units proposed to be renovated. As to PSD, the company would have had to accept operational restrictions or lower emissions rates to "net out" of review. Regarding SO$_2$, for example, WEPCO could have almost doubled its projected level of future operations without triggering PSD review. However, WEPCO did not want to be constrained by new source requirements, and so sought review in the Seventh Circuit Court of Appeals.

### B.    The Court's Decision.

### 1.    Physical Change.

The court unequivocally agreed with EPA that the replacement of steam drums, air heaters, and other major components was a nonroutine "physical change," and thus met the first of two tests for a modification under NSPS and PSD. The Agency found that the

3

renovations proposed by WEPCO were exactly the type of industrial changes that were meant to be addressed by the NSPS and PSD programs.  In upholding EPA's finding that a physical change would occur, the court strongly endorsed EPA's reading of the basic congressional intent in adopting the modification provisions of the NSPS and PSD programs, because to rule otherwise "would open vistas of indefinite immunity from the provisions of NSPS and PSD" (slip op. at 11).  The court also relied on the reasonableness of EPA's consideration of the magnitude, purpose, frequency, and cost of the work in upholding EPA's finding that the renovations are not "routine" (slip op. at 14-18).  In addition, the court rejected WEPCO's argument that the renovations could not be deemed a modification for NSPS purposes because they did not constitute a "reconstruction" under 40 CFR 60.15 (slip op. at 18-20).

2.   NSPS Emissions Increase.

The court upheld EPA's decision that there would be an increase in hourly emissions at three of the units, and thus for those three units, WEPCO met the second test for NSPS applicability.  The Agency had argued that the regulations require NSPS emissions increases to be determined by comparing the current (pre-change) hourly emissions capacity of each affected facility with the post-renovation hourly emissions capacity of each unit.  The Seventh Circuit agreed, and rejected WEPCO's argument that original design capacity or past "representative" capacity no longer achievable at the plant should be used for the baseline emissions rate (slip op. at 20-25).

3.   PSD Emissions Increase.

The regulatory preamble to the PSD regulations provides that the set of emissions units that have "not begun normal operations" includes both "new or modified" units (45 FR 52676, 52677, 52718) (1980).  Consequently, EPA used the "actual-to-potential" calculus in evaluating WEPCO's life extension project.  The court rejected this methodology in the case of WEPCO's "like-kind replacement," asserting that EPA's reasoning was circular (slip op. at 28).  [In addition, the court held (slip op. at 27 n. 11) that the exemption in 40 CFR 52.21(b)(2)(iii)(f) for emissions increases due to expanded operations did not apply, because WEPCO's increased operations were directly tied to the life extension project.]  Instead, the court ruled that EPA should recalculate post-change emissions considering past operating conditions where it is possible to make a more realistic assessment of future emissions (slip op. at 29-31).  Alternatively, the court stated that EPA could conduct new rulemaking to explicitly apply the "actual-to-potential" calculus to "like-kind replacements" (slip op. at 30).

4

## II. THE WEPCO DECISION IN THE CONTEXT OF THE PSD PROVISIONS

The Seventh Circuit held that EPA could not wholly disregard past operating history and automatically apply the actual-to-potential methodology for determining PSD applicability to WEPCO's "like-kind replacements." In describing the WEPCO changes as "like-kind replacements" and limiting its decision to such changes, the court did not dispute the correctness of EPA's application of the actual-to-potential test to the full spectrum of new and modified sources not covered by this subcategory of change. The recent decision in Puerto Rican Cement Co. v. EPA, 889 F.2d 292 (1st Cir. 1989), explicitly upheld EPA's position that the actual-to-potential concept should be applied to "modified" emissions units. The First Circuit case involved the modernization and reconfiguration of existing emissions units [see 889 F.2d at 293 (company planned to "convert kiln No. 6 from a 'wet' to a 'dry' cement-making process, and to combine that with Kiln No. 3")]. A key issue was whether EPA properly held that the "modified" units had "not begun normal operation" and therefore the actual-to-potential concept applied in calculating emissions increases. The First Circuit affirmed EPA's position that the actual-to-potential concept should be applied to the company's "modified" units. Puerto Rican Cement, 889 F.2d at 297. Consequently, the court found that both the language and expressed purpose of the regulations indicate that EPA applied the regulations properly in using the actual-to-potential test for a proposed modification. The Seventh Circuit in WEPCO did not dispute the correctness of EPA's application of the actual-to-potential test to the full spectrum of changes not covered by the subcategory of changes (like-kind replacements) created by the court.[1]   Therefore, in the case of nonroutine physical or

---

[1]   EPA will leave to future case by case applicability determinations what is a "like-kind replacement." But for guidance of the parties, EPA presently considers that only for projects that are genuine "like-kind replacements" can future emissions projections be calculated using "estimated future actual emissions" in lieu of potential to emit. EPA does not consider "like-kind replacement" to mean the entire replacement (or reconstruction) of an existing emissions unit with an identical new one or one similar in design or function.  Rather, EPA considers "like-kind replacements" to encompass the replacement of components at an emissions unit with the same (or functionally similar) components. Under this interpretation of the term, new components that perform essentially the same function as old ones will be viewed as "like-kind replacements." In addition, even if the design or purpose of a new component is identical to that of an old one, if the new component is part of a project that will fundamentally change the production process at an existing stationary source, this would be beyond the scope of a "like-kind replacement." Under either of those

5

operational changes at an existing major source which are not
specifically "like-kind replacements" in nature, EPA will
continue to apply the actual-to-potential test for PSD
applicability purposes.

III.   THE AGENCY'S RESPONSE TO THE COURT'S REMAND ORDER

A.   The PSD Baseline Emissions.

Determining the "baseline" level of actual emissions before a
physical or operational change is a necessary first step to
determine if emissions increase as a result of the physical
change.   The Agency's regulations define the baseline for PSD
purposes, as follows:

> In general, actual emissions as of a particular date shall
> equal the average rate, in tons-per-year (tpy), at which the
> unit actually emitted the pollutant during a 2-year period
> which precedes the particular date and which is
> representative of normal source operation.   The
> Administrator shall allow the use of a different time period
> upon a determination that it is more representative of
> normal source operation.   Actual emissions shall be
> calculated using the unit's actual operating hours,
> production rates, and types of materials processed, stored,
> or combusted during the selected time period [see 40 CFR
> 52.21(b)(21)(ii)].

The purpose of the definition is to establish a baseline
that is "representative" of "normal" source operations prior to
the change.   The Agency historically has followed a presumption

---

circumstances, it would be unreasonable to rely on pre-
modification usage patterns to estimate future levels of capacity
utilization.   Instead, in such cases, EPA believes that it is
reasonable to assume that in the absence of federally-enforceable
limits on hours of operation or production rates, the new
components may result in a substantial increase over historical
levels of utilization of the emissions unit following
modification [see Puerto Rican Cement, supra, 869 F.2d at 297 ("a
firm's decision to introduce new, more efficient machinery may
lead the firm to decide to increase the level of production")]
and will compare pre-modification actual emissions to post-
modification potential emissions.   In addition to this
circumstance, there are cases in which sources that undergo
changes that qualify as add-on control systems would, under
certain circumstances, be exempt from new source review.   See
Letter to Timothy J. Method, Assistant Commissioner, Indiana
Department of Environmental Management, from David Kee, EPA
Region V, January 30, 1990.

6

that the most recent 2 years should be used, but has allowed
another period where the source demonstrates that recent
operations are abnormal [see 40 CFR 52.21(b)(21)(ii); see also
45 FR 52676, 52718 (1980)].  The WEPCO baseline period is an
example of this.  In this instance, plant utilization was
disrupted by physical problems that led to nonroutine physical
changes to remedy those problems.  Consequently, EPA determined
that a period prior to the onset of such problems was
representative of normal operations, and as required by its
regulations, used this period to establish the baseline.  The
period used was also within the contemporaneous period specified
in 40 CFR 52.21(b)(3)(ii).  It should be emphasized that, in the
WEPCO case, the parties and the court agreed that 1983-84 (prior
to discovery of steam drum cracks) should be the baseline years
(slip op. at 26); these years had an average 29 percent
utilization rate.  We continue to believe this is the appropriate
baseline period for the Port Washington renovation.

B.      Calculating Post-Change Emissions Under PSD.

        The court concluded that "EPA's reliance on an assumed
continuous operation as a basis for finding an emissions increase
is not properly supported" (slip op. at 30).  Although the court
held that EPA cannot, in this case, wholly disregard past
operating conditions at the plant, it also held that EPA could
not reasonably rely on the company's own unenforceable projection
of operating conditions (slip op at 29).  The court remanded the
question of PSD applicability to EPA for further proceedings not
inconsistent with its decision.

        Before the court remanded EPA's determination, it attempted
to ascertain whether, in fact, the proposed project would be a
major modification even using the assumptions least likely to
result in an emissions increase.  The court felt (and we agree)
that such a "best" case scenario for WEPCO would assume that the
"present hours and conditions" would not change at all following
the renovations (despite, of course, WEPCO's own estimates of at
least tripling of utilization over current levels) (slip op. at
31, n. 14).  The court, however, lacked the data to make this
calculation, so it could not determine whether a major
modification would result using a set of assumptions most
favorable to WEPCO.  Therefore, the court remanded the
determination to EPA for further consideration.

        A conceivable interpretation of the court's opinion is that
EPA must calculate WEPCO's post-modification emissions increases
based on "present hours and conditions."  However, for the
reasons discussed below, EPA believes that this interpretation is
incorrect.  Under such an interpretation, EPA would determine
WEPCO's post-renovation annual emissions in tons per year (tpy)
by simply projecting into the future the hours of operation and
conditions (i.e., hourly emissions rate) that existed just before

7

the renovations. This is the interpretation urged by WEPCO in a February 9, 1990 letter to EPA. Such a calculus will always result in exactly the same level of emissions before and after the physical change, and thus would always exempt "like-kind replacements" from PSD review. In addition, calculating emissions increases using this assumption would flatly contradict the record in this case. The WEPCO has stated that it will greatly increase capacity utilization over both current levels and the baseline levels used in the previous determinations. Capacity utilization in terms of heat input to the plant (based on nameplate capacity) during 1978-1979 was about 40 percent (Record item 7.4, WEPCO Submission, April 19, 1988 meeting with EPA). During the 1983-1984 baseline period, it was approximately 27 percent. Id. It has since declined to less than 10 percent (1988-1989 data). Id. The WEPCO has advised the State of Wisconsin that it intends to return to a forecasted 42 percent utilization level in the years following renovation, with an upper maximum forecast of 50 percent [Letter from Walter Woelfle, WEPCO, to Dale Zeige, Wisconsin Department of Natural Resources, March 29, 1990, Table 7 (enclosed)]. It would be wrong to assume that unit 5 would not be operated at all in the future when an explicit purpose of the renovation is to bring the unit back on line at its original design capacity; moreover, unit 5 is presently inoperative. Most importantly, this methodology is not fairly discernible from any reading of the current regulations. In addition, using "present hours and conditions" would disregard planned changes at WEPCO that will affect the post-renovation hourly emissions rate [e.g., increased capacity, lowering of sulfur content, and enhancement of the electrostatic precipitators (ESP)].

The court upheld EPA's position that increased utilization in the future that is linked to construction or modification activity should not be excluded in determining post-renovation emissions. Nevertheless, the court told EPA not to automatically assume 100 percent utilization in the future when historical data are available. The WEPCO has definite plans to return the plant to historical levels of utilization that are well above baseline levels of utilization, and which could not be physically or economically attained but for the renovation project. Accordingly, EPA believes it is consistent with the court decision for EPA to base its remand decision on these facts and not rely on the present hours and conditions as conclusive of post-renovation emissions. After a thorough review of the possibilities, EPA has concluded that the court intended that estimates of future emissions for WEPCO's "like-kind replacements" should consider historic pre-renovation operating hours and production rates, as well as other relevant factors, in estimating future utilization levels, and should also consider the increased capacity, switching to lower-sulfur fuel, and other changes affecting the hourly emissions rate for PSD purposes. Consequently, for WEPCO's "like-kind replacements," EPA will

8

compare representative actual emissions for the baseline period
to estimated future actual emissions based on all the available
facts in the record. Specifically, in calculating post-
renovation actual emissions, this approach takes into account 1)
physical changes and operational restrictions that would affect
the hourly emissions rate following the renovation, 2) WEPCO's
pre-renovation capacity utilization, and 3) factors affecting
WEPCO's likely post-renovation capacity utilization.

   To quantify WEPCO's estimated future actual emissions after
the proposed changes EPA relied heavily on projected and
historical operational data (e.g., fuel consumption, MMBTU
consumed) representative of the source. Specifically, the Agency
considered available information regarding (1) projected post-
change capacity utilization filed with public utility
commissions; (2) Federal and State regulatory filings; (3) the
source's own representations; and (4) the source's historical
operating data. As described below, EPA determined an
appropriate utilization factor for future operations and combined
this with post-change emissions factors (to the extent they are
or will be made federally enforceable) to estimate a future level
of annual emissions for the purpose of determining whether the
proposed physical and operational changes would be considered a
major modification for PSD purposes. Where a significant
emissions increase is projected to occur, WEPCO could voluntarily
agree to federally-enforceable limits on any aspect of its future
operation (including physical capacity and hours of operation) to
ensure that no significant emissions increase will occur.

IV.   THE AGENCY'S REVISED PSD APPLICABILITY DETERMINATION

A.      Estimated Future Actual Emissions.

   The Agency has revised its October 14, 1989 PSD
applicability determination for WEPCO's proposed Port Washington
renovation based on a "representative actual" to "estimated
future actual emissions" comparison (as outlined above). As
previously discussed, estimated future actual emissions
projections take into account the likelihood that the plant will
operate in the future as it has in the past.

   The stated purpose of WEPCO's renovations is to refurbish
the power plant units to an "as-new" condition in terms of their
capacity, efficiency, and availability. Consequently, EPA has
used actual, historical, operational data representative of the
plant's past operations, approximating an "as-new" configuration,
to calculate "estimated future actual emissions." The Agency has
verified these data by comparison to WEPCO's own projections of
post-renovation capacity utilization and industry averages.

   As to the emissions factors used to calculate future
emissions, EPA has used WEPCO's own emissions factors for future

9

hourly emissions rates. These emissions factors are based on
WEPCO's own assumptions regarding future sulfur in fuel and
control technology performance levels. However, since these
assumptions go beyond current state implementation plan (SIP)
requirements, they must be made federally enforceable for EPA to
continue to consider them for PSD applicability purposes.

Operational data (i.e., heat input) from the years 1978-1979
show a capacity utilization factor of 42 percent. These data
points represent the closest projection of WEPCO's operational
characteristics, approximating an "as-new" state, as currently
available to EPA. The data currently available to us regarding
WEPCO's past operational levels are limited to a 10-year period.
The Agency believes that these historical levels of operation are
representative of the plant's past operations in an "as-new"
condition. In addition, the 1978-79 data points appear
consistent with WEPCO's own projection of future operations for
the year 2010 (as submitted to the Wisconsin Department of
Natural Resources on March 29, 1990) and common capacity levels
for the utility industry, in general, for new units. However, by
this letter, EPA is requesting that WEPCO submit operational data
from previous years (i.e., pre-1978), if such data show heat
input levels notably higher than the 1978-1979 levels.

As previously mentioned, to calculate future emissions
levels for each pollutant, EPA assumed that the amount of future
coal consumed in terms of heat input to the plant would be
comparable to WEPCO's annual average 1978-1979 coal-consumption
figure. On March 29, 1990, WEPCO submitted to the Wisconsin
Department of Natural Resources information which contained
estimates of future emissions for different levels of coal and
heat input to the plant. The Agency used these estimates to
establish future emissions based on 1978-1979 heat-input values.
Again, it is important to note that EPA's calculation of
"estimated future actual emissions" is based on WEPCO's
projection of control technology performance levels and/or fuel
sulfur content for post-renovation operations. Consequently,
EPA's PSD applicability determination is valid only to the extent
that the emissions factors (based on control technology
performance levels and sulfur in fuel) used to calculate future
emissions are made federally enforceable. Otherwise, the
calculation of estimated future actual emissions for each
pollutant will need to be revised by EPA based on existing
federally-enforceable limits (i.e., applicable SIP, NSPS). The
use of current, federally-enforceable emissions in the current
SIP would result in higher projected future emissions than
assumed in EPA's calculations and, consequently, could affect the
indicated PSD applicability finding.

10

B.  Revised Finding

In sum, EPA has considered past operations at WEPCO's Port
Washington plant in estimating future actual emissions.
Specifically, EPA has relied on the 42 percent utilization level
(in terms of heat input) during 1978-1979.  The Agency believes
this is a reliable indicator of future utilization because it is
consistent both with WEPCO's own projections of post-renovation
operations and typical industry usage.  The Agency has also
considered post-renovation emissions rates on the assumption that
they will be made federally enforceable.  Compared to the 1983-
1984 baseline period, those hourly rates are lower for $SO_2$ and
PM, and unchanged for $NO_x$.  The 42 percent estimated post-
renovation capacity utilization is substantially higher than the
29 percent utilization level during the baseline period.
However, in calculating total annual actual emissions, that
increased usage is offset for $SO_2$ and PM by the decreased hourly
emissions rates resulting from improvements to control systems
and the use of low sulfur coal.  Consequently, WEPCO is not
subject to PSD review for those pollutants.

In the case of $NO_x$, there will be a direct correlation
between increased utilization resulting from the renovations and
increased actual emissions.  Hence, WEPCO is subject to review
for that pollutant and must obtain a PSD permit.  The company
should contact the Wisconsin Department of Natural Resources
regarding the processing of a permit application for $NO_x$.  Due to
insufficient source-specific information regarding emissions
factors, PSD applicability for PM-10, lead, and noncriteria
pollutants listed at 40 CFR 52.21 (b)(23)(i) and (ii) cannot be
determined at this time.  The PSD applicability for these
pollutants should also be based on the "actual-to-actual"
emissions test described herein.

This PSD applicability determination applies to WEPCO's
currently planned renovations to units 1-5 (see Enclosure A), or,
if WEPCO no longer wishes to proceed with renovating unit 5, only
the renovation of units 1-4 (see Enclosure B).  However, a
decision to cancel the currently planned renovations to unit 5
could result in a PSD review for that unit should WEPCO
reconsider renovating it some time in the future.

It is our understanding that WEPCO proposes to avoid
triggering NSPS for $SO_2$ and PM at units 1 and 4 by using dry
sorbent injection and improving the existing ESP's to offset the
potential emissions increases of these pollutants.  To the extent
that the controls are federally enforceable, and no increase in
hourly emissions would occur at maximum capacity, WEPCO can use
these options to avoid triggering NSPS for PM and $SO_2$ at units 1
and 4.  However, the two units are still subject to the NSPS
requirements for $NO_x$.  Unit 5 cannot, however, avoid triggering

11

NSPS for any pollutant and, therefore, is subject to the NSPS
requirements for $NO_x$, $SO_2$, and PM.

Sincerely,

William G. Rosenberg
Assistant Administrator
for Air and Radiation

3 Enclosures

JUN 8 1990

NOTE TO:   Bob Grady, OMB
           Boyden Gray, Counsel
           Dick Schmalensee, CEA
           Mark Steinberg, WEPCO
           Linda Stuntz, DOE
           Don Theiler, Wisconsin Dept. of Natural Resources


        The enclosed letter is EPA's response to the Seventh Circuit's
remand of the WEPCO case.


                                    William G. Rosenberg

Table 7                                                                              03/29/90

PORT WASHINGTON POWER PLANT
MAY 1989 FORECAST
Units 1 - 5

| YEAR | MEGAWATT HOURS GENERATED | CAPACITY FACTOR | FUEL CONSUMPTION COAL (13200 Btu/lb) BURNED TONS |
|------|------|------|------|
| 1995 | 825,286 | 0.24 | 365,548 |
| 1996 | 941,779 | 0.27 | 415,332 |
| 1997 | 1,081,002 | 0.31 | 475,624 |
| 1998 | 1,114,313 | 0.32 | 490,068 |
| 1999 | 1,247,296 | 0.36 | 546,546 |
| 2000 | 1,349,329 | 0.38 | 589,569 |
| 2001 | 1,391,882 | 0.40 | 608,621 |
| 2002 | 1,481,464 | 0.42 | 646,417 |
| 2003 | 1,420,120 | 0.41 | 620,153 |
| 2004 | 1,432,122 | 0.41 | 625,174 |
| 2005 | 1,431,412 | 0.41 | 624,904 |
| 2006 | 1,460,471 | 0.42 | 637,519 |
| 2007 | 1,488,124 | 0.42 | 649,133 |
| 2008 | 1,481,423 | 0.42 | 646,909 |
| 2009 | 1,463,981 | 0.42 | 638,750 |

PORT WASHINGTON POWER PLANT
UPPER MAXIMUM FORECAST
Units 1 - 5

| YEAR | MEGAWATT HOURS GENERATED | CAPACITY FACTOR | FUEL CONSUMPTION COAL (13200 Btu/lb) BURNED TONS |
|------|------|------|------|
| 1995 | 1,074,957 | 0.31 | 473,981 |
| 1996 | 1,202,460 | 0.34 | 528,838 |
| 1997 | 1,341,074 | 0.38 | 587,412 |
| 1998 | 1,390,470 | 0.40 | 609,237 |
| 1999 | 1,501,584 | 0.43 | 656,710 |
| 2000 | 1,600,500 | 0.46 | 696,483 |
| 2001 | 1,651,930 | 0.47 | 718,252 |
| 2002 | 1,748,046 | 0.50 | 760,000 |
| 2003 | 1,690,000 | 0.48 | 735,000 |
| 2004 | 1,690,000 | 0.48 | 734,000 |
| 2005 | 1,690,000 | 0.48 | 734,000 |
| 2006 | 1,710,000 | 0.49 | 741,000 |
| 2007 | 1,720,000 | 0.49 | 748,000 |
| 2008 | 1,720,000 | 0.49 | 747,000 |
| 2009 | 1,695,000 | 0.48 | 737,000 |

## Enclosure A

Revised PSD Applicability Determination
Port Washington Power Plant Renovation of Units 1-5

(all emissions calculations are in tons per year)

| Pollutant | Actual Emissions Baseline (1) | Estimated Future Actual Emissions (2) | Net Emissions Change | PSD Significance Level | Subject to PSD Review (3) |
|---|---|---|---|---|---|
| Particulate matter (4) (5) | 328 | 323 | -5 | 25 | no |
| Sulfur dioxide (4) | 24,236 | 15,919 | -8,317 | 40 | no |
| Nitrogen oxides (5) | 2,592 | 3,405 | 813 | 40 | yes |
| Carbon monoxide | 144 | 217 | 73 | 100 | no |
| Hydrocarbon | 17 | 25 | 9 | 40 | no |

Other Regulated Pollutants: Due to insufficient source-specific information
regarding emission factors, PSD applicability for PM-10, lead and noncriteria
pollutants listed at 40 CFR Section 52.21 (b)(23)(i) and (ii) cannot be determined
at this time.

1) Average actual emissions for 2-year period defined by calendar years 1983 and 1984.

2) Calculated by EPA based on the following information submitted by WEPCO:

   a. The average historic firing rate (approximately 17x10⁷ Mbtu per year) for the 2-year period defined by calendar years 1978 and 1979.

   b. The emissions estimates for the renovated units based on future coal characteristics (e.g., sulfur and heat content) and actual emissions after pollution controls for particulate.

   c. Sulfur dioxide controls applied to unit 5 at 75 percent sulfur dioxide removal to comply with NSPS Subpart Da. Sulfur dioxide removal of 22 and 13 percent at units 1 and 4, respectively, to exclude these units from NSPS requirements for greater control of sulfur dioxide.

3) If new data indicate that annual, historic-firing rates at the Port Washington facility exceeded historic 1978 and 1979 levels, the indicated applicability determination could change.

4) The calculation of estimated, future, actual emissions for this pollutant is based on WEPCO's projection of control technology performance levels and/or fuel sulfur content for post-renovation operations. Consequently, EPA's PSD applicability determination is valid only to the extent that the specific particulate and sulfur dioxide emissions factors used for units 1-5 to calculate future emissions (based on particulate and SO₂ control technology performance levels and fuel sulfur and heat content) are made federally enforceable. Otherwise, the calculation of estimated, future, actual emissions for this pollutant will be revised by EPA, based on existing federally-enforceable limits (i.e., applicable SIP, NSPS). The use of current, federally-enforceable emissions factors would result in higher, projected, future emissions and, consequently, could affect the indicated PSD applicability finding.

5) Baseline emissions (actual emissions for 2-year period defined by calendar years 1983 and 1984) have been revised based on additional information submitted by WEPCO.

## Enclosure B

### Revised PSD Applicability Determination
### Port Washington Power Plant Renovation of Units 1-4

(all emissions calculations are in tons per year)

| Pollutant | Actual Emissions Baseline (1) | Estimated Future Actual Emissions (2) | Net Emissions Change | PSD Significance Level | Subject to PSD Review (3) |
|---|---|---|---|---|---|
| Particulate matter (4) (5) | 328 | 339 | 11 | 25 | no |
| Sulfur dioxide (4) | 24,235 | 18,505 | -5,731 | 40 | no |
| Nitrogen oxides (5) | 2,592 | 3,396 | 804 | 40 | yes |
| Carbon monoxide | 144 | 217 | 73 | 100 | no |
| Hydrocarbon | 17 | 25 | 9 | 40 | no |

Other Regulated Pollutants:  Due to insufficient source specific information
regarding emission factors, PSD applicability for PM-10, lead and noncriteria
pollutants listed at 40 CFR Section 52.21 (b)(23)(i) and (ii) cannot be determined
at this time.

1) Average actual emissions for 2-year period defined by calendar years 1983 and 1984.

2) Calculated by EPA based on the following information submitted by WEPCO:

    a. The average, historic-firing rate (approximately 17x10⁶ Mbtu per year) for the 2-year period defined by calendar years 1978 and 1979.

    b. The emissions estimates for the renovated units based on future coal characteristics (e.g., sulfur and heat content) and actual emissions after pollution controls for particulate.

    c. Unit 5 inoperative.  Sulfur dioxide removal of 22 and 13 percent at units 1 and 4, respectively, to exclude these units from NSPS requirements for greater control of sulfur dioxide.

3) If new data indicate that annual, historic-firing rates at the Port Washington facility exceeded historic 1978 and 1979 levels, the indicated applicability determination could change.

4) The calculation of estimated, future, actual emissions for this pollutant is based on WEPCO's projection of control technology performance levels and/or fuel sulfur content for post renovation operations.  Consequently, EPA's PSD applicability determination is valid only to the extent that the specific particulate and sulfur dioxide emissions factors used for units 1-4 to calculate future emissions (based on particulate and SO₂ control technology performance levels and fuel sulfur and heat content) are made federally enforceable.  Otherwise, the calculation of estimated, future, actual emissions for this pollutant will be revised by EPA, based on existing federally-enforceable limits (i.e., applicable SIP, NSPS).  The use of current, federally-enforceable emissions factors would result in higher, projected, future emissions and, consequently, could affect the indicated PSD applicability finding.

5) Baseline emissions (actual emissions for 2-year period defined by calendar years 1983 and 1984) have been revised based on additional information submitted by WEPCO.

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

OKLAHOMA GAS AND ELECTRIC
COMPANY,

    *Defendant*.

Civil Action No. CIV-13-690-D

Judge Timothy D. DeGiusti

## BRIEF OF UTILITY AIR REGULATORY
## GROUP AS *AMICUS CURIAE*

## Exhibit 6

```
0001
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2
    - - - - - - - - - - - - - - - - :
 3                                  :
    UNITED STATES OF AMERICA,       :
 4                                  :
         Plaintiff,                 :
 5                                  :  Civil Action
         vs                         :  No. 1:00 CV 1262
 6                                  :
    DUKE ENERGY CORPORATION,        :
 7                                  :
         Defendant.                 :    Washington, D.C.
 8                                  :
    - - - - - - - - - - - - - - - : October 4, 2001
 9
10                                      Volume I
11
12      Deposition of:
13              DAVID A. LLOYD
14   called for examination by counsel for the defendant,
15   pursuant to notice, at the offices of Hunton &
16   Williams, 1900 K Street, Northwest, Washington, D.C.,
17   commencing at 9:30 a.m., before James M. Turner, RMR,
18   Notary Public for the District of Columbia.
19
20
21
22
23            TURNER REPORTING SERVICES
                10510 Sideburn Court
24             Fairfax, Virginia  22032
                  (703) 425-0139
0002
 1  APPEARANCES:
 2  For the Plaintiff:
 3      ROBERT A. KAPLAN, ESQ.
        JASON A. DUNN, ESQ.
 4      Environmental Enforcement Section
        Environmental and Natural Resources Division
 5      Department of Justice
        1425 New York Avenue, N.W.
 6      Washington, D.C.  20005
 7
    For the Defendant:
 8
        T. THOMAS COTTINGHAM, III, ESQ.
 9      Hunton & Williams
        101 South Tryon Street, Suite 3500
10      Charlotte, North Carolina  28280
11      MAKRAM JABER, ESQ.
        Hunton & Williams
12      1900 K Street, N.W.
        Twelfth Floor
13      Washington, D.C.  20006-1109
```

```
14        GARY S. RICE, ESQ.
          Duke Energy Corporation
15        Legal Department
          422 S. Church Street, PB05#
16        Charlotte, North Carolina
17
                         C-O-N-T-E-N-T-S
18
                    WITNESS: David A. Lloyd
19
     EXAMINATION BY:                              PAGE
20
          Mr. Cottingham                           4
21
22
23
24
0003
 1                       E-X-H-I-B-I-T-S
 2                                              IDENT.
 3
     No. 1 - Rule 30(b)(5) and (6) deposition notice.... 25
 4   No. 2 - Ltr Kaplan to Cottingham 9/28/01........... 26
     No. 3 - Ltr Cottingham to Kaplan 10/3/01........... 26
 5   No. 4 - Ltr Kaplan to Cottingham 10/3/01........... 26
     No. 5 - Notice re individual deposition........... 27
 6   No. 6 - Ltr Duke Power to Helms 8/17/83........... 109
     No. 7 - Ltr Duke Power to Davis 8/17/83........... 109
 7   No. 8 - Memo Rasnic to Skie 11/19/91.............. 119
     No. 9 - Notice of Dep w/handwritten notes by
 8        witness.................................. 129
     No. 10 - USA Responses to Duke Interrogs......... 151
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
0004
 1                    P-R-O-C-E-E-D-I-N-G-S
 2        Thereupon,
 3                 DAVID A. LLOYD
 4   was called as a witness and, after being duly sworn by
 5   the notary, was examined and testified as follows:
 6             MR. COTTINGHAM: The court reporter signed the
 7   confidentiality agreement.
 8             MR. KAPLAN: Okay, good.
```

```
 9            MR. COTTINGHAM: I took care of that issue
10  before you all got here.
11            EXAMINATION BY COUNSEL FOR THE DEFENDANT
12            BY MR. COTTINGHAM:
13       Q    Your name is David A. Lloyd?
14       A    Yes.
15       Q    You work for the Environmental Protection
16  Agency?
17       A    Yes.
18       Q    You are here in this case pursuant to a
19  30(b)(5) and (6) deposition notice.  Is that correct?
20       A    That's correct.
21       Q    As you probably know, I'm Tom Cottingham.  I
22  represent Duke Energy in this lawsuit filed by the
23  United States that relates to some projects and work
24  that Duke did on certain plants in North and South
0005
 1  Carolina.  And you are familiar with that, I
 2  understand.
 3       A    Yes, I am.
 4       Q    What city do you live in, Mr. Lloyd?
 5       A    I live in Atlanta.
 6       Q    And what work do you do for the Environmental
 7  Protection Agency?
 8       A    I work for the Air Enforcement Section.  My
 9  main duties involve state coordination in Kentucky and,
10  essentially, this PSD initiative.
11       Q    Do you work for Region 4?
12       A    Yes, I do.
13       Q    So your work is state coordination in
14  Kentucky?
15       A    That is part of my work, yes.
16       Q    Okay. And then working on the, did you call
17  it the environmental initiative?
18       A    This utility initiative as we have termed it.
19       Q    What is, in your terms, the utility
20  initiative?
21       A    It is a PSD initiative that responds to what
22  was considered an area that needed enforcement, that we
23  considered, the Agency considered it to be an area that
24  needed attention. So that initiative is those efforts
0006
 1  to look into those PSD issues as they relate
 2  specifically to the utility industry.
 3       Q    When did you first start working for the EPA?
 4       A    In August of 1992.
 5       Q    When did you first start working on the
 6  utility initiative?
 7       A    In November of 1999. It may have been
 8  December.  Somewhere in there.
 9       Q    What were you doing just before you started
10  working on the utility initiative?
11       A    Before November of 1999, I was with the Waste
12  Division and that is what I was doing. I was working on
13  Super Fund sites.
14       Q    Now, this 30(b)(5) and (6) notice relates
15  primarily to emissions calculations and issues in the
```

16  case that deal with emission calculations, emission
17  increases and the cause of those.
18      A    Uh-huh (affirmative response).
19      Q    If I were working at a coal-fired electric
20  utility in Region 4 and we were doing some work that we
21  considered nonroutine, and wanted to know how to
22  calculate whether or not there was an emissions
23  increase, would you be the person we would go to to ask
24  for advice?
0007
 1      A    I would be one contact, one potential person
 2  that you could go to.
 3      Q    Who else would we contact?
 4      A    We have a PSD expert that works in our
 5  Permitting Section, and he is one of my primary
 6  resources.  So if I have overall PSD issues, not just
 7  the utility initiative --
 8      Q    What is his name?
 9      A    It is Jim -- I'm sorry, his name is escaping
10  me.
11      Q    We will come back to that. Does he work in
12  Atlanta?
13      A    Yes, he works in Atlanta.
14      Q    Does he also work for Region 4?
15      A    Yes.
16      Q    What is his title?
17      A    He is -- let's see, he is in the Permitting
18  Section. I don't know what his exact title is. He is
19  probably an environmental engineer.
20      Q    So if we came to you and asked you for advice
21  about how to perform calculations to determine whether
22  we were going to have an emissions increase as a result
23  of this work we were going to do, what would you tell
24  us?
0008
 1      A    I would say consult the regulations. I would
 2  explain the types of calculations that were required by
 3  the regulations.
 4      Q    Tell us what types of calculations are
 5  required by the regulations.
 6      A    Well, the primary calculation that you should
 7  do for utilities follows the WEPCO rule and the
 8  definition of major modification, calculated whether or
 9  not there's an emissions increase before the change as
10  projected after the change, as clarified in Part 52
11  PSD.
12      Q    Did you say it is clarified in Part 52?
13      A    I think the overall approach is given in Part
14  52.
15      Q    How would we determine what the emissions
16  were before the change?
17          MR. KAPLAN: I object to the form.
18          BY MR. COTTINGHAM:
19      Q    What would you advise us about how we would
20  determine that?
21          MR. KAPLAN: Objection to form. Are you asking
22  about right now or at a certain time period?

23            MR. COTTINGHAM: Any time.
24            BY MR. COTTINGHAM:
0009
 1      Q    If we came to you and asked you for that
 2  advice.
 3      A    If you came to me now and you asked me if you
 4  had determined that you had a nonroutine physical
 5  change or change in method and modification, you would
 6  calculate -- you would calculate the baseline emissions
 7  as per the WEPCO rule. And you would compare that to
 8  the emissions that you project to occur on a ton per
 9  year basis in the future.
10            BY MR. COTTINGHAM:
11      Q    And that's what I was really asking you. You
12  told me in general terms, but I'm asking you more
13  specifically. You said we would determine the baseline
14  emissions as per the WEPCO rule, so I'm asking you
15  specifically how do we determine that.
16      A    The way we've been interpreting the WEPCO
17  rule is to apply to the baseline emissions the highest
18  24-month period in the 60 months before the project.
19      Q    The highest 24 months of operation in the 60
20  months before?
21      A    The highest 24 months emissions in the 60
22  months before the project.
23      Q    Does it matter whether the unit is operating
24  or not during that time?
0010
 1      A    I'm not sure I understand. In other words, is
 2  the unit not operating at any time during that
 3  five-year period?
 4      Q    Yes, if the unit is not operating at any time
 5  during that five-year period, do you count that period?
 6      A    Yes, the emissions would be zero.
 7      Q    When you determine the highest 24 months, do
 8  you do that on an average basis, on a month-to-month
 9  basis? How do you do that?
10      A    It is a rolling 24-month average.  But it is
11  related -- you equate it to a year, so you take the two
12  years, the highest 24-month emissions in those two
13  years and you calculate a yearly average for that
14  two-year period.
15      Q    You said, or your lawyer actually said in
16  objecting to the form, whether we were talking about
17  now or some other period in my coming to you and asking
18  you for advice. Has there been any change in the way
19  you would calculate the baseline period for instance?
20      A    The regulations changed with the WEPCO rule.
21  And that employed this concept of representative actual
22  annual emissions and also this concept of, if you go to
23  the preamble of the rule it talks about the concept of
24  the five-year period, the highest emissions in those
0011
 1  five years. If it was before that in time, it would be
 2  a different test.
 3      Q    The change made in 1992 in the baseline
 4  period related to how you calculated the representative

```
 5    annual emissions for the 24 months. Was that part of
 6    what you were saying?
 7         A    I'm not sure I understand.
 8         Q    We will come back to that in a second. Are
 9    those the only changes you are talking about as to
10    whether we ask for it now or any other time?
11         A    I can't think of any others.
12         Q    Okay. Have all states in Region 4 adopted the
13    WEPCO rule?
14         A    Yes, that is my understanding.
15         Q    Have you done any survey to determine that?
16         A    My counsel in Region 4, Alan Dion, has done
17    research on that and has worked through the state
18    implementation plans.  So we have a general
19    understanding of that, or at least I have a general
20    understanding of that.
21         Q    So you would determine the baseline period
22    and then how would you -- what would you do next to
23    determine whether there had been an increase in
24    emissions?
0012
 1         A    Let me clarify. Is this the situation sort of
 2    at hand where we are doing these retrospective
 3    projections or are we still under the scenario where
 4    the utility is coming to me?
 5         Q    I'm still under the scenario where the
 6    utility is coming to you right now.
 7         A    Okay. Well, we would request information
 8    having to do with what your emissions would be
 9    projected -- first of all, we would ask the utilities
10    to do the calculation. But that would be based on what
11    emissions would -- are projected to be after the
12    project.
13         Q    Once you determine what they were projected
14    to be after the project, what would you do?
15         A    I would compare that to the baseline
16    emissions, any other increases and decreases, and see
17    if there's an increase above the threshold emissions.
18         Q    What years after -- what years of projections
19    would you ask for?
20         A    Generally, it is the first two years after
21    the project. The rule allows us to consider other time
22    periods that we consider more representative of normal
23    source operations.
24         Q    How would you determine whether another time
0013
 1    period was more representative?
 2         A    I would ask for company plans on how they
 3    intend to operate the unit. I would ask the company to
 4    produce those. If the operation of the unit is expected
 5    to significantly change in periods other than those
 6    first two years, then I might consider an alternate
 7    time period.
 8         Q    Would you take just the emissions projected
 9    by the company, would you take any other or do any
10    calculation related to those emissions?
11         A    Well, I think as part of our normal review
```

12  during these analyses if we had questions or comments
13  we would bring them to the company. So, I would
14  imagine, you know, in the process of making this
15  determination that there would be some amount of back
16  and forth.
17      Q    Is there any other part of the calculation to
18  determine whether there was an increase that you would
19  do?
20      A    Given that scenario of current day, I don't
21  see that we would do any other types of calculations.
22      Q    How would you then determine whether the work
23  we were talking about caused that increase?
24      A    I would look for available information,
0014
1   considering -- well, one way that we have done it
2   retrospectively -- and, I think, is also a way we could
3   do it for current situations -- is to look at the GADS
4   data. Are there significant -- is there a significant
5   amount of forced outage based on other results from the
6   components being replaced as part of the project. That
7   would be -- that would be one line. I would consider
8   whether or not the unit has been derated and will be,
9   whether the rating will increase as part of the
10  project. There may be other factors in there as well.
11      Q    What do you mean by derated?
12      A    Well, if for some reason the maximum heat
13  input or the megawatt rating of the unit had been
14  scaled down because it was either unsafe or it
15  exceeded, you know, it exceeded what the unit could
16  withstand because of the condition of the unit, then
17  that's sort of, in my mind, a derating. And to the
18  extent the project would recover either that heat input
19  or those megawatt hours, it would be related to the
20  increase.
21      Q    Would you determine whether the unit was
22  going to produce or could have produced the same amount
23  of power in the time after the work was done as it did
24  in the time before the work was done in the baseline
0015
1   period?
2       A    Yes, but I'm not sure exactly how to go about
3   that. But.
4       Q    But you agree --
5       A    Well, the definition of projected emissions
6   called for a determination of that. It is part of the
7   equation. And so, yes, I would do that.
8       Q    What would the result be if you found that it
9   could produce the same amount in the post-work period
10  as it did in the baseline period; how would that affect
11  your causation analysis?
12      A    That would be one component of it. The other
13  part of that analysis would have to do with -- well,
14  essentially it states in the reg that it should be, the
15  increase should be unrelated to the project. So that is
16  sort of another half of the issue. So, it would be one
17  thing I would consider.
18      Q    What other factors would you consider?

```
19      A    The purpose of the project. If there were
20  significant amounts of down time because of the
21  components being replaced, I think it's pretty safe to
22  infer that the project is related to those recovered
23  hours that you would have under that scenario.
24      Q    Even if there was no increase in its ability
0016
 1  to produce the same amount of power as it did in the
 2  baseline period?
 3      A    The PSD regulations do not, are not based on
 4  a potential to a potential type test or an hourly
 5  increase in emissions. They are based on actual
 6  emissions on a ton per year basis.
 7      Q    Would you consider whether there was any
 8  change in the dispatch ranking of the unit as a result
 9  of the work in your causation analysis?
10      A    If I had that information, I might consider
11  it. If a project would cause the dispatch -- cause it
12  to be higher on the dispatch order, in other words, to
13  operate more before other units would operate, that
14  might be something to consider.
15      Q    What if, under the projections, it appeared
16  that there would be no change in the dispatch order,
17  how would that affect your causation analysis?
18      A    That would be just that particular aspect of
19  the analysis wouldn't factor in.
20      Q    Would not factor in? So you wouldn't consider
21  that?
22      A    If a dispatch order didn't change?
23      Q    Didn't change.  You wouldn't consider that as
24  any factor in the causation analysis?
0017
 1      A    I can't really think why I would.
 2      Q    If the -- well, to what extent would you take
 3  into account whether demand caused the emissions
 4  increases in the projections?
 5      A    If the ability to meet that demand growth is
 6  unrelated to the project, then I would not consider
 7  demand growth in the calculation of representative
 8  actual annual emissions.
 9      Q    How would you determine whether the ability
10  to meet the demand growth was related or unrelated to
11  the project?
12      A    I would look at the condition of the unit,
13  whether it was causing -- whether there were a lot of
14  forced outages that were expected to be remedied by the
15  project. I would look at whether or not the boiler
16  would be expected to be reliable without the
17  implementation of the project.
18      Q    Would you consider whether the work that was
19  done -- and let's assume for purposes now it is
20  replacement of a part. Would you consider whether that,
21  the new part, was thermally equivalent to the replaced
22  part?
23      A    I'm not sure I'm qualified to answer that,
24  that question.
0018
```

```
 1      Q    So you wouldn't consider that as a factor?
 2           MR. KAPLAN: Objection to form.
 3           THE WITNESS:  I don't know. If that were
 4  raised as a question, if a utility had, were to come in
 5  for a determination and raise that as an issue, I would
 6  have to consult somebody.
 7           BY MR. COTTINGHAM:
 8      Q    Would you do any calculations to net
 9  emissions?
10           MR. KAPLAN: Objection to form. And are you
11  asking about net emissions?
12           MR. COTTINGHAM: I'm asking if he would do any
13  netting in his calculations, netting of emissions.
14           MR. KAPLAN: This is an appropriate time to
15  say that we sent you a letter on October 3 indicating
16  that we would not be designating this witness for
17  topics 14 and 15 of your Schedule A, which refer to
18  netting.
19           BY MR. COTTINGHAM:
20      Q    Would you ask for more information from the
21  utility about netting?
22      A    If they proposed a netting scenario, I would
23  consider what they proposed.
24           MR. KAPLAN: Let me make clear that that
0019
 1  answer the witness just gave was not in his 30(b)(6)
 2  capacity.
 3           BY MR. COTTINGHAM:
 4      Q    Is there any other factor or calculation that
 5  you would do in determining whether there was an
 6  emissions increase caused by the work we were telling
 7  you we were going to do?
 8      A    In the case of a current scenario, I can't
 9  think of any others right now.
10      Q    Any other factors you would take into
11  account?
12      A    Possibly. I mean I can't say that definitely
13  but, I think we've covered the main factors.
14      Q    When did you first -- when did you first
15  learn how to do the calculations we've just talked
16  about?
17      A    Shortly after I started with the Air Program,
18  which was November of '99.
19      Q    How did you learn about it?
20      A    Talking with some of the engineers that were
21  already in the Air Program at the time and had been
22  working on the initiative. We had -- there was a
23  meeting we had some time that fall from different
24  regions where we discussed these calculations, these
0020
 1  approaches.
 2      Q    That was in the fall of '99?
 3      A    Yes.
 4      Q    Who was in those meetings?
 5      A    A variety of people from several EPA regions
 6  and headquarters. I think there were a couple of
 7  attorneys from DOJ at those meetings.
```

```
 8      Q    I was asking specifically who were the
 9 people.
10      A    Oh. Well, I can tick off the ones I know.
11 John Hewson was there. Jason Dressler.
12      Q    Dressler?
13      A    Yes.
14      Q    D-R-E-S-S-L-E-R?
15      A    Uh-huh (affirmative response). I know Bruce
16 Buckheit made an appearance. Let's see. Jaffe, Greg
17 Jaffe was there. Dave Solomon was there. There
18 certainly were a lot more people, but I can't recall
19 for sure. Essentially, since I had just met those
20 people for the first time. I don't recall any other
21 names, although there were a number more than I have
22 said there.
23      Q    You said there were lawyers there. Who were
24 the lawyers?
0021
 1      A    Well, Greg Jaffe is a lawyer. I don't know if
 2 Bruce is or not. I don't recall who was there from DOJ.
 3      Q    Was there somebody there from DOJ?
 4      A    Uh-huh (affirmative response).
 5           MR. KAPLAN: It wasn't me.
 6           MR. COTTINGHAM: You avoided another
 7 deposition.
 8           MR. KAPLAN: That's right.
 9           BY MR. COTTINGHAM:
10      Q    What is John Hewson's position?
11      A    He is no longer with EPA.
12      Q    What was he?
13      A    He was -- he was an environmental engineer in
14 our -- I believe he was in -- he was formerly in the
15 Air Enforcement Section, but he moved to the Permitting
16 Section. But he continued to work on the utility
17 initiative.
18      Q    Do you know what his position was in November
19 or the fall of '99 other than an environmental
20 engineer?
21      A    He he had left the Air Enforcement Section
22 but he was still in the Air Division. His job -- I
23 don't know what his job title was, but he was working
24 officially in pollution prevention, P2, and I'm not
0022
 1 familiar with that. But he was spending a lot of his
 2 time working on the utility initiative. So his position
 3 did not change from when I started in the Air Program
 4 until when he left the Agency.
 5      Q    When did he leave?
 6      A    It was July, I believe, late June or July, of
 7 this year.
 8      Q    What was Jason Dressler's position?
 9      A    He is an environmental engineer in the Air
10 Enforcement Section.
11      Q    Region 4?
12      A    Region 4.
13      Q    Is he still there?
14      A    Yes.
```

```
 5      A    Well, enforceable.  For example, let's say
 6  there was an enforceable limit on SO2 emissions that
 7  could be factored in and that could be a way, even
 8  under the actual to potential test, of reducing the
 9  potential and not triggering PSD.
10      Q    So, after you did the NOV calculations we
11  were talking about, additional changes that you made in
12  the calculations, one is you did the actual to
13  potential calculations for some projects. How did you
14  decide which projects to do that for?
15      A    At that point I had a general sense of when
16  the SIPs incorporated the WEPCO rule. So, for those
17  projects and earlier I went back and did the actual to
18  potential calculation.
19      Q    When did the SIPS at issue here incorporate
20  the WEPCO rule?
21      A    I can't recall exactly, but somewhere after
22  '94, somewhere after 1994.
23      Q    But you don't remember exactly when?
24      A    Correct.
0069
 1      Q    Were there -- what other changes or
 2  differences were there in your calculations after the
 3  NOV was issued?
 4      A    We changed the, under the GADS approach,
 5  recovered forced outages, we changed the period from
 6  which we extracted the outage hours in most cases. In
 7  -- that was done to conform pretty much with how they
 8  were doing the calculations at TVA at that time.
 9      Q    So, for the NOV you had used a different
10  method for determining the period for which you
11  extracted the outage hours?
12      A    I used the same methodology for the overall
13  calculation, but that time period from which I
14  extracted those hours was essentially standardized
15  after the NOV.
16      Q    And before it wasn't standardized?
17      A    Before, it changed probably from project to
18  project.
19      Q    Why would it change from project to project?
20      A    Well, the -- in some cases it would use the
21  two years before the project. In some cases it would --
22  actually, it was sort of targeted towards those times
23  that showed a lot of forced outages. And the concern
24  was that we weren't taking a standard approach for each
0070
 1  project. So that was the reason that we changed it
 2  after the NOV.
 3      Q    So, in my hypothetical that I started out
 4  with today, I come to you and ask you how to do these
 5  calculations, if I had come to you before you issued
 6  the NOV on this issue of what period to extract the
 7  outage hours under GADS, you may have told me one
 8  thing, and later that year you might have told me
 9  something different. Correct?
10      A    There was some discussion going on --
11      Q    Am I correct in what I just said, you may
```

12  very well have given me two different answers?
13      A    It is possible. I may have referred you to
14  some other expert.
15      Q    But if we were, if you were the one to go
16  to --
17      A    Right.
18      Q    -- before May of '99, you would have given us
19  one answer; after May of '99 you probably would have
20  given us a different answer?
21      A    Yes. And -- yes, I think that's correct.
22      Q    Okay. If we hadn't come to you and just tried
23  to do it on our own, how would we have known which way
24  to do it?
0071
 1      A    I think you would have started with the
 2  regulation and done the calculations based on the
 3  information you had or the information that you could
 4  have generated at the time, come to us for an
 5  applicability determination, and worked through the
 6  issues.
 7      Q    You started with the regulation, didn't you?
 8      A    Uh-huh (affirmative response).
 9      Q    Was there any change in the regulation
10  between January '99 and May of '99 -- I mean May of
11  2000?
12      A    January of '99?
13      Q    I'm sorry, I have it wrong. January of 2000
14  and May of 2000.
15      A    Oh. Not that I am aware of.
16      Q    Was there any change in the regulation
17  between May 2000 and December 2000?
18      A    Not that I am aware of.
19      Q    So we were looking at the same regulation,
20  and you say there are still two different ways you
21  might have done this?
22      A    There are two different ways that I
23  interpreted the evidence based on these retrospective
24  predictions.
0072
 1      Q    Two different numbers you would have used in
 2  your formula, in your calculation. Correct?
 3      A    I'll just say that I did use two different
 4  numbers before and after the NOV.
 5      Q    And there's no way we would have known which
 6  one you were going to use, was there?
 7      A    I think you would have been able to come up
 8  with a reasonable interpretation of what to do, and
 9  that would have been clarified under any applicability
10  determination.
11      Q    If we had sent you the applicability
12  determination before May of 2000, you would have used
13  one number. If we sent it to you after May of 2000, you
14  would have used a different one. Correct?
15      A    I think we would have focused more on your
16  calculations, why you did what you did, and if it
17  seemed reasonable, we would have accepted it. So, I
18  can't say what information you would have sent me

15      A    I would say that we used different available
16  evidence to use that one methodology. So, yes, there
17  were two distinct types of calculations that we used
18  based on the evidence that was available to us.
19      Q    And those two distinct types are one using
20  GADS data and one using Duke projections. Correct?
21      A    Yes, correct.
22      Q    Are you saying that well did you use GADS
23  data because you did not have Duke projections or Duke
24  projections because you did not have GADS data?
0137
1       A    Well, in some cases we used both. If we had
2   unit specific projections based on the ten-year
3   projections, we used that calculation based on those
4   ten-year projections. So, you will see when you look
5   through the calculations that from '89 through '93 we
6   have unit specific projections. That is the available
7   data we have from the 114 response.
8       Q    You are saying you have ten years?
9       A    Each projection projects out ten years. But
10  those yearly ten-year projections were conducted every
11  year from 1989 through '93.
12      Q    Okay.
13      A    And for each year that I had unit specific
14  projections I did the projection based on that data.
15      Q    And when did you use the GADS data?
16      A    Essentially, for everything else. And in some
17  cases I used the GADS data as well.
18      Q    Why would you use both the GADS data and the
19  projections?
20      A    It's just an additional line of evidence.
21  It's just more information that can go into our
22  evaluation of the case.
23      Q    Which is the valid and appropriate method to
24  use?
0138
1       A    I think either method could be valid. It is
2   -- there's no specific method or no specific type of
3   calculation. The regulation sets up the methodology,
4   and it does not say specifically how that methodology
5   was to be implemented.  Now we use the same
6   methodology. It was still an actual to projected actual
7   test. We used differing sets of data to evaluate that
8   methodology.
9       Q    And sometimes you had GADS data and you had
10  projections and you tried it both ways. Correct?
11      A    We conducted the calculations in some cases
12  both ways.
13      Q    And did it come out the same?
14      A    In some cases similar and in some cases no.
15      Q    If one using the GADS data showed no increase
16  and using the projection method showed an increase,
17  which one would you use?
18      A    I don't know. That never happened. I would
19  have to look at the specific case and weigh all the
20  factors at the time. I can't really say.
21      Q    What factors would you weigh if that did

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

OKLAHOMA GAS AND ELECTRIC
COMPANY,

    *Defendant*.

Civil Action No. CIV-13-690-D

Judge Timothy D. DeGiusti

## BRIEF OF UTILITY AIR REGULATORY
## GROUP AS *AMICUS CURIAE*

## Exhibit 7

```
0001
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 3
 4   UNITED STATES OF AMERICA,
 5             Plaintiff(s),
 6   ENVIRONMENTAL DEFENSE, NORTH CAROLINA
     SIERRA CLUB, NORTH CAROLINA PUBLIC
 7   INTEREST RESEARCH GROUP,
 8         vs.                    Case No: 1:00CV126
 9   DUKE ENERGY CORPORATION,
10             Defendant(s).
11                   V I D E O T A P E D
12                   D E P O S I T I O N
13   WITNESS:          JOHN HEWSON
14   DATE:             Monday, December 17th, 2001
15   TIME:             9:30 a.m.
16   LOCATION:         Allgood, Childs & Mehrhof
                       615 Telfair Street
17                     Augusta, Georgia
18   TAKEN BY:         Attorneys for the Defendant
19   REPORTED BY:      LISA D. JETER,
                       Registered Professional Reporter
20
21
22   - - - - - - - - - - - - - - - - - - - - - - - - - -
23               LOWRANCE REPORTING SERVICE
                     3335 Chilham Place
24             Charlotte, North Carolina 28226
25                   1-704-543-7995
0002
 1   APPEARANCES:
 2        ATTORNEYS FOR THE PLAINTIFF/INTERVENORS:
 3             ALAN DION, ESQUIRE
               ASSOCIATE REGIONAL COUNSEL USEAP REGION 4
 4             61 Forsyth Street, Southwest
               Atlanta, Georgia  30303
 5
 6        ATTORNEYS FOR THE DEFENDANT:
 7             HUNTON & WILLIAMS
               BY:  T. THOMAS COTTINGHAM, III
 8             101 South Tryon Street, Suite 3500
               Charlotte, North Carolina  28280
 9
10             DEAN MOESER, ESQUIRE
               DUKE ENERGY COUNSEL
11
12   ALSO PRESENT:
13             MAC MCLEOD, VIDEOGRAPHER
14
15
16             (INDEX AT REAR OF TRANSCRIPT)
17
18
19
20
21
22
23
24
25
```

25
0003
```
 1          STIPULATION:  It is stipulated by
 2  and among counsel that this deposition is being
 3  taken in accordance with the Federal Rules,
 4  and that the deponent does not waive the right to read
 5  and sign the deposition transcript.
 6          - - - - - - - - - - - - - - - -
 7               JOHN HEWSON, being first duly
 8  sworn, testified as follows:
 9          EXAMINATION
10  BY MR. COTTINGHAM:
11      Q.   Your name is John Hewson?
12      A.   That's correct.
13      Q.   Mr. Hewson, as you know, I'm Tom Cottingham.
14  I represent Duke Energy in this environmental
15  enforcement action filed by the United States.
16          Where do you work at the present time?
17      A.   I work at PCS Nitrogen, LP, Augusta plant,
18  Augusta, Georgia.
19      Q.   At one time you worked for the
20  US Environmental Protection Agency?
21      A.   That's correct.
22      Q.   When did you work for the EPA?
23      A.   I believe I started January 27th, 1991.  And
24  my last day was June 30th, the year 2001.
25      Q.   Tell us where you grew up and where you went
```
0004
```
 1  to school.
 2      A.   Well, I guess I -- I originally grew up in
 3  Savannah, Georgia; lived there from the age of two to
 4  18.  Then I went to Atlanta to go to college.  I went to
 5  Georgia Tech.  So that would have been in September of
 6  1985.  And I attended Georgia Tech for five years,
 7  graduated June of 1990.  Then I got the job at EPA
 8  January of '91.
 9      Q.   Did you -- what degree did you get from
10  Georgia Tech?
11      A.   Chemical engineering bachelor degree.
12  Bachelor of science.
13      Q.   Did you work between June of '90 and January
14  of '91?
15      A.   I had a couple of part-time jobs.  I worked
16  for two weeks doing telecommunications, just
17  cold-calling people.  And then I worked for about two
18  and a half months at the Center of Disease Control
19  looking over Superfund documents and putting the --
20  going through the documents and classifying the
21  different pollutants and the different media that the
22  pollutants were in, that sort of thing.
23          Again, it was not a very technical job.  And
24  it was -- it was just something part-time to get me
25  through until I found the job that I wanted.
```
0005
```
 1      Q.   Okay.  What do you do at PCS Nitrogen?
 2      A.   I'm an environmental engineer.
 3      Q.   What does that involve?
 4      A.   Well, my title is senior environmental
 5  engineer.  I work for the environmental health and
 6  safety manager, Virgil Fowler.  And my -- I do all of
```

```
 7   environmental compliance.  I'm -- they recently lost one
 8   of their -- their, probably, most senior environmental
 9   engineer.  My manager has a safety background, and so
10   I'm probably their most educated environmental
11   specialist they have there.  So my specialty, though, is
12   air pollution, because of my 10 years of experience in
13   the air division at EPA.
14        Q.   Is your work in environmental compliance for
15   PCS limited to the Augusta facility or is it broader
16   than that?
17        A.   It's broader than that in that I do
18   communicate with the corporate environmental managers.
19   We have two corporate environmental managers, and
20   particularly Gene McNeil.  I talk to him occasionally,
21   and with their senior counsel, who is obviously involved
22   in the legal side of the environmental issues.  I have
23   conference calls with them.  I discuss environmental
24   issues with them.  Next year I will probably be doing
25   environmental audits in the other facilities that PCS
0006
 1   owns.
 2        Q.   How many -- just give us some idea of where
 3   PCS is located, where it does business?
 4        A.   Right.  PCS is Potash Corporation of
 5   Saskatchewan.  Originally it was in Saskatchewan,
 6   Canada.  It was a government-owned operation.  They were
 7   privatized, I believe, in the late seventies.  Then they
 8   bought out -- so they just mine Potash.  Then they
 9   bought out Arcadian which is what the Augusta plant used
10   to be.
11             And Arcadian had five or six plants in the
12   United States, and that became the nitrogen division of
13   PCS.  And then they also bought out another corporation
14   which had five or six -- had like four or five
15   facilities which became the phosphorous division.  And
16   so, overall, you put those three together, and that's
17   the -- that's what PCS does.  They make fertilizer and
18   other chemical products.
19        Q.   Does PCS have operations in North Carolina?
20        A.   Yes, they do.
21        Q.   What other states does it have operations?
22        A.   Ohio, Florida, Louisiana; our headquarters is
23   in Chicago.  Of course, we have our potash mines in
24   Saskatchewan.  We have another phosphorous mine we just
25   bought in Chile, South America.  And a -- I believe it's
0007
 1   also a phosphorous mine we bought a year and a half ago
 2   just outside of Rio de Janeiro, Brazil.
 3        Q.   What specific work does PCS do at the
 4   nitrogen -- PCS Nitrogen facility in Augusta?
 5        A.   We make ammonia, urea, ammonium nitrate,
 6   nitric acid and blends of urea and ammonium nitrate.
 7   And we also have two side facilities.  We have a
 8   50 percent joint venture, which is called "ACI," which
 9   makes CO2 for carbonating sodas; and a calcium nitrite
10   facility, which is a different company, but they're on
11   our property and they use NOx off -- which is N-O-X, NO2
12   and NO3 -- NO and NO2 off of our process.
13        Q.   What do you know about the operations in
14   North Carolina?  Where is that located?
```

```
15        A.   I believe it's White Plains.  But that's about
16   all that I know about it.  I have read the corporate
17   report for the year 2000 about two months ago.  And so,
18   in that, I just learned a general overview of the
19   company.  But other than that, I haven't personally been
20   told a whole lot about the different facilities.
21        Q.   In your work in environmental compliance for
22   PCS Nitrogen, do you prepare applicability
23   determinations?
24        A.   Yes, I do.
25        Q.   Have you prepared any since -- in the six
0008
 1   months, approximately, you have been there?
 2        A.   Yes, I -- well, when I hear that term, I think
 3   back to my old days at EPA where it was very formalized.
 4   At PCS, I would say it's not quite as formalized a
 5   process, but I have generated memos to the file on
 6   applicability for PCS.
 7        Q.   Okay.  And has that related to air quality?
 8        A.   Yes, it has.
 9        Q.   Have you actually made any applications to EPS
10   for applicability determination?
11        A.   No, we have not.
12        Q.   Have you had any communication with EPA other
13   than in connection with this deposition?
14        A.   Yes, I have.  I have called EPA on several
15   occasions about applicability determinations.  And I
16   have gotten a lot of feedback on the phone with my old
17   colleagues, but I haven't asked for anything in writing
18   from them.
19        Q.   I'm not trying to ask you anything that would
20   be confidential --
21        A.   Uh-huh.
22        Q.   -- or business information.  But just what,
23   generally, has been the nature of your request to PC --
24   EPA?
25        A.   It's been concerning PSD issues.  It's been
0009
 1   concerning NSPS issues.  And it's been concerning
 2   Title 5 permitting issues.
 3        Q.   Who have you contacted at EPA in connection
 4   with those issues?
 5        A.   I have contacted Scott Miller regarding
 6   Title 5 permitting.  I have contacted Jim Little about
 7   PSD permitting.  And I have contacted David McNeil and
 8   Keith Goff regarding NSPS.
 9        Q.   Are all of those people at Region 4?
10        A.   Yes, they are.
11        Q.   Tell us, if you will just go through with us
12   in chronological order, what work you did at EPA
13   starting in January 1991 when you started there.  And
14   let's start with what your title was at that time.
15        A.   Sure.  My title was environmental engineer.
16   That general title held for my whole tenure at EPA.  I
17   had a more specific title later, but I guess -- I
18   started as a GS-5, and I was in the air enforcement
19   section as a staff level engineer.  I worked for a man
20   named Mark Armentrout.
21             And I would say my first -- really, my first
22   year was training.  EPA has a very formalized training
```

23   that you have to go through, and you have to have
24   completed.  It's like six different courses before you
25   can legally do an inspection or -- this is their policy.
0010
1   You have to have done these courses before you can do an
2   inspection on your own to be a certified inspector.  So
3   your first year you're doing those courses.
4         Also around -- I can't remember exactly, but
5   right around a year after I started, I started going out
6   on inspections with senior inspectors.  I went out to
7   Georgetown, South Carolina with Phillip Barnette, and we
8   did two inspections there.  And I --
9      Q.   What did y'all -- what were you inspecting in
10  Georgetown?
11     A.   We went to Georgetown Steel, and we went to
12  International Paper.
13     Q.   And that was after you had been with EPA about
14  a year?
15     A.   That's correct.  I think it was in the
16  spring -- I'm not positive.  So that would have put it
17  about 15 months -- 16 months after I started.
18     Q.   Approximately the spring of '92 --
19     A.   Yes.
20     Q.   -- you started doing these inspections?
21     A.   I think so.
22     Q.   Okay.
23     A.   And then I went out with Floyd Ledbetter, and
24  we went to a very small town in northern-central
25  Tennessee, Cookeville.  And we went to approximately
0011
1   five or six small facilities whose main pollutant of
2   concern was volatile organic compounds.
3     Q.   Then did you -- did you come -- well, go
4   ahead.  I didn't mean to interrupt you.  Go ahead.  What
5   did you do after that?
6     A.   Okay.  So -- well, let's see.  Around October
7   of 1991, Mark Armentrout left the agency.  And then, at
8   the time that he left, he assigned me to be the
9   pollution prevention specialist for the air enforcement
10  section.
11     Q.   Did you stay in enforcement, air enforcement
12  the entire time you were at EPA?
13     A.   No, I did not.  I was in air enforcement from
14  January of 1991 through April of 1998.  And from April
15  of 1998 through June of 2001, I was in the air
16  permitting section, is what it is called now.  I think
17  it actually had a different, more technical-sounding
18  name when I first joined it.
19     Q.   Okay.
20     A.   So I can't remember exactly, but when I first
21  did my inspection by myself, it -- I'm just not sure.
22  It would have been either the summer of '92 or sometime
23  in '93.  But I, essentially, became an inspector at that
24  point.
25        And my job in the air enforcement section was
0012
1   to be a -- I was assigned -- okay, when I first started
2   at EPA, I was assigned the -- what they called the local
3   programs for the State of Tennessee.  I did -- I was
4   assigned the big cities that had their own local air

```
 5   pollution control agencies, which were Nashville,
 6   Chattanooga, Knoxville and Memphis.
 7        Q.   So when you say you were assigned to local
 8   programs, you mean you worked with cities that had their
 9   own local programs?
10        A.   That is correct.
11        Q.   And you did that in Tennessee?
12        A.   That's correct.  I was the EPA liaison.  So,
13   for instance, we would have a monthly conference call
14   with each of those cities.  And it was my duty -- I
15   would conduct the call.  I would set up the call.  I
16   would call the, generally, air enforcement branch chief
17   for those agencies and have a call with them and go over
18   all of the enforcement actions that they were taking
19   that under EPA's policy needed to be tracked by EPA.
20        Q.   How long did you do this work?
21        A.   I did this work, I think, until around the
22   beginning of '92, and then I was given the whole state
23   of Tennessee.  And then I had the state program and the
24   local programs.  And then, I believe, in '93, like maybe
25   fall of '93, approximately, I was given the state of
0013
 1   Kentucky and its local programs.
 2        Q.   Was that in addition to Tennessee?
 3        A.   No.  That was in replacement of.  So at
 4   that --
 5        Q.   What was the reason for that change?
 6        A.   EPA, I would say, has a high level of turn
 7   over, and a lady -- I remember a lady named Vera had
 8   just left the agency.  There may have been another
 9   person that left.  You just sort of shuffle the
10   responsibilities around.
11             A lot of times it was not uncommon when a new
12   person comes on board to give them the local programs
13   first as sort of a training.  And as you move up, you
14   take more responsibility and you usually get a state
15   program.
16        Q.   Okay.  When you have a state program like you
17   had in Tennessee and then later in Kentucky, does -- do
18   you then have responsibility for any activity in that
19   state as far as EPA is concerned?
20        A.   That is correct.  You are the liaison between
21   EPA and the state.  So if any citizen calls and wants to
22   talk to a federal official about environmental issues in
23   the state that you're covering, you're the person that
24   they will reach.  You are the staff-level person who is
25   assigned to that area.
0014
 1             So we would field citizens' complaints.  We
 2   would field all of the calls from industry.  If an
 3   industry representative had a call about applicability
 4   or enforcement issues, or really anything, there is a
 5   good chance that they would reach the enforcement
 6   coordinator at EPA.
 7        Q.   How long did you work with the State of
 8   Kentucky?
 9        A.   I continued to work with the State of Kentucky
10   through April of 1998 until I left that section.
11        Q.   Okay.  Did you work with any other states
12   during that time?
```

13        A.   Not directly, but indirectly.
14        Q.   But you were with the one -- you were the EPA
15   liaison for the State of Kentucky --
16        A.   And I was -- yeah, that's right.
17        Q.   -- from about -- I may have missed the date,
18   but about 1994 through 1998?
19        A.   That's right.  I think it was probably
20   actually '93 through '98.  Say the fall of '93, is my
21   best guess, through April of '98.
22        Q.   Okay.  During that time, was part of your
23   responsibility conducting inspections in Kentucky?
24        A.   Yes.
25        Q.   Did you conduct inspections in any other
0015
1   states during that time?
2        A.   Yes, I did.
3        Q.   What would be the occasion for conducting
4   inspections in other states?
5        A.   I conducted inspections in Alabama.  I was on
6   a team.  It was a team organized around Mobile, the Bay
7   area there.  There was Environmental Justice concerns in
8   that area.  And there had been a lot of citizens that
9   were very upset, and there was -- the National Estuary
10   Program had started doing whatever they do.  And -- but
11   it's -- I hate to say it like that, but it's a real big
12   deal at EPA.  There's this -- they get a big grant, they
13   have a lot of money to do things.  They move into the
14   area.  They set up all of these committees.
15             And as part of that effort, I think that
16   they -- the air division wanted to make sure that it was
17   covering its side of this initiative that was going on.
18   So they set up a team.  There were about six of us.  I
19   was on that team, and then we decided one of the things
20   that we would do is we would go down to the Mobile area
21   and do inspections.
22        Q.   Is that what you mean by Environmental Justice
23   concerns, this issue about citizen complaints and other
24   complaints in the Mobile area?
25        A.   That's right.  Environmental Justice is a
0016
1   program, as I understand it, set up by EPA to address
2   citizen concerns in impoverished and minority areas.
3             I also did inspections at Muscle Shoals,
4   Alabama, which is more on the northern half.  I was, at
5   that time -- this would -- I think this would have been
6   around '96 if I had to guess, but I'm really not sure.
7   I was the -- what they called the chlora -- chloralkali
8   mercury cell expert, per se, for the -- for specialists
9   or something.
10        Q.   Did y'all have a big ceremony when they made
11   you that expert?
12        A.   Yeah.  I had been involved in a case against
13   Olin Chemicals in Charleston, Tennessee.  And that was
14   the type of facility -- that was one of the facilities
15   at the Olin plant.  And that was -- the chloralkali
16   mercury cell was the unit involved in litigation with
17   EPA.
18             So I was the staff-level engineer assigned to
19   that case.  And in learning about that process, they
20   decided that was my new thing, and that I would go

21    around and inspect a lot of these other chloralkali
22    mercury cells in the region.
23           So I went to the one in Muscle Shoals and
24    inspected that one.  That ended up being the first and
25    last one I did.  After that, we sort of got sidetracked,
0017
1     in that those inspections -- the rest of the inspections
2     at those facilities didn't happen.
3         Q.   Okay.  So you did -- you did some inspections
4     in Tennessee, some in Kentucky, these in Alabama.  Any
5     other states?
6         A.   Yes.  Well, I did inspections at
7     Tampa Electric in Florida.
8         Q.   When was that?
9         A.   That inspection was conducted in March of
10    1998.
11        Q.   Okay.  I'm going to come back to that one in a
12    minute.
13        A.   Hold on a second.  Let me think here.  I did
14    the inspections and training that I told you about in
15    South Carolina and Tennessee.  I know that I have never
16    done -- oh, I did -- I have never done an inspection in
17    Mississippi.  I have told you about all of the
18    inspections in Alabama.  I did do two inspections in
19    Georgia -- well, two -- well, three inspections in
20    Georgia.
21           I inspected a very small fertilizer operation
22    about 20 minutes, 40 minutes outside of Atlanta.  I
23    can't remember the name of the company.  It was a very
24    small facility.  It only took us two or three hours.  I
25    went with the person who was the Georgia EPA
0018
1     representative who handled all of the Georgia concerns.
2     Her name was Yolanda Vivas at the time.  Now it's
3     Yolanda Adams.
4            And then I inspected Grady Hospital's medical
5     incinerator.  That would have been late '96.  That was
6     kind of an interesting one.  I could see the smoke
7     coming out of their incinerator from our high-rise
8     building at EPA.  And, finally, I just couldn't stand it
9     and I told my supervisor I wanted to go over there and
10    do an inspection.
11        Q.   So it pays not to have a facility near an EPA
12    office?
13        A.   That's right.  And then I did a facility -- an
14    inspection at a -- at a yarn manufacturing operation.
15    Again, I was driving back from Chattanooga, Tennessee,
16    back to Atlanta, and I just saw smoke coming out of this
17    stack at the yarn manufacturer.  I didn't really do a
18    full inspection.  I just stopped and asked them about
19    it.  And I took a second look at it, and it didn't look
20    as bad as it did from the road, so I just kept going.
21        Q.   Have you done -- have you performed any
22    inspections in North Carolina?
23        A.   Yes, I have.  I have done inspections at
24    Duke Power.
25        Q.   When did you do the inspection at Duke Power?
0019
1         A.   To be honest with you, I don't remember
2     exactly, but --

```
 3        Q.    There were some in the March time frame of
 4    2000?
 5        A.    That's -- that would have been -- I did two
 6    inspections.  And, again, I hope it doesn't make me look
 7    too bad.  But I remember I did an inspection with
 8    David Lloyd at Belews Creek --
 9        Q.    Uh-huh.
10        A.    -- and a second facility that I don't recall.
11        Q.    Before you -- and that was -- let's see.  That
12    was in 2000.  You had been to Tampa Electric in March of
13    '98.  Let's go before March of '98.  Had you performed
14    any inspections at electric utilities?
15        A.    Yes, I had.  I had -- I had -- actually, I
16    guess it's technically a different state.  As part of
17    my -- well, no, it's not.  It's in this -- in -- as part
18    of my functions for Kentucky, I did inspections at
19    Cincinnati, at Cinergy.  And I guess their headquarter
20    is in Ohio, but the facility was in Kentucky.  It was
21    just over the river.
22        Q.    What facility was that?
23        A.    It's -- I can't tell you what city in Kentucky
24    it's in, but it's within 40 minutes of the city of
25    Cincinnati.  It's just over the river from Cincinnati.
0020
 1        Q.    When did you do that inspection?
 2        A.    I did that inspection in the 1995 time frame.
 3        Q.    Any other utilities before Tampa Electric?
 4        A.    Yes.  I did inspections at Louisville Gas and
 5    Electric, which was in 1997, the summer of '97.  I did
 6    inspections at Kentucky Utilities in the '94-'95 time
 7    frame.  I think that's it.
 8              Let me make sure here.  I visited
 9    Virginia Power's facility about 45 minutes outside of
10    Washington, D.C.  It was not an inspection.  The company
11    agreed to let EPA representatives come tour the facility
12    to become familiar with electric utility plants.  There
13    were a couple of EPA headquarters' attorneys who came
14    along.
15        Q.    When did that occur?
16        A.    That was -- I believe that was the -- in the
17    December time frame of 1997.
18        Q.    What was the reason for wanting to become
19    familiar with electric utility plants?
20              MR. DION:  Objection to form.
21    BY MR. COTTINGHAM:
22        Q.    You can go ahead.
23        A.    So I do answer the --
24              MR. DION:  You can answer the question.
25              THE WITNESS:  Okay.  It was organized by
0021
 1    Bruce Buckheit, and he wanted to become familiar with
 2    electric utility plants.  And he wanted the rest of the
 3    people that he had gathered to be on this initiative to
 4    become familiar with electric utility plants.
 5    BY MR. COTTINGHAM:
 6        Q.    This is a utility-enforcement initiative?
 7        A.    That is correct.
 8        Q.    And what was Bruce Buckheit's position at that
 9    time?
10        A.    He was director of the air enforcement section
```

```
11   in EPA headquarters.
12        Q.   Does he still hold that position?
13        A.   Yes, he does.  As far as I know.
14        Q.   Yeah.  What -- tell us what role you had in --
15        A.   I thought of one clarification.  I actually
16   went to two -- no, that's not right.  I only went to
17   one.  I just went -- at first I -- I've have answered
18   citizens' complaints for two Louisville Gas and
19   Electric, but I've only done inspections at one.
20        Q.   What was your role in the electric utility
21   enforcement initiative?
22        A.   I was -- I guess it started in October of --
23   September or maybe even as early as August.
24   Somewhere -- I would say August of 1997, a guy named
25   Kevin Taylor had just left the agency.  He was the
0022
 1   contact before I was for the initiative.
 2        Q.   Kevin Taylor?
 3        A.   Kevin Taylor.
 4        Q.   Where was he located?
 5        A.   You mean where does he live?
 6        Q.   No.  I meant where did he work for EPA?
 7        A.   He worked for EPA; that's correct.
 8        Q.   And was it Region 4?
 9        A.   That's correct.
10        Q.   He was in Region 4?
11        A.   Kevin Taylor worked at EPA Region 4 in the air
12   enforcement section with myself.
13        Q.   Okay.
14        A.   And he was a staff-level engineer as I was.
15   And he had been assigned to this electric utility
16   initiative as a staff-level engineer contact for EPA
17   Region 4.  He left the agency somewhere around August of
18   1997.
19        Q.   Had the utility initiative already started at
20   the time he left or had it just started?
21        A.   Like all things in life, there is no date
22   certain when it started, but there had been meetings and
23   conference calls.  When I say meetings, I was not
24   involved in any of them.  I don't know anything about
25   them.  But I know that at least there were national
0023
 1   conference calls between the regions and headquarters,
 2   and there were meeting minutes that I saw briefly.
 3   There were at least a couple of meetings in the summer
 4   of '97.
 5        Q.   Okay.  Then Kevin Taylor left in about August
 6   of '97, and how did that -- then what role did you take?
 7        A.   My supervisor, Beverly Spagg, assigned me as
 8   the EPA Region 4 coordinator or staff person who would
 9   deal with the electric utility initiative.
10        Q.   Why were you selected to do that?
11        A.   I honestly couldn't tell you.
12        Q.   Okay.  Were you the only person at that time
13   in --
14        A.   That's correct.
15        Q.   -- Region 4 working on the initiative?
16        A.   That is correct.
17        Q.   Tell us, just in your own words, what the
18   electric utility enforcement initiative is.
```

18  room, and, gosh, there were probably at least 40 people
19  there.  And we were around -- it was a table set up like
20  a horseshoe, so we were all in sort of like a
21  semicircle.  And there's a podium with a drawing board
22  at the front.  And different speakers would get up and
23  present on different things.
24          I gave a presentation on how Region 4 was
25  doing its emission calculations at that meeting.
0069
 1      Q.   How did -- how did you learn how to do the
 2  emission calculations?
 3      A.   Through the conversations that we had had
 4  about it, and the conversations that I had had with
 5  Gregg Worley -- and I -- at this point, I believe,
 6  Jim Little was on board with EPA -- conversations I
 7  would have had with Jim Little, and my reading and
 8  interpreting of the regulation.
 9      Q.   And these conversations you're talking about,
10  where you learned how to do the emission calculations so
11  you could make this presentation in the fall of '99, are
12  these -- are we talking about conversations that
13  occurred in 1999 at the other two meetings?
14      A.   I think that in the fall of '99, one of the --
15  that in the fall of '99, the different people were
16  putting different emphasis on different emission
17  calculations.  And I think that this was really a
18  meeting to make sure that EPA spoke with one voice and
19  came up with its best -- its policy on what -- what the
20  procedure should be when you do an emission calculation.
21  I guess the thing with the emission calculations is that
22  there are several different calculations that can and
23  probably should be done.
24          And so -- and each situation is different with
25  the -- with respect to a major modification.  So this
0070
 1  was really a training to see what the other regions were
 2  doing to date and how they were doing the emission
 3  calculations, and to inform the Department of the
 4  Justice attorneys and others who were learning about PSD
 5  for the first time and were not as familiar with the
 6  process.
 7      Q.   How did it happen that the regions were doing
 8  the emission calculations in different ways --
 9          MR. DION:  Objection to form.
10          THE WITNESS:  I would --
11  BY MR. COTTINGHAM:
12      Q.   -- in 1999?
13      A.   I would say that, again, there is -- if you
14  look at the PSD rule itself, as it stands now, it's --
15  there is something called "actual emissions," is one of
16  the definitions, one of the terms that's defined.  I
17  can't remember exactly, but I believe that that term has
18  approximately five subletters under it, in how it's
19  defined.  In other words, it can be defined as what most
20  people would consider actual emissions, kind of the way
21  Webster would -- would -- what's actually put into the
22  environment, loaded into the environment, is the first
23  definition that's given.
24          Another one of the definitions of actual
25  emissions is what the potential to emit is of the
0071

```
 1   facility.  Another definition of actual emissions is
 2   what the regulatory limit is of the facility.  Another
 3   definition is -- I can't remember -- there were -- I
 4   believe there are five of them.  So you've got these
 5   five subparagraphs under the definition of actual
 6   emissions.
 7        Q.   You're talking about the definition in the
 8   WEPCO rule past --
 9        A.   In the PSD rule.
10        Q.   -- '92?
11        A.   Right, 40-C --
12        Q.   After '92?
13        A.   That's right.  It's 40-CFR Part 52 Section 21.
14   And in that part of the federal regulations, which is
15   generally thought of as the PSD and NSR regulations,
16   there's all of these definitions.  And one of the
17   definitions is for actual emissions.  And this becomes
18   real significant -- that's a bad word to use because
19   it's also defined under the regs.  But this becomes very
20   important because then you have to compare -- you have
21   to decide if there has been a net significant emission
22   increase.
23             And the net significant emission increase is
24   also defined under the regs, and it's defined as the sum
25   of -- it's defined as where the sum of the following
0072
 1   exceeds zero, and it's got paragraphs A and B.  And
 2   Paragraph A talks about actual emission increases due to
 3   the change at the facility.  And Paragraph B is all
 4   other emission -- actual emission increases at the
 5   facility.
 6             So you've got to say, well, what are actual
 7   emissions?  I mean, is it the potential to emit?  Is it
 8   the regulatory limit?  Is it what was actually loaded to
 9   the environment?  Was it these other two paragraphs?
10             And so there ends up being a bunch of ways
11   that you could do it under the regulations.  The
12   regulation is not specific enough to distinguish between
13   these different subparagraphs.
14             But EPA does have guidance.  We have what
15   people affectionately call the "puzzle book," which is a
16   guidance that was issued by EPA.  And there are also,
17   I'm sure, tens, if not more, of actual applicability
18   determinations made by EPA where EPA, I think, has been
19   generally consistent that the rule of thumb that the
20   emission calculation that should be done on almost all
21   incidences is what they call the "actual to potential
22   test."  You will get the actual emissions before the
23   change versus the potential emissions after the change.
24        Q.   Now, I don't want to you get off track.
25   Wasn't the actual to potential test a test that was used
0073
 1   before the WEPCO case?
 2        A.   That is correct.  It's -- the WEPCO case
 3   changed everything for the electric utilities.  What the
 4   WEPCO case -- the WEPCO judge remanded EPA and told EPA
 5   that it needed to change its -- its -- I can't remember
 6   exactly what he said.  But, essentially, EPA needed to
 7   change its regulations to fix what he considered flaws.
 8        Q.   And one of the flaws was using the actual to
 9   potential test?
```

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

OKLAHOMA GAS AND ELECTRIC
COMPANY,

    *Defendant*.

Civil Action No. CIV-13-690-D

Judge Timothy D. DeGiusti

**BRIEF OF UTILITY AIR REGULATORY**
**GROUP AS *AMICUS CURIAE***

**Exhibit 8**

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ENVIRONMENTAL DEFENSE, ET AL., | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:00 CV 1262 |
| | ) | |
| DUKE ENERGY CORPORATION | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFFS' OPPOSITION TO DUKE ENERGY CORPORATION'S
MOTION FOR SUMMARY JUDGMENT ON SUBJECT MATTER
JURISDICTION**

that the plain meaning of the rules was so clear in this regard that requiring increased utilization to be ignored in the post-project emission projection would effectively invalidate the regulations.  *Id.* at 1436.  Duke's *ex-poste* attempt to re-litigate whether the 1980 rules require a projection of increased utilization enabled by a project is flatly contrary to their plain language, as well as *Duke III*.

> **B.      Simply Because the Rules Do Not Prescribe the Precise Method of Calculating Increases Does Not Mean the Court Loses its Jurisdiction**

As set forth above, the 1980 rules mandate an actual annual increase test measured on an actual-to-projected or actual-to-potential basis, depending on whether the unit at issue has begun normal operations.  While the rules are clear that sources must predict whether a change will increase "actual operating hours" 40 C.F.R. § 51.166(b)(3), (21)(ii), the rules do not describe particular data or formulas that must be used to estimate such increases for units that have begun normal operations.  Simply because the rules are "broadly-drafted" and do not prescribe precisely how to project future representative operating hours for such units does not render them ambiguous.  *Or. Paralyzed Veterans v. Regal Cinemas*, 339 F.3d 1126, 1133 (9th Cir. 2003) (breadth is not ambiguity) (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)).  Indeed, such precision would be particularly inappropriate since the PSD rules apply to all major sources, not just utilities.

In any case, courts routinely determine whether a set of facts proves a violation of general regulatory criteria, and "[a]n agency's enforcement of a general statutory or regulatory term against a regulated party cannot be defeated on the ground that the agency has failed to promulgate a more specific regulation."  *United States v. Cinemark*, 348 F.3d 569, 580 (6th Cir. 2003) (citing *SEC v. Chenery* 332 U.S. 194, 201 (1947)); *see Maynard*

---

[2](...continued)
operating hours and projected actual production rates"); *United States v. Murphy Oil,* 143 F. Supp. 2d 1054, 1104 (W.D. Wis. 2001) (actual-to-projected-actual or actual-to-potential test applies under 1980 rules, depending on whether normal operations have begun).

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

OKLAHOMA GAS AND ELECTRIC
COMPANY,

    *Defendant*.

Civil Action No. CIV-13-690-D

Judge Timothy D. DeGiusti

## BRIEF OF UTILITY AIR REGULATORY
## GROUP AS *AMICUS CURIAE*

## Exhibit 9

No. 05-848

**In the**

# Supreme Court of the United States

ENVIRONMENTAL DEFENSE, ET AL.,
*Petitioners,*

v.

DUKE ENERGY CORPORATION, ET AL.,
*Respondents.*

On Writ of Certiorari to the
United States Court of Appeals
for the Fourth Circuit

**BRIEF OF THE STATES OF ALABAMA, ALASKA, COLORADO, INDIANA, KANSAS, NEBRASKA, SOUTH CAROLINA, SOUTH DAKOTA, VIRGINIA, AND WYOMING, AND THE STATE OF WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION, AS AMICI CURIAE IN SUPPORT OF RESPONDENTS**

Olivia Rowell
*General Counsel*

ALABAMA DEPARTMENT OF
ENVIRONMENTAL MANAGEMENT
1400 Coliseum Blvd.
Montgomery, Alabama 36110
(334) 271-7858

Troy King
*Attorney General*

Kevin C. Newsom
*Solicitor General*
Counsel of Record*

Robert D. Tambling
*Chief, Environmental Division*

STATE OF ALABAMA
Office of the Attorney General
11 South Union Street
Montgomery, Alabama 36130
(334) 242-7401

September 15, 2006

(Additional counsel for amici curiae are listed inside the front cover.)

14

* * *

It is worth pausing briefly to take stock of the story that EPA's present enforcement initiative – and the newfound view of the NSR/PSD rules that underlies it – requires the Court to believe.  The current batch of enforcement actions alleges rampant, if not near-universal, non-compliance with NSR/PSD rules stretching back some 20 years.  How, on EPA's retelling, did we get to this point?  *First*, we must assume that nearly every major utility-industry player (and, more particularly, every major player's lawyers) either fundamentally misunderstood or blatantly ignored EPA guidance on the meaning of the term "major modification." *Second*, and worse, we must assume that the state environmental agencies that reviewed and approved the hundreds of building projects now under challenge (ADEM in Alabama Power's case, the North Carolina Department of Environment and Natural Resources in Duke's) likewise either misunderstood or ignored EPA guidance.  *Finally*, and most bizarrely, we must assume that the EPA regulators themselves, whose very business it was to look over the States' shoulders, were (at best) asleep at the wheel.  EPA's story here is either an elaborate conspiracy theory or a monument to bureaucratic incompetence.  Occam's Razor suggests a different explanation:  EPA's current litigating position just wasn't the prevailing understanding of NSR/PSD applicability during the two decades that preceded the current enforcement initiative's launch in 1999.

## II. EPA's Litigating Position Undermines the Clean Air Act's Carefully Calibrated State-Federal Enforcement Scheme.

Congress enacted the Clean Air Act with federalism firmly in mind.  There are two important federalism-related points worth making here, neither of which the state amici supporting petitioners seem to have come to grips with.  First, whereas the Act makes States primarily responsible for regulating air pollution, and carves out NSR/PSD as a narrow exception to that general rule of state control, the

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

OKLAHOMA GAS AND ELECTRIC
COMPANY,

    *Defendant*.

Civil Action No. CIV-13-690-D

Judge Timothy D. DeGiusti

## BRIEF OF UTILITY AIR REGULATORY GROUP AS *AMICUS CURIAE*

## Exhibit 10

FILED
2006 Jul-05  AM 07:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| SIERRA CLUB and ALABAMA ENVIRONMENTAL COUNCIL, INC., | ) ) ) ) | |
| **Plaintiffs** | ) ) | |
| v. | ) ) | **No. CV-02-2279-VEH** |
| TENNESSEE VALLEY AUTHORITY, | ) ) ) | |
| **Defendant** | ) | |

## MEMORANDUM OPINION ON SIERRA CLUB MOTION TO RECONSIDER STAY AND REFERRAL TO MEDIATION

I. <u>Background and Current Posture</u>

This is a civil action filed by the Plaintiffs Sierra Club and Alabama Environmental Council, Inc. ("AEC")[1] against the Defendant Tennessee Valley Authority ("TVA") for declaratory and injunctive relief and the imposition of civil penalties under the Clean Air Act, 42 U.S.C. §§ 7401-7671q ("CAA", "the Act"). The action also sought an order penalizing and enjoining TVA's excessive emission of harmful air pollutants from the TVA Fossil Plant in Tuscumbia, Colbert County, Alabama ("Colbert Plant") in violation of the CAA, the Alabama State

---

[1] Unless the context indicates otherwise, plaintiffs will collectively be referred to as "Sierra Club".

Implementation Plan ("SIP"), 40 C.F.R. § 52.69 *et seq.* and previously at 40 C.F.R. § 52.50 *et seq.*, and the TVA Colbert Plant's Air Permits, 701-0010-Z009; 701-0010-Z013. The Complaint alleged a Count of violation of the CAA each time the Colbert plant's exceeded the twenty per cent opacity limits on the Colbert plant's emissions.

In *Sierra Club v. TVA*, 430 F.3d 1337 (11th Cir. 2005) (doc. 90), the Court of Appeals affirmed the use of continuous opacity monitoring system ("COMS") as credible evidence of opacity violations, reversed my ruling that the Alabama Department of Environmental Management's ("ADEM") use of the "2% de minimis" rule[2] was a permissible interpretation of the CAA, and affirmed Judge Johnson's ruling that TVA was immune from civil penalties under the CAA . The action was remanded to me for proceedings consistent with the Court's opinion.

The parties dispute how many opacity violations would be proven using COMS data. I will have more to say about opacity violations later, but for purposes of this opinion suffice it to say that, in the words of the Court of Appeals, there should be "plenty".

By Orders entered May 23, 2006 (docs. 111, 112, & 113), I stayed this action, ordered the parties into mediation, and denied all outstanding motions as moot, granting the parties leave to seek permission to file new and updated motions should

---

[2] Ala. Admin. Code r. 335-3-4-.01(4).

2

I lift the stay.  The motions pending on May 23 were the parties' 2003 motions for summary judgment pending at the time the case was appealed to the Eleventh Circuit, and motions to strike various evidentiary filings and declarations in connection with Sierra Club's renewed Motion for Summary Judgment (which incorporated its 2003 motion).

The Order Referring Action To Mediation ("Mediation Order") directed the parties to notify the court's courtroom deputy, on or before June 9, 2006, of the mediator selected and the time, date and place of the initial mediation sessions.  (Doc. 112).

On May 26, 2006, Sierra Club moved for reconsideration of the Mediation Order (doc. 112) and the Stay Order (doc. 111).  (Doc. 114).  On May 30, 2006, I issued my standard motion response Order giving TVA eleven (11) days to respond to Sierra Club's motion to reconsider.  TVA filed its response on June 12, 2006. (Doc. 115).  Sierra Club filed a Reply on June 14, 2006.

In this Opinion, I review Sierra Club's Motion to Reconsider, TVA's Response, and the issues I see arising, directly and indirectly.  While I have no love for reconsideration motions and ultimately deny Sierra Club relief, the pleadings and my review of the file convince me that further explanation of my views on the current status of the action and its resolution may assist the parties in reaching a resolution.

3

If not, they can better prepare for trial.

## II.   The Mediation Order; Rule To Show Cause

Apparently lost on the parties in the latest round of pleadings is that no one obeyed that part of the Mediation Order requiring the naming of a mediator and the furnishing of the information about the initial mediation session by June 9, 2006. Perhaps Sierra Club believed that the filing of a Motion For Reconsideration automatically stays the effect of an Order; it does not.  Perhaps Sierra Club and TVA believed that my May 30 standard motion response Order modified the Mediation Order because it permitted TVA's Response to be filed after June 9, 2006; the May 30 Order said nothing about the June 9, 2006 deadline.  By Order entered separately, I am directing the parties to either provide the information required by the Mediation Order to my courtroom deputy, in a joint filing signed by counsel for all parties, by 4:00 p.m. Thursday, July 13, 2006, or to appear before me at 4:00 p.m. Friday, July 14, 2006, to show cause, if they can, why they should not be held in contempt for their failure to abide by the applicable terms of the Mediation Order.

## III.   Sierra Club's Motion To Reconsider; TVA's Response

A.      Sierra Club seeks reconsideration because it says (further) mediation will

be futile[3]; because the pendency of the *Duke Energy*[4] appeal does not warrant a stay; seeks leave to file an updated motion for summary judgment; and, in the alternative, if I don't reconsider and withdraw the Mediation and Stay Orders, requests me to certify, pursuant to 28 U.S.C. § 1292(b), an interlocutory appeal addressing the rulings in those Orders. (Doc. 114)

B.     TVA's response says that the parties have yet to mediate in person as required by this District's ADR plan (a point that Sierra Club's response does not contest) and that Sierra Club has failed, as a matter of law, to establish good cause for vacating the Mediation Order.

C.     TVA says I should not reconsider the stay Order because it would be moot if the mediation were successful, and, should the mediation fail, I was correct when I said that the Supreme Court's decision in *Duke Energy* is likely to be binding <u>or</u> informative. (Doc. 113, emphasis in original).

D.     TVA says I should deny Sierra Club's request to file an immediate, updated motion for summary judgment.

---

[3]  Sierra Club says there have been two (2) appellate telephone mediations between the parties, and neither was successful. One of those mediations was conducted through the Eleventh Circuit during the appeal of this action, the second by the Sixth Circuit (05-6329) during an appeal that is still pending.

[4]  *U.S. v. Duke Energy*, 411 F.3d 539 (4th Cir. 2005), *certiorari granted by Environmental Defense v. Duke Energy Corp., _____ S.Ct. _____, 2006 WL 1310699, 74 USLW 3407 (U.S. May 15, 2006) (No. 05-848).*

E.     TVA says interlocutory appeal would not be appropriate under the instant facts and law.

I discuss each contention, although not in the exact order above.

## IV. Discussion

1.     The Mediation Order - I have little doubt that the Mediation Order was well within my discretion and it would be inappropriate to certify that Order.  *E.g., Abele v. Hernando  County*, 161 Fed.Appx. 809 (11th Cir. 2005).

2.     Interlocutory Appeal - I believe this is the worst thing I could do.  First of all, the Orders in docs. 111 and 112 are not, in my view, appropriate 28 U.S.C. § 1292(b) Orders.  The Mediation Order is clearly discretionary, and the question of whether *Duke Energy* warrants a stay of this action is not a controlling question of law, it's a question of timing.  Sierra Club misses the mark on timing for a number of reasons.  First, the stay is not indefinite; at this point it's less than a year at most, i.e., the end of the Supreme Court's October, 2006 term.  Second, there is no guarantee that the Eleventh Circuit would accept the 28 U.S.C. § 1292(b) appeal and, even if it did, that it would resolve such appeal any faster than the Supreme Court will resolve *Duke Energy*.  Finally, if the Court of Appeals took the appeal and ordered me to lift the stay based on *Duke Energy*, that would still leave the stay based on mediation in full force and effect, another reason I doubt the Eleventh Circuit would

6

agree to hear a 28 U.S.C. § 1292(b) appeal of the Mediation and Stay Orders.  In short, certifying either of both of the Orders would reactivate the war of pleadings the parties have waged since 2003 instead of making them sit down face to face and see if they can use their powers of persuasion and advocacy to settle, rather than prolong, this litigation.

3.     The effect of *Duke Energy* - While I continue to believe *Duke Energy* is likely to affect the operations of TVA's Colbert Plant, I also think, after further consideration, that Sierra Club is probably correct when it says that *Duke Energy* is unlikely to be dispositive of this action, and that the facts of this action are sufficiently different from *Duke Energy's* that any impact will be limited.  *Duke Energy* is most likely to affect Colbert Unit 5, which is the subject of a related CAA (modification without proper permitting) case involving these parties, *National Parks Conservation Association & Sierra Club v. TVA*, cv-01-403-VEH (the "*NPCA*" action), currently on appeal to the Eleventh Circuit.  *Duke Energy* is less likely to affect Colbert Units 1 - 4, which are not involved in the *NPCA* action.

It is certainly possible that the Supreme Court will decide only the first question on which *certiorari* was granted, i.e., whether the Fourth Circuit's decision in *Duke Energy* invalidated the 1980 Prevention of Significant Deterioration ("PSD") regulations in violation of 42 U.S.C. § 7607(b), which reserves challenges to CAA

regulations having nationwide impact to the D.C. Circuit exclusively. I expressed my views about this issue most recently in the Mediation Order, noting, *inter alia*, that the D.C. Circuit was aware of, cited to, and declined to express an opinion on, the key regulatory issue decided by the Fourth Circuit in *Duke Energy*, which was whether the definition of "modification" was the same in both the CAA's New Source Performance Standards ("NSPS"), 42 U.S.C. §§ 7411, 7411(a) and the Prevention of Significant Deterioration ("PSD"), provisions, 42 U.S.C. §§ 7470 - 7492. *NY v. EPA I*, 413 F.3D 3, 19 - 20.[5]

And Sierra Club should temper any enthusiasm about *Duke Energy's* potential outcome with the thought that getting what you wish for can be problematic: even should the Supreme Court vacate the Fourth Circuit's opinion, it is speculation to say that doing so would somehow limit the Eleventh Circuit's power over the ultimate resolution of this action, particularly with respect to any injunctive relief Sierra Club may, or may not, be awarded. And it would be even more speculative to suggest that, should Sierra Club be unhappy with the ultimate litigation outcome here, the Supreme Court would grant *certiorari* and overturn that outcome.

It is axiomatic that how the Supreme Court frames the issues(s) will in no small

_____

[5] PSD review of new and modified sources is called "New Source Review", or "NSR", *NY v. EPA I*, 413 F.3d at 12 -13.

8

part determine the *Duke Energy* analysis, and therefore the outcome.  I stand by my *Alabama Power* observations that, regardless of what the law is (or may be by the time *Duke Energy* permeates down to me) it is singularly unwise, under any standard of administrative deference, to say grace over the retroactive agency interpretation of regulations affecting a huge, nationally regulated industry where the new interpretation will result in the expenditures, collectively, of billions of dollars trying to retrofit work that wasn't designed to meet the standards now being imposed.  It may be, how do I say it, expedient from a regulatory point of view, but I view *Mead* in part as the judiciary's response to the "that was then, this is now" approach to such regulation.  I do not see how anyone can say with a straight face that EPA's 1999 interpretation of RMRR and emissions, as set out in *Alabama Power* and the other 1999 EPA enforcement actions, one being *Duke Energy*, was the same interpretation as ADEM's published SIP regulations.[6]  Even if the example given is inaccurate (the Alabama Administrative Code does not tell me how long 335-3-1.02(mm)2.(I) - (ii) has been in effect), there is more than sufficient documentation in the filed exhibits that leads one to conclude that, under the 1999 enforcement theory, EPA deliberately failed to enforce the Act for almost two (2) decades, with all the state environmental

---

[6]  *See, e.g.*, Ala. Admin. Code r. 335-3-1.02(mm)2.(I) - (ii) (changes in production rate or an increase in the hours of operation shall not be considered a change in the method of operation as set out in the definition of "modification" found at Ala. Admin. Code r. 335-3-1.02(oo)).

agencies and national environmental groups standing idly by while the industry spent

billions on "life extension" projects that EPA and the state attorneys general now say

were modifications that required permitting.   *NPCA* is a good example; TVA's

intention  to spend hundreds of millions of dollars on Colbert 5 was widely reported

in the media, and well known to EPA, ADEM, Sierra Club, *et al*.  Twenty (20) years

passed before Sierra Club attacked the work as a violation of the Act.   If the

plaintiffs' positions in *NPCA* and *Alabama Power* are examples of how the CAA is

supposed to work, all I can say is that it's a heck of a way to run a railroad.[7]

4.      New/"Updated" Motions for Summary Judgment - I believe the parties,

if they want to, can successfully resolve this action, in mediation or independent of

mediation.  Having said that, I have no wish to further delay my role in the resolution

of this action.  I believe another round of summary judgment motions will do just

that.

In order to explain the basis for my belief, I first have to modify something I

have said previously, which is that all that remains before me in this action is the

---

[7]  I say this with some awareness that the United States, the various state attorneys general
and *amici* in the remaining 1999 enforcement actions, e.g. *U.S. v. Cinergy*, 384 F.Supp2d 1272
(S.D. Ind. 2005), Case No. 06-1224 (argued June 2, 2006, 7th Cir.) and Petitioner and its *amici* in
*Duke Energy*, *supra*, strongly disagree with my assessment of the 1999 enforcement actions as
set out in *Alabama Power*,  *NPCA*, and here, as well as my analysis in those actions of how
emissions are to be measured, and what constitutes routine maintenance, replacement and repair
("RMRR"), under the CAA.

question of remedies.  The Court of Appeals was clear: the COMS data constitute "credible evidence" of violations of the 20% opacity provisions of TVA's permit. What I have in effect said since, which is broader than what the Court of Appeals said, is that opacity violations, standing alone, mean that TVA has violated the Act, and what's left for trial is appropriate injunctive relief.  That may be the ultimate outcome, but further review of Eleventh Circuit jurisprudence, the Alabama State Implementation Plan ("SIP") regulations, and TVA's Colbert permit, leads me to modify my assertion as follows: the COMS data are credible evidence of violations of the 20% opacity provisions of TVA's CAA permit, and therefore make out a *prima facie* violation of the Act.

The reasons that the 20% opacity violations do not, standing alone, end the liability inquiry, can be seen in *Sierra Club v. Georgia Power Co.*, 443 F.3rd 1346 (11th Cir. 2006) ("*Georgia Power*"), decided March 30, 2006.  There, the District Court, in a case arising from Georgia Power's Wansley's coal-fired electricity generating plant[8], did what Sierra Club urges me to do now: using COMS data that showed opacity limitation violations, the court granted partial summary judgment on Counts One and Two against Georgia Power, holding that the COMS data showed violations of the Georgia State Implementation Plan ("SIP") and Georgia Power's

---

[8]  Colbert is a coal-fired electricity generating plant.

11

permit for the Wansley plant .  Georgia Power, like TVA here, did not dispute the COMS data, but did contend that the emissions exceedances were not CAA violations because all of them occurred during periods of startup, shutdown, or malfunction ("SSM").   The permit and the Georgia SIP allowed opacity to exceed the (40%) limitation during SSM.   The district court concluded that even if the violations occurred during SSM, Georgia Power could not raise an SSM defense.   Because Georgia Power conceded that the exceedances took place, the district court's rejection of Georgia Power's ability to raise SSM defenses led the court to grant partial summary in Sierra Club's favor.  *Georgia Power*, 443 F.3d 1346, 1352.  The district court, at Georgia Power's request, certified its ruling for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

The Court of Appeals granted Georgia Power's petition for leave to appeal the partial summary judgment order and reversed.  In doing so, the Court rejected various Sierra Club arguments (Georgia's SSM rule was broader than EPA 1999 SSM Guidance; the SSM defense only applied to government, not citizen suit, enforcement actions, and SSM applicability was a matter of discretion with the Georgia Environmental Protection Division[9]) and held that, on remand, Georgia Power should be allowed to raise an SSM affirmative defense to the exceedances alleged by Sierra

---

[9]  Georgia's ADEM.

Club.  The Court further held that the burden was on Georgia Power to prove, as to all such exceedances, that each met the criteria set forth in Georgia's SSM Rule and the Wansley Plant's SSM condition.  *Id.* at 1357.

There are two sets of TVA Colbert Plant CAA Permits before me.  The first was issued in 1991, the second in 1998.  Sierra Club Motion for Summary Judgment, Exhibit 6., TVA Motion for Summary Judgment, Exhibit 6.  Based on the Court of Appeals opinion here, the second set of permits, Permit No. 7-1-0010-Z009 - 13, covering Colbert Units 1 - 5 respectively ("the Colbert permit"), applies since COMS data were not credible evidence until after 1998.

Section 7.a. of the Colbert permit prohibits average and maximum excess emissions over 20% computed from six-minute averages.   Section 9. provides exceptions to the opacity requirements: startup (9.a.), shutdown (9.b.), and load change (9.c.).[10]

There are other, potentially applicable, Alabama SIP provisions that TVA could seek to raise in defense of the opacity violations.  Ala. Admin. Code r. 335-3-4-.01, Visible Emissions, sets forth at (1)(a) the 20% opacity standard, provides in (1)(b) for a 40% opacity discharge "[d]uring one six (6) minute period in any sixty

_____

[10] "Shutdown" and "Startup" are defined terms, AL Admin. Code r. 335-3-1.02(lll), (ttt); "load change" is not.

(60) minute period"[11], sets forth at (1)(c) the startup, shutdown, load change, "and rate change or other short, intermittent periods of time upon terms approved by the Director and made part of such permit", and, at (1)(d), allows ADEM's director to approve other exceptions in accordance with the provisions of (d) 1. - 5.[12]

The above discussion, like *Georgia Power*, suggest that, as part of its affirmative defense to the opacity violations, i.e., as a way of proving that such violations do not violate TVA's (Title V) permit, the Alabama SIP, and the CAA, TVA may choose to offer evidence as to the opacity violation(s). Should TVA decide to do so I strongly suggest that the parties explore the facts as to proof in detail during mediation if for no other reason than that, should mediation fail, I will require a very detailed and succinct summary of the opacity violations and which ones are, and are not, subject to any such defense(s). Put another way, I do not intend to hear lengthy testimony about matters that reasonable people can stipulate to, and I expect the parties to be reasonable.[13] And, to assist the parties in their efforts to be reasonable,

---

[11] Which is <u>not</u> the same as saying, as TVA does, that ". . . Alabama law permits plumes of up to 40% opacity for over two hours every day". TVA Brief In Opposition to Plaintiffs' Renewed Motion For Summary Judgment. (Doc. 93 at 20).

[12] Ala. Admin. Code r. 335-3-4-.01 also contains, at (4), the 2 % "de minimis" standard rejected by the Court of Appeals.

[13] I am aware that such a "case by case" defense of the opacity violations would contradict TVA's writing to Sierra Club that "TVA does not intend to undertake such a one-by-one examination of the appropriate exemption classification of each alleged violation and does not intend to present such one-by-one evidence to the Court in defense of the Plaintiffs' claim for

I do not accept TVA's interpretation of Ala. Admin. Code r. 335-3-4.01(1)(b) "six minutes in any sixty (60) minute period" opacity exceedance.  I count sixty minutes from the time of the first violation; if ADEM and EPA had meant to say "every hour", the regulation would say "every hour".  Thus, in the case of an opacity exceedance fifty-nine (59) minutes after another exceedance, the second exceedance would be an opacity violation.

Further, I have substantial reservations that, as TVA asserts, an opacity violation does not "count" unless and until that violation is reconciled with or adjusted to the older Method 9 methodology.  The Court of Appeals didn't say this, and the literal language of the credible evidence rule does not require it.  Ala. Admin. Code r. 335-3-1.-.13.  TVA is free to argue that I should not rely on the COMS data, standing alone or otherwise, to support a finding that Sierra Club has carried its burden of proof to show CAA violations; the evidence proffered will ultimately

---

injunctive relief."  June 6, 2003 letter from Lancaster to Moore, Exhibit 21, Volume II to Plaintiffs' Exhibits in Support of Motion for Summary Judgment.  (Doc. 25).  That letter was written two (2) years before the initial Eleventh Circuit decision in this action and nearly three (3) years before the Court's *Georgia Power* decision.  I consider those decisions, taken together, as sufficiently changing the legal landscape that, should mediation fail, I would permit TVA to undertake such a one-by-one defense, should it be so advised, and subject to the limitations set forth above, i.e., that I will not permit either party to offer "dueling experts" on any/each such opacity violation.  If the parties are unreasonable and cannot stipulate as set out above, I will use a Special Master or appoint an independent expert as the court's witness to accomplish this task, and I will assess the costs thereof proportionately against the party(ies) I find to have been unreasonable.

15

control my decision.  TVA is free to preserve for the record its argument that the COMS data must be reconciled or adjusted to Method 9 methodology; I reject that argument.

Having said this, I also advise the parties, particularly the Plaintiffs, that proving the opacity violations may not, as they requested in their motion for summary judgment, automatically lead to an Order directing TVA to submit a plan to correct those violations and prevent their recurrence.  That may happen, but TVA, as it requests in its Brief in Opposition to Plaintiffs Renewed Motion For Summary Judgment (doc. 93), is entitled to a hearing where the court will hear, **briefly and succinctly**, evidence on the various factors affecting the issuance and content of any injunction herein.

Finally, I am constrained from suggesting the person(s) the parties may select as their mediator but cannot refrain from observing that, given the technical subject matter involved, it would make a lot of sense to select a mediator who, in addition to possessing substantial mediation skills and experience, "gets it" when it comes to the technical and engineering issues.

A separate Order will issue.

**ENTERED** this the 5th day of July, 2006.

**VIRGINIA EMERSON HOPKINS**
United States District Judge