## UNITED STATES DISCTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| _____ ) | | |
| UNITED STATES OF AMERICA, ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| And ) | | |
| ) | | |
| SIERRA CLUB, ) | Civil Action No. 5:13-cv-00690-D | |
| ) | | |
| Plaintiff-Intervenor ) | | |
| ) | | |
| v. ) | | |
| ) | | |
| OKLAHOMA GAS & ELECTRIC ) | | |
| COMPANY, ) | | |
| ) | | |
| Defendant. ) | | |
| _____ ) | | |

## SIERRA CLUB'S BRIEF IN OPPOSITION TO DEFENDANT'S
## MOTIONS TO DISMISS

David C. Bender
McGillivray Westerberg & Bender LLC
211 S. Paterson St., Suite 320
Madison, Wisconsin 53703
P: (608) 310-3560
F: (608) 310-3561

Jacquelyn L. Dill
Dill Law Firm, P.C.
12101 N. MacArthur Blvd.
Suite 200
Oklahoma City, Oklahoma 73162
P: (405) 722-9600
F: (405) 694-4568

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..............................................................................iii

ARGUMENT ............................................................................................ 1

I.    Background on the Clean Air Act Program Applicable To This Case .............. 1

II.   OG&E's Motion Has No Basis In The Applicable Oklahoma State
Implementation Plan ............................................................................ 5

     A.   The Approved Oklahoma State Implementation Plan Is The
Applicable Law ....................................................................... 6

     B.   The Applicable Law in Oklahoma Does Not Contain The
"Projected Future Actual" Regulation That OG&E's Entire
Argument Relies Upon ........................................................... 6

     C.  A "Projected Future Actual" Definition Cannot Be Grafted Onto
the Approved And Applicable Oklahoma Implmentation Plan
Regulations By The Court ....................................................... 9

III.  OG&E's Motion Assumes That It May Selectively Choose Portions of EPA
Rulemakings That Were Never Applicable In Oklahoma, While Avoiding
Other Provisions of Those Rulemakings ....................................... 11

     A.  OG&E's Unapproved Use Of The Highest Pre-Project Emission Rate
From Anytime During The Five Years Preceding the Project, Instead
of the 24-Months Immediately Prior, Has No Basis In The Approved
Oklahoma Implementation Plan ................................................ 12

     B.   OG&E's Proposal to Limit Emissions Following The Projects To
Ensure That Post Project Emissions Do Not Exceed Pre-Project
Emission Rates By More Than The Amount of Emissions Defined
As "Significant" Without Complying With The Requirements Of
An Actual Cap Circumvents The Law .......................................... 15

     C.   OG&E's Assumption That It Can Determine Pre-Project Emissions
Based on Any 24-Month Period That Experienced The Highest
Emissions During The Prior 5 Years, While Calculating Post Project
Emissions Only On A Calendar Year Basis Is Without Merit ............. 18

IV.     Although the Federal Regulations OG&E Cites Are Inapplicable, OG&E
        Misinterprets Those Regulations ...................................................................... 19

V.      OG&E's Argument That EPA Cannot Enforce The Law Is Without Merit  ... 22

CONCLUSION ................................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*Alabama Power v. Costle*,
636 F.2d 323 (D.C. Cir. 1979) .......................................................................................... 2

*Alaska Dept. of Envtl. Conservation v. EPA*,
540 U.S. 461 (2004) ........................................................................................................... 6

*Envtl. Def. v. Duke Energy Corp.*,
549 U.S. 561 (2007) ........................................................................................................... 1

*Gen. Motors Corp. v. U.S*,
496 U.S. 530 (1990) ....................................................................................................... 3, 4

*Mitchell v. Robert DeMario Jewelry, Inc.*,
361 U.S. 288 (1960) ......................................................................................................... 22

*Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*,
480 F.3d 410 (6th Cir. 2007) ....................................................................................... 1, 23

*New York v. EPA*,
413 F.3d 3 (D.C. Cir. 2005) .............................................................................................. 2

*Safe Air for Everyone v. United States*,
488 F.3d 1088 (9th Cir. 2007) ........................................................................................... 4

*Tiberi v. Cigna Corp.*,
89 F.3d 1423 (10th Cir. 1996) ......................................................................................... 23

*Union Elec. Co. v. EPA*,
427 U.S. 246 (1976) ........................................................................................................... 3

*U.S. v. Cemex, Inc.*,
864 F.Supp.2d 1040 (D.Colo. 2012) ............................................................................... 23

*U.S. v. Cinergy Corp.*,
623 F.3d 455 (7th Cir. 2010) ....................................................................................... 2, 10

*United States v. DTE Energy Co.*,
711 F.3d 643 (6th Cir. 2013) ........................................................................................ 7, 8

*U.S. v. Ohio Edison Co.,*
276 F.Supp.2d 829 (S.D. Ohio 2003) ................................................................. 2

*U.S. v. Telluride Co.,*
146 F.3d 1241 (10th Cir. 1998) ........................................................................ 22

*U.S. v. United States Steel Corp.,*
Case 2:12-cv-304, 2013 U.S. Dist. LEXIS 118513 (N.D.Ind. Aug. 21, 2013) ............... 22

*Wis. Elec. Power Co. v. Reilly,*
893 F.2d 901 (7th Cir. 1990) ............................................................................ 2

**Federal Statutes**

28 U.S.C. § 2462 ................................................................................... 22, 23

42 U.S.C. § 7401(b)(1) ............................................................................... 1, 6

42 U.S.C. § 7410 ......................................................................................... 3

42 U.S.C. § 7410(a) .................................................................................... 10

42 U.S.C. § 7410(j) .................................................................................... 23

42 U.S.C. § 7410(l) ..................................................................................... 9

42 U.S.C. § 7411(a)(4) ................................................................................. 2

42 U.S.C. § 7426 ......................................................................................... 4

42 U.S.C. § 7471 ...................................................................................... 3, 6

42 U.S.C. § 7470 ........................................................................................ 20

42 U.S.C. § 7473 ......................................................................................... 2

42 U.S.C. § 7475(a) ............................................................................... *passim*

42 U.S.C. § 7479(2)(C) .............................................................................. 2, 3

42 U.S.C. § 7479(3) ................................................................................. 2, 23

42 U.S.C. § 7602(k) ............................................................................................. 23

42 U.S.C. § 7602(q) ............................................................................................... 4

## Federal Regulations

40 C.F.R. § 51.166 ............................................................................................ 3, 4

40 C.F.R. § 51.166(a) ........................................................................................... 6

40 C.F.R. § 51.166(a)(5) ..................................................................................... 10

40 C.F.R. § 51.166(a)(7)(iv)(c) ........................................................................ 7, 9

40 C.F.R. § 51.166(b)(21)(v) ........................................................................... 7, 9

40 C.F.R. § 51.166(b)(32) ................................................................................... 7

40 C.F.R. § 51.166 (b)(40)(i) ........................................................................ 15, 20

40 C.F.R. § 51.166(w)(1) .................................................................................. 15

40 C.F.R. § 51.24 (1978) ................................................................................. 3, 4

40 C.F.R. § 52.21 (1978) ..................................................................................... 3

40 C.F.R. § 52.21(b)(48) (i) .......................................................................... 12, 13

## State Regulations

OAPCR 1.4.4 ..................................................................................................... 6, 7

OAPCR 1.4.4(a) ............................................................................................... 3, 23

OAPCR 1.4.4(b) .............................................................................................. 6, 7

OAPCR 1.4.4(b)(2)(A) .................................................................................. 4, 20

OAPCR 1.4.4(b)(3)(A)(i) ................................................................................ 4, 8

OAPCR 1.4.4(b)(20) ..................................................................................... *passim*

OAPCR 1.4.4(b)(22) ................................................................................................ 4, 14

**Federal Register**

45 Fed. Reg. 52,676 (Aug. 7, 1980) ...................................................................... 3

48 Fed. Reg. 38,635 (August 25, 1983) ............................................................... 3, 6

56 Fed. Reg. 27,630 (June 14, 1991) .................................................................... 9

57 Fed. Reg. 32,314 (July 21, 1992) ............................................................. 4, 7, 9, 20

67 Fed. Reg. 80,186 (Dec. 31, 2002) ............................................................. 4, 7, 9, 15

68 Fed. Reg. 9,892 (March 3, 2003) ..................................................................... 10

Sierra Club, an Intervenor-Plaintiff in this case, provides this response in opposition to Defendant Oklahoma Gas & Electric's ("OG&E") Motion to Dismiss Sierra Club's Complaint in Intervention, Mot., Dkt. # 18, and to OG&E's Motion to Dismiss the United States' Complaint, Dkt. # 10, which are based on the same arguments.  (Dkt. # 18 ¶ 6 (incorporating the reasons for dismissal from OG&E's Motion to Dismiss, Dkt. # 10.)

## <u>Argument</u>

OG&E's motions argue that because the company's pollution emissions purportedly did not increase after the eight modifications it made to those plants at issue in this case, that this case must be dismissed.  OG&E's motions are not well taken because they rely on laws that do apply in Oklahoma.  Moreover, OG&E's motions are meritless because, even if the law OG&E cites applied in Oklahoma, OG&E's argument misinterprets that law and relies on a skewed representation of the emission data that hides the fact that emissions from its plants actually increased.  OG&E's motions must be denied.

## I.     Background on the Clean Air Act Program Applicable To This Case.

The Clean Air Act is designed to protect and enhance the quality of the nation's air "so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).  In 1977, Congress added the New Source Review program's Prevention of Significant Deterioration provisions (which are the provisions at issue in this case), because earlier attempts to limit pollution failed "to discourage existing polluters from increasing their pollution levels… or to encourage new polluters to minimize their emissions." *Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 480 F.3d 410, 412 (6th Cir. 2007); *see also Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561,

567–68 (2007).  Through the Prevention of Significant Deterioration program, Congress

required regulated facilities: (1) obtain and operate in compliance with a permit; (2)

demonstrate that their emissions do not "cause" or "contribute to" violations of ambient

air standards; and (3) meet stringent "best available pollution control technology"

(BACT) emission limits, developed based on the maximum degree of pollution reduction

achievable, among other requirements.  42 U.S.C. §§ 7473, 7475(a)(3) and (4), (d), (e),

7479(3).

Acknowledging the potential burden of immediately applying new requirements to

existing plants, Congress temporarily "grandfathered" existing facilities under the

assumption that they would be retired at the end of their useful lives and replaced by new

facilities that would be required to comply with the Prevention of Significant

Deterioration program. *U.S. v. Cinergy Corp*., 623 F.3d 455, 457 (7th Cir. 2010) (noting

that while the Clean Air Act grandfathered existing plants, there was an expectation that

they would wear out and be replaced with new ones fitted with modern pollution

controls).  But as a backstop—to ensure that existing plants were not permanently

exempted from the pollution control requirements—Congress mandated that existing

plants comply once they undergo a modification. 42 U.S.C. §§ 7479(2)(C), 7411(a)(4);

*Nat'l Parks*, 480 F.3d at 412; *New York v. EPA*, 413 F.3d 3, 13 (D.C. Cir. 2005); *Wis.

Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990) ("*WEPCO*") ("Congress did

not permanently exempt existing plants from these requirements; section 7411(a)(2)

provides that existing plants that have been modified are subject to the Clean Air Act

programs at issue here."); *Alabama Power v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1979);

*U.S. v. Ohio Edison Co.,* 276 F.Supp.2d 829, 865-66 (S.D. Ohio 2003).  Grandfather status ends, and the obligations under the Prevention of Significant Deterioration program are triggered, when a "major modification" occurs.  42 U.S.C. § 7475(a), 7479(2)(C); OAPCR 1.4.4(a) ("The new source requirements of this section… shall apply to… major modifications….").  Ensuring that all plants—new and existing—are eventually subject to similar pollution control obligations is one of the Clean Air Act's attempts to level the playing field between existing facilities and would-be competitors in the market.  If existing facilities are not eventually required to comply with the same pollution control requirements, newer and cleaner businesses would have a permanent economic disadvantage against older and dirtier competitors.

EPA promulgated regulations to implement the Prevention of Significant Deterioration program in 1978, 40 C.F.R. §§ 51.24, 52.21 (1978), and revisions in 1980 following a D.C. Circuit remand.  45 Fed. Reg. 52,676 (Aug. 7, 1980).  But, with some exceptions not relevant to this case, the Clean Air Act is implemented through plans developed by the states.  42 U.S.C. §§ 7410, 7471; *see also Gen. Motors Corp. v. U.S*, 496 U.S. 530, 533 (1990); *Union Elec. Co. v. EPA*, 427 U.S. 246, 249-50 (1976).  So, EPA's implementing regulations actually consisted of two parts: first, in § 51.24 (later recodified at 51.166), EPA provided the minimum standards for states to create their own programs; second, EPA established a temporary program in § 52.21 to apply until it approved the state's own program.  45 Fed. Reg. at 52,676.

EPA approved Oklahoma's Prevention of Significant Deterioration program, and simultaneously revoked § 52.21 for plants in Oklahoma, in 1983.  48 Fed. Reg. 38,635

(August 25, 1983).  Since then, the applicable Prevention of Significant Deterioration

program in Oklahoma is under the state's own program, which defines a "major

modification" triggering Prevention of Significant Deterioration requirements for an

existing plant as "any physical change or change in the method of operation of" a major

stationary source that would "result in a significant net emissions increase of any

pollutant subject to regulation" under the Act.  *See* OAPCR 1.4.4(b)(2)(A).  A "net

emissions increase" is defined, in turn, based on the "increase in actual emissions,"

OAPCR 1.4.4(b)(3)(A)(i), and "actual emissions" are specifically defined in OAPCR

1.4.4(b)(22).

On While EPA has revised the federal Prevention of Significant Deterioration

template for state plans in 40 C.F.R. § 51.166, and the temporary federal program in §

52.21 for states without approved plans, to revise the procedure for measuring emission

increases from a modification, 57 Fed. Reg. 32,314 (July 21, 1992); 67 Fed. Reg. 80,186

(Dec. 31, 2002), the Oklahoma plan has not incorporated those changes.  In states like

Oklahoma with an approved program, the state's implementation plan continues to

provide the applicable law governing the Prevention of Significant Deterioration program

unless and until the EPA approves a revision and promulgates a rule in the Code of

Federal Regulations accepting a revised state plan.  42 U.S.C. §§ 7426 (prohibiting a state

from enforcing any standard less stringent than the approved implementation plan),

7602(q) (the applicable State Implementation Plan is the set of regulations approved by

EPA for the state); *General Motors Corp. v. EPA*, 496 U.S. 530, 540 (1990) (holding that

an implementation plan remains binding federal law unless and until EPA approves a

change); *Safe Air for Everyone v. United States*, 488 F.3d 1088, (9th Cir. 2007) (holding that an approved implementation plan remains binding federal law "unless and until EPA approved any change").

## II.     OG&E's Motion Has No Basis In The Applicable Oklahoma State Implementation Plan.

OG&E's motion must be denied because it is based on the wrong law.

OG&E argues that the Court lacks Article III jurisdiction under the Constitution because OG&E did not violate any laws, and therefore, there is no injury for the Court to redress.  (OG&E Br., Dkt. 10-1, pp. 7-18.)  While couching its argument as raising a jurisdictional issue, it is really just denying the allegations against it based on what it asserts is the applicable law.  This is not a jurisdictional question, but one on the merits at the pleadings stage of this case.

OG&E's motions require a determination of whether OG&E complied with the applicable law when it claims that its plant modifications do not trigger Prevention of Significant Deterioration requirements.  (OG&E Br., Dkt # 10-1, at 7-11.)  The parties dispute whether OG&E's legal analysis is correct and, therefore, there is a controversy that must be redressed by this Court.  This belies OG&E's claim that there is no dispute that can be redressed by this Court.  Moreover, as explained below, OG&E's argument on the merits also relies on federal regulations that do not apply to its plants in Oklahoma and must be denied.

## A.   The Approved Oklahoma State Implementation Plan Is The Applicable Law.

As noted above, states adopt their own Prevention of Significant Deterioration program through their EPA-approved implementation plans.  42 U.S.C. §§ 7401(b)(1), 7471; 40 C.F.R. § 51.166(a); *Alaska Dept. of Envtl. Conservation v. EPA*, 540 U.S. 461, 470 (2004).  The Environmental Protection Agency approved Oklahoma's in 1983, and has never approved changes corresponding to EPA's 1992 and 2002 rules.  48 Fed. Reg. 38,635 (Aug. 25, 1983) (approving OAPCR 1.4.4 (1983) into the state implementation plan for Oklahoma); *see also* OG&E Br., Dkt. 10-1, at 5 (acknowledging that the Oklahoma implementation plan has not changed since 1983 for purposes of this suit) and 12 n.6 (acknowledging that the applicable implementation plan in Oklahoma does not include revisions from EPAs' 1992 rule).[1]

## B.   The Applicable Law In Oklahoma Does Not Contain The "Projected Future Actual" Regulation That OG&E's Entire Argument Relies Upon.

As OG&E notes, the issue for decision by the Court is whether the physical changes made to OG&E's coal fired power plants were "major modifications" under the applicable Prevention of Significant Deterioration law, based on an assessment of whether the changes "would result in" an increase that is "significant."  (OG&E Br., Dkt. 10-1, at 8-9 (citing OAPCR 1.4.4(b).)  But where OG&E goes wrong is in its contention that an increase is measured based on the difference between "Past Actual emissions" and

---

[1] OGE's brief contains numerous additional acknowledgements that the approved Oklahoma implementation plan is the controlling law in this case.  *See e.g.*, Dkt. #10-1 at 5 (referring to "[t]he EPA-approved regulations" as controlling), 6 (referencing "[t]he EPA-approved regulations in the SIP" as dictating OGE's obligations), 8 (noting what is required by "the approved SIP"), 18 ("the EPA-approved SIP for Oklahoma").

"[t]he projected post-project level of emissions… referred to as 'Projected Future Actual' emissions" as defined in 40 C.F.R. § 51.166(b)(21)(v) and (32) (1993). (OG&E Br., Dkt. 10-1, at 10 and n.3 & 4.) The "Projected Future Actual emissions" definitions OG&E cites were adopted in the 1992 EPA regulation that was never approved into Oklahoma's implementation plan. 57 Fed. Reg. at 32,335; OG&E Br., Dkt 10-1, at 12 n.6 (acknowledging that EPA's 1992 rules, including 40 C.F.R. 51.166(b)(21)(v), "were never adopted by Oklahoma.").[2] *Compare* 40 C.F.R. § 51.166(b)(21)(v) (1993) (definition of "actual emissions" including representative actual emissions) and § 51.166(b)(32) (1993) (defining "representative actual emissions") *with* OAPCR 1.4.4(b) (containing no such definitions). Nor was the 2002 rulemaking OG&E cites adopted. (OG&E Br., Dkt. 10-1, at 15-18 (citing 67 Fed. Reg. 80,186).) *Compare* 40 C.F.R. § 51.166(a)(7)(iv)(c), (b)(40) (setting forth an emission increase calculation method based on "projected actual emissions") *with* OAPCR 1.4.4 (containing no such provisions). The absence of a "projected future applicable emissions" provision in the Oklahoma implementation plan does not mean OG&E can graft one in by citing inapplicable federal regulations. Rather, it means OG&E must demonstrate that it complied with the Clean Air Act by applying the Oklahoma plan's provisions for determining whether emissions would increase from a project.

Moreover, OG&E's reliance on *United States v. DTE Energy Co.*, 711 F.3d 643 (6th Cir. 2013), is misplaced for the same reason. That case interpreted and applied

---

[2] Similarly, OGE's reliance on 40 C.F.R. § 51.166(b)(32)(ii) (1993) for a so-called "demand growth exclusion," OGE Br. at 12, has no basis in the applicable Oklahoma implementation plan. *Compare to* OAPCR 1.4.4 (containing no similar provision).

EPA's 2002 rulemaking, as well as a subsequent 2007 rulemaking that supplemented EPA's 2002 rule.  *DTE Energy*, 711 F.3d at 646-47, 650-52 (discussing the "project and report scheme" adopted in EPA's 2002 and 2007 rulemakings and the Federal Register preambles to those rules).  The Sixth Circuit did not interpret the Oklahoma implementation plan, or even the 1980 EPA regulations that Oklahoma's plan is based on.  The *DTE Energy* case is simply not relevant.

Contrary to OG&E's argument, the applicable Oklahoma implementation plan omits any reference to "Projected Future Actual emissions" as a basis for determining application of the Prevention of Significant Deterioration program to facilities in Oklahoma.  As the Oklahoma implementation plan's Prevention of Significant Deterioration program contains the only relevant provisions, applicability depends on whether there would be an increase in "actual emissions" from a physical change.  OAPCR 1.4.4(b)(3)(A)(i).  And none of the definitions of "actual emissions" contains a "Projected Future Actual" concept.  OAPCR 1.4.4(b)(20)(A)-(C).  Any determination that OG&E complied with the Oklahoma implementation plan for Prevention of Significant Deterioration must be based on the plants' "actual emissions" before and "actual emissions" after each project, as defined by OAPCR 1.4.4(b)(20)(A) through (C).  OG&E's motions fail to do so.  For this reason, alone, the Court must deny OG&E's motion. It is unnecessary to venture further and address whether OG&E correctly interpreted EPA's 1992 or 2002 rulemakings that do not apply in Oklahoma.

**C.  A "Projected Future Actual" Definition Cannot Be Grafted Onto the Approved And Applicable Oklahoma Implementation Plan Regulations By The Court.**

Formal rulemaking was required at the federal level to create the "projected future actual" definition in EPA's rules before it could be applied to facilities directly governed by those regulations.  Because it did not exist in prior rules, or in the Clean Air Act itself, EPA needed to specifically promulgate new rules to actually create the optional "actual-to-representative-actual" test in the early 1990s.  56 Fed. Reg. 27,630 (June 14, 1991) (proposing to adopt the new definitions for representative actual emissions); 57 Fed. Reg. at 32,317 (final rule); 40 C.F.R. § 51.166(b)(21)(v), (33) (1993) (providing a new "representative actual emissions" definitions that did not previously exist).  Oklahoma's implementation plan was never changed to incorporate those new definitions.  Likewise, for such rules to apply to OG&E, Oklahoma would need to go through formal rulemaking and request a revision of its implementation plant.  *See* 42 U.S.C. §§ 7410(*l*); 40 C.F.R. §§ 51.102, 51.104.  The Court cannot apply rules to facilities in Oklahoma that were never adopted into the Oklahoma implementation plan.

EPA subsequently revised the federal Prevention of Significant Deterioration regulations in 2002.  67 Fed. Reg. 80,186, 80,240 (Dec. 31, 2002).  Those revisions replaced the "representative actual" definition from EPA's 1992 rule with a new definition of "projected actual" emissions.  *See* 40 C.F.R. § 51.166(a)(7)(iv)(c), (b)(40); 67 Fed. Reg. at 80,191-94, 80,196 (describing changes made to the applicability test in the 2002 rule).  Again, those revisions were only applicable in states that had not adopted their own implementation plan, as Oklahoma had.  67 Fed. Reg. at 80,240 (explaining

9

that the rule would take effect only in areas where EPA was the permitting authority and

that states would need to revise their Plans to incorporate the rule changes); s*ee also* 68

Fed. Reg. at 9892-94 (March 3, 2003) (noting that states with prior versions of the

Prevention of Significant Deterioration program in their approved Plans were not affected

by the EPA's 2002 rule changes and could "determine whether to adopt and submit the

same rules, or 'customize' its program…").  The Court cannot apply the 2002 rulemaking

without effectively creating new regulations that were never adopted for Oklahoma,

contrary to the prescribed and mandatory process for doing so.  *See* 42 U.S.C. §

7410(a)(2) and (l) (requiring reasonable notice and a public hearing before adopting or

revising a State Implementation Plan); 42 U.S.C. §§ 7410 (a)(3)(B) (requiring submission

of a proposed revision by state to EPA and a decision on that proposed revision by EPA),

(i) (prohibiting any modification of any State Implementation Plan except through the

specified process); and 40 C.F.R. § 51.166(a)(5) (requiring a public hearing before any

State Implementation Plan can be revised).  Instead, the Court must apply the regulations

that are actually included in the Oklahoma implementation plan.  *See e.g., U.S. v. Cinergy

Corp.*, 623 F.3d 455, 458 (7th Cir. 2010) (holding that the enforceable federal law is what

is approved into the state's implementation plan and not any subsequent changes by EPA

to EPA's rules).   Accordingly, OG&E's motion is based on a legal standard that is not

applicable to OG&E and should be denied.

### III.   OG&E's Motion Assumes That It May Selectively Choose Portions of EPA Rulemakings That Were Never Applicable In Oklahoma, While Avoiding Other Provisions of Those Rulemakings.

In addition to its reliance on the 1992 and 2002 EPA rulemakings that are not and were never applicable in Oklahoma, OG&E also errs by selectively citing only the portions of those rulemakings that favor its position, while ignoring other parts of the rules that tip the other way.   Specifically, OG&E's contention that emissions have not increased from the modifications it made to its plants requires all three of the following inputs for the emission change calculation:

- Separately finding the highest 24 months of emissions for each pollutant from the five years preceding the project, using 24-month periods for different pollutants, which is allowed by EPA's 2002 rule but not the Oklahoma implementation plan;

- Calculating post-project emissions based on a cap on emissions met through artificial constraints on plant operations, rather than projecting the maximum post-project emissions once the unit returns to "normal operations," as required by EPA's 1992 and 2002 rules, and without meeting the 2002 rule's requirements for the use of an emission caps to determine post project emissions; and

- Calculating post-project emissions only based on a January 1 through December 31 calendar year (instead of any 12-month period to correspond to how it calculated pre-project emissions without regard to calendar years), which is not allowed by any regulation.

Fatal to OG&E's motion, there is no legal support for this contrived regulatory regime. The Oklahoma implementation plan that provides the applicable law does not allow *any* of these components, much less *all of them*, as OG&E attempts in its calculations. OG&E's claim that there has been no significant net emissions increase for any of the projects is legally and factually unsupported and its motion to dismiss must be denied.

**A.  OG&E's Unapproved Use Of The Highest Pre-Project Emission Rate From Anytime During The Five Years Preceding The Project, Instead Of The 24-Months Immediately Prior, Has No Basis In The Approved Oklahoma Implementation Plan.**

OG&E purports to have determined whether the project constituted a major modification through submissions to the state agency prior to the eight physical changes to OG&E's power plants at issue in this case.  (OG&E Br., Dkt. 10-1, p. 9; see also Dkt. 8-5, 8-6, 8-7, 8-8, 8-9, 8-10, 8-11, 8-12.)  Those submissions set forth pre-project emission rates based on 40 C.F.R. § 52.21(b)(48) (i), which does not apply in Oklahoma, but defines baseline emissions as "the average rate, in tons per year, at which the unit actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator, within the 5-year period immediately preceding when the owner or operator begins actual construction…."  (*See* Dkt. 8-5 at 6 of 18;  8-6 at 6 of 17, 8-7 at 6, 7 of 17; 8-8 at 6 of 18; 8-9 at 6 of 17; 8-10 at 6 of 17; 8-11 at 6 of 18; 8-12 at 6 of 17.)  Specifically, OG&E combed through the data to hand-pick "the 24-month rolling period with *the highest* activity/emission rates" (emphasis added).  (Dkt. 8-5 at p. 7 of 18; 8-6 at

12

p. 7 of 17; 8-7 at p. 8 of 17; 8-8 at p. 7 of 18; 8-9 at p. 7 of 17; 8-10 at p. 7 of 17; 8-11 at p. 8 of 18; 8-12 at p. 8 of 18.).[3]

Picking the highest possible emission rate from years gone by is allowed by 40 C.F.R. § 52.21(b)(48)(i), but not the Oklahoma implementation plan applicable to OG&E's plants.  Unlike 40 C.F.R. § 52.21(b)(48)(i), Oklahoma's implementation plan requires pre-project emissions based on the annual average emission rate during the period 24-months immediately preceding a project, unless the state approved a different period "upon a determination that it is more representative of normal source operation." OAPCR 1.4.4(b)(20)(A).  OG&E has not produced any evidence that the Oklahoma Department of Environmental Quality approved a period other than the 24-months immediately preceding each of OG&E's modifications to its plants.  Absent evidence of such approval, the correct pre-project emission rate is the 24 months immediately preceding each project.  OAPCR 1.4.4(b)(20)(A).  When the correct baseline period is

---

[3] In fact, as the attachments to its letters confirm, OGE not only hand-picked a period of high emissions, but it searched for and picked different 24-month periods *for each pollutant* to ensure that it selected the highest possible pre-project emission rate it could find for each pollutant.  (Dkt.## 8-5 at p. 17 of 17 (selecting the 24-month period ending July, 2001, for SO2 and H2SO4; June, 2001, for NOx; and August, 2001, for VOC, CO, ad PM10); 8-6 at p. 17 of 17 (selecting the 24-month period ending December, 1999, for SO2 and H2SO4; March, 2000, for NOx; February, 2001, for VOC, CO and PM10); 8-7 at 17 of 17 (selecting the 24-month period ending February, 2001, for SO2 and H2SO4; April, 2002, for NOx; and December, 2003, for VOC, CO and PM10); 8-8 at p. 17 of 18 (selecting the 24-month period ending June, 2002, for SO2, VOC, CO, PM10 and H2SO4; and September, 2001, for NOx); 8-9 at pp. 16-17 of 17 (selecting the 24-month period ending June, 2004, for SO2, VOC, CO, PM10 and H2SO4; and March, 2002 for NOx); 8-10 at pp. 16-17 of 17 (s Selecting the 24-month period ending February, 2004, for SO2, VOC, CO, PM10 and H2SO4; and August, 2002, for NOx); 8-11 at p. 18 of 18 (selecting the 24-month period ending August, 2004, for SO2 and H2SO4; November, 2008, for NOx; and March, 2004, for VOC, CO and PM10); 8-12 at p. 18 of 18 (selecting the 24-month period ending June, 2006, for SO2 and H2SO4; May, 2006, for NOx; and August, 2006, for VOC, CO and PM10).

used, there are clear increases in emissions (even if the rest of OG&E's analysis is accepted). For example, the Muskogee 4 economizer replacement project began in September, 2003. (Dkt.# 27-12 p. 3 of 50.) During the 24-months immediately preceding, the emissions of $SO_2$ averaged 9167.0 tons per year. (*Id*. at p. 6 of 50.) Emissions of $SO_2$ after the project were 9704.3 tons for the 12 months ending December, 2004; 9774.6 tons for the 12 months ending December, 2006; and 9,704.58 tons for the 12 months ending December, 2008. (Dkt.# 27-13 pp. 4, 8, and 12 of 159.) Similarly, the Muskogee 5 economizer replacement project began in September, 2005. The $SO_2$ emission rate for the 24 months immediately prior was 9617.10 tons. (Dkt.# 27-7 p. 18 (24-month total ending August, 2005).) The $SO_2$ post-project emission rate for the 12-months ending December, 2006, was 10,224 tons. (Dkt.# 27-13 p. 103.) These increases all exceed 40 tons, which is "significant." OAPCR 1.4.4(b)(22)(A).[4]

Furthermore, even if the state *had* allowed OG&E to use a pre-project baseline emission rate period other than the 24-months immediately preceding the project start dates, there is no basis in OAPCR 1.4.4(b)(20) for OG&E's use of *different* 24-month baseline periods for different pollutants. The regulation allows the state to approve "*a different time period*," instead of the default 24-months immediately prior to the project, based on a determination that "*it* is more representative of normal source operations." OAPCR 1.4.4(b)(20)(A) (emphasis added). The regulation does not allow the state to approve multiple different time periods for each pollutant. Therefore, not only is

---

[4] There are likely other examples in the projects at issue, but the emission data submitted in the record is either incomplete or illegible.

OG&E's unsupported presumption that the state has approved a baseline period other than the 24-months immediately prior pursuant to OAPCR 1.4.4(b)(20)(A) incorrect, but the state could not have approved multiple different baseline time periods under the applicable Oklahoma implementation plan.  Without the ability to cherry-pick different baseline periods for calculating pre-project emissions, OG&E's motion must be denied.

**B.  OG&E's Proposal To Limit Emissions Following The Projects To Ensure That Post Project Emissions Do Not Exceed Pre-Project Emission Rates By More Than The Amount of Emissions Defined As "Significant" Without Complying With The Requirements Of An Actual Cap Circumvents The Law.**

Another fatal flaw in OG&E's motion is that it presumes the ability to use an unenforceable cap on plant emissions post-project, and artificially constrains plant operations to meet that cap, as a "projection" of future emissions post-project.

To comply with the 2002 rule it cites, OG&E would have had three options: (1) project emissions post-project based on the maximum emissions during any "12-month period" after the unit "resumes regular operation after the project," 40 C.F.R. § 51.166(b)(40)(i); (2) accept an enforceable plant-wide emission cap incorporated into a permit limit and report emissions on a 12-month rolling average, 40 C.F.R. § 51.166(w)(1); 67 Fed. Reg. at 80,206-222; or (3) obtain a "synthetic minor" permit to cap the modified unit's emissions post-project so that they could not increase.  U.S. S.J. Br. at 8, Dkt. # 8-1, at 8-9.  But, OG&E opted for none of these options. While OG&E claims to have "projected" its emissions post project, it wants the benefit of an emission cap to avoid Prevention of Significant Deterioration requirements, and cites to EPA's 2002

rulemaking as authority, the company failed to meet the procedural and substantive

obligations that accompany use of the 2002 regulations to avoid Prevention of Significant

Deterioration.

For example, for the 2004 economizer upgrade and replacement project on its

Muskogee Unit 4, OG&E announced its intent to:

> [L]imit emissions… on Unit #4 after economizer replacement
> such that the emission increase will not exceed the PSD
> significant threshold increase level.

(Dkt. 8-5 p. 9 of 18.)  It did the same for each of the other projects.  (Dkt.## 8-6 at 9 of

17; 8-7 at 9 of 17; 8-8 at 9 of 18; 8-9 at 8 of 17; 8-10 at 8 of 17, 8-11 9 of 18; 8-12 at 9 of

19.)

It is clear that OG&E never projected what its emissions would be once it resumed

*normal operations*, but instead calculated a threshold below which it intended to

temporarily manage its emissions.  The future emission rate in each of OG&E's

calculations was exactly its pre-project emission rate plus the threshold for a "significant

increase," minus one tenth of a ton.  *See e.g.*, Dkt. 8-5 at p. 8 of 18; 8-6 at 8 of 17; 8-7 at

p. 8 of 17; 8-8 at p. 8 of 17; 8-9 at p. 7 of 17; 8-10 at p. 8 of 17; 8-11 at p. 8 of 18; 8-12 at

p. 8 of 18.  In fact, when OG&E recalculated its pre-project emissions, it adjusted its

proposed "Allowable Emissions for Project" accordingly.  Dkt.# 27-12 at 7-9, 12-13,16-

18 of 50.  While OG&E labeled these future emission thresholds in some documents as

"projections," it is clear from OG&E's description of  how they were derived in other

documents, as well as in OG&E's own internal discussions, that they are really the

"allowable" emissions under temporary caps that OG&E would temporarily operate

16

below, rather than a projection of the unit's operations under normal conditions.  Dkt.## 8-15 at 3 of 3 (describing OG&E's intent to operate at reduced rates and not "take full advantage of [an] upgrade" to a plant "for at least five years after the last upgrade to a unit"), 8-16 at 2 (describing OG&E's plan to cap emissions after a plant modification for five years), 8-17 at 2 (describing OG&E's plan to operate modified units differently and at lower rates "for five years after the first upgrade" due to a cap on emissions and "not any mechanical or operational issues"); PS EH&S Quarterly Update, Feb. 23, 2004 (attached as Exhibit 1) ("We have now developed a strategy and process to operate [Muskogee] 4 within the cap requirements to prevent NSR issues with this unit."); PS Environmental Quarterly Update, Jan. 24, 2005 (attached as Exhibit 2) ("Currently committed to operate all coal units except Sooner 1 within self imposed limits to minimize NSR liability.").  Its own documents do not support that it "projected" post-project emissions to conclude there was no net emissions increase to require it to comply with the Prevention of Significant Deterioration program, part of the "NSR" requirements, but rather tacked on a *temporary* emissions cap to avoid the program's requirements under the guise that it was complying with the 2002 rules.

OG&E cannot rely on EPA rulemakings that were not incorporated into the Oklahoma plan and it certainly cannot cherry pick only those parts of such rulemakings that benefit OG&E.

**C. OG&E's Assumption That It Can Determine Pre-Project Emissions Based on Any 24-Month Period That Experienced The Highest Emissions During The Prior 5 Years, While Calculating Post Project Emissions Only On A Calendar Year Basis Is Without Merit.**

OG&E's argument that its post-project emissions did not exceed pre-project emissions, Dkt.# 10-1 at 15-20 of 32, also assumes without a basis in law that OG&E can select the highest 24-month period from the 60 months prior to a project to calculate the baseline emission rate, and determine the post-project emission rate only on a calendar year basis. Nowhere in the definition of "actual emissions" in OAPCR 1.4.4(b)(20) is there a basis for such an interpretation. If post-project emissions are measured in the same way that OG&E used to determine pre-project emissions—any continuous period without regard to calendar years—then OG&E's argument also fails because even assuming all of the rest of OG&E's assumptions were correct, and measuring post-project emissions based on any 12-month period during the five years after each project, calendar year, there were several significant emission increases. Using OG&E's own "Figure A", Dkt. # 10-1 at 11, but substituting the highest 12-month emission period following each project instead of the highest calendar year, shows many increases greater than the 40-ton threshold:

| A | B | C | D | E |
|---|---|---|---|---|
| Unit/Project | Year | Past Actual (tpy)[5] | "Projected Future Actual"[6] | Maximum Actual In Any Subsequent 12-month period (tpy) |
| Muskogee Unit 4 Economizer Replacement | 2003 | 10,201 | 10,240.9 | 10,814 (Mar. '06-Feb '07) **[613 ton increase]** |
| Sooner Unit 2 Economizer Replacement | 2004 | 11,168.5 | 11,208.4 | 10,552 (April '08- Mar. '09) |
| Muskogee Unit 5 Turbine Blade Replacement and Boiler Heat Transfer Surface Project | 2004-05 | 10,209.5 | 10,249.4 | 10,727 (Sept. '04-Aug. '05) **[391.8 ton increase]** |
| Muskogee Unit 6 Turbine Blade Replacement and Boiler Heat Transfer Surface Project | 2004 | 10,381.2 | 10,421.1 | 10,963 (June '08-May '09) **[581.8 ton increase]** |
| Muskogee Unit 4 Turbine Blade Replacement and Boiler Heat Transfer Surface Project | 2005 | 9,918.7 | 9,958.6 | 10,814 (March '06-Feb. '07) **[895.3 ton increase]** |
| Muskogee Unit 5 Economizer Replacement and Steam Turbine Blade Replacement | 2005 | 10,209.5 | 10,249.4 | 10,409 (Feb. '06-Jan. '07) **[199.5 ton increase]** |
| Sooner Unit 1 Turbine Blade Replacement and Boiler Heat Transfer Surface Project | 2006 | 10,453.0 | 10,429.9 | 11,366 (Nov. '06-Oct. '07) **[913 ton increase]** |
| Sooner Unit 2 Turbine Blade Replacement and Boiler Heat Transfer Surface Project | 2006 | 9,761.2 | 9,801.1 | 10,552 (April '08-March '09) **[790.8 ton increase]** |

Thus, OG&E's own Figure A, but calculated correctly over 12-months, rather than on a calendar year, shows that each of the eight projects did cause a significant net emissions increase for which the Prevention of Significant Deterioration program applies.  OG&E's motion must be denied.

## IV.   Although the Federal Regulations OG&E Cites Are Inapplicable, OG&E Misinterprets Those Regulations.

Even if the 1992 and 2002 federal rulemakings that OG&E relies on applied to

---

[5] According OGE's Figure A.  However, actual emission data indicate that at least the Muskogee Unit 4 project in 2004 "Past Actual" may be incorrect.

[6] This is OGE's label, but the values represent the annual emission rate above which the increase constitutes a major modification (based on OGE's baseline rate assumptions).

Oklahoma plants, OG&E's motion must still be denied because OG&E misinterprets the regulations.

The Prevention of Significant Deterioration program of the Clean Air Act is, as the word "prevention" in its name suggests, a prophylactic program whose applicability and emission-preventing requirements must be assessed before any potentially emission-increasing projects occur.  42 U.S.C. §§ 7470, 7475(a); OAPCR § 1.4.4(b)(2)(A); *see also* U.S. Opening Br. in Supp. of Mot. for Sum. J., Dkt. # 8-1, at 23 (describing the preemptive, pollution avoiding, provisions in the Prevention of Significant Deterioration program) ("U.S. S.J. Br.").  The Prevention of Significant Deterioration program could not actually *prevent* pollution problems if—as OG&E interprets the program—its application can only be determined *after* a project and its resulting pollution have occurred.  Under the 1992 regulations, plant operators must determine the "representative actual emissions" by projecting the plant's emissions once it returns to normal operations to determine whether planned upgrades "will" or "would" result in emissions increases.  *See* U.S. S.J. Br., Dkt. # 8-1, at 22-23 (*citing* 57 Fed. Reg. at 32,325 and *In re Columbia Generating Station* Order (Dkt.# 8-13) at 9.)  Similarly, under the 2002 rulemaking, the operator must project the "maximum" emission rate the unit is projected to emit "following the date the unit resumes *regular operation*…."  40 C.F.R. § 51.166(b)(40)(i) (emphasis added).

While inconsistent as to whether it believes this case was filed too early[7] or too late[8], OG&E's fundamental premise is that under the 1992 or 2002 EPA regulations, OG&E can substitute post-project emission reporting from periods when it is artificially constraining operations to avoid emission increases, for the obligation to conduct a pre-project analysis of maximum emissions from normal plant operations.  But that wait-and-see approach, combined with artificial (not "normal" or "regular") post-project constraints, conflicts with the pre-project, pollution avoidance structure of the Prevention of Significant Deterioration program and the regulations OG&E purports to apply.  *See* U.S. S.J. Br., Dkt. # 8-1, at 22-29.  Too conveniently, OG&E also argues that by the time its plan to temporarily limit emissions for the five years following each project expires, and the plants resume normal operations and increases emissions, it will be too late for EPA to address the increase because either the statute of limitations will have run, Dkt.#10-1 at 19, 24, or because those emission increases do not count,   Dkt. #10-1 at 17 (arguing that EPA's 2002 rulemaking concludes that no action by EPA is appropriate if emissions increase after five years).  In sum, OG&E's arguments would transform the Prevention of Significant Deterioration programs pre-project, pollution avoidance, scheme into nothing more than a five-year delay in pollution increases unencumbered by the program Congress intended to even the playing field between old and new

---

[7] OGE Br., Dkt. #10-1, at 21 (arguing that the United States must wait until emissions post-project increase and that once that occurs "the Government would have the right at that point to bring an enforcement action.").

[8] OGE Br., Dkt. #10-1, at 17 ("The Complaint should also be dismissed on the alternative ground that it comes too late."), 19 (arguing that the United State's claims come too late and are barred by the statute of limitations).

competitors.  The Court should reject OG&E's invitation to rewrite the Clean Air Act and

should deny OG&E's motion.

### V.      OG&E's Argument That EPA Cannot Enforce The Law Is Without Merit.

OG&E's final argument is that the statute of limitations for actions seeking

penalties, 28 U.S.C. § 2462, bars this suit seeking a declaration of law.  Dkt.# 10-1 at 19-

25.  But, OG&E admits that this statute applies only to penalties and not to equitable or

injunctive relief.  *Id*. at 20.  And a "penalty" is different than equitable relief that

remedies an unlawful act and costs the defendant money.  *U.S. v. Telluride Co*., 146 F.3d

1241, 12-46-48 (10th Cir. 1998).  Therefore, even if OG&E's modifications triggered only

historic obligations, and not presently applicable requirements that it continues to violate,

the Court has equitable authority to remediate the ongoing effects of those historic

violations.  *Mitchell v. Robert DeMario Jewelry, Inc*., 361 U.S. 288, 290-92 (1960); *see*

*also U.S. v. United States Steel Corp*., Case 2:12-cv-304, 2013 U.S. Dist. LEXIS 118513,

*39, *43 (N.D.Ind. Aug. 21, 2013) (holding that there is not a single case barring

injunctive relief by the government, and ultimately concluding that "the government must

be allowed to bring violators into compliance with its laws").

But, OG&E's premise that violations of the Prevention of Significant

Deterioration program begin and end "at the time construction or modification

commences" is false.  While the Prevention of Significant Deterioration envisions that

those who comply with its requirements, will seek to do so even before they begin

construction, 42 U.S.C. § 7475(a), the Act is concerned about pollution and pollution

occurs after construction when a plant begins operating.  That is why the Act imposes

ongoing operational requirements in the Prevention of Significant Deterioration program.

42 U.S.C. §§ 7410(j), 7475(a)(1).  Specifically, a facility triggering the program's

requirements must be "subject to the best available control technology," § 7475(a)(4),

which is an "emission limitation" that must be complied with "on a continuous basis." 42

U.S.C. §§ 7479(3), 7602(k); see also *Nat'l Parks Conservation Ass'n v. TVA*, 480 F.3d

410, 419 (6th Cir. 2007).  If there were any doubt that the best available control

technology emission limitation applies as a separate and ongoing requirement for a

modified facility, the Oklahoma implementation plan states that "[t]he new source

requirements of this section… shall apply to all.. major modifications." OAPCR

1.4.4(a)(1).  Notably, contrary to OG&E's argument, it does not state that the

requirements only apply at the time of construction, but that the requirements apply to the

modification.  Failure to be subject to best available control technology continuous

emission limits is, therefore, a violation that OG&E violates every single day that it

operates its plants without subjecting them to the limit.

Moreover, even if the failure to comply with Prevention of Significant

Deterioration requirements constituted a single violation for each project, and 28 U.S.C. §

2462 applied, the claim would not have accrued for purposes of the statute of limitations

until the date of the last injury from the violation.  *Tiberi v. Cigna Corp.*, 89 F.3d 1423,

1430-31 (10th Cir. 1996).  This applies to Prevention of Significant Deterioration

program claims where the defendant's continued emission of pollutants that are not

subjected to the more stringent limits that would have applied if the defendant complied

23

with the law.  *U.S. v. Cemex, Inc.*, 864 F.Supp.2d 1040, 1047-48 (D.Colo. 2012).  Here, OG&E's air pollutant emissions continue at higher rates than if it had complied with the Prevention of Significant Deterioration program and been subjected to best available control technology.  The injury to public health are suffered as long as the unlawful concentrations of pollution continue to be emitted from the facility, so the claim has not yet accrued under the "continuing wrong doctrine." *Tiberi*, 89 F.3d at 1430-31.

**Conclusion**

For the foregoing reasons, OG&E's motions to dismiss (Dkt. ## 10 and 18) are not well taken.  The applicable Oklahoma implementation plan does not support OG&E's arguments.  Nor do the facts.  The Court should deny the motions to dismiss.

Respectfully submitted this 8th day of November, 2013.

For Plaintiff-Intervenor, Sierra Club,

   s/ David C. Bender_____

David C. Bender
McGillivray Westerberg & Bender LLC
211 S. Paterson St., Suite 320
Madison, Wisconsin 53703
P: (608) 310-3560
F: (608) 310-3561

Jacquelyn L. Dill
Dill Law Firm, P.C.
12101 N. MacArthur Blvd.
Suite 200
Oklahoma City, Oklahoma 73162
P: (405) 722-9600
F: (405) 694-4568

*Certificate of Service*

☑ I hereby certify that on (date) <u>11/8/2013</u>, I electronically transmitted the

attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on

file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants: (insert names)

Brian J Murray    bjmurray@jonesday.com

Charles T Wehland    ctwehland@jonesday.com

Donald K Shandy    dshandy@RyanWhaley.com, jmickle@ryanwhaley.com, mcole@RyanWhaley.com

Elias L Quinn    elias.quinn@usdoj.gov, argentieri.sabrina@epa.gov, bethanne.walinskas@usdoj.gov, efile_ees.enrd@usdoj.gov, jason.dunn@usdoj.gov

☐ I hereby certify that on (date) _____, I served the attached document by

(service method) _____ on the

following, who are not registered participants of the ECF System: (insert names and addresses)

s/ David Bender
_____
s/ Attorney Name