# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

      Plaintiff,

             and

SIERRA CLUB

      Intervenor-Plaintiffs

             v.

OKLAHOMA GAS & ELECTRIC CO.,

      Defendant.

Civil Action No. 5:13-cv-00690-D

Judge Timothy D. DeGiusti

## PLAINTIFF UNITED STATES' OPPOSITION
## TO DEFENDANT OG&E'S MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ............................................. vi

OVERVIEW ............................................................................................ 1

DECLARATORY JUDGMENT JURISDICTION ............................................................ 3

STANDARD OF REVIEW ............................................................................... 5

ARGUMENT ............................................................................................ 5

I.      OG&E'S "NO INCREASE, NO VIOLATION" THEORY
        IS NEITHER COMPLIANT NOR ACCURATE ............................................. 6

        A.      OG&E's Claim of Compliance Is Unsupported and
                Unfit for Resolution in its Motion to Dismiss ........................................ 6

        B.      OG&E's Emissions Data Shows Significant Increases
                In Air Pollution After Its Renovation Projects ..................................... 10

        C.      OG&E's "No Harm, No Foul" Argument Misses
                the Point and Misconceives the Law ..................................................... 12

II.     PSD REGULATES OPERATIONS, AND PSD VIOLATIONS
        DO NOT EVAPORATE AFTER FIVE YEARS ............................................. 16

        A.      The Act Expressly Imposes Operational Requirements ....................... 17

        B.      Even if the Certain Penalty Claims Are Untimely,
                the United States Can Seek Injunctive Relief to Redress
                PSD Violations  .................................................................................. 22

CONCLUSION .......................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937) .......................................................... 4

*AKM LLC dba Volks Constructors v. Sec'y of Labor*, 675 F.3d 752 (D.C. Cir. 2012) ..... 20

*Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372 (10th Cir. 2011) ................ 4, 15

*Dias v. City & County of Denver*, 567 F.3d 1169 (10th Cir. 2009) .................................... 5

*Fitzgerald v. Seamans*, 553 F.2d 220 (D.C. Cir. 1977) ...................................................... 20

*In re Theater Row Phase II Assoc.*, 385 B.R. 511 (Bankr. S.D.N.Y. 2008) ..................... 12

*Kaw Valley Elec. Coop. Co. v. Kan. Elec. Power Coop., Inc.*, 872 F.2d 931
   (10th Cir. 1989) ........................................................................................................... 20

*Kunkel v. Cont'l Cas. Co.*, 866 F.2d 1269 (10th Cir. 1989) ................................................ 4

*Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498 (1972) ........................................... 4, 16

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ................................................ 4

*Mata v. Anderson*, 635 F.3d 1250 (10th Cir. 2011) .......................................................... 20

*Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288 (1960) ...................................... 23

*Nat'l Parks Conservation Ass'n v. TVA*, 480 F.3d 410 (6th Cir. 2007) ........................... 20

*New York v. Solvent Chem. Co.*, 664 F.3d 22 (2d Cir. 2011) .............................................. 4

*Pardini v. Allegheny Intermediate Unit*, 524 F.3d 419 (3d Cir. 2008) ............................ 24

*Parkinson v. Cal. Co.*, 233 F.2d 432 (10th Cir. 1986) ........................................................ 9

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946) ........................................................ 23

*Pound v. Airosol Co.*, 498 F.3d 1089 (10th Cir. 2007) ...................................................... 13

*Pub. Serv. Comm'n of Utah v. Wycoff*, 344 U.S. 237 (1952) ........................................... 15

*Sierra Club v. Dairyland Power Coop.*, No. 10-CV-303-bbc, 2010 WL 4294622
 (W.D. Wis. Oct. 22, 2010) ...................................................................................... 19, 21

*Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133 (10th Cir. 2005) ...................... 20

*State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979 (10th Cir. 1994) .............................. 16

*Tiberi v. Cigna Corp.*, 89 F.3d 1423 (10th Cir. 1996) ...................................................... 21

*United States v. Cemex, Inc.*, 864 F. Supp. 2d 1040 (D. Colo. 2012) .............................. 21

*United States v. Cinergy Corp.*, 458 F.3d 705 (7th Cir. 2006) .......................................... 13

*United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055 (S.D. Ind. 2008) ......................... 23

*United States v. DTE Energy Co.*, 711 F.3d 643 (6th Cir. 2013) .............................. 8, 9, 14

*United States v. Duke Energy Corp.*, No. 1:00-cv-1262, 2010 WL 3023517
 (M.D.N.C. July 28, 2010) ......................................................................................... 13

*United States v. E. Ky. Power Coop.*, 498 F. Supp. 2d 970 (E.D. Ky. 2007) ................... 20

*United States v. EME Homer City Generation, L.P.*, 727 F.3d 274 (3d Cir. 2013).... 22, 24

*United States v. Fisher-Otis Co.*, 496 F.2d 1146 (10th Cir. 1974)......................... 4, 14, 15

*United States v. Holtzman*, 762 F.2d 720 (9th Cir. 1985) ................................................. 24

*United States v. Lane Labs-USA, Inc.*, 427 F.3d 219 (3d Cir. 2005) ................................ 24

*United States v. La. Generating, LLC*, 938 F. Supp. 2d 615 (M.D. La. 2011) ........... 21, 22

*United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996) ........................ 21

*United States v. Oakland Cannabis Buyers' Coop.*,532 U.S. 483 (2001)......................... 23

*United States v. Ohio Edison*, 276 F. Supp. 2d 829, 865 (S.D. Ohio 2003) ..................... 16

*United States v. Ohio Edison Co.*, No. 99-cv-1181, 2003 WL 23415140,
 (S.D. Ohio. Jan. 17, 2003) ........................................................................................ 21

*United States v. Telluride Co.*, 146 F.3d 1241 (10th Cir. 1998) ....................................... 22

*United States v. U.S. Steel Corp.*, --F. Supp. 2d --, No. 2:12-cv-304,
2013 WL 4495665 (N.D. Ind. Aug. 21, 2013) .......................................................... 22

*United States v. Xcel Energy Inc.*, 759 F. Supp. 2d 1106 (D. Minn. 2010) ....................... 9

*U.S. Pub. Interest Research Group v. Atlantic Salmon of Maine, LLC*, 339 F.3d 23
(1st Cir. 2003) .................................................................................................... 24

*United Steelworkers of Am. v. Or. Steel Mills, Inc.*, 322 F.3d 1222 (10th Cir. 2003) ...... 13

## Federal Statutes

U.S. Const. art. III § 2 ............................................................................................ 4

28 U.S.C. § 2201 ................................................................................................... 5

28 U.S.C. § 2201(a) ............................................................................................... 3

28 U.S.C. § 2462 ............................................................................................ 21, 22

42 U.S.C. § 7410(j) ......................................................................................... 16, 18

42 U.S.C. § 7413(b) ........................................................................................ 21, 23

42 U.S.C. § 7470 ................................................................................................... 6

42 U.S.C. 7475(a) ............................................................................................ 2, 17

42 U.S.C. § 7475(a)(1) .................................................................................... 6, 7, 18

42 U.S.C. § 7475(a)(4) ....................................................................................... 7, 19

42 U.S.C. § 7477 .......................................................................................... 2, 8, 13

42 U.S.C. § 7479(3) .......................................................................................... 18, 19

42 U.S.C. § 7602(k) ..................................................................................... 16, 18, 19

42 U.S.C. § 7604(a)(3) ........................................................................................ 2, 8

## Federal Regulations

40 C.F.R. § 51.166(b)(21) (1993)...................................................................... 10

40 C.F.R. § 52.21(b)(9) (1984)........................................................................ 2

40 C.F.R. § 52.21(j)(2) (1984) ........................................................................ 20

40 C.F.R. § 52.21(j)(3) (1984) ........................................................................ 20

40 C.F.R. § 52.21(r)(1) (1984) ........................................................................ 6

40 C.F.R. § 52.21(r)(6)(ii) (2013) .................................................................... 8


45 Fed. Reg. 52,676 (Aug. 7, 1980) ............................................................. 8, 9

## State Regulations

OAPCR § 1.4.4(b)(2)(A) ................................................................................. 6

OAPCR § 1.4.4(b)(9)........................................................................................ 2

OAPCR § 1.4.4(b)(10)...................................................................................... 2

OAPCR § 1.4.4(b)(22)(A) ............................................................................ 6, 7

OAPCR § 1.4.4(e) .......................................................................................... 20

## Other Materials

26 C.J.S. *Declaratory Judgments* § 3 (2013) ............................................... 4, 14

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| CAA | Clean Air Act |
| BACT | Best Available Control Technology |
| EPA | United States Environmental Protection Agency |
| $NO_x$ | Nitrogen Oxides |
| NSR | New Source Review |
| OAPCR | Oklahoma Air Pollution Control Regulations |
| ODEQ | Oklahoma Department of Environmental Quality |
| OG&E | Oklahoma Gas & Electric Co. |
| PSD | Prevention of Significant Deterioration |
| $SO_2$ | Sulfur Dioxide |
| tpy | tons per year |
| TSD | Technical Support Document |
| VOC | Volatile Organic Compounds |

**OVERVIEW**

The Clean Air Act requires operators to take preventative measures and adopt modern pollution control techniques if a preconstruction analysis reveals a modification "would" result in significant increases in air pollution. For sulfur dioxide ($SO_2$) and nitrous oxides ($NO_x$) pollution, the Prevention of Significant Deterioration (PSD) regulations set "significant" to be 40 tons per year.

OG&E "upgraded" its Sooner and Muskogee generating facilities starting in 2003, and the Company justified spending millions of dollars on those upgrades on the grounds that they would, *e.g.*, "greatly enhance the operability, efficiency, and maximum continuous net generation" of the plants. Complaint (ECF 1), ¶ 42. If these "enhancements" were expected to increase emissions by more than the 40-ton PSD threshold, then OG&E was supposed to get PSD permits for them. The Company decided not to obtain permits for its upgrades; instead, OG&E sent "Project Notifications" to the State permitting authority and represented that every one of its plants would emit just 39.9 tons of extra pollution.

This was not a convenient coincidence. Rather, OG&E's Project Notifications were mere unenforceable promises to keep pollution below PSD-triggering levels for a short while. As the United States has explained in its pending Motion for Summary Judgment (ECF 8-1), the central question in this declaratory judgment action is whether such a temporary emissions management scheme is a legal way to avoid getting a PSD permit. The United States sought a declaration that it is not. OG&E's PSD-avoidance strategy does not comply with the statute's directive to protect the public health, nor does

1

it live up to the purpose Congress enshrined in the program's very name: to *prevent*—not merely delay—the deterioration of air quality.  Indeed, OG&E's theory that it could avoid all PSD obligations until an illegal increase in air pollution had already occurred is directly contrary to the CAA, which allows EPA and citizens to sue operators *before* construction has begun on a major modification—and so necessarily before any emissions increase has resulted from the project.  42 U.S.C. §§ 7477; 7604(a)(3).  Thus, and as detailed in the United States' Motion for Summary Judgment, the Company's methods fall far short of compliance with PSD's statutory and regulatory requirements.

In its Motion to Dismiss, OG&E first relies on the same "no increase, no violation" theory of PSD it included in its Project Notifications.  But where OG&E's Project Notifications tried to support the theory with citations to EPA's regulations, now the Company is relying on a jurisdictional argument to claim that, until its units actually increase their emissions, there is no redressible injury that can be contemplated by this Court.  But this new version of its theory fares no better than the original.  The CAA still expressly authorizes forward-looking enforcement, and the Act and regulations explicitly impose "preconstruction requirements" which must be followed, as the phrase indicates, *before* construction.  42 U.S.C. § 7475; OAPCR § 1.4.4(b)(9), (10); 40 C.F.R. § 52.21(b)(9) (1984).  Moreover, this case seeks a declaration of law, and courts enjoy jurisdiction over actions for declaratory judgment whether or not an injury has occurred. Finally, and contrary to the central (though irrelevant) claim of the Company's brief, some of OG&E's upgraded facilities in fact *have* increased their emissions by hundreds of tons over the PSD significance threshold.

2

OG&E's second line of argument flatly contradicts its first.   While the Company first claims the Government's suit comes too early, it next insists the suit comes too late, arguing any declaratory relief issued by this Court would amount to a "penalty" barred by the statute of limitations.  But this argument misreads PSD's requirements and strains the meaning of "penalty" to the breaking point.  OG&E was required to perform preconstruction emissions projections.  The United States here seeks to review OG&E's preconstruction assessments and to compel specific performance in accordance with the regulations, Complaint (ECF 1) ¶¶ 51–52; in no way "penal," the sought relief is clearly tailored to the alleged misconduct.

What OG&E really wants is to dictate the terms of Clean Air Act compliance and enforcement.  According to the Company, its determinations about whether to get a PSD permit before it upgraded its facilities can be reviewed by neither agency nor court, and any enforcement actions must await its self-reported violation based on its own illegal reading of the PSD program's requirements.  To be sure, PSD gives operators the initial responsibility to assess their proposed modifications under the program's requirements.  But it does not give operators the sole authority to determine their own compliance.  OG&E's Motion to Dismiss should be denied.

## DECLARATORY JUDGMENT JURISDICTION

A declaratory judgment may be brought in any case "of actual controversy" and a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  The Supreme Court has equated the "actual controversy" requirement with the

3

Constitution's case-or-controversy requirement. *See, e.g., MedImmune, Inc. v. Genentech, Inc.* 549 U.S. 118, 126 (2007); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-40 (1937); U.S. Const. art. III § 2. In order for a case to satisfy this requirement, the dispute between the parties must be definite and concrete, affecting the parties' adverse legal interests with sufficient immediacy as to justify relief. *See MedImmune*, 549 U.S. at 127; *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 508 (1972).

However, "no actual wrong need have been committed or loss have occurred in order to sustain [a declaratory judgment] action." *United States v. Fisher-Otis Co.*, 496 F.2d 1146, 1151 (10th Cir. 1974); *see also* 26 C.J.S. *Declaratory Judgments* § 3 (2013). Moreover, "the relief granted [need not] entirely dispose of the matter" for the court to extend jurisdiction over the controversy. *Kunkel v. Cont'l Cas Co.*, 866 F.2d 1269, 1274 (10th Cir. 1989)); *accord New York v. Solvent Chem. Co.*, 664 F.3d 22, 26–27 (2d Cir. 2011) ("It does not matter that a declaratory judgment of liability alone will not finalize the controversy and offer relief from all uncertainty." (quotations and brackets omitted)). Rather, what is required is a concrete dispute that implicates a "real-world consequence." *Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1379 (10th Cir. 2011). Thus, though an action for declaratory judgment should seek adjudication of a party's "right to do, or to have, [some]thing in particular,"[1]

> nothing in the Declaratory Judgment Act prohibits a court from deciding a purely legal question . . . which arises in the context of a justiciable controversy presenting other factual issues. The Act specifically states that the court "may declare the rights and other legal relations of any interested

---

[1] *BancInsure*, 650 F.3d at 1380 (quoting and *Pub. Serv. Comm'n of Utah v. Wycoff*, 344 U.S. 237, 244 (1952)).

party seeking such declaration, *whether or not further relief is or could be sought*."

*Kunkel*, 866 F. 2d at 1276 (quoting 28 U.S.C. § 2201) (emphasis original).

## STANDARD OF REVIEW

When reviewing the "harsh" remedy requested by a motion to dismiss, courts should "assume the truth of all well-pleaded facts in the complaint, and draw all reasonable inferences therefrom in the light most favorable to the plaintiffs." *Dias v. City and County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

## ARGUMENT

It is easy to see OG&E's view of PSD is fatally flawed.  The Company's Motion to Dismiss suffers from a dizzying inconsistency as to the nature of a PSD violation, leading the Company to simultaneously argue that this law suit comes too early and that it comes too late.  In some places, OG&E urges that a judicially cognizable harm arises only after emissions have increased.  *See*, *e.g.*, ECF 10-1 at 14–15.  Indeed, the Company concedes that, if it increases its emissions *in the future*, the United States "would have the right at that point to bring an enforcement action."  *Id.* at 21.  But elsewhere, OG&E argues that PSD imposes *only* pre-construction obligations; the Company claims that any PSD violation is "complete" when construction commences—necessarily *before* any annual emissions increase could be realized.  Thus the Company urges that any suit brought more than five years after a modification is untimely.  *Id.* at 19; *see also id.* at 24. Conveniently, under OG&E's worldview, the statute of limitations can run on a PSD claim before the claim could ever be heard by a court of law.

5

Of course, the inconsistency of OG&E's argument stems from the central fallacy of its legal theory. The Company's apparent notion that PSD claims can expire before they ripen is tailor-made to justify its temporary emissions management scheme—*i.e.*, simply keep emissions low for the duration of the statute of limitations. But PSD aims to *prevent* the degradation of air quality, not merely delay it. In the end, as it strains to craft its "no harm, no foul" argument, OG&E misreads PSD's requirements, misconstrues PSD's purpose, and just plain misses the central issue of this case.

## III.   OG&E'S "NO INCREASE, NO VIOLATION" THEORY IS NEITHER COMPLIANT NOR ACCURATE

The United States seeks a judicial declaration that OG&E's proposed pollution management scheme does not satisfy the emissions projection requirements of PSD. OG&E asks this court to dismiss the action, arguing that (A) the Company did comply with the projection requirements, and (B) air pollution from its units has not increased since the project was performed. It is wrong on both counts. In any event, the Company's attempt to argue "no harm, no foul" misconceives declaratory judgment law.

### A.   OG&E's Claim of Compliance Is Unsupported and Unfit for Resolution in its Motion to Dismiss

Congress' PSD program aims to *prevent* the degradation of air quality. 42 U.S.C. § 7470. To effectuate this goal, the program imposes certain forward-looking obligations on power plant operators. *See*, *e.g.*, 42 U.S.C. §§ 7475(a); OAPCR § 1.4.4(b)(2)(A); 40 C.F.R. § 52.21(r)(1) (1984). Operators must assess proposed modifications to their facilities to determine in advance whether the upgrades "would" result in emissions increases. OAPCR § 1.4.4(b)(22)(A), (B); 40 C.F.R. § 52.21(b)(2)(i) (1984). If that

analysis shows the modifications will lead to emissions increases, operators must take steps to protect the public from such increases by adopting techniques to meet modern emissions limitations.  42 U.S.C. §§ 7475(a)(1), (a)(4).

Contrary to the well-pleaded complaint, OG&E claims it *did* project its future emissions in accordance with regulatory requirements.  *See* ECF 10-1 at 10 n.4.  According to the Company, its "pre-project emissions projections [were] *identified* as projected emissions in OG&E's Project Notifications."  *Id.* at 14 (emphasis added).  Of course, this begs a central question in this case, *see* Complaint, ECF 1 ¶ 49, and as explained in Plaintiff's Motion for Summary Judgment, ECF 8-1 at 20–25, OG&E's reliance on its Project Notifications fails to meet the regulatory requirements.

Although OG&E purports to "identify" certain calculations in its Project Notifications as projections, the numbers themselves belie that claim.  The PSD-triggering significance threshold for $SO_2$, $NO_x$, and volatile organic compounds (VOC) is 40 tons per year (tpy).  *See* OAPCR § 1.4.4(b)(22)(A).  The Complaint lists eight "upgrade" projects that OG&E performed across five electric generating units.  ECF 1 ¶¶ 42(a)–(h).  In *every* case—a total of 24 separate "projections"—the Company represented that each unit's future emissions of those pollutants would be *exactly* 39.9 tons per year over historic baseline emissions levels.

In fact, OG&E's Project Notifications *explain* the Company's management scheme—though the method is readily visible in the numbers themselves.  First, OG&E calculated what it called the "allowable emissions increase" for each pollutant by adding the regulatory significance level to the unit's historic, baseline emissions rate.  *See* ECF

Nos. 10-4 – 10-11.  Then, OG&E put those emissions numbers in a column under the
header "Projected Future Actual" in a table titled "Allowable Emissions For Project."
*See*, *e.g.*, ECF 8-1 at 12 (providing an example table).  Finally, the Company
"propose[d]" to limit its emissions to that level for five years.  Complaint ECF 1 ¶ 45.
Under OG&E's approach, there is *no difference* between what was allowable and what
the Company "projected" for each unit with each upgrade.  But the whole point of the
projection requirement is for an operator to compare its projection of future emissions
during periods of normal operations to the amount "allowable" under the regulations—a
critical first step in determining whether pollution prevention actions are necessary.
Simply equating the two with a wave of the hand undermines the fundamental premise of
the program, and indeed the forward-looking requirements of the Act.

OG&E never explains how such a scheme is compliant with PSD requirements.
Instead, OG&E cites the Sixth Circuit's ruling in *United States v. DTE Energy Company*
to argue EPA should not "second guess" an operator's preconstruction determinations.
ECF 10-1 at 16.  But the Sixth Circuit expressly held in the same case that EPA must be
able to review an operator's determinations to ensure compliance with regulatory
requirements.  *See United States v. DTE Energy Co.*, 711 F.3d 643, 650 (6th Cir. 2013).

To be sure, operators have always had the first responsibility to assess their
projects and determine whether PSD applies.  *See*, *e.g.*, 45 Fed. Reg. 52,676, 52,725
(Aug. 7, 1980); 40 C.F.R. § 52.21(r)(6)(ii) (2013).  But that does not mean an operator's
determination is unreviewable, nor that it is the final word on PSD applicability.  To the
contrary, the CAA clearly authorizes protective and preventative enforcement against

8

violators of these requirements.  *See* 42 U.S.C. §§ 7477, 7604(a)(3); *see also DTE*, 711

F.3d at 650 ("The [CAA's] language is clear"; EPA "must" be allowed to ensure

operators follow PSD's preconstruction requirements); *United States v. Xcel Energy Inc.*,

759 F. Supp. 2d 1106, 1113 (D. Minn. 2010) (PSD "clearly accords EPA the authority to

investigate, and then to prevent through appropriate legal remedies, violations committed

before construction commences."). This framework allows operators the flexibility of

moving ahead with planned projects without waiting for an Agency's prior approval, but

allows regulatory authorities to police compliance with PSD's preconstruction

requirements to ensure the public receives the protective actions it is due under Congress'

enactment.  *See* 45 Fed. Reg. at 52,725.  If an operator does not do the analysis—or does

not in accordance with regulatory requirements—then PSD "is not working."  *DTE*, 711

F.3d at 649.  Thus, EPA can—indeed, it "must" be able to—ensure sources have

projected future emissions in accordance with regulatory requirements.  *Id.* at 650.

Ultimately, OG&E's motion to dismiss puts the cart before the horse.  The

Company asserts its 39.9 ton-per-year emissions management plan complied with PSD

requirements, ECF 10-1 at 10 n.4, but asks this court to dismiss a case seeking review of

that very question.  OG&E may have offered an unenforceable plan to keep air pollution

to below PSD-triggering levels for a while, but that does not suffice for preconstruction

analysis.  *See generally* ECF 8-1.  In any event, the resolution of this merits issue—

whether OG&E's representations complied with the regulations or can shield the

Company's conduct from review—is improper in a motion to dismiss where the issue is

presented contrary to the well-pleaded Complaint.  *Accord Parkinson v. Cal. Co.* 233

F.2d 432, 436 (10th Cir. 1986).

### B.    OG&E's Emissions Data Shows Significant Increases In Air Pollution After Its Renovation Projects

The United States is compelled to respond to a factual error in OG&E's Motion to

Dismiss, even though resolution of the factual dispute is irrelevant to the instant case,

which seeks a declaration of law.  Specifically, OG&E points to public emissions data

which, it claims, "confirms" that its facility upgrades did not lead to PSD-triggering

emissions increases.  ECF 10-1 at 7–15.  This is a central point of OG&E's brief.  On this

foundation, OG&E constructs its various arguments that the United States' suit does not

present a justiciable controversy (*id*. at 16–18), that any relief granted in this case—even

declaratory relief—would somehow amount to a "penalty" (*id.* at 20–23), and that

OG&E's emissions analyses were correct (*id.* at 14–17) and compliant (*id.* at 9–10).

OG&E's founding premise is incorrect.

OG&E graphs its units' calander-year emissions to support its assertion that its

units have not increased air pollution over significance levels since the various upgrade

projects were performed.  But the graphs OG&E presents do not tell the whole story—or

even the relevant story—about the emissions from its facilities.  The regulatory provision

OG&E cites[2] as inspiration for its flawed compliance plan requires emissions to be

tracked "on an annual basis for a period of five years *from the date the unit resumes*

*regular operation*."  40 C.F.R. § 51.166(b)(21) (1993) (emphasis added).  Even if

---

[2]    ECF 10-1 at 12 n.6.

OG&E's temporary-emissions-management scheme could be called "regular operations" (it cannot), the very same data that OG&E relies upon reveals that several of its units *have in fact* increased their emissions to far above significance levels.[3]

**Figure 1: Example of Muskogee Unit 4 Post-Upgrade $SO_2$ Emissions**
(Muskogee 4 restarted operations April 2005)



**Figure 2: Example of Sooner Unit 1 Post-Upgrade $SO_2$ Emissions**
(Sooner 1 restarted operations March 2006)



---

[3]   Actual emissions data for Figures 1 and 2 is from EPA's Acid Rain data, which is available online as OG&E describes.  ECF 10-1 at 12 n.7.  That data is also attached in Exs. 1 and 2, respectively.  "Baseline" and "planned cap" numbers are as reported by OG&E, *id.* at 11 (though OG&E called the latter its "projected future actual" emissions).

Thus, instead of "confirming" the Company's hollow "projections," the data OG&E

relies upon reveals that some of its units have emitted far more than the Company

proposed they would, and far more than the significance thresholds established by the

regulations.   Insofar as OG&E argues this case is moot because its units have never

significantly increased since they were upgraded, OG&E's motion cannot succeed—the

very data OG&E reported to EPA undermines its claim.  *Accord In re Theater Row Phase*

*II Assoc.*, 385 B.R. 511, 520 (Bankr. S.D.N.Y. 2008) (when ruling on a 12(b)(6) motion,

a "court can take judicial notice of all of the documents filed in the case although it must

not make factual findings about disputed facts from those documents").

### C.    OG&E's "No Harm, No Foul" Argument Misses the Point and Misconceives the Law

Despite the statute's imposition of preconstruction obligations and authorization of

preconstruction enforcement, OG&E has claimed—in notices to the state and again in its

Motion to Dismiss—that PSD liability is controlled by post-construction data.  ECF 10-1

at 7 (arguing that absent evidence of a post-project emissions increase there is no injury

for a court to redress).  The Company claims its unenforceable plan to temporarily

constrain its emissions is sufficient under the Act's preconstruction requirements, and

thus asserts that PSD liability cannot ripen unless and until it actually emits illegal

pollution that harms the public.  In other words, according to OG&E, since the Company

*said* its emissions would not increase, the United States is precluded from bringing any

PSD-related action until emissions *do* increase.  Of course, PSD's preconstruction

requirements impose strict liability obligations which cannot be satisfied with an

12

operator's "say so."  *See Pound v. Airosol Co.*, 498 F.3d 1089, 1097 (10th Cir. 2007)

("The [Clean Air] Act imposes strict liability upon owners and operators who violate the

Act."); *United Steelworkers of Am. v. Or. Steel Mills, Inc.*, 322 F.3d 1222, 1229 n.4 (10th

Cir. 2003).  But, OG&E goes a step further to argue its "say so" is enough even to

preclude this action seeking declaratory relief about the sufficiency of that proclamation.

The Company's argument begins with an attempt to undermine a hypothetical case

that the United States did not file.  Specifically, OG&E argues that the Government could

not sue the Company for failing to have obtained PSD permits until emissions actually

increase at its upgraded units.[4]  Thus, OG&E concludes, this suit for declaratory relief

does not implicate an "actual controversy" over which the Court could extend

jurisdiction.  ECF 10-1 at 16.

Contrary to OG&E's claims, the United States *can* bring actions for PSD permit

violations based on emissions projections rather than on post-projected emissions data.

*See* 42 U.S.C. § 7477; *see also United States v. Duke Energy Corp.*, No. 1:00-cv-1262, 2010

WL 3023517, at *6 (M.D.N.C. July 28, 2010) (considering whether utility "reasonably should

have projected a significant increase in emissions" (citing *United States v. Cinergy Corp.*, 458

F.3d 705, 707-08 (7th Cir. 2006))).  PSD imposes two distinct permitting triggers—one in

---

[4]   OG&E cites *DTE* for the proposition that post-project emissions data must be
considered if it is available—but, tellingly, OG&E cites the *dissenting opinion* to support
its claim.  ECF 10-1 at 16.  Though OG&E claims the majority "essentially agree[d]," the
majority in fact remanded the case for the district court's further consideration even
though post-project data did not show increased emissions.  711 F.3d at 652; *see also
United States v. Ohio Edison*, 276 F. Supp. 2d 829, 865 (S.D. Ohio 2003) (stating "[i]t
would be both bad law and bad public policy" to consider post-construction emissions
data where an operator was otherwise required by law to obtain a preconstruction permit).

the event that emissions projections performed in accordance with the regulations reveal a project "*would*" result in an emissions increase; another in the event that later operational data reveals that the projects *did* result in an emissions increase. Though the United States certainly agrees that it can bring a PSD enforcement action based upon actual operational data that shows projects have resulted in a significant emissions increase, *cf.* ECF 10-1 at 21, the Government *can also* bring enforcement actions based projected emissions increases—just as the Clean Air Act clearly requires. *Accord DTE*, 711 F.3d at 644 (emissions "projection projection determines whether the project constitutes a "major modification" and thus requires a permit").

Even assuming that OG&E could not face an enforcement action for failing to obtain a PSD permit until emissions actually increase as a result of its projects—an assumption plainly contrary to the statute and the regulations—OG&E's argument ignores the hornbook principle that actions for declaratory judgment "relieve[] litigants from the common law rule prohibiting a judicial declaration of rights until a right has been violated." 26 C.J.S. *Declaratory Judgments* § 3 (2013). Indeed, the Tenth Circuit has already squarely rejected OG&E's line of reasoning in *United States v. Fisher-Otis Company. See* 496 F.2d at 1151. There, the United States sought a declaratory judgment to establish the Government's rights under a flowage easement deed on certain tracts of land owned by the defendant. Specifically, the parties disputed whether landfill and construction could progress within the flowage easement area.

> [D]efendants contend that if the Government cannot uphold its allegations
> with respect to defendants' past conduct . . ., then no 'actual controversy'

14

exists between the parties upon which to base an action for declaratory judgment.

Defendants misconstrue the requirement that a proceeding for declaratory judgment be based upon an actual controversy. The essential distinction between a declaratory judgment action and an action seeking other relief is that in the former no actual wrong need have been committed or loss have occurred in order to sustain the action.

*Id.* at 1150–51. Just as the defendant in *Fisher-Otis* claimed a present right to landfill within the flowage easement area, *id.*, OG&E claims a present right to operate its upgraded facilities without a PSD permit. EPA seeks to review the Company's determinations; the Company claims its determinations are unreviewable at present. Thus, the Parties plainly have a "specific dispute"—*i.e.*, whether OG&E's "proposed plan of action for compliance" for each of the specific projects listed in the Complaint complies with the CAA's requirements. *Accord BancInsure*, 650 F.3d at 1379. And that dispute most definitely has a "real-world consequence"—*i.e.*, whether OG&E's pre-construction decisions can be reviewed by Court or Agency, and whether the Company can be held liable for pre-construction violations based on pre-construction conduct. *Id.*

The "particularity" of the United States' request is readily visible in the Complaint: this Court should declare OG&E's "plan of action" non-compliant as a matter of law, and direct the company to perform and provide emissions projections analyses that conform with the regulations' requirements. *See* Complaint ¶¶ 50–52; *cf. Wycoff*, 344 U.S. at 244.[5] And the "the immediacy and reality" of the United States' concerns in

---

[5]   OG&E's argument that the regulations would not otherwise require reporting of these projections is a red herring. ECF 10-1 at 18. The Company admits that it must perform the analyses, and EPA has ample authority to request and review those decisions under its information gathering authority in CAA § 114. 42 U.S.C. § 7414.

this case stem from its ability to assess violations of the Clean Air Act that may be ongoing *now*. *Cf. Lake Carriers' Ass'n*, 406 U.S. at 508. As such, far from "futile," this Court's declaration will serve to "clarify[] the legal relations" between the Parties and outline their relative obligations under the Clean Air Act with regard to OG&E's specific "upgrade" projects and their ongoing effect on human health. *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir.1994).

## IV. PSD REGULATES OPERATIONS, AND PSD VIOLATIONS DO NOT EVAPORATE AFTER FIVE YEARS

The Prevention of Significant Deterioration program imposes preconstruction requirements that can trigger ongoing obligations. That is plain from the statutory text, *see* 42 U.S.C. §§ 7410(j), 7602(k), but it also just makes sense: the program would not *prevent* anything if it did not regulate operations. The purpose of the PSD's preconstruction analysis requirements is to provide a solid basis for determining whether preventative efforts are necessary, that is, whether an operator must obtain a PSD permit protect the public health and welfare. *See Ohio Edison*, 276 F. Supp. 2d at 865.

Nevertheless, OG&E suggests that the PSD program is simply a construction permitting program, which does not impose operation obligations. The Company argues that, even assuming the Company *did* violate PSD when it upgraded its Muskogee and Sooner electric generating units, those violations were "complete" upon construction and are now barred by the statute of limitations. ECF 10-1 at 19, 24. Thus, OG&E concludes, there is nothing this court can address, and any declaration of rights from this

Court would amount to a civil penalty, and is similarly barred by the statute of limitations. *See id*. at 20–25.

As a threshold matter, OG&E contradicts itself. Since the first half of its brief insists enforcement cannot proceed unless and until emissions actually increase as a result of the modifications (ECF 10-1 at 7–18), the Company is claiming that any PSD suit arising from its upgrade projects would both be untimely *and* unripe. It cannot be that PSD violations accrue upon construction, but that enforcement cannot proceed until the unit operates and increases its annual emissions.

In any event, OG&E's statute of limitations argument is doubly-flawed. First, as the plain text of the statute illustrates, PSD regulates *operations*, not just construction. And second, even if PSD's sole concern *was* illegal construction, long-standing principles of equitable jurisdiction ensure the public can obtain judicial remedies for PSD violations. If OG&E's upgrade projects violated PSD requirements, those violations are cognizable and remediable. OG&E's argument that any declaration of law from this court would necessarily be punitive in nature should therefore be rejected.

## A.    The Act Expressly Imposes Operational Requirements

Section 165(a) of the Clean Air Act imposes various "Preconstruction requirements" on a facility undertaking a major modification. 42 U.S.C. § 7475(a). But the statute's reference to "construction" does not make it merely a construction permitting program. The Clean Air Act is concerned with pollution. The sub-provisions of Section 165(a) clearly impose ongoing, operational requirements. Violations of the PSD program may begin with a facility's construction project, but they do not end there.

17

Before commencing construction of a "major modification," an operator must obtain a PSD permit "setting forth emissions limitations for such facility" in accordance with the Act's requirements.  42 U.S.C. § 7475(a)(1).  The Act defines "emissions limitation" as a requirement restricting "emissions of air pollutants *on a continuous basis*, including any requirement relating to *the operation* or maintenance of a source to assure *continuous* emission reduction." 42 U.S.C. § 7602(k) (emphasis added).   Indeed, as a condition of the permit's issuance, modified sources must show that the "modification *and operation* of such source will be in compliance" with the Act's requirements.  42 U.S.C. §§ 7410(j) (emphasis added), 7479(3), 7602(k).

To be sure, a PSD permit is supposed to be obtained prior to beginning construction, but it must also contain substantive, ongoing operational requirements that reduce air pollution on a continuous basis.  *See* 42 U.S.C. §§ 7410(j), 7475(a)(1).  Thus, though coined a "preconstruction permit" by the statute, a PSD permit necessarily contains—by statutory definition—operating requirements with which modified sources must comply on an ongoing basis.[6]  Not surprisingly, *every* decision OG&E cites for the proposition that PSD permits impose only construction—and not operational— requirements completely ignores the statute's definition of "emissions limitation," 42 U.S.C. § 7602(k), and the statute's discussion of permit preconditions, *id.* § 7410(j), both of which expressly describe ongoing, operational obligations.  *See*, *e.g.*, ECF 10-1 at 24 (citing cases).  By contrast, the cases that have correctly found PSD obligations to be

---

[6]    *United States v. Marine Shale Processors*, 81 F.3d 1329, 1355-1356 (5th Cir. 1996) (noting "confusion" that results from co-existence of NSR "preconstruction" and Title V "operating" permits, even though both contain operating requirements).

ongoing have rejected the superficial temptation to rest their holdings on *when* the PSD review process must be performed, and have instead given effect to the statute's clear requirement that PSD permits themselves, though issued prior to construction, actually govern a plant's post-construction operation.  *See*, *e.g.*, *Sierra Club v. Dairyland Power Coop.*, No. 10-cv-303, 2010 WL 4294622, at *12-14 (W.D. Wis. Oct. 22, 2010) (because a PSD permit, unlike a "building permit," actually "imposes ongoing operational requirements that may be violated after construction is complete, a major source has an obligation to obtain a permit even after its construction is complete."); *Sierra Club v. Portland Gen. Elec. Co.*, 663 F. Supp. 2d 983, 993 (D. Or. 2009) ("The PSD program contemplates not only preconstruction requirements, but also ongoing operational requirements. . . .  Failure to obtain a permit in the first instance does not relieve an operator of the Act's ongoing operational requirements."); *United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 650 (M.D.N.C. 2003) (criticizing the superficial reasoning of decisions that focus on the preconstruction aspects of PSD to the exclusion of the operational requirements such as emission limitations).

Additionally, Section 165(a)(4) of the Act says that no new or modified plant may be constructed unless it "is subject to" best available control technology or "BACT."  42 U.S.C. § 7475(a)(4).  But again, by definition, BACT is more than just a permitting requirement.  Congress defined BACT itself as an "emissions limitation," 42 U.S.C. § 7479(3), so, even without a permit, modified sources have an independent obligation to meet BACT-level "emissions of air pollutants *on a continuous basis*." 42 U.S.C. § 7602(k) (emphasis added).  The PSD regulations echo this requirement by instructing

19

that any new or modified facility "shall apply" BACT.  40 C.F.R. § 52.21(j)(2), (j)(3); *see also* OAPCR § 1.4.4(e) (describing technology to be "applied").  As the Sixth Circuit held, these provisions "create[] an ongoing obligation to apply BACT" emissions limitations once PSD is triggered.  *Nat'l Parks Conservation Ass'n v. TVA*, 480 F.3d 410, 419 (6th Cir. 2007); *see also United States v. E. Ky. Power Coop.*, 498 F. Supp. 2d 970, 973-4 (E.D. Ky. 2007) ("shall apply" BACT requirement imposes a continuing obligation to comply with PSD).

If OG&E improperly skirted the PSD permitting process, it has been improperly emitting air pollution at far above BACT-levels for years.  Because PSD permits contain important operating requirements, and because issuance of PSD permits protects human health and the environment from excess emissions on an ongoing basis, each day that a company illegally operates without a PSD permit is a discharge of illegal pollution that injures the public anew.  In other words, each day of running the facility without a permit constitutes an affirmative and "independent act" that results in a "new and accumulating" injury to the public.  *Kaw Valley Elec. Co-op Co. v. Kan. Elec. Power Co-op.*, 872 F.2d 931, 933 (10th Cir. 1989) (describing the "continuing violation" requirements); *accord Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1141–46 (10th Cir. 2005) (discharge of water pollution without a permit constitutes a violation).  No "mere failure to right a wrong," *c.f. Fitzgerald v. Seamans*, 553 F.2d 220, 230 (D.C. Cir. 1977), the failure to obtain a PSD permit which sets forth operational requirements is a "continual unlawful act[]."  *Mata v. Anderson*, 635 F.3d 1250, 1253 (10th Cir. 2011); *accord Volks Constructors v. Sec'y of Labor*, 675 F.3d 752, 758 (D.C. Cir. 2012) ("[W]here, for

20

example, a company continues to subject its employees to unsafe machines" enforcement

may proceed "since the dangers created by the violations persist.").

This does not mean that the applicable statute of limitations (28 U.S.C. § 2462)

plays no role in this case.  If OG&E is ultimately found to have illegally modified its

plants, the United States may only seek penalties for days of unpermitted operation that

occurred within five years of the filing of the complaint.  Each new day of unpermitted

operations that occurs within this period subjects OG&E to per diem penalties.  *See* 42

U.S.C. § 7413(b) (providing for daily penalties for PSD violations); *United States v. La.*

*Generating LLC*, 938 F. Supp. 2d. 615 (M.D. La. 2011) (daily penalties available for

days of operation within five years of the complaint); *see also Sierra Club v. Dairyland*

*Power Coop.*, No. 10-CV-303-bbc, 2010 WL 4294622 at *15; *United States v. Ohio*

*Edison Co.*, No. 99-cv-1181, 2003 WL 23415140, at *6 (S.D. Ohio. Jan. 17, 2003).  As a

District Court in Colorado recently put it: "Given that the CAA is a statute intended to

prevent emission of air pollution, the continued emission of pollutants that would

otherwise be limited had the source complied with the PSD . . .  program[] could be

considered a repeated injury" under Tenth Circuit jurisprudence.  *United States v. Cemex,*

*Inc.*, 864 F. Supp. 2d 1040, 1048 (D. Colo. 2012) (citing *Tiberi v. Cigna Corp.*, 89 F.3d

1423, 1430-31 (10th Cir. 1996)).  Indeed, when considering claims under PSD's sister-

program, the minor-source NSR program (PSD concerns "major sources" of air

pollution), the Fifth Circuit said it was "frivolous" to suggest that the statute of

limitations barred the claim simply because operations began more than five years before

the complaint was filed.  *United States v. Marine Shale*, 81 F.3d at 1357.

**B.      Even if the Certain Penalty Claims Are Untimely, the United States Can Seek Injunctive Relief to Redress  PSD Violations**

As explained above, PSD imposes preconstruction requirements that trigger ongoing obligations to control air pollution—and recurring violations if an operator shirks those obligations.  But even if this Court determined that PSD violations do not give rise to recurring violations with every new day of illegal pollution, PSD violations are redressible, and so judicially cognizable.

OG&E admits that the applicable statute of limitations bars only claims for penalties—not equitable or injunctive relief.  ECF 10-1 at 20 (discussing 28 U.S.C. § 2462).  As the Tenth Circuit explained at length in *United States v. Telluride Co*., 146 F.3d 1241, 1246–48 (10th Cir. 1998), whether relief amounts to a "penalty" turns on whether the relief sought is "unrelated to, or in excess of, the damages caused by the defendant." *Id.*  at 1246.  Far from a "penalty" unconnected to the underlying wrong act, requiring an operator to obtain a PSD permit that it should have obtained years earlier is precisely the kind of "restorative" and "remedial" relief that is unhindered by the operation of Section 2462.  *See id.*; *see also United States v. U.S. Steel Corp*, -- F. Supp. 2d --, No. 2:12-cv-304, 2013 WL 4495665, *10–*15 (N.D. Ind. Aug. 21, 2013); *La. Generating*, 938 F. Supp. 2d. 615 (noting "there is ample support for the proposition that the statute of limitations does not apply to actions for equitable relief in CAA enforcement actions" and collecting cases).[7]  Similarly, ordering the required assessment

---

[7]     OG&E suggests that two recent cases, *Midwest Generation* and *EME Homer City*, hold otherwise.  ECF 10-1 at 18–19.  Those cases were wrongly-decided, but they are also off point.  Both cases considered the availability of relief where the current owner of

of OG&E's "upgrade" projects to facilitate PSD review is not disassociated from the Company's failure to perform the requisite preconstruction analysis.

Furthermore, unless explicitly curtailed by Congress, district courts enjoy broad equitable authority to craft injunctive relief.  *See Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).  That broad authority includes the remediation of past violations—even under forward-looking enforcement provisions.  *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 290–92 (1960); *see also United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496 (2001) ("For several hundred years, courts of equity have enjoyed sound discretion to consider the necessities of the public interest when fashioning injunctive relief." (internal citations and quotations omitted)).

OG&E can cite no express "limitation" on the Court's remedial authority under the Clean Air Act.  *See United States v. Cinergy Corp.,* 582 F. Supp. 2d 1055, 1060-62 (S.D. Ind. 2008) (holding, in the only power plant PSD case to proceed to a remedy trial, that 42 U.S.C. § 7413(b) provides district courts with extensive authority to fashion measures to remedy even past PSD violations).  In fact, Supreme Court precedent would contradict any attempt to do so.  In *Mitchell*, the Court considered a district court's statutory authority under the Fair Labors Standards Act "to restrain violations"—nearly identical language to that in the PSD enforcement provision cited by OG&E, 42 U.S.C. § 7413(b).  361 U.S. at 290–92.  The Court held there that the district court retained equitable authority to order employers to reimburse lost wages to employees who had

---

the modified facility differed from the owner that actually performed the illegal modification.  Whatever the merits of those cases, that scenario is not presented here.

previously been unlawfully discharged.  *Id.* at 289-92, 296.  In so holding, the Court

underscored that, absent an express command from Congress, district courts have

equitable authority to provide relief for past statutory violations.  *Id.* at 290-92.

Circuit courts considering other statutes which provide jurisdiction for courts to

"restrain violations" have followed the Supreme Court's ruling in *Mitchell*.  *See*, *e.g.*,

*United States v. Lane Labs-USA*, 427 F.3d 219, 223–26 (3d Cir. 2005) (district courts

retain equitable authority to issue "backward"-looking injunctions even under forward-

looking enforcement provisions)[8]; *U.S. Public Interest Research Group v. Atlantic

Salmon of Maine, LLC*, 339 F.3d 23, 31 (1st Cir. 2003) ("Conventionally, a court's

equitable power to enforce a statute includes the power to provide remedies for past

violations—an area in which the courts have settled authority and competence."); *United

States v. Holtzman*, 762 F.2d 720, 724-725 (9th Cir. 1985) (District courts have inherent

equitable authority to "enjoin otherwise lawful activity when necessary and appropriate

in the public interest to correct or dissipate the evil effects of past unlawful conduct.").

---

[8]   OG&E cites the Third Circuit's opinion in *United States v. EME Homer City*, 727
F.3d 274 (3d Cir. 2013), for the proposition that the CAA's "restrain such violation"
language grants courts authority only for forward-looking remedies.  ECF 10-1 at 19.
But the *Homer City* court's denial of certain injunctive relief in that case pertained to
claims against a former owner who had since sold the plant, and a current owner who had
not modified the plant.  That is not the case here, where OG&E has been the owner of its
plants at all relevant times.  In circumstances such as those present in this case, the Third
Circuit specifically held that EPA *can* obtain an injunction to remedy PSD non-
compliance, even under that court's erroneous construction-only view of PSD.  727 F.3d
at 289.  In any case, *Homer City* cannot be read as broadly as OG&E suggests; if it were
read to bar backward-looking remedies, it would be contrary to the Third Circuit's prior
holding in *Lane Labs* which considers nearly identical statutory language, 427 F.3d at
223–26, and so the *Homer City* ruling would have no precedential value on that point.
*See Pardini v. Allegheny Intermediate Unit*, 524 F.3d 419, 426 (3d Cir. 2008) (when
Panel decisions conflict, the earlier controls and the latter is "ineffective as precedents").

The law is settled that, under statutes such as the CAA under which courts can "restrain violations," the United States can seek—and courts can order—defendants to remediate their past violations and make whole the public that was harmed by the illegal act.

Of course, this declaratory judgment action concerns only the threshold question of whether PSD liability can be based on preconstruction conduct under the program's various preconstruction requirements, and whether regulatory authorities and district courts can review an operator's preconstruction determinations.  But, should this case progress to an applicability determination or an enforcement action, this Court can rest assured that its equitable authorities to right past wrongs remain intact, and any misconduct on OG&E's part need not be shrugged aside.  If OG&E should have obtained a PSD permit before upgrading its Sooner and Muskogee facilities, the Court enjoys every authority to order the Company to comply with PSD now.  And since PSD violations most certainly result in redressible injuries, this suit for a declaration of law regarding PSD requirements most plainly sets forth a cognizable issue for determination.

## CONCLUSION

In its motion to dismiss this declaratory judgment action, OG&E argues the Government cannot challenge the Company's compliance scheme because it claims to have complied with that scheme.  In support of its circular argument, OG&E musters conflicting reasons, sometimes claiming that the suit comes too early, sometimes that the suit comes too late.  Ultimately, OG&E asks for all PSD enforcement to on its own terms—its pre-project determinations unreviewable, and its compliance measured in the manner it sees fit.  OG&E's Motion to Dismiss should be denied.

Dated: November 8, 2013              Respectfully Submitted,

                                     ROBERT G. DREHER
                                     Acting Assistant Attorney General
                                     Environment and Natural Resources
                                       Division
                                     U.S. Department of Justice


                                     s/  *Elias L. Quinn*
                                     ELIAS L. QUINN
                                     Bar Number: 42159 (CO)
                                     JASON A. DUNN
                                     JAMES A. LOFTON
                                     Attorneys for Plaintiff United States
                                     Environmental Enforcement Section
                                     Environment and Natural Resources
OF COUNSEL:                            Division
                                     U.S. Department of Justice
SABRINA ARGENTIERI                   P.O. Box 7611
Attorney-Advisor                     Washington, DC  20044-7611
U.S. EPA, Region 5                   Telephone:  (202) 514-2756
77 W. Jackson Blvd.                  Facsimile:  (202) 514-0097
Chicago, IL 60604                    E-mail: Elias.Quinn@usdoj.gov

LORRAINE DIXON
Assistant Regional Counsel
U.S. EPA, Region 6
1445 Ross Avenue
Dallas, Texas 75202

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2013, I electronically filed the foregoing

Opposition Brief and all supporting documents to the Clerk of Court using the ECF

System for filing.  Based on the records currently on file, the Clerk of Court will transmit

a Notice of Electronic Filing to the following ECF Registrants:

**Brian J. Murray**
Jones Day

**Charles T. Wehland**
Jones Day

**Donald K. Shandy**
Ryan Whaley Coldiron Shandy PC

**Patrick R. Pearce, Jr.**
Ryan Whaley Coldiron Shandy PC

**David C. Bender**
McGillivray Westerberg & Bender LLC

**Jacquelyn L. Dill**
Dill Law Firm PC


s/ *Elias L. Quinn*