# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No. CIV-13-690-D |
| | ) | |
| v. | ) | Judge Timothy D. DeGiusti |
| | ) | |
| OKLAHOMA GAS AND ELECTRIC COMPANY, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## OKLAHOMA GAS AND ELECTRIC COMPANY'S CONSOLIDATED REPLY BRIEF IN SUPPORT OF ITS MOTIONS TO DISMISS

Donald K. Shandy (OBA No. 11511)
    DShandy@ryanwhaley.com
Patrick R. Pearce, Jr. (OBA No. 18802)
    RPearce@ryanwhaley.com
RYAN WHALEY COLDIRON
SHANDY PLLC
119 N. Robinson Avenue, Ste 900
Oklahoma City, OK 73102
Telephone:  (405) 239-6040
Fax:          (405) 239-6766

Date:  November 22, 2013

Brian J. Murray
    bjmurray@jonesday.com
Charles Wehland
    ctwehland@jonesday.com
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601-1692
Telephone:  (312) 782-3939
Fax:          (312) 782-8585

*Counsel for Defendant Oklahoma Gas & Electric Company*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

I.   EPA LACKS STANDING AND THERE IS NO INJURY TO REDRESS IN
     THIS CASE BECAUSE OG&E CORRECTLY PROJECTED NO
     SIGNIFICANT INCREASE FROM ANY OF THE PROJECTS ................................... 3

     A.   Federal Jurisdiction Requires an "Actual Case or Controversy." ........................ 3

     B.   Plaintiffs' Claims Must Be Dismissed Because OG&E's Pre-Project
          Emissions Projections Were Correct and Complied With Applicable Law .......... 4

          1.   EPA Fails To Allege an Inconsistency Between Applicable PSD
               Rules and OG&E's Future Emissions Projections .................................... 4

          2.   Sierra Club's Arguments Are Either Irrelevant or Contrary To
               Established Law ............................................................................. 6

          3.   The Plaintiffs' Arguments Based On Reported Emissions Data
               Apply The Wrong Legal Test For Evaluating Post-Project
               Emissions ................................................................................... 8

II.  PLAINTIFFS' CLAIMS ARE BARRED BY THE FIVE YEAR STATUTE OF
     LIMITATIONS BECAUSE PLAINTIFFS' "CONTINUING VIOLATION"
     THEORY HAS BEEN REPEATEDLY REJECTED ..................................................... 12

     A.   The Five Year Statute of Limitations Begins to Run at the Time of
          Construction or Modification .......................................................................... 12

     B.   The Five Year Statute of Limitations Has Expired and Plaintiffs' Claims
          Are Barred By the Concurrent Remedy Doctrine .............................................. 15

     C.   The Statute of Limitations Does Not Prevent Future Enforcement If
          Emission Increases Caused by the Projects Actually Occur .............................. 16

CONCLUSION .................................................................................................... 17

# TABLE OF AUTHORITIES

CASES

*Cope v. Anderson*,
331 U.S. 461 (1947) ................................................................................................15

*Disability Law Ctr. v. Millcreek Health Ctr.*,
428 F.3d 992 (10th Cir. 2005) ...............................................................................4

*Johnson v. Interstate Transit Lines*,
163 F.2d 125 (10th Cir. 1947) ...............................................................................4

*Mitchell v. Chambers Const. Co.*,
214 F.2d 515 (10th Cir. 1954) ...............................................................................4

*Nat'l Parks and Conservation Ass'n Inc. v. Tenn. Valley Auth.*,
502 F.3d 1316 (11th Cir. 2007) ......................................................................12, 15

*Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*,
480 F.3d 410 (6th Cir. 2007) ................................................................................14

*New York v. EPA*,
413 F.3d 3 (D.C. Cir. 2005) ...................................................................................6

*Pa. Dep't of Envtl. Prot. v. EME Homer City Generation, L.P.*,
727 F.3d 274 (3d Cir. 2013) ...................................................................12, 14, 15

*Rio Grande Silvery Minnow v. Bureau of Reclamation*,
601 F.3d 1096 (10th Cir. 2010) .............................................................................3

*Sierra Club v. Dairyland Power Coop.*,
No. 10-cv-303, 2010 WL 4294622 (W.D. Wis. Oct. 22, 2010) ..............................12, 13

*Sierra Club v. Duke Energy Ind., Inc.*,
1:08-CV-437-SEB-TAB, 2010 WL 3667002 (S.D. Ind. Sept. 14, 2010) .....................15

*Sierra Club v. Otter Tail Power Co.*,
615 F.3d 1008 (8th Cir. 2010) .......................................................................12, 14, 15

*United States v. Cemex, Inc.*,
864 F. Supp. 2d 1040 (D. Colo. 2012) ................................................................13

*United States v. DTE Energy Co.*,
711 F.3d 643 (6th Cir. 2013) ....................................................................... passim

*United States v. Marine Shale Processors*,
81 F.3d 1329 (5th Cir. 1996) ...............................................................................14

*United States v. Murphy Oil USA, Inc.*,
   143 F. Supp. 2d 1054 (W.D.Wis. 2001) ...................................................................13

*United States v. Telluride Co.*,
   146 F.3d 1241 (10th Cir. 1998) ...............................................................................15

*Wisc. Elec. Power Co. v. Reilly*,
   893 F.2d 901 (7th Cir. 1990) ("*WEPCO*") .............................................1, 2, 6, 10

*Wyoming v. U.S. Dep't of Agric.*,
   414 F.3d 1207 (10th Cir. 2005) .................................................................................3

**STATUTES**

Clean Air Act ("CAA") .......................................................................1, 5, 14, 17

**OTHER AUTHORITIES**

40 C.F.R. § 51.166(b)(21) (1993) ................................................................8, 9, 10, 16

40 C.F.R. § 51.166(b)(32) (1993) ...................................................................5, 10, 16

40 C.F.R. § 51.166(r)(6)(iii)-(iv) (2003) ...........................................................9

57 Fed. Reg. 32,323 ....................................................................................8, 10, 16

57 Fed. Reg. 32,325 ...........................................................................................7, 8

57 Fed. Reg. 32,314 (July 21, 1992) ..................................................................6

67 Fed. Reg. 80,192 ...........................................................................................9

67 Fed. Reg. 80,196 (Dec. 31, 2002) .................................................................6

## INTRODUCTION

The Response Briefs submitted by the Environmental Protection Agency ("EPA") and Sierra Club underscore why Oklahoma Gas and Electric Company's ("OG&E's") motion to dismiss should be granted.  At bottom, Plaintiffs ask this Court to read into the Clean Air Act ("CAA") a prior approval scheme for emission projections.  That is, Plaintiffs want the Court to say that OG&E's math was wrong on the Prevention of Significant Deterioration ("PSD") emission projections done so many years ago pursuant to the CAA even though actual emissions monitoring confirms the projections' accuracy. This retroactive prior approval scheme is not and cannot be the law.

To be sure, a misapplication of the PSD rules *on the face of the projections* could support an enforcement challenge prior to a significant increase in emissions.  *See United States v. DTE Energy Co.*, 711 F.3d 643, 650 (6th Cir. 2013).  But neither EPA nor Sierra Club has identified an actual misapplication of the rules (indeed, of either of the sets of rules they say applies).  Instead, Plaintiffs merely disagree with the numbers as projected. Therefore, this lawsuit asks the Court to enforce the PSD rules as Plaintiffs *wish they were written*, *not as they are actually written*.

Plaintiffs' briefs confirm that this approach can't work:  unmoored from any statutory or regulatory guidance, EPA and the Sierra Club do not even agree on what rules to apply.  EPA asks this Court for a declaration that OG&E's emission projections were contrary to the 1992 *WEPCO* version of the federal PSD rules, (*see* Compl. ¶ 2

1

(citing 57 Fed. Reg. 32,314 (July 21, 1992)).[1]  Sierra Club, in contrast, says that the 1992

*WEPCO* rules are irrelevant, and argues instead for its own misinterpretation of the PSD

rules in the Oklahoma State Implementation Plan ("SIP"), (*see* Sierra Club Resp. Br. 6-

10).

     This is precisely why the Sixth Circuit got it right in *United States v. DTE Energy*

*Co.*, reasoning that plaintiffs cannot turn the PSD requirements into a "prior approval

scheme" just because they disagree with projected emissions numbers.  *See* 711 F.3d at

649-51.[2]  To hold otherwise would place OG&E at the mercy of Plaintiffs who have not

identified any inconsistency between OG&E's emission projections and the PSD rules

yet demand that OG&E comply with different versions of the PSD rules.  Nothing in the

statute, the applicable regulations, or certainly common sense, recommends (let alone

requires) this kind of post-hoc regulation by subjective bad math.  There is no articulated

injury to redress, and there is no "case or controversy."

     The Plaintiffs' "too early, too late" mantra misreads the motion to dismiss.  (*See,*

*e.g.*, EPA Resp. Br. 3, 5; Sierra Club Resp. Br. 21.)  The absence of an injury for the

Court to redress is not a timing issue.  Instead, it means that Plaintiffs do not have

---

[1] The 1992 *WEPCO* rules derive their common name from the Seventh Circuit's decision in *Wisc. Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ("*WEPCO*").

[2] While Sierra Club tries to make much of the fact that *DTE Energy* dealt with the 2002 version of the federal PSD rules, (Sierra Club Resp. Br. 7-8), the Sixth Circuit's reasoning in that case applies with equal force to actual emission projections under any version of federal PSD rules and the Oklahoma SIP.  PSD requirements have never created a prior approval scheme.  *See DTE Energy*, 711 F.3d at 651 ("A project-and-report scheme is entirely compatible with the statute's intent.").

standing to assert their claims *regardless of when the projects occurred* in relation to the

filing of this action.  But the undisputed fact that the projects occurred between 2003 and

2006 provides an *additional statute of limitations defense* in this case; therefore, *this*

*action was filed too late*.  For these reasons, this Court should dismiss the Complaints.

I.     **EPA LACKS STANDING AND THERE IS NO INJURY TO REDRESS IN**
       **THIS CASE BECAUSE OG&E CORRECTLY PROJECTED NO**
       **SIGNIFICANT INCREASE FROM ANY OF THE PROJECTS**

       EPA's central theme is that "no actual wrong need have been committed" in order

to penalize OG&E through this declaratory judgment action.  (EPA Resp. Br. 3-5.)  That

might well be how EPA administers its regulatory apparatus.  But this is a federal

lawsuit—and the federal judicial power extends only to "actual, ongoing cases or

controversies."  *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1211 (10th Cir. 2005).

There is no "ongoing case or controversy" here.

       A.     **Federal Jurisdiction Requires an "Actual Case or Controversy."**

        In order for there to be an "actual . . . case or controversy" in a declaratory

judgment action, "[t]he crucial question is whether granting a present determination of

the issues offered will have some effect in the real world."  *Rio Grande Silvery Minnow*

*v. Bureau of Reclamation*, 601 F.3d 1096, 1110 (10th Cir. 2010).  Plaintiffs mistakenly

argue that no injury whatsoever is required.  But "[t]he essential distinction between a

declaratory judgment action and the usual action is that in the former no actual wrong

need have been committed or loss have occurred in order to sustain the action, *but there*

*must be no uncertainty that the loss will occur or that the asserted right will be invaded*.

If that is clearly established, one may proceed under the Declaratory Judgment Act and

3

need not await the actual happening of the event complained of." *Johnson v. Interstate Transit Lines*, 163 F.2d 125, 129 (10th Cir. 1947) (emphasis added).

Where actual post-project data confirms that OG&E's pre-project projections were accurate, the court must dismiss for lack of standing because *there is no certainty that any invasion of rights or "loss" will occur.* It is illogical to argue that there can be a "case or controversy" without any current or threatened future injury. (*See* EPA Resp. Br. 4-5.) Similarly, a court sitting in equity "will not do a useless or vain thing" and is "fully justified in refraining from entering an empty decree." *Mitchell v. Chambers Const. Co.*, 214 F.2d 515, 517 (10th Cir. 1954). Plaintiffs ignore the essential standing requirement, and gloss over the fact that a redressable injury is a prerequisite to seeking equitable relief. Where there is nothing for the court to redress because no injury is occurring or imminent the case must be dismissed—whether the suit is for monetary, *injunctive, or declaratory relief.* Contrary to Plaintiffs' "too early, too late" argument, then, dismissal is required *regardless of when EPA decided to file this action* because this prerequisite to federal jurisdiction is not met. *See Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir. 2005) ("[T]he existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction.").

**B.    Plaintiffs' Claims Must Be Dismissed Because OG&E's Pre-Project Emissions Projections Were Correct and Complied With Applicable Law.**

**1.    EPA Fails To Allege an Inconsistency Between Applicable PSD Rules and OG&E's Future Emissions Projections.**

At their core, EPA's claims are based on the fact that the pre-project emissions projections were close to, albeit less than, the PSD significance thresholds. (*See* EPA

4

Resp. Br. 8 ("[T]here is *no difference* between what was allowable and what the Company 'projected' for each unit with each upgrade.").)  But there is a reason why EPA's Response contains sweepingly vague references to "the whole point of the projection requirement" and "the fundamental premise of the [PSD] program" (*id.*) rather than detailed regulatory citations:  OG&E's emissions projections are consistent with the PSD rules.  And a fit of regulatory pique does not make for a justiciable CAA violation.

EPA attempts to obscure the PSD rules by saying that "OG&E never explains how such a scheme is compliant with PSD requirements."  (*Id.*)  The relevant observation, however, is that EPA never explains how OG&E's emissions projections were *contrary to* what the PSD rules actually require.  EPA cannot do this because the PSD rules simply do not lay out granular details on how a projection of future actual emissions is to be made.  *See* 40 C.F.R. § 51.166(b)(32) (1993) (listing factors for sources to consider when projecting future emissions without requiring a specific formula).  The limited framework for projections provided by these rules demonstrates that it is not a prior approval scheme.  This is not to say that "an operator's determination is unreviewable, nor that it is the final word on PSD applicability."  (EPA Resp. Br. 8.)  For example, EPA can challenge an emissions projection that applies the wrong significance threshold or uses an improper baseline.  *DTE Energy*, 711 F.3d at 651.  And "[i]f a company's projections are later proven incorrect, EPA can bring an enforcement action."  *Id*. at 651.  What EPA cannot do is second-guess the outcome of emissions projections that follow the framework, especially where real-world emissions data that represents normal operations after the projects proves that the projections were accurate.

### 2. Sierra Club's Arguments Are Either Irrelevant or Contrary To Established Law.

Sierra Club, in its Response, takes a completely different approach than EPA and argues that OG&E is improperly relying on the 1992 *WEPCO* rules and the 2002 federal PSD rules, 67 Fed. Reg. 80,196 (Dec. 31, 2002). (Sierra Club Resp. Br. 6-10.) As an initial matter, Sierra Club fails to recognize that the *WEPCO* rules, although not part of the Oklahoma SIP, were cited *by EPA* in its Complaint as the rules applicable to this action. (EPA Compl. ¶ 2.) OG&E discusses them to illustrate the reasonableness of its projections under the Oklahoma SIP, which defines "actual emissions" in pertinent part as an average rate, in tons per year ("tpy"), over a two-year period but does not otherwise explain how to project future actual emissions. OAPCR 1.4.4(b)(20)(A). Furthermore, the 2002 federal PSD rules contain the same test for electric utilities as the 1992 *WEPCO* rules and also represent a reasonable interpretation of the Oklahoma SIP.

To the extent that Sierra Club means to imply in its Response that the Oklahoma SIP did not allow for *any* projection of future actual emissions, its position was squarely rejected by the Seventh Circuit in *WEPCO*, 893 F.2d at 916-18, and by EPA following that decision, *see* 57 Fed. Reg. 32,314 (July 21, 1992) (conforming the test that electric utilities use for measuring emissions increases to *WEPCO*); *see also DTE Energy*, 711 F.3d at 643 ("[T]he Seventh Circuit struck down [the actual-to-potential] test as a requirement for power plants . . . ."); *New York v. EPA*, 413 F.3d 3, 15 (D.C. Cir. 2005) ("[T]he Seventh Circuit [in *WEPCO*] agreed that EPA should measure future emissions

6

by projecting future actual emissions rather than assuming, as it had done under the actual-to-potential test, that the source would operate at full capacity in the future.").

After trying to explain why the 2002 federal PSD rules are not relevant to OG&E's projects, Sierra Club makes an about-face and argues that the 2002 federal rules required OG&E to transform its projections of actual emissions into enforceable permit limitations.  (Sierra Club Resp. Br. 15.)  But this understanding of emissions projections was rejected by EPA over 20 years ago.  57 Fed. Reg. at 32,325 ("The EPA does not, however, agree with comments that post-change emissions estimates must always be made into permanent federally enforceable permit conditions.  To do so . . . would fail to account for the very real possibility that emissions might increase over baseline levels in the future for reasons unrelated to the physical or operational change in question . . .").  Moreover, where an emissions projection shows no significant increase, monitoring operations to stay below PSD significance thresholds is consistent with the project and report framework of the rules.  *See DTE Energy*, 711 F.3d at 650.

Sierra Club also misinterprets how baseline "actual emissions" are determined under the Oklahoma SIP.[3]  (Sierra Club Resp. Br. 12-15.)  It takes issue with the use of a 24-month average of emissions from the five years before the projects.  In 1992, however, EPA adopted a presumption that any two years within the five years before a project can be used to determine baseline emissions under the same definition of "actual

---

[3] In contrast, the Complaints do not discuss OG&E's determination of its baseline actual emissions.  (EPA Compl. ¶¶ 2, 44) (addressing post-project emissions projections only); Sierra Club Compl. ¶¶ 2, 46) (same).)

emissions" that appears in the Oklahoma SIP at OAPCR 1.4.4(b)(20)(A). *See* 57 Fed. Reg. at 32,325 ("[T]he presumption recognizes the nature of utility operations without compromising the existing regulatory language which requires that the pre-change 2-year period used in defining baseline emissions be representative of "normal" operations."); 40 C.F.R. § 51.166(b)(21)(ii) (1993). EPA adopted this presumption because it recognized that the interpretation advocated by Sierra Club is "not required by the regulations." 57 Fed. Reg. at 32,323. Sierra Club's back-up argument—that OG&E had to select a single two-year period as the baseline for all pollutants—relies on a strained reading of the rules and ignores the fact that PSD applicability reviews are conducted on a pollutant-by-pollutant basis. Therefore, the reference to "*a* different time period" in OAPCR 1.4.4(b)(20)(A) does not constrain OG&E to a single baseline period for all pollutants.

> **3.    The Plaintiffs' Arguments Based On Reported Emissions Data Apply The Wrong Legal Test For Evaluating Post-Project Emissions.**

To distract from their Complaints' redressability problems, both Plaintiffs apply an improper test in an attempt to show that emissions from OG&E's units increased significantly following the projects. The actual emission data submitted every calendar year by OG&E, however, shows that actual emissions are consistent with the projections that the projects would not cause a significant emissions increase. (Opening Br. 9-14.)

To support their new argument,[4] Plaintiffs offer tables of post-project emissions data using a rolling 12-month average.  (*See* EPA Resp. Br. 11; Sierra Club Resp. Br. 18-19.) These tables ignore OG&E's project notifications and the rules for determining actual emissions.  OAPCR 1.4.4(b)(20)(A); *see also* 40 C.F.R. § 51.166(b)(21)(ii) (1993).

In its project notifications submitted to the Oklahoma Department of Environmental Quality ("ODEQ") between 2003 and 2006, OG&E notified the agency that it would submit monitoring data on a calendar year basis, using the newest procedures that had been adopted by EPA at the time of those projections—the 2002 PSD reform rules.[5]  In those rules, EPA provided for reporting on a "calendar year" basis.  40 C.F.R. § 51.166(r)(6)(iii)-(iv) (2003); *see also* 67 Fed. Reg. at 80,192 ("To make this projection, you must use the maximum annual rate at which the changed units are projected to emit the pollutant in any of the 5 calendar years following the time the unit resumes regular operations after the project.").  The first time anyone suggested that a different reporting period was appropriate was in Plaintiffs' Response Briefs—over 10 years after OG&E notified ODEQ, the primary permitting authority in Oklahoma, about the procedure it would use to report actual emissions.

---

[4] Neither Complaint alleges a significant increase in actual emissions.  In fact, EPA's Complaint asks this Court to require OG&E to re-assess "*whether* its projects were likely to result in a significant emissions increase."  (EPA Compl. ¶ 52 (emphasis added).)

[5] The Oklahoma SIP does not contain any post-project reporting obligation, let alone an obligation to report rolling monthly average emissions.  *See* OAPCR 1.4.4.

The use of a 12-month rolling average in Plaintiffs' actual emissions tables is flatly inconsistent with the plain language of both the Oklahoma SIP and the 1992 *WEPCO* rules. Both sets of rules call for actual emissions to be measured by the annual average rate (tpy) over a two-year period, not a 12-month period. The Oklahoma SIP says that "actual emissions as of a particular date shall equal the average rate in tons per year at which the unit actually emitted the pollutant during a two year period which precedes the particular date." OAPCR 1.4.4(b)(20)(A). "Similarly, the 1992 *WEPCO* rules say that representative actual annual emissions means "the average rate, in tons per year, at which the source is projected to emit a pollutant for the two-year period after a physical change or change in the method of operation of a unit." 57 Fed. Reg. at 32,323; *see also* 40 C.F.R. § 51.166(b)(21)(v), (b)(32) (1993).

Plaintiffs ignore the regulatory language concerning a two-year averaging period in their Responses. EPA altogether fails to mention the Oklahoma SIP definition of "actual emissions," located at OAPCR 1.4.4(b)(20)(A). (EPA Resp. Br. 10-12.) Sierra Club mentions OAPCR 1.4.4(b)(20) but does not address the definition of "actual emissions" in subsection (b)(20)(A) of that rule when discussing post-project emissions data. (Sierra Club Resp. Br. 18.) Sierra Club also incorrectly purports to offer data showing "post-project emissions [that] are measured in the same way that OG&E used to determine pre-project emissions." (*Id*.) Actually, Sierra Club's Response Brief shows 12-month rolling averages of emissions data, whereas OG&E determined pre-project emissions based on 24-month rolling averages consistent with OAPCR 1.4.4(b)(20)(A).

10

(*See, e.g.*, OG&E Motion To Dismiss Ex. 2 at 8 (explaining that past actual emissions were determined from the "Maximum annual average from a 24 month period").)

Extending the data periods selected by EPA for Figures 1 and 2 of its Response to incorporate a 24-month averaging time shows no emissions increase above OG&E's projected levels and, in fact, shows decreases relative to the baseline emissions.  (*See* Ex. 1, EPA Examples of $SO_2$ Emissions as 24-Month Annual Averages.)  Likewise, extending Sierra Club's 12-month periods for post-project $SO_2$ emissions (*see* Sierra Club Resp. Br. 19) to 24-month annual averages with the same start-dates shows nothing but decreases compared to the baselines.[6]  (*See* Ex. 2, Sierra Club Table of $SO_2$ Emissions as 24-Month Annual Averages.)  Therefore, the Plaintiffs' Response Briefs do not identify any current or threatened future injury.  That alone requires dismissal.

---

[6] Using 24-month averages, the actual emissions of $SO_2$ at Sooner Unit 2 calculated as of November 2009 were 9,889 tpy, which is higher than the 9,801 tpy projection for the 2006 project at that unit.  None of the calendar year reports submitted by OG&E showed an increase.  As previously discussed, the calendar-year monitoring protocol provided to ODEQ over 10 years ago is appropriate under the PSD rules.  The 2006 project did not cause an actual emissions increase at Sooner Unit 2 even using a 24-month average.  As explained in the Opening Brief, OG&E's monitoring reports do not exclude emissions that could have been accommodated before the 2006 project occurred. (Opening Br. 12.)  If these emissions were excluded as allowed by the PSD rules, actual emissions calculated as of November 2009 would be less than the projected amount. This is evident from the fact that projected emissions at the same unit for a project in 2004 were 11,208 tpy.

II.     **PLAINTIFFS' CLAIMS ARE BARRED BY THE FIVE YEAR STATUTE OF LIMITATIONS BECAUSE PLAINTIFFS' "CONTINUING VIOLATION" THEORY HAS BEEN REPEATEDLY REJECTED**

    A.     **The Five Year Statute of Limitations Begins to Run at the Time of Construction or Modification.**

Plaintiffs' claims are all time-barred and should be dismissed for that reason independent of their lack of standing.  Their Responses on the statute of limitations ignore all of the recent Circuit Court precedent holding that PSD claims must be asserted within five years after a physical change or change in method of operation occurs.  *See Pa. Dep't of Envtl. Prot. v. EME Homer City Generation, L.P.*, 727 F.3d 274, 284-85 (3d Cir. 2013) ("[N]othing in the text of § 7475 even hints at the possibility that a fresh violation occurs every day until the end of the universe if an owner that lacks a construction permit operates a completed facility."); *Midwest Generation*, 720 F.3d 644, 647 (7th Cir. 2013) ("The violation is complete when construction commences without a permit in hand."); *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1014-15 (8th Cir. 2010) ("This language [of the statute] unambiguously indicates that the PSD requirements are conditions of construction, not operation."); *Nat'l Parks and Conservation Ass'n Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316 (11th Cir. 2007) (same).

    EPA offers little support for its argument that PSD violations are ongoing after construction commences.  It cites one case—*Sierra Club v. Dairyland Power Coop.*, No. 10-cv-303, 2010 WL 4294622 (W.D. Wis. Oct. 22, 2010)—which is no longer good law in the Seventh Circuit after *Midwest Generation* held that PSD violations are not

ongoing.  720 F.3d at 647.[7]  And the only court within the Tenth Circuit to hold that the

five year statute of limitations did not foreclose PSD claims denied summary judgment

because the company took "affirmative acts to conceal" the modification at issue, so there

was an issue of fact as to whether the statute of limitations had been tolled *due to the*

*concealment.  United States v. Cemex, Inc.*, 864 F. Supp. 2d 1040, 1048 (D. Colo. 2012).

There, the court based its decision on the fact that the defendant had failed to "self-

report" its modifications, and made affirmative misrepresentations to the permitting

authorities about whether a change had been made to the facility's kiln.  *Id.* at 1049.

There is no hint of concealment in this case, where OG&E sent notifications to ODEQ for

each project at issue, and has followed up by reporting emissions for years after each

project took place.  (*See* Opening Br. 12-15.)  *Cemex* is inapposite.

Plaintiffs' only other support for their "ongoing violation" claims are unpublished

cases from district courts in different jurisdictions, an antitrust case, a Clean Water Act

case, civil rights and tort cases, and this statement:

> [E]very decision OG&E cites for the proposition that PSD permits impose
> only construction—and not operational—requirements completely ignores
> the statute's definition of 'emissions limitation,' 42U.S.C. § 7602(k), and

---

[7] Indeed, the judge who wrote *Dairyland* had previously reached the opposite conclusion.  *See United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1084–85 (W.D.Wis. 2001).  She described her change of heart as motivated by "policy reasons." *Dairyland Power Co-op.*, 2010 WL 4294622, at *7 (W.D. Wis. Oct. 22, 2010).  She noted that in *Murphy Oil* she "discounted these policy considerations because it did not appear that the plaintiff United States should have had significant difficulty detecting the violations at issue.  The defendant had made several modifications to an oil refinery and those modifications were disclosed to both the state Department of Natural Resources and to the EPA."  *Id.*  Regardless, *Murphy Oil* is now the law again in Wisconsin (and the entire Seventh Circuit), because *Dairyland* was interred by *Midwest Generation*.

the statute's discussion of permit preconditions, *id.* § 7410(j), both of which expressly describe ongoing, operational obligations.

(EPA Resp. Br. 18.)  But that statement is just wrong.  *See, e.g.*, *EME Homer City*, 727 F.3d at 287 (using the CAA to explain at-length why "just because the PSD program requires a source to obtain a permit that sets some operating conditions does not mean that the PSD program requires a source without a permit to comply with operating conditions"); *Otter Tail Power Co.*, 615 F.3d at 1017 (explaining why "[e]ven though the preconstruction permitting process may establish obligations which continue to govern a facility's operation after construction, that does not necessarily mean that such parameters are enforceable independent of the permitting process[]").  These decisions squarely address the "ongoing violation" issue and establish the correct rule.  Plaintiffs neither meaningfully distinguish them, nor explain why the Tenth Circuit would decline to follow *every other Circuit Court case to directly address this issue.*[8]

---

[8] Though EPA cites a Fifth and Sixth Circuit case to support the "ongoing violation" theory, as one court explained, "[n]either [the Fifth or Sixth] circuit . . . has expressly held that the theory is tenable under the CAA."  *Midwest Generation*, 694 F. Supp. 2d 999, 1006 (N.D. Ill. 2010) *aff'd* 720 F.3d 644 (7th Cir. 2013).  "The Fifth Circuit's decision in *United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996), is inapposite.  In that case, the court was presented with an issue regarding 'minor source' violations, which are not subject to the PSD preconstruction requirements at issue in this case."  *Id.*  Likewise, "[t]he Sixth Circuit's decision in *Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 480 F.3d 410 (6th Cir. 2007), is also of limited value.  In that case, the Sixth Circuit was interpreting a Tennessee SIP that explicitly imposed an obligation to obtain an after-the-fact construction permit 'where a source or modification was constructed without first obtaining a construction permit,'  The federal regulations at issue in this case contain no such obligation."  *Id.* (internal citations omitted).

### B.     The Five Year Statute of Limitations Has Expired and Plaintiffs' Claims Are Barred By the Concurrent Remedy Doctrine.

All claims must be dismissed because each OG&E project commenced more than five years before the Complaints were filed.  (*See* Opening Br. Exs. 2-9.)  First, it is well settled that Sierra Club, as a non-governmental entity, is barred from seeking declaratory relief after five years by the concurrent remedy doctrine, and its Complaint must be dismissed.  *See Cope v. Anderson*, 331 U.S. 461, 463-64 (1947); *Sierra Club v. Duke Energy Ind., Inc.*, 1:08-CV-437-SEB-TAB, 2010 WL 3667002, at *10-11 (S.D. Ind. Sept. 14, 2010); *Otter Tail Power Co.*, 615 F.3d at 1019; *Nat'l Parks & Conservation Ass'n*, 502 F.3d at 1327.  EPA is also subject to the concurrent remedy doctrine because its requested relief "goes beyond remedying the damage caused to the harmed parties by the defendant's action."  *United States v. Telluride Co.*, 146 F.3d 1241, 1246 (10th Cir. 1998).

Here, actual data proves that there *was no injury to EPA or the environment as a result of the projects and EPA has not identified any assured future injury*.  Therefore, EPA's requested relief—and any relief sought to remedy the non-existent "violation"— would penalize OG&E.  (*See* Opening Br. 20-23.)  EPA attempts to distinguish *Midwest Generation* and *EME Homer City*—cases where the courts found that the Government's equitable relief was barred by the concurrent remedy doctrine—by limiting them to their facts.  (*See* EPA Resp. Br. 22 n.7.)  But those courts did not base their decisions to bar equitable relief on the fact that the applicable units had been sold before the case was filed.  *See EME Homer City*, 727 F.3d at 295 (basing decision that injunctive relief was

"prospective" on other PSD requirements under the canon of *ejusdem generis*); *Midwest Generation*, 720 F.3d at 648 (denying all relief based on five year statute of limitations without relying on the fact that plant had been sold in the interim).  Likewise, EPA's claims for declaratory and/or injunctive relief for projects commenced over five years ago should be dismissed because the remedies sought go beyond any injury alleged (there is no current or future injury alleged).  *See supra* Section I.

### C.    The Statute of Limitations Does Not Prevent Future Enforcement If Emission Increases Caused by the Projects Actually Occur.

Plaintiffs' concern that a temporary emission management plan could allow a source to increase emissions more than five years after the completion of a project in order to evade review is perhaps the most crimson of red herrings.  (*See* EPA Resp. Br. 1; Sierra Club Resp. Br. 17.)  First, the issue is not actually before this Court.   Each of the projects cited in EPA's Complaint was completed well over five years ago, and OG&E's post-project reporting demonstrates that not one project resulted in a significant emissions increase.[9]   Therefore, EPA's concern that "the statute of limitations can run on a PSD claim before the claim could ever be heard by a court of law," (*see* EPA Resp. Br. 5), "ring[s] hollow" in this case.  *DTE Energy Co.*, 711 F.3d at 652.  Second, if there is a significant increase in actual emissions in the future, EPA would still have a cause of

---

[9] Reports of actual emissions have been submitted for at least five calendar years for each project, and for more than five years in many cases.  To the extent EPA complains that these reports do not represent regular operation (EPA Resp. Br. 10-11), the remedy under the PSD rules is to require post-project reporting for a longer period of time, which OG&E has been doing and plans to continue to do.  *See* 57 Fed. Reg. at 32,323; *see also* 40 C.F.R. § 51.166(b)(21)(v), (b)(32) (1993).

16

action "so long as the increase is traceable to the construction."  *Id*.  But that hasn't happened, and EPA hasn't shown that it will.  Rank speculation cannot justify a draconian rewriting of the CAA to suit EPA's subjective mathematical desires to right a wrong that never happened.

## CONCLUSION

For the foregoing reasons, and those stated in its Opening Brief, OG&E respectfully requests that this Court grant its motion to dismiss.

Date: November 22, 2013

Respectfully Submitted,

s/ Brian J. Murray
 Brian J. Murray
   bjmurray@jonesday.com
 Charles T. Wehland
   ctwehland@jonesday.com
 JONES DAY
 77 West Wacker Drive, Suite 3500
 Chicago, Illinois  60601-1692
 Telephone:  (312) 782-3939
 Facsimile:   (312) 782-8585

 Donald K. Shandy (OBA No. 11511)
   DShandy@ryanwhaley.com
 Patrick R. Pearce, Jr. (OBA No. 18802)
   RPearce@ryanwhaley.com
 RYAN WHALEY COLDIRON
 SHANDY PLLC
 119 N. Robinson Avenue, Ste 900
 Oklahoma City, OK 73102
 Telephone:  (405) 239-6040
 Fax:           (405) 239-6766

 *Counsel for Defendant Oklahoma Gas
 & Electric Company*

17

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2013 I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Elias L Quinn
US Dept of Justice Civil Div-601-DC
601 D St NW
Washington, DC 20004
Phone:  (202) 514-2756
Fax:      (202) 514-0097
elias.quinn@usdoj.gov

David C Bender
MCGILLIVRAY WESTERBERG & BENDER LLC
211 S Paterson St
Suite 320
Madison, WI 53703
(608) 310-3560
Fax: (608) 310-3561
bender@mwbattorneys.com

Jacquelyn L Dill
DILL LAW FIRM PC
12101 N MacArthur Blvd
Suite 200
Oklahoma City, OK 73162
(405) 722-9600
Fax: (405) 694-4568
jdill@dilllawfirm.com

s/ Brian J. Murray
Brian J. Murray