## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| – and – | ) | |
| | ) | |
| SIERRA CLUB, | ) | |
| | ) | |
| Intervenor-Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-13-690-D |
| | ) | |
| OKLAHOMA GAS AND ELECTRIC | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## O R D E R

Before the Court are Defendant Oklahoma Gas and Electric Company's motion to dismiss Plaintiff's complaint [Doc. No. 10] and motion to dismiss Intervenor-Plaintiff's complaint [Doc. No. 18]. Plaintiff has filed its response brief in opposition [Doc. No. 31] as has Intervenor-Plaintiff [Doc. No. 30]. Defendant has filed a consolidated reply [Doc. No. 37]. In addition, with leave of court, Defendant has filed a Notice of Supplemental Authority [Doc. No. 45].

Defendant seeks dismissal of this action on jurisdictional grounds. Defendant contends there is no injury for the Court to redress. Alternatively, Defendant contends the action should be dismissed because Plaintiffs' claims are time-barred.

# I.    The Parties

Plaintiff, the United States of America, at the request of the Administrator of the Environmental Protection Agency (EPA), brings this action for declaratory and injunctive relief for alleged violations of the Clean Air Act.[1]

Intervenor- Plaintiff, the Sierra Club (Sierra Club), brings a citizen suit under the Clean Air Act and seeks declaratory relief identical to that sought by EPA. Where appropriate, the Court refers to EPA and Sierra Club jointly as "Plaintiffs."

Defendant is the Oklahoma Gas & Electric Company (OG&E). OG&E owns and operates coal-fired electric generating units in Oklahoma and its operation of these units is subject to compliance with the Clean Air Act.

# II.    Overview

Under the Clean Air Act, various programs exist to protect air quality. At issue in this litigation is the Act's Prevention of Significant Deterioration (PSD) program. As the name suggests, the program is designed to prevent the deterioration of air quality in areas where National Ambient Air Quality Standards are being met.

OG&E operates coal-fired electric generating units which produce pollutants subject to these air quality standards, including sulfur dioxide and nitrogen oxides. The units at issue in this litigation are referred to as the Muskogee and Sooner plants.[2] The plants were constructed before

---

[1] For ease of reference, the Court identifies Plaintiff herein as EPA.

[2] The Muskogee and Sooner plants have been the subject of other litigation under the Clean Air Act. *See Oklahoma v. U.S. E.P.A.*, 723 F.3d 1201 (10th Cir. 2013); *Sierra Club v. Oklahoma Gas and Elec. Co.*, No. 13-CV-356-JHP, 2014 WL 1820322 (E. D. Okla. May 7, 2014) (unpublished op.).

Congress enacted the PSD program. As a result, the plants have "grandfathered status," but if they undergo modifications they may be subject to permit requirements under the PSD program.

A permit is required if the modification is deemed to be "major." The permit aims to bring these grandfathered sources of pollutants up to modern standards of environmental compliance. For example, the permit requires the implementation of Best Available Control Technology (BACT).

The PSD program requires an operator to determine, prior to commencing construction, whether the modification is subject to the permitting requirement. The operator must project whether the modification would result in an increase in emissions. If the increase exceeds a threshold amount, then the modification is deemed a "major modification" and a permit is required.

Plaintiffs seek a declaration that OG&E did not properly project whether the modifications to the Sooner and Muskogee plants would result in an increase in emissions. Plaintiffs further request the Court to order OG&E to now make projections in accordance with governing law and regulations and submit those projections to EPA for agency review.

OG&E moves for dismissal on grounds it made projections as it was required to do and those projections demonstrate that the modifications would not result in a significant net emissions increase. OG&E contends that actual post-modification emissions data now confirms there has been no increase in emissions in excess of that authorized by law. OG&E further contends that where projections have been made and post-modification actual emissions data shows no significant increase in emissions, there is no redressable injury and EPA lacks standing to pursue its claims.

### III.    The Statutory and Regulatory Framework

#### A.    *The Clean Air Act*

Congress enacted the Clean Air Act in 1970 to protect the nation's air resources and promote public health through the prevention and control of air pollution. *See* 42 U.S.C. § 7401(b)-(c). The Act charges EPA with the duty to develop national standards regulating the emission of certain hazardous airborne pollutants. *Id*., § 7409. In addition, the Act requires EPA to create regulations to establish National Ambient Air Quality Standards (NAAQS). *Id*.

Each state, in turn, is charged with achieving and maintaining the NAAQS within their respective territories. 42 U.S.C. § 7407. The states must submit for approval by EPA a state implementation plan (SIP) that designates how the national standards will be achieved and maintained within their borders. *Id*., § 7407(a). *See also id*., § 7410. A state must designate the areas within its borders as "attainment, non-attainment or unclassifiable" with respect to each NAAQS. *Id*., § 7407(d).[3]

In 1977, concerned with the effects of new pollution sources on existing air quality, Congress amended the Act and created a New Source Review (NSR) program. The program imposes two types of permitting requirements depending on whether the new emissions occur in an attainment area or a non-attainment area. The parties agree that emissions from the Sooner and Muskogee plants occur in attainment areas and the Court, therefore, focuses its analysis on the requirements governing such areas.

---

[3]A non-attainment area exists where a regulated pollutant's levels exceed the NAAQS (the area is so designated because it is not attaining EPA's standards). In attainment areas, EPA's standards are being met.

For attainment areas, the PSD program ensures that any new emissions will not significantly degrade existing air quality. *See* 42 U.S.C. §§7470-7479. Under the PSD program, an operator of a pollution source must obtain a permit from the state or EPA before constructing a "major emitting facility." 42 U.S.C. § 7475 (preconstruction requirements); § 7479(2)(C) (defining "construction" to include a modification of any source or facility); and § 7411(a)(1)(4) (defining "modification" as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted"). If a source was built before 1977, it has "grandfathered" status and is exempt from the PSD permit requirement unless it undergoes a "major modification." *See* 42 U.S.C. § 7475.

### B.    *EPA's Implementing Regulations Governing PSD Permits*

Under EPA's regulations implementing the PSD program, a "major modification" includes physical or operational changes to a power plant that would result in a "significant net emissions increase" as to certain identified pollutants. *See* 40 C.F.R. § 52.21 (b)(2)(i) (1984).[4] A net emissions increase for either sulfur dioxide or nitrogen oxides, two of the pollutants at issue in this case, is "significant" if it is greater than 40 tons per year. *See* 40 C.F.R. § 52.21(b)(23)(i). If the modification so qualifies, then EPA requires the owner or operator of the facility to obtain a preconstruction permit that includes Best Available Control Technology (BACT) regarding the

---

[4]EPA's implementing regulations defining the minimum requirements for the PSD program are set forth in 40 C.F.R. § 52.21. The minimum requirements that must be included in a state's SIP are set forth in 40 C.F.R. § 51.166. The definitions set forth herein are the same under both sets of regulations and for ease of reference, therefore, the Court cites to § 52.21. Unless otherwise stated, the Court references the regulations in effect in 1984 which mirror the definitions set forth in Oklahoma's SIP. The definitions cited have not changed substantively over the years.

relevant pollutants to be emitted. 40 C.F.R. § 52.21(b)(12). The permitting process includes incorporation of stringent pollutant emission controls at the plant and the incorporation of costly equipment and procedures. *See, e.g., United States v. DTE Energy Co.*, 711 F.3d 643, 647 (6th Cir. 2013) (noting that "[w]hether a permit is ultimately required is a high stakes determination" and that "installing these complex technologies is very expensive for operators").

## C.    *Oklahoma's State Implementation Plan*

Oklahoma's State Implementation Plan (SIP) includes PSD requirements for attainment areas as set forth in the Oklahoma Air Pollution Control Regulations (OAPCR), § 1.4.4. *See* Defendant's Motion, OAPCR [Doc. No. 10-1]. EPA first approved the OAPCR in 1983. *See* 48 Fed. Reg. 38, 635. "Approved SIPs are enforceable as federal law[.]" *US Magnesium v. U.S. E.P.A.*, 690 F.3d 1157, 1159 (10th Cir. 2012) (*citing* 42 U.S.C. §§ 7410(a)(1), 7413, 7604). The parties agree that as relevant to the claims presented, the provisions of Oklahoma's SIP, as approved in 1983, govern and that the provisions have remained unchanged for the time period applicable to the claims in this lawsuit. *See* EPA's Complaint, ¶ 27; Sierra Club's Complaint in Intervention, ¶ 26; OG&E's Motion at pp. 4-5.

OARC § 1.4.4(b)(2)(A) defines a "major modification" as "[a]ny physical change in or change in the method of operation of a major source that would result in a significant net emissions increase of any pollutant subject to regulation." A "net emissions increase," in turn, is defined as "[a]ny increase in actual emissions from a particular physical change or change in the method of operation at a source." OARC § 1.4.4(b)(3)(A)(i). "Actual emissions" is defined as "the average rate in tons per year at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation." OARC

§ 1.4.4(b)(20)(A). Consistent with the federal regulations, "significant" is defined as 40 tpy for, *inter alia*, sulfur dioxide and nitrogen oxide. OARC § 1.4.4(b)(22).

IV. **Projections of Post-Construction Actual Emissions**

    A.    *Legal Requirements Governing Projections*

The parties agree that before construction commences, an operator is required to make projections of post-construction emissions. *See, e.g.,* 40 C.F.R. § 52.21(a)(2)(iv)(b) (2014). These projections allow operators to determine whether the modification may constitute a major modification that would then require a permit.

Oklahoma's SIP contains no express guidance on how those projections should be made. Over the years, the method governing how the projections should be made has undergone significant change. *See, e.g., DTE Energy*, 711 F.3d at 645-648 (discussing the regulatory changes). Before 1992, EPA required operators to use an "actual-to-potential" test which required operators to determine the maximum potential emissions of the source after the change and compare them to current emissions. *Id.* at 645.

But that test was struck down by the Seventh Circuit Court of Appeals in *Wisconsin Elec. Power Co. (WEPCO) v. Reilly*, 893 F.2d 901, 917 (7th Cir. 1990). Following WEPCO, EPA promulgated a new test, known as the "actual-to-future-actual" test, which required operators to project the source's actual, instead of potential, emissions after the change. "Because the modification must be the cause of the emissions increase to qualify as a major modification, EPA allowed utilities to exclude from their calculations any increase in emissions caused by an independent factor," the most common being growth in demand, *i.e.*, "the demand growth exclusion." *DTE Energy.* 711 F.3d at 646 (*citing* 57 Fed. Reg. 32, 326 (July 21, 1992)).

The "actual-to-future-actual" test remained unchanged until 2002. At that time, EPA replaced the "actual-to-future-actual" test with the"actual-to-projected-actual" test. *Id.* (*citing* 67 Fed. Reg. 80,186, 80, 191 (Dec. 31, 2002)). The purpose of this change was to "restore[] uniformity between utility and non-utility sources by allowing both to use the same test" and one of the changes provided that an operator "'need only make and report a projection . . . when there is a reasonable possibility that the given project may result in a significant emissions increase.'" *Id.*

In addition to making projections, after the 1992 WEPCO rules, and "[t]o ensure operators did not deliberately underestimate emissions to avoid the permit requirement, EPA required sources using [the "actual-to-future-actual"] test to track their emissions for five years and provide to the reviewing authority, generally a state environmental agency, information demonstrating that the change did not result in an emissions increase." *DTE Energy*, 711 F.3d at 645-46 (*citing* 57 Fed. Reg. 32,325).

The 2002 rules changed record keeping and reporting requirements. Under the 2002 rules, an operator was required to make *and report* projections if there were a reasonable possibility that the project may result in a significant emissions increase. *Id.* According to EPA, "the changed record keeping and reporting requirements would allow reviewing authorities to assure that any changes sources make are consistent with Clean Air Act requirements." *Id.* (*citing* 67 Fed. Reg. 80, 192).

The record keeping changes in the 2002 rules were subsequently challenged. In *New York v. U.S. E.P.A.*, 413 F.3d 3, 34 (D.C. Cir. 2005), the court required EPA to provide an acceptable explanation for its reasonable possibility standard. According to the court, the standard created the potential for sources to "take advantage of the reasonable possibility standard to avoid record

keeping altogether" and EPA had failed to explain how "'absent record keeping, it [would] be able to determine whether sources [had] accurately concluded that they have no 'reasonable possibility' of significantly increased emissions.'" *DTE Energy*, 711 F.3d at 646 (*quoting New York*, 413 F.3d 3, 34).

In response, EPA promulgated another set of regulations in 2007. *See DTE Energy*, 711 F.3d at 646 (*citing* 40 C.F.R. § 52.21(r)(6)(vi)). Those regulations involve a three-step process operators must follow when making projections to determine whether a modification requires a permit. *Id.* at 647. The new regulations require an operator to report its projection calculations to the reviewing authority in limited circumstances and to monitor the emissions for at least five years and report to the relevant agency if its projections prove to have been too conservative. *Id.*

In this litigation, the last project was completed in 2006. Therefore, the changes to the regulations in 2007 do not apply. As alleged in Sierra Club's Complaint in Intervention, the WEPCO rules were not incorporated into Oklahoma's SIP, and any "actual-to-estimated-future-actual" test was not made a part of Oklahoma's SIP. *See id.*, ¶ 36.

**B.     *OG&E's Project Notifications*[5]**

As discussed *infra*, the Clean Air Act does not require an operator to submit its projections for agency approval and the parties appear to concede this. *See, e.g.,* EPA's Response at p. 8 ("To be sure, operators have always had the first responsibility to assess their projects and determine

---

[5]Because the Project Notifications are central to the allegations of the complaint, the Court can consider the Project Notifications without converting OG&E's motion to dismiss into a motion for summary judgment. *See, e.g., Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010); *Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008); *Paper, Allied-Industrial, Chemical and Energy Workers Int'l Union v. Continental Carbon Co.*, 428 F.3d 1285, 1292-93 (10th Cir. 2005). Even so, the Court has not relied on the Project Notifications to resolve any factual dispute.

whether PSD applies." (citation omitted). Nonetheless, OG&E submitted Project Notifications to the ODEQ for all the unit modifications at issue. *See*, *e.g.,* Project Notification, Muskogee Generating Station Unit 4 [Doc. No. 10-4].[6] Each of the Project Notifications begins with a "Summary" which provides in part: "[t]his document determines potential emission impacts for the proposed project, the potential applicability to New Source Performance Standards (NSPS) and New Source Review (NSR), and sets forth OG&E's proposed plan of action for compliance." *Id.* at p. 1. The Project Notifications include a "Background & Project Description," information regarding OG&E's "Emission Calculation Methodology," and cites the regulations relied upon. *Id.* at pp. 1, 3-5, 6.[7] In the Project Notifications, OG&E further agreed to annually report to ODEQ for a period of five years from the date the unit resumes regular operation "information demonstrating that the [modification] did not result in an emissions increase." *Id.* at p. 6. In its Motion to Dismiss, OG&E contends that its "determination of Projected Future Actual emissions was entirely consistent with the requirements for projecting future actual emissions." *See* Motion at p. 10, footnote 4.[8]

---

[6]The additional seven Project Notifications concerning the construction projects at issue are substantially similar. Thus, the Project Notification for the Muskogee Unit 5 is used for illustrative purposes.

[7]The Project Notifications set forth OG&E's method of determining "projected annual emissions" referred to in the parties' briefing as "projected future actual emissions." OG&E explains that hourly emissions rates would not change after the projects. They also explain that in calculating future actual emissions, OG&E could exclude emission changes associated with increased utilization but not associated with the project, *e.g*., generation demand. In addition, the Project Notifications set forth OG&E's proposal to limit emissions "such that the emission increase will not exceed the PSD significant threshold increase level" excluding any emissions increase caused by demand growth. *Id*. at p. 5.

[8]In its Project Notifications, OG&E notes that "[w]hether or not physical changes to equipment at existing power plants triggers New Source Review (NSR) can be a complicated and controversial issue." *Id*. at p. 3. OG&E cited EPA's 1992 WEPCO rules as guidance for making its projections. *Id*. Although EPA also cites the WEPCO rules in its Complaint, *see id*., ¶ 2, the parties
(continued...)

EPA contends "OG&E's reliance on its Project Notifications fails to meet the regulatory requirements." *See* Response at p. 7. According to EPA, Plaintiff did not *calculate* any projections and did not "compare its projection of future emissions during periods of normal operations to the amount 'allowable' under the regulations." *Id*. at p. 8. Instead, EPA contends OG&E merely "with the wave of a hand" identified what the statutorily authorized maximum emissions increase would be without deeming the project a major modification, and "promised" to limit emissions to that number.[9]

Apparently EPA deems not relevant the issue of *how to project* because, as set forth, it contends OG&E did not project at all. Instead, EPA contends OG&E made an unenforceable promise to limit emissions for a five-year period following the completion of construction. *See* EPA Complaint, ¶¶ 44-45 (alleging that OG&E, in its Project Notifications, "failed to include a projection of post-project emissions as required by EPA and ODEQ regulations" and "[i]nstead . . . 'propose[d] to limit emissions' from the generating units 'such that the emissions increase [would] not exceed the PSD significant threshold increase level' during the five years following each project"); Sierra Club makes virtually identical allegations. *See* Complaint in Intervention, ¶ 47 ("[T]he company

---

[8](...continued) emphasize that the WEPCO rules were never incorporated into Oklahoma's SIP. Therefore, while the WEPCO rules may provide guidance, they do not appear to be controlling. In fact, the parties do not agree on what test governs the projections.

[9]In its Complaint, EPA alleges that to evaluate whether a modification would result in a significant net emissions increase of any regulated pollutant, a company must "compar[e] its pre-construction baseline emissions with a projection of the future post-project emissions that are likely to result from the project." *See* Complaint, ¶ 33; *see also* Complaint, ¶ 44 (alleging that OG&E "failed to include a projection of post-project emissions as required by EPA and ODEQ regulations"). But EPA makes no allegations as to how the projections which form the basis for the comparisons must be made. Like EPA, Sierra Club makes no allegations as to how the projection of future post-project emissions must be made. *See* Complaint in Intervention, ¶¶ 34, 46.

'propose[d]' to 'limit emissions' from the generating units 'such that the emissions increase [would] not exceed the PSD significant threshold increase level' during the five years following each project.") (alterations in original). And, in EPA's response to OG&E's motion to dismiss, EPA states: "the central question in this declaratory judgment action is whether such a temporary emissions management scheme is a legal way to avoid getting a PSD permit." *See* Response at p. 1.

Although Plaintiffs fault OG&E for failing to make "legally sufficient" projections, they do not allege facts to either identify the method by which those projections should have been made or how OG&E's Project Notifications are legally insufficient. As OG&E observes:

> EPA never explains how OG&E's emissions projections were *contrary to* what the PSD rules actually require. EPA cannot do this because the PSD rules simply do not lay out granular details on how a projection of future actual emissions is to be made.

*See Reply* at p. 5 (emphasis in original) *citing* 40 C.F.R. § 51.166(b)(32)(1993). *See also United States v. Duke Energy Corp.*, 981 F. Supp.2d 435, 438 (M.D.N.C. 2013) (addressing 1980 PSD regulations and noting they do not require a company to be "prescient" but only require that the utility "undertake a reasonable estimate of what post-project emissions would be") (citation omitted).

## V.     EPA's PSD Enforcement Initiatives

During the same time the regulations governing projections of future actual emissions were undergoing changes, EPA launched a series of enforcement initiatives concerning PSD permits which continue today. *See  United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 281-283 (3d Cir. 2013) (discussing EPA's enforcement initiatives). Historically, in these actions, EPA has brought "virtually identical allegations." EPA alleges that the modifications at existing electric generating units are "major modifications" and that the operator's "failure to obtain preconstruction

permits constitutes a continuing violation, rendering ongoing operation of the units unlawful." *Id.* at 281-82 (citation omitted).[10]  As one court has observed, "[t]he question 'how much repair or change requires a permit?' has been contentious and difficult."  *Midwest Generation,* 720 F.3d at 645.

In the course of this PSD permit litigation, to this Court's knowledge, only the Sixth Circuit in *DTE Energy* undertook extensive analysis regarding enforcement of projection requirements in relation to the Clean Air Act's PSD permitting rules.  The present case appears to be initiated by EPA in response to the *DTE Energy* decision.  But unlike that action, here EPA does not also seek an injunction to require OG&E to stop construction or obtain a permit as it did in *DTE Energy*. Indeed, EPA does not even allege the projects at issue are major modifications.  Instead, EPA's requested relief is very narrowly tailored to the sufficiency of OG&E's Project Notifications as purported projections. A review of the Sixth Circuit's *DTE Energy* decision helps contextualize the issues.

## VI.    The Sixth Circuit's Decision in *DTE Energy*

Both parties rely upon aspects of *DTE Energy* as favorable to their respective positions. Therefore, the Court finds it instructive to set forth in detail the analysis undertaken by the Sixth

---

[10]A substantial amount of EPA's enforcement litigation concerning the PSD permitting requirements has been driven by timeliness issues.  The majority of Circuit Courts of Appeals have determined that a violation of the PSD preconstruction permitting requirements ends when construction is complete and, contrary to EPA's litigation position, is not an ongoing violation. In reaching this conclusion, courts have recognized that the PSD permit requirements do not create operational duties. *See, e.g., EME Homer*, 727 F.3d at 284-85; *United States v. Midwest Generation, LLC*, 720 F.3d 644, 647 (7th Cir. 2013); *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1014-15 (8th Cir. 2010); *National Parks and Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 502 F.3d 1316 (11th Cir. 2007).  The issue is presently pending before the Tenth Circuit Court of Appeals in litigation involving the same Muskogee plant as the one at issue here.  *See Sierra Club v. Oklahoma Gas and Electric Co.*, Case No. 14-7065 (10th Cir., Brief of Appellant filed Oct. 14, 2014).

Circuit Court of Appeals in that case. But before doing so, the Court notes that in *DTE Energy*, the EPA did not contend, as it does here, that the operator failed to make a projection or failed to follow the regulations in making a projection. Instead, EPA relied on its own expert's opinion to "second guess" the operator's projections. *See id*. at 653 n. 2 (dissenting op.).

The Court in *DTE Energy*, framed the "single question" before it as follows: "[C]an EPA challenge [a preconstruction] projection before there is post-construction data to prove or disprove it?" *Id*. at 644. The Court answered the question, *yes*.

The project modifications at issue in *DTE* were completed in June 2010 and EPA filed its complaint in August 2010 *before* any post-project annual emissions data was available. EPA sought injunctive relief – enforcement of the permitting requirement – on grounds the project constituted a major modification. The defendants in *DTE* challenged EPA's enforcement action as premature because no data was yet available to determine whether the modifications had resulted in actual emissions increases. According to the defendants, the United States would have to wait and see whether emissions had actually increased to regulatory significant levels before it could enforce the permitting requirements of the Act. The district court agreed with the defendants that EPA's action was premature and concluded EPA could pursue an enforcement action "if and when post-construction monitoring show[ed] a need to do so." *United States v. DTE Energy Co.*, Case No. 10-cv-13101, 2011 WL 3706585 at *4 (E.D. Mich. Aug. 23, 2011) (unpublished op.).

The Sixth Circuit reversed and concluded that an enforcement action could be instituted without awaiting post-construction monitoring data. The court held EPA could bring such a challenge, but under limited circumstances.[11]

The court made two particularly important determinations. First, the court held that an operator's preconstruction projections are not subject to any prior approval from the agency. As the court observed, "if the agency can second-guess the making of the projections, then a project-and-report scheme would be transformed into a prior approval scheme." *Id*. Thus, a projection can be made at any time before construction – even just one day before construction begins – and be "fully consistent with a project-and-report scheme." *Id*. at 650 *citing* 40 C.F.R. § 52.21(r)(6)(ii) ("Nothing in this paragraph (r)(6)(ii) shall be construed to require the owner or operator of [a utility] to obtain any determination from the Administrator before beginning actual construction.").

Second, the court held that even though no prior approval is required, the operator must "make projections according to the requirements for such projections contained in the regulations." *Id*. And, the government can bring an enforcement action if the operator does not make projections in accordance with the regulations. The court reasoned, "EPA must be able to prevent construction if an operator, for example, uses an improper baseline period or uses the wrong number to determine whether a projected emissions increase is significant." *Id*. at 650. "If EPA did not have such

---

[11]The court reached this holding interpreting the 2002 NSR Reform Rules. As discussed *supra*, those rules utilize an "actual-to-projected-actual" methodology for making preconstruction projections. But that test is not determinative of any issues here.

power, the project-and-report scheme would not work because the reviewing agency would not have

properly-done projections to compare with post-construction data." *Id.*[12]

However, the Sixth Circuit narrowly proscribed the circumstances which would give rise to

such an enforcement action. The Sixth Circuit reasoned that "EPA must be able to *prevent*

construction if an operator, for example, uses an improper baseline period or uses the wrong number

to determine whether a projected emissions increase is significant." 711 F.3d at 650 (emphasis

added). The Sixth Circuit relied upon express statutory authority in support of its holding. *See id.*

at 650 *citing* 42 U.S.C. § 7477 ("The [EPA] shall, and a State may, take such measures, including

issuance of an order, or seeking injunctive relief, as necessary to *prevent* the construction or

modification of a major emitting facility which does not conform to the requirements of this part.")

(emphasis added). The Court gave as an example of an error that would render a projection

"improper" a projection where the operator "misread the rules and used 400 tons per year instead

---

[12]The dissent criticized the result reached by the majority contending the majority, in effect, adopted a prior-approval scheme notwithstanding its holding to the contrary. As the dissent stated:

> The majority ultimately holds that USEPA must be able to challenge the accuracy of the operator's scientific or technical preconstruction projections and remands the case for renewed (further) proceedings in the district court on that basis. Let us be very clear, if the USEPA can challenge the operator's scientific preconstruction emissions projections in court—to obtain a preliminary injunction pending a court decision as to whether the operator or USEPA has calculated the projections correctly—that is the exact same thing as requiring prior approval. Put the other way, under a prior-approval scheme, if USEPA disagreed with the projections and forbid construction on that basis, the operator would have to go to the court for a final decision on the projections. The only difference between the scheme that [the] majority endorses and the prior-approval scheme (that the majority purports to reject) is which party is the plaintiff and which the defendant. Otherwise, it is identical.

*Id.* at 653 (footnotes omitted) (Batchelder, CJ, dissenting).

of 40 tons per year as the significance threshold." *Id*. at 650 (citation omitted). Thus, the Sixth Circuit contemplated that only objective requirements governing projections would give rise to EPA's ability to prevent modification. Such a limitation comports with its holding that an operator's projections are not subject to prior agency approval.

Further cautioning against any "prior-approval scheme," the Sixth Circuit rejected EPA's suggestion of bad faith "on the part of an operator that intends to keep its post-construction emissions down in order to avoid the significant increases that would require a permit." *See id*. at 650. The court relied on the statutory definition of a major modification which requires a "significant net emissions increase." As the court stated: "these definitions are incompatible with EPA's argument that New Source Review is a program designed to force every source to eventually adopt modern emissions control technology." *Id*. at 650-51. The court noted EPA's concession at oral argument that "the statute and regulations allow sources to replace parts indefinitely without losing their grandfathered status so long as none of those changes causes an emissions increase." *Id*. at 651.

Addressing EPA's concern that defendants were "purposely manag[ing] the cost of electricity from Monroe Unit #2 to keep its emissions from increasing" the Court stated that "[s]uch actions further the goal of the statute." *Id*. The Court also rejected EPA's concern that " after the five-year monitoring period is over, DTE could surreptitiously increase its emissions, having permanently avoided permitting for that change." The Court found these concerns "ring hollow." As the Court explained, EPA can bring an enforcement action at any time, as "[n]either the statute nor the regulations create a time barrier." *Id*. at 651. Moreover, "EPA can bring an enforcement action whenever emissions increase, so long as the increase is traceable to the construction." *Id*.

On remand, the district court again granted summary judgment to the defendants. *See* Notice of Supplemental Authority, Opinion and Order, *United States v. DTE Energy Company*, Case No. 10-cv-13101 (E. D. Mich. March 3, 2014) [Doc. No. 45-1]. The district court relied on the fact that EPA did not "contend that defendants violated any of the agency's regulations when they computed the preconstruction emission projections from Unit 2." *Id*. at p. 3. Instead, the district court found EPA was attempting to second-guess the defendants' projections – a tactic expressly precluded by the Sixth Circuit. *Id*. Thus, "without adequate proof that defendants violated the regulations governing preconstruction emission projections" the district court granted summary judgment in favor of the defendants. *Id*.

The district court further addressed the fact that actual post-modification data showed the emissions from Unit 2 never increased. Significantly, the government conceded this fact. The court therefore expressed its "bewilderment" as to what EPA stood to gain from pursuing the litigation. *Id*. at p. 3. As the court concluded: "since its own preconstruction emissions projections are now verifiably inaccurate, the government is unable to show that the renovations to Unit 2 constituted a major modification." *Id*. at p. 4.

The parties have plucked from *DTE Energy* aspects of the Court's holding favorable to their respective positions. EPA contends *DTE Energy* authorizes it to require OG&E to submit projections to it. OG&E contends *DTE Energy* makes clear that prior agency approval is not required and precludes the relief requested by EPA where actual post-construction emissions data shows no significant increase in emissions. As discussed below, the litigation posture of this case is somewhat different from that presented in *DTE Energy*. Thus, while aspects of the *DTE Energy* opinion may be persuasive to the issues presented here, they are not determinative.

**VII.    Analysis**

With the above framework to guide the Court's analysis, the Court turns to whether Plaintiffs have presented an actual case or controversy sufficient for the Court's exercise of jurisdiction. OG&E's motion to dismiss is premised, in part, on its assumption that the Project Notifications do, in fact, qualify as projections of post-construction actual emissions and that those projections are "legally sufficient." But the focus of Plaintiffs' declaratory judgment action challenges this very assumption. The Court agrees with Plaintiffs, therefore, that OG&E has put the proverbial cart before the horse. *See* EPA's Response at p. 9.

As set forth above, a permit is required only if a modification is a major modification. OG&E's motion to dismiss is based largely upon its analysis of post-construction emissions data. OG&E contends the post-construction data establishes that the modifications at the Sooner and Muskogee plants do not qualify as major modifications because the data confirms its projections that no significant emissions increase would occur as a result of the modifications. But in responding to OG&E's motion to dismiss, EPA and Sierra Club contest what the actual post-construction data shows and how the data is to be applied and interpreted.

Had Plaintiffs brought this action to enforce the permit requirements of the Act by alleging that the modifications at issue constitute major modifications, the Court may have been required to delve into this post-construction emissions data. But Plaintiffs do not seek such relief or make such allegations. Instead, Plaintiffs' requested relief is specific to OG&E's projections. Thus, whether the modifications of the Muskogee and Sooner Plants are "major modifications" is not an issue raised in Plaintiffs' Complaints and is not before the Court. Accordingly, OG&E's jurisdictional challenge is misplaced. Nonetheless, the Court finds jurisdiction lacking, albeit for different reasons

than those raised by OG&E.  *See Phelps v. Hamilton*, 122 F.3d 1309, 1315-16 (10th Cir. 1997)

(recognizing court's independent duty to inquire into its jurisdiction).

### A. *Plaintiffs Complaint Fails to Allege Facts Demonstrating an Actual Case or Controversy*

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its

jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may

declare the rights and other legal relations of any interested party." 28 U.S.C. § 2201(a). The Act

does not in itself confer jurisdiction upon federal courts. *Skelly Oil Co. v. Phillips Petroleum Co.*,

339 U.S. 667, 671 (1950).  As the Supreme Court has held, "the phrase 'case or actual controversy'

in the Act refers to the types of 'Cases' and 'Controversies' that are justiciable under Article III" of

the United States Constitution.  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

A case or controversy, in the constitutional sense, does not exist here.  The underlying

dispute among the parties is whether OG&E was required to obtain a PSD permit before

commencing the modifications of the Muskogee and Sooner plants at issue.  As discussed, the

permit requirements only apply to major modifications.  *See also Environmental Defense v. Duke

Energy Corp.*, 549 U.S. 561, 569 (2007) ("EPA's 1980 PSD regulations require a permit for a

modification . . . only when it is a major one and only when it would increase the actual annual

emission of a pollutant above the actual average for the two prior years."); *Tennessee Valley Auth.*,

502 F.3d at 1320 (recognizing that "[t]o be viable" claims alleging that utility failed to obtain

construction permits and install emissions controls required that the project be "characterized as a

'major modification,' triggering the . . . preconstruction permitting requirements . . . .").  But

Plaintiffs do not seek enforcement of the permit requirements.  They do not claim the modifications

at issue are major modifications.  And, they do not allege the emissions from the Sooner and

Muskogee plants constitute significant emissions increases. Nor do they seek penalties for violations of the PSD permit requirements or injunctive relief requiring OG&E to obtain permits post-construction. Instead, Plaintiffs have carved out a preliminary, but dependent claim – the legal sufficiency of OG&E's Project Notifications as projections. Plaintiffs seek that determination in anticipation of bringing an enforcement action for a PSD permit violation. EPA makes this clear in its briefing:

> Of course, this declaratory judgment action concerns only the *threshold question* of whether PSD liability can be based on preconstruction conduct under the program's various preconstruction requirements, and whether regulatory authorities and district courts can review an operator's preconstruction determinations. *But, should this case progress to an applicability determination or an enforcement action*, this Court can rest assured that its equitable authorities to right past wrongs remain intact, and any misconduct on OG&E's part need not be shrugged aside.

*See* EPA's Response at p. 25 (emphasis added).

The Supreme Court has held that Article III's case or controversy requirement bars use of the Declaratory Judgment Act for such anticipatory purposes. *See Calderon v. Ashmus*, 523 U.S. 740, 746 (1998) (where a judgment in the action "would not resolve the entire case or controversy" but would "merely determine a collateral legal issue governing certain aspects of [a] pending or future suit[]" a case or controversy does not exist). *See also Columbian Financial Corp. v. Bancinsure, Inc.*, 650 F.3d 1372, 1380 (10th Cir. 2011) ("A declaratory judgment that would not have practical consequences without later additional litigation is not proper."). Thus, the piecemeal adjudication which Plaintiffs seek in this litigation is prohibited.

Even if OG&E failed as a matter of law to evaluate whether the modifications would result in a significant increase in post-modification emissions of regulated pollutants at each facility, *see,*

*e.g.,* EPA Complaint at ¶ 49, that failure to project is not, without more, determinative of whether a PSD permit is required. Unmoored from a claim that the modifications at issue are major modifications, Plaintiffs ask this Court to make a declaration as to a collateral legal issue governing aspects of a future potential suit. EPA's attempt at piecemeal litigation, therefore, cannot withstand the Court's jurisdictional limitations.

The Sixth Circuit's holding in *DTE Energy* does not suggest a different result. As set forth *supra*, in *DTE Energy* EPA sought relief beyond the sufficiency of the projections made. Indeed, EPA had made its own projections to demonstrate the project was a major modification and then sought to enforce the PSD permit requirements of the Clean Air Act. The projections were central to the dispute because unlike here, no post-construction data was yet available. EPA sought injunctive relief to stop construction and further alleged a violation of the PSD permit requirements. EPA also sought to recover civil penalties. As set forth, no similar relief is sought here.[13]

### B.     *Alternatively, the Court Exercises its Discretion and Declines to Grant Declaratory Relief*

Even if Plaintiffs' request for declaratory relief did present an actual case or controversy, "the existence of a 'case' in the constitutional sense does not confer upon a litigant an absolute right to a declaratory judgment." *Kunkel v. Continental Cas. Co.*, 866 F.2d 1269, 1274 (10th Cir. 1989). Rather, whether to grant declaratory relief is a matter of the court's discretion. *Mid-Continent Cas. Co. v. Village at Deer Creek Homeowners Ass'n. Inc.*, 685 F.3d 977, 980 (10th Cir. 2012). ("[B]ecause the [decision whether to exercise declaratory judgment authority] necessarily involves a discretionary assessment of disparate, often incommensurate, and case-specific concerns" a district

---

[13]It appears EPA did not seek civil penalties here because any such claim would be time-barred by the applicable five-year statute of limitations. *See* 28 U.S.C. § 2462.

court's decision is reviewed for abuse of discretion. *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1240 (10th Cir. 2008). For the following reasons, the Court alternatively declines to exercise jurisdiction.

First, the declaratory relief sought by EPA is directed to past conduct. The projection requirement is clearly a *preconstruction* requirement. There is no requirement under the Clean Air Act that projections be done following completion of construction. While the regulations may impose post-modification reporting requirements in certain circumstances, no ongoing projection requirements exist. Significantly, the current regulations make clear the determination of whether a significant emissions increase will occur is made "before beginning actual construction" and expressly state "*regardless of* any preconstruction projections, a major modification results if the project causes a significant emissions increase." 40 C.F.R. § 52.21(a)(2)(iv)(b) (2014).

In this case, the failure to project or to project in a legally-sufficient manner relates to past conduct occurring several years ago. "A declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply to proclaim liability for a past act." *Lawrence v. Kuenhold*, 271 Fed. Appx. 763, 766 (10th Cir. 2008) (citation omitted); *see also Corliss v. O'Brien*, 200 Fed. Appx. 80, 84 (3d Cir. 2006) (unpublished op.) (declaratory relief is "inappropriate solely to adjudicate past conduct" or to merely "proclaim that one party is liable to another"); *Tapia v. U.S. Bank, N.A.*, 718 F. Supp.2d 689, 695 (E.D. Va. 2010) (a declaratory judgment is inappropriate where the wrong plaintiff alleges to have suffered has already occurred); *Bolger v. District of Columbia*, 510 F. Supp.2d 86, 92 (D. D.C. 2007) (a plaintiff seeking declaratory relief must allege a likelihood of future violations of their rights by the defendant, not simply future effects from past violations). EPA's requested relief – that the Court declare the projections legally

insufficient – would amount to a judicial declaration that OG&E previously engaged in unlawful conduct.

Second, although EPA purports to bring a single claim for declaratory relief, EPA actually seeks two types of relief in this action. EPA seeks a declaration that OG&E failed as a matter of law to evaluate whether the projects would result in a significant increase in post-modification emissions of regulated pollutants at each modified facility. *See* Complaint at ¶ 49. But EPA also seeks injunctive relief, requesting the Court to require OG&E "to properly assess whether its projects were likely to result in a significant emissions increase or a significant net emissions increase and to submit that assessment of its projects to EPA within 90 days of the issuance of the order, to be evaluated and permitted as necessary thereafter[.]" *See id.* at ¶ 52.[14]

The Court is not aware of any decision in which the injunctive relief requested by EPA has been granted, or for that matter, ever requested. As the parties concede, there is no statutory or regulatory requirement that projections be submitted to EPA or any other regulatory authority in the first instance. And, as the Sixth Circuit addressed in *DTE Energy*, there is no prior approval required by the agency. Thus, if the Court were to grant the injunctive relief requested by EPA it would be directing OG&E to submit projections where no statutory or regulatory authority for such action exists. The availability of relief of the nature requested by EPA is a matter to be addressed by Congress, not this Court.

---

[14]Although EPA couches this relief as "declaratory" the relief sought is clearly injunctive in nature. *See, e.g., Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1222 (10th Cir. 2009) ("this court defines injunctive relief as all equitable decrees compelling obedience under the threat of contempt"). Sierra Club makes no similar claim for injunctive relief.

Absent the availability of the injunctive relief requested by EPA, any declaratory relief would amount to nothing but an advisory opinion.  As the Tenth Circuit has recognized:

> To be sure, an advisory opinion may sometimes be valuable.  Often two persons (or many more) disagree about what the law requires and one, or both, would be willing to incur the expense of having the courts resolve the matter.  But more is required before one can invoke the authority of courts created by Article III.  It is not the role of federal courts to resolve abstract issues of law.  Rather, they are to review disputes arising out of specific facts when the resolution of the dispute will have practical consequences to the conduct of the parties.

*Columbian*, 650 F.3d at 1376. Consequently, while a declaration concerning the legal sufficiency of the projections might be valuable, it is not warranted here as it lacks practical consequence.

## VIII.  Conclusion

In sum, the narrow claims brought by Plaintiffs seek piecemeal relief as to the parties' underlying dispute. The claims necessarily, therefore, do not present the Court with an actual case or controversy and Article III jurisdiction is lacking.  Because the Court finds jurisdiction is lacking the Court need not address OG&E's alternative request for dismissal on grounds Plaintiffs' claims are time-barred by the applicable statute of limitations.  Alternatively, the Court declines to exercise jurisdiction regarding the declaratory relief sought here.

IT IS THEREFORE ORDERED that EPA's Complaint [Doc. No. 1] and Sierra Club's Complaint in Intervention [Doc. No. 17] are DISMISSED for lack of subject matter jurisdiction. A separate judgment of dismissal will be entered herewith.

IT IS SO ORDERED this  15th  day of January, 2015.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE